UNITED STATES OF AMERICA
Before the
COMMODITY FUTURES TRADING COMMISSION

|  |  |  |
|---|---|---|
| In the Matter of | : | |
| | : | |
| Currency Trading Systems, | : | CFTC Docket No. 00-06 |
| | : | |
| Joyce Roeder a/k/a Joyce Valdez, | : | |
| | : | |
| Glenn Cybulski, | : | ORDER MAKING FINDINGS AND |
| | : | IMPOSING REMEDIAL SANCTIONS |
| -and- | : | AS TO ALL RESPONDENTS |
| | : | |
| Michael Stewart, | : | |
| | : | |
| Respondents. | : | |
| | : | |

**I.**

On February 6, 2001 the Commodity Futures Trading Commission (the "Commission") filed an Amended Complaint and Notice of Hearing against Joyce Roeder a/k/a Joyce Valdez ("Roeder"), Currency Trading Systems ("Currency Trading"), Glenn Cybulski ("Cybulski"), and Michael Stewart ("Stewart") (collectively the "settling Respondents"). The five-count Amended Complaint alleged that Roeder violated Sections 4b(a)(i) and (iii) and 4m(1) of the Commodity Exchange Act, 7 U.S.C. §§ 6b(a)(i) and (iii) and 6m(1) (1994), as amended by the Commodity Futures Modernization Act of 2000, Appendix E of Pub. L. No. 106-554 (2000) ("the Act"), and Sections 4.31(a) and (b) of the Commission's Regulations ("Regulations"), 17 C.F.R. §§ 4.31(a) and (b) (2001), that Roeder and Currency Trading violated Section 4.41(b) of the Regulations, 17 C.F.R. § 4.41(b) (2001), and that the settling Respondents violated Section 4o(1) of the Act, 7 U.S.C. § 6o(1), and Section 4.41(a) of the Regulations, 17 C.F.R. § 4.41(a).

**II.**

In order to dispose of the allegations and issues raised in the Amended Complaint, Roeder and Currency Trading have submitted a Joint Offer of Settlement (the "Joint Offer"), Stewart has submitted an Offer of Settlement ("Stewart Offer") and Cybulski has submitted an Offer of Settlement ("Cybulski Offer"), all of which the Commission has determined to accept. Without admitting or denying any of the allegations of the Amended Complaint or the findings of fact in the Order Making Findings and Imposing Remedial Sanctions ("Order"), and prior to any adjudication on the merits, the settling Respondents each acknowledge service of the Order and consent to the

EXHIBIT

9

use of the findings in this Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party.[1]

## III.

The Commission finds the following:

### A.    SUMMARY

Between approximately February 1997 and July 1998, the settling Respondents solicited members of the public to attend seminars sponsored by Currency Trading.  More than 175 people paid between $4,200 and $4,500 to attend these seminars. The seminars, which were conducted by Roeder, Cybulski, Stewart, and others, taught students how to trade exchange-traded foreign currency futures contracts pursuant to one or more trading systems.  The settling Respondents solicited prospective seminar clients through newspaper advertisements, the Currency Trading Internet website, and pre-recorded telephone messages (collectively "advertisements").  They further solicited those who responded to these advertisements orally and with written promotional literature.

In these solicitations, the settling Respondents made numerous misrepresentations, including overstatements of the performance record of the Currency Trading system (the "System") and overstatements regarding Roeder's, Cybulski's, and Stewart's own purported profitable trading pursuant to the System.  The settling Respondents also misrepresented the risk of trading pursuant to the System, as well as Roeder's background and experience.

In addition to her seminar-related activities, Roeder, although not registered as a commodity trading advisor ("CTA"), managed at least four trading accounts pursuant to signed powers of attorney.  She never provided these managed accounts with the required Disclosure Document.  In or about July 1998, the settling Respondents stopped teaching the seminars.

### B.    SETTLING RESPONDENTS

**Joyce Roeder**, who resides at 5395 Via Asturias, Yorba Linda, California, was the owner and President of Currency Trading at all relevant times.  Roeder has never been registered with the Commission in any capacity.

---

[1]     The settling Respondents do not consent to the use of the Offer or this Order, or the findings to which they have consented in the Offer, as the sole basis for any other proceeding brought by the Commission other than a proceeding brought to enforce the terms of this Order. They do not consent to the use of the Offer or this Order, or the findings to which they have consented in their Offer, by any other person or entity in this or any other proceeding.  The findings to which they have consented to in the Offer, as contained in this Order, are not binding on any other person or entity named as a respondent or defendant in this or in any other proceeding.

**Currency Trading Systems** was an unregistered and unincorporated California company with a principal place of business located at 18101 Von Karman Avenue, Suite 350, Irvine, California.

**Glenn Cybulski**, who resides at 12 Roger Drive, San Rafael, California, was a CTS seminar trainer and seminar trainer supervisor.  Cybulski has never been registered with the CFTC.

**Michael Stewart**, who resides at 28849 N. 46th Way, Cave Creek, Arizona, was a CTS seminar trainer.  Stewart has never been registered with the CFTC.

## C.    FACTS

### 1.    The Currency Trading System

In or about 1995-1996, the System's developer ("the developer") began creating a trading system that eventually became the System.  In 1996, the developer started teaching individuals at seminars to trade on-exchange foreign currency futures contracts pursuant to the System.  Roeder attended one of these seminars in or about October 1996.  Although she had no experience trading commodity futures or options, Roeder approached the developer one month after she took the class and requested his authorization to teach the System to others.  In February 1997, the developer and Roeder entered into a licensing agreement whereby Roeder was permitted to solicit prospective students and to teach the System to clients.

In February 1997, Roeder formed Currency Trading and began soliciting students and teaching seminars on behalf of Currency Trading.  From approximately February 1997 until July 1998, Currency Trading solicited clients for, and conducted, one-day seminars to teach clients how to trade pursuant to the System.   In her position as Currency Trading president, Roeder was responsible for soliciting clients for the seminars, teaching the seminars, and providing technical follow-up support to Currency Trading clients.  On one occasion, as part of her follow-up support, Roeder allowed two clients who were losing money trading to watch her place purportedly real trades in her account.  Roeder was also responsible for the day-to-day management of Currency Trading and its employees.  Roeder made the final decision regarding the hiring of new employees, controlled the content of most of Currency Trading's advertising and entered into Territorial Licensing agreements with new instructors on behalf of Currency Trading.

Each client paid generally between $4,200 and $4,500 to attend a seminar and to receive one year of follow-up technical trading support via the Internet and telephone.  Currency Trading taught more than 175 clients, who paid a total of approximately $760,000 in fees.  Currency Trading generally recommended one or two introducing brokers with which to open trading accounts.

In addition to conducting her seminars at Currency Trading, Roeder also had power of attorney over at least four trading accounts.  At least two of the four managed accounts were solicited and opened as a result of Currency Trading's advertising.  In return for managing these

accounts, Roeder was to receive a percentage of any profits made in the accounts. None of the accounts was profitable, and therefore she did not receive any fees for managing these accounts.

In March 1997, Cybulski attended a CTS seminar taught by Roeder, and, by June 1997, Cybulski was employed at CTS as a seminar trainer. In late June or early July 1997, Stewart attended a CTS seminar, and, by November 1997, Stewart was employed at CTS as a seminar trainer.

Roeder, Cybulski, and Stewart each was individually responsible for CTS' activities within certain defined geographical regions. Roeder was primarily responsible for Southern California, Cybulski was responsible for Northern California and Colorado and Stewart was responsible for Arizona. Each CTS trainer was responsible for soliciting prospective students by placing advertisements in local newspapers, and then distributing CTS promotional materials and directly soliciting, either in person or on the telephone, those persons who responded to the advertisements. Each trainer taught classes within his or her specified area, collecting the seminar fees from students, and handling student follow-up questions. Each trainer was responsible for personal contact with prospective students either in person, on the telephone or via e-mail. Each trainer also held free in-person demonstrations for prospective students of how the system worked.

## 2.     The Settling Respondents' Misrepresentations

The settling Respondents solicited seminar clients through newspaper advertisements and an Internet website, then followed up with oral solicitations, written promotional literature, a video, and demonstrations of computer trading by Roeder, Cybulski, Stewart and the other people Roeder hired to solicit clients and teach seminars. In these solicitations, the settling Respondents fraudulently misrepresented the likelihood of profit and the risk of loss from trading pursuant to the System. In particular, they misrepresented that they had earned substantial profits by trading pursuant to the System, when in fact Currency Trading had no actual trading results and Roeder, Cybulski and Stewart had lost money trading pursuant to the System.

### a.     Newspaper Advertisements and 800 number

During the period between February 1997 and July 1998, to solicit seminar clients on behalf of Currency Trading, the settling Respondents placed newspaper advertisements in the business opportunity sections of newspapers across the country that stated the following:

- "Proven results with on-going support immediate income, no selling, average $500 per day at home w/PC system."

Another Currency Trading newspaper advertisement stated:

- "Immed. Income!  No selling.  no exper.  I average $500/4hrs per day at hm w/PC system."

4

None of the settling Respondents ever averaged $500 per day in actual profits trading foreign currency futures contracts.  The largest profit that Roeder ever made in any given month of trading was $190.64.  The largest profit Cybulski ever made in any given month was $1,191.25.  The largest profit Stewart ever made in any given month $131.40.  Moreover, the settling Respondents did not consistently make money; to the contrary, they consistently lost money.

The newspaper advertisements contained an 800 telephone number for interested persons to call, which generally was answered by a pre-recorded voicemail message left by Roeder in which she represented as follows:

- Currency Trading has "a proven track record of high success, high profit margins;"

- "With the use of state-of-the-art computer programs, the Internet and real-time live data feeds, my personal computer tells me precisely when to buy and when to sell, taking the guesswork out of currency trading, minimizing risk and maximizing our profit potential;"

- "Monthly our programs average an 80 point gain.  So, as a beginning student trading three contracts, your earnings would be around $3,000 per month.  More advanced trading, ten contracts will earn over $10,000 per month;" and

- "[W]e limit our losses to approximately $300 per contract per trade."

There is no basis for the representations that: (1) Currency Trading has "a proven track record of high success, high profit margins;" (2) the "programs average an 80 point gain;" and (3) a beginning student would average around $3,000 per month in profits and an advanced trader would average $10,000 per month in profits.  Indeed, Currency Trading never had an actual trading account, and the settling Respondents consistently lost money in their personal trading, which was conducted pursuant to the System.  There also is no basis for the representations concerning limiting or minimizing risk to a specific dollar amount.  Not only is it inherently impossible to limit risk in futures trading, but, in addition, Roeder, while trading pursuant to the system, had lost more than the advertised limit.

### b.    The Currency Trading Internet Website

The Currency Trading Internet website made numerous misrepresentations to clients and prospective clients concerning profits, limited risk, and experience. For example, the website stated the following:

- "We have been actively trading using exact methods we teach since 1990;"

- Currency Trading has been able to "average gains of 5 to 10% *each day* on our capital account" (emphasis in original);

5

- "So long as traders follow the computerized signals they will make money much more often then [sic] they will lose it;"

- The Currency Trading system provides the opportunity for a "***steady, high income***" (emphasis in original);

- "Using [Currency Trading] techniques and good risk management strategy, your risk can be limited to $125 per contract in any given trade by use of stop loss orders;" and

- "Working with the computer takes much of the financial risk out for currency traders."

All these representations are false.  First, Currency Trading did not exist until 1997, and the developer did not begin developing the System until approximately 1995-1996.  Moreover, the developer did not trade pursuant to the System until approximately October 1996.  Second, Currency Trading never had a trading account and never made 5 to 10% a day in profits.  Nor is there any basis for Currency Trading's claims that a trader can make a steady, high income by trading pursuant to the System or that a trader who follows the signals generated by the System will make money much more often than he will lose.  Indeed, Roeder traded foreign currencies on the Chicago Mercantile Exchange from approximately October 1996 until July 1998, and, during this 22-month period of time, she lost $40,792.68.   Cybulski lost more than $15,000.   Stewart lost more than $10,000.  Ninety-six percent of the Currency Trading client accounts were unprofitable.  Overall, Currency Trading clients lost in excess of $400,000.

Equally baseless are the last two claims that clients can limit their losses to $125-$300 per contract in any given trade or that its trading strategies removes much of the risk for its students.  The developer himself believed that there was no way to limit client losses to a specific amount and informed Roeder of this fact and requested that she remove any representations to the contrary from Currency Trading's website.  Yet, Currency Trading continued to advertise on its website that the System could limit client losses to a specified amount.

### c.   Promotional Literature

When clients contacted Currency Trading, they were sent a packet of promotional literature.  Generally included in this literature was a multi-page flyer (entitled "Changing Your Life Profitably, Forever!") which made similar misrepresentations to those on Currency Trading's website.  For example, the flyer represented:

- Currency Trading offers clients the possibility of "a ***steady, high income*** that can ***secure [their] future***…with a ***minimal factor of risk***" (emphasis in original);

6

- "We have been actively trading using the exact methods we teach for over *eight years*" (emphasis in original);

- "We have been able to average a **5-10%** return on our capital account each day of trading.  Some people make more, some people make less" (emphasis in original);

- As long as traders followed the computerized signals they would make money much more often than they would lose money;

- Risk could be limited to a specified amount ($125 per contract in one version of the literature and $375 per contract in another version); and

- "We began the training aspect for a few friends and relatives who became excited over the new life style our business afforded us."

As previously discussed, the settling Respondents had no basis for representing that: (1) the System offered steady income of any amount, let alone enough to "secure one's future;" (2) they had averaged 5-10% each day of trading, as neither of the settling Respondents had made any money trading pursuant to the System; (3) they had been trading pursuant to the System for eight years, as the System was not developed until approximately October 1996; (4) the System made money more often than it lost; and (5) risk could be limited to a specified amount.  Finally, Currency Trading's representation that the System was taught initially to friends and relatives who had seen Currency Trading's new "life style" is also false.  The System was not taught initially to friends and relatives of Currency Trading and its employees, and the settling Respondents' "life styles" did not improve as a result of their trading.

Also included in Currency Trading's promotional literature to prospective clients was a chart entitled "Swiss Currency Historical Results," which purported to show that a $3,500 account trading pursuant to the System grew to $75,000 during the period June 1996 through December 1996.  Although the chart contained solely hypothetical trading results, it did not contain any indication that the trading was hypothetical.

### 3.   Oral Misrepresentations by Roeder, Cybulski and Stewart

#### a.   The Settling Respondents Misrepresentations Concerning the Developer's Experience and Trading Results

Roeder, Cybulski, and Stewart told prospective clients different stories regarding the length of time that the developer had been a currency trader, saying at times that the developer had been trading for anywhere between eight and twenty years.  At various times, Roeder stated that she had been trading currency futures for eight, ten, or up to twenty years.  In fact, the developer did not open his first commodity account until 1996.  By at least January 1998, Cybulski and Stewart knew that Roeder had been trading pursuant to the System for approximately one year rather than the

eight years that Cybulski and Stewart had represented to prospective students and that the developer also had been trading pursuant to the System for approximately one year rather then the eight to twenty years the settling Respondents had represented to prospective students.  Nevertheless, the settling Respondents continued to disseminate false information to prospective students concerning the trading history of both the developer and Roeder.

        **b.**        **Roeder's Misrepresentations Concerning Roeder's Background**

Roeder made numerous misrepresentations concerning her background.  Roeder told her instructors that she had been trading for several years when, in fact, she had only been trading for one year.  Roeder also told clients and prospective clients that she left a six-figure executive-level job at Chicago Title Company ("Chicago Title") because she was able to make the same amount of money trading foreign currency futures.  In fact, Chicago Title fired Roeder in December 1995 after it discovered that she had submitted over $63,000 in false expense account claims.

        **c.**        **Roeder's Misrepresentations Concerning Roeder's Trading Results**

Roeder represented to the other seminar instructors, who in turn represented to prospective clients, that she had been trading foreign currencies for more than eight years.  In fact, Roeder first began trading foreign currency futures in 1996.  Roeder also told prospective clients that she was an experienced and successful trader.  Roeder told a number of her seminar clients that she was able to leave a job that paid her $200,000 a year because she was making as much, if not more, money trading.  Roeder showed two other clients what she alleged were her own trading results that showed that she had made $12,500 in one day of trading.  In fact, Roeder lost over $40,000 trading pursuant to the System, and the most money she ever made in any given day of trading was approximately $3,300.

Roeder and Currency Trading gave one or more in-person demonstrations to bolster their misrepresentations concerning their purported trading success.  They used a "test" account that they set at a $200,000 balance to demonstrate the System, but they did not tell prospective clients that the account was not an actual trading account or that the balance in the account was not an actual trading balance. Roeder and Currency Trading thereby led prospective clients to believe that they had large, successful personal trading accounts.  In the Spring of 1998, Roeder demonstrated the System to two prospective clients, at which time she purported to show the clients (who later took the seminar) how she had placed a 10-contract trade that day and made an actual profit of $12,500.  In fact, she made the trade only in the test account.  No such trade ever took place in her actual trading account.

Roeder also misrepresented to prospective clients that another instructor had made significant profits trading pursuant to the System.  In fact, that instructor's trading was only profitable in two of the approximately 20 months in which he maintained a trading account, and overall he lost $15,085.79.

###### d.      Cybulski's Misrepresentations Concerning
###### Cybulski's Background and Trading Record

Roeder referred prospective students to Cybulski in connection with her solicitation.  When such prospective students called Cybulski, he represented to them that he was a successful and profitable trader.  Moreover, during Cybulski's solicitations of one or more prospective students, he represented that he was a "successful" trader who: (1) was able to give up his construction business because of his profitable trading pursuant to the System; (2) bought a car for his mother from the profits from his first two months of trading; and (3) was able to buy a $450,000 house in Lake Tahoe, Nevada as a result of trading pursuant to the CTS System.  In fact, Cybulski lost $4,704.25 during his first two months of trading, and lost more than $14,330.89 during his 20 months of sporadic and limited trading.  He never made enough money trading to buy either a car or a house or to give up his construction business.  Cybulski's construction license was revoked in 1991.

###### e.      Stewart's Misrepresentations Concerning Stewart's Trading Record

During his solicitations of prospective students, Stewart represented that he was doing well trading and was making "real money" trading.  Stewart used a laptop computer and his purported trading account "statements" during his in-person demonstrations to show one or more prospective students the results of his purportedly real trades.  Stewart never told these prospective students that the trading results were not his own actual trading results.  In fact, Stewart lost approximately $10,500 during his one year of trading pursuant to the System, and he made money in only one of the months during which he traded.

## D.      LEGAL DISCUSSION

### 1.      Roeder Made Fraudulent Misrepresentations of Material
### Facts in Violation of Sections 4b(a)(i) and (iii) of the Act

Sections 4b(a)(i) and (iii) of the Act prohibit any person from cheating, defrauding, or willfully deceiving, or attempting to cheat, defraud, or willfully deceive, other persons in, or in connection with, the purchase and sale of commodity futures contracts.  The mere attempt to defraud or deceive violates Section 4b(a) of the Act.  *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 103-104 (7th Cir. 1977).  Fraudulent conduct can occur during solicitations to open commodity accounts as well as in the handling of commodity investments.  *Saxe v. E.F. Hutton & Co. Inc.*, 789 F.2d 105, 109-11 (2d Cir. 1986).  Fraud that occurs in the marketing of a trading system designed as a tool specifically for use in the futures markets is conduct "in connection with" futures transactions.  *In re R&W Technical Services, Ltd.,* [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,582 at 47,744 (CFTC March 16, 1999), *aff'd in relevant part,* 205 F.3d 165 (5th Cir. 2000).

To find that Roeder cheated, defrauded, or willfully deceived her clients, the Court must find that she misrepresented or omitted to state a material fact.  *See Saxe,* 789 F.2d at 110-11; *Hammond v. Smith Barney Harris Upham & Co.,* [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 at 36,657-59 (CFTC Mar. 1, 1990).  A statement is material if it is substantially

likely that a reasonable investor would consider the matter important in making an investment decision. *In re R&W Technical Services, Ltd.,* [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,582 at 47,744 (CFTC March 16, 1999), *aff'd in relevant part* 205 F.3d 165, (5th Cir. 2000). The misrepresentation or omission must be made with scienter.  *See Drexel Burnham Lambert, Inc. v. CFTC,* 850 F.2d 742, 748 (D.C. Cir. 1988).  A finding of scienter can be supported by proof of recklessness and by inferences from circumstantial evidence.  *CFTC v. Savage,* 611 F.2d 270, 283 (9th Cir. 1979); *In re JCC, Inc.,* [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,080 at 41,579 (CFTC May 12, 1994), *aff'd sub nom. JCC, Inc. v. CFTC,* 63 F.3d 1557 (11th Cir. 1995).

In general, all manner of misrepresentations of material fact regarding futures transactions violate the antifraud provisions of the Act, including misrepresentations concerning the likelihood of profits, the risk of loss, and the experience of the broker.  *See, e.g., In re R&W Technical Services, Ltd.,* [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,582 at 47,744 (CFTC March 16, 1999), *aff'd in relevant part* 205 F.3d 165 (5th Cir. 2000) (misrepresentations regarding the likelihood of profits); *First Nat. Monetary Corp v. Weinberger*, 819 F.2d 1334, 1340 (6th Cir. 1987) ("Misrepresentations as to a salesperson's knowledge and experience can also be actionable"); *CFTC v. U.S. Metals Depository Co.*, 468 F. Supp. 1149, 1160-1161 (S.D.N.Y. 1979) ("glowing" representations concerning market expectations and likelihood of profit); *CFTC v. Crown Colony Commodity Options, Ltd.,* 434 F. Supp. 911, 917-919 (S.D.N.Y. 1977) (misrepresentations concerning the likelihood of profit); *CFTC v. J.S. Love & Assocs. Options, Ltd.,* 422 F. Supp. 652, 655 (S.D.N.Y. 1976) (misrepresentations regarding profit potential and the trading experience of account executives); *Levine v. Refco, Inc.,* [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,488 at 36,115 (CFTC July 11, 1989) ("bold predictions of significant profit coupled with claims that risks are subject to specific limitations amounts to the type of guarantee of profits prohibited under Section 4b"); *Secrest v. Madda Trading Co.,* [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24, 627 at 36,698 (CFTC Sept. 14, 1989) (misrepresentations concerning the limitation of losses); *Munnell v. Paine Webber Jackson & Curtis,* [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,313 at 32,863 (CFTC Oct. 8, 1986) (promises of large and certain profits, such as statements that an investor could conservatively expect a profit of 32% per year, amount to a guarantee of profitability and are inherently fraudulent).

As detailed above, Roeder violated Sections 4b(a)(i) and (iii) by repeatedly misrepresenting, among other things, that:

- A Currency Trading capital account traded extremely profitably pursuant to the System;

- Roeder and other instructors traded extremely profitably;

- The System had been developed by someone with eight to twenty years of currency trading experience;

- The System was able to average $500 per 4 hours in profits;

- The System was able to make 5 to 10% in profits each day of trading; and

- Clients would be able to limit their losses to a specified amount.

These statements were material to any investor's decision whether to sign up for Roeder's managed account services. Roeder knew that these statements were false when she made them. Roeder certainly knew the dismal results of her own trading pursuant to the System. Moreover, the developer specifically informed her of the details of his experience and development of the System and asked her to stop misrepresenting his experience. This conscious and knowing disregard for the truth amounts to intentional conduct or, at a minimum, recklessness sufficient to demonstrate scienter. *Hammond*, ¶ 24, 617 at 36,659. Reckless conduct "departs so far from the standards of ordinary care that it is very difficult to believe that [actor] was not aware of what he was doing." *Drexel Burnham Lambert,* 850 F.2d at 748-49.

## 2. The Settling Respondents, While Acting as CTAs, Violated Section 4<u>o</u>(1) of the Act and Section 4.41(a) of the Regulations; <u>Roeder and Currency Trading Violated Section 4.41(b) of the Regulations.</u>

Section 4<u>o</u>(1) of the Act and Regulation 4.41 broadly prohibit fraudulent transactions by a CTA. These sections apply to all CTAs whether registered, required to be registered, or exempt from registration. *See CFTC v. Skorupskas*, 605 F. Supp. 923, 932 (E.D. Mich. 1985).

### a. The Settling Respondents Acted as CTAs

Section 1a(5) of the Act defines a CTA, subject to certain provisos, as any person who "for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery made or to be made or subject to the rules of a contract market."

The settling Respondents acted as CTAs by virtue of their seminar activities. Commodity trading advice includes the sale of trading systems that generate specific trade recommendations. *CFTC v. Avco Fin. Corp.*, 28 F. Supp. 2d 104, 118-119 (S.D.N.Y. 1998), *aff'd in relevant part, rev'd and remanded in part sub nom., CFTC v. Vartuli*, No. 98-6280 (2d Cir. September 22, 2000) (company acted as a CTA under "the plain language of the [Act]" when it marketed computer software that generated specific recommendations to buy and sell futures contracts); *In re R&W* [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) at 47,738 (trading signals generated by computerized trading system, together with advertisements which convince clients that the signals will be highly profitable, constitute advising others). Individuals who conduct seminars to teach trading systems also have been found to give commodity trading advice. *In re Armstrong*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,657 at 40,149 (CFTC Feb. 8, 1993) (individual providing a telephonic news service with specific trade recommendations, as well as personalized consultation services and seminars that teach the mechanics of placing orders, strategies, and the use of commodity trend charts, was providing commodity trading advice),

*remanded on other grounds sub nom., Armstrong v. CFTC,* 12 F.3d 401 (3d Cir. 1994).  The settling Respondents thus acted as CTAs by teaching a trading system at seminars which gave precise buy and sell signals to clients, and by providing post-seminar technical follow-up support regarding the mechanics of trading to her clients.

> **b.    The Settling Respondents Committed Fraud in Violation of Section 4o(1) of the Act and Regulation 4.41(a)**

Section 4o(1)(A) of the Act makes it unlawful for a CTA to directly or indirectly employ any device, scheme or artifice to defraud any client or prospective client.  Section 4o(1)(B) of the Act makes it unlawful for a CTA to engage in any transaction, practice or course of business that operates as a fraud or deceit upon any client or prospective client.  Although Section 4o(1)(A) of the Act requires proof of scienter, Section 4o(1)(B) does not, so long as the conduct operated as a fraud. *In re Kolter,* [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,262 at 42,198 (CFTC Nov. 8, 1994) (*citing Messer v. E.F. Hutton & Co.,* 847 F.2d 673, 678-79 (11th Cir. 1988).

In similar fashion, Regulation 4.41(a) prohibits fraudulent advertising by CTAs.  Regulation 4.41(a) prohibits CTAs from advertising "in a manner which:  (1) Employs any device, scheme or artifice to defraud any participant or client or prospective participant or client; or (2) Involves any transaction, practice or course of business which operates as a fraud or deceit upon any participant or client or any prospective participant or client."

The same conduct by Roeder that violated Section 4b(a) of the Act violated Section 4o(1) of the Act and Regulation 4.41(a) because Roeder engaged in that conduct in her capacity as a CTA. *Skorupskas*, 605 F. Supp. at 932-33 (the same conduct that violates Section 4b can violate Section 4o(1)); *In re R&W Technical Services, Ltd.,* [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,582 at 47,744 (CFTC March 16, 1999), *aff'd in relevant part,* 205 F.3d 165, (5th Cir. 2000).

Currency Trading, Cybulski and Stewart also violated Section 4o(1) of the Act and Regulation 4.41(a) because, through their misrepresentations and omissions regarding their background and trading history, as discussed above, they directly or indirectly employed a device, scheme or artifice to defraud clients and prospective clients and engaged in transactions, practices and a course of business that operated as a fraud or deceit upon their clients and prospective clients.

> **c.    Roeder and Currency Trading Presented Hypothetical Performance Results Without the Required Cautionary Statement in Violation of Regulation 4.41(b)**

Regulation 4.41(b) requires that any advertisement presenting hypothetical performance results must prominently display a cautionary statement alerting clients and prospective clients to the limitations inherent in hypothetical performance results.  The cautionary statement set forth in Regulation 4.41(b) itself or the similar cautionary statement drafted by the NFA must be used to satisfy this requirement.

Regulation 4.41(c) provides that the cautionary statement requirement applies to all forms of promotional material.  The Commission has stated that the Regulation 4.41(b) disclaimer serves to "alert clients to the limited predictive value" of hypothetical performance results, and has held that a failure to include the cautionary statement in advertisements touting hypothetical performance results is a violation of Regulation 4.41(b).  *Skorupskas,* 605 F. Supp. at 933 n.21 (performance tables presenting hypothetical and perhaps fictitious performance results were in violation of Regulation 4.41(b) because they were not accompanied by the required cautionary statement).

Roeder and Currency Trading violated Regulation 4.41(b) by distributing the "Swiss Currency Historical Results" chart without including the necessary cautionary statement, thereby failing to alert clients to the fact that the phenomenal hypothetical results shown in the chart were actual results achieved by Currency Trading.

### 3. Roeder Acted as an Unregistered CTA in Violation of Section 4m(1) of the Act When She Managed Four Client Accounts

Section 4m(1) of the Act makes it unlawful to make use of the mails or instrumentalities of interstate commerce to provide commodity trading advice to 15 or more persons during the preceding 12-month period, or to hold oneself out generally to the public as a CTA, unless registered as a CTA under the Act.  Roeder managed at least four accounts pursuant to powers of attorney and held herself out to the public as a CTA.[2]  At least two of Roeder's managed accounts first heard about Roeder as a result of Currency Trading's advertising.  Thus, under Section 4m(1) of the Act, Roeder acted as a CTA and was required to be registered as such.

### 4. Roeder Violated Regulations 4.31(a) and (b)

Section 4.31(a) of the Regulations provides that any CTA registered or required to be registered under the Act is prohibited from soliciting prospective clients, or entering into agreements with prospective clients, to direct the client's commodity futures trading account unless the CTA "at or before the time it engages in the solicitation or enters into the agreement (whichever is earlier), delivers or causes to be delivered to the prospective client a Disclosure Document for the trading program pursuant to which the trading advisor seeks to direct the client's account…."  Section 4.31(b) prohibits a CTA from entering into an agreement to direct a client's account unless the CTA has received a signed acknowledgement from the client that states that the client has "received a Disclosure Document for the trading program pursuant to which the trading advisor will direct his account…."

---

[2]      In *In re Armstrong*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. ¶ 25,657 at 40,151 (CFTC Feb. 8, 1993), the Commission found it unnecessary to determine whether the respondent had advised more than 15 people within the preceding 12 months, since he had held himself out to the public as a CTA.  Holding oneself out as a CTA occurs "through such conduct as promoting advisory services through mailings, directory listings, and stationery, or otherwise initiating contacts with prospective clients."  Interpretive letter No. 91-9 [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,189 (Dec. 30, 1991).

Roeder solicited and entered into agreements with four managed account clients, which allowed her to direct the trading in the four accounts. Nevertheless, Roeder never provided these clients with the mandatory Disclosure Document and she never received a signed acknowledgement of receipt of the Disclosure Document. Therefore, Roeder violated Regulations 4.31(a) and (b).

### 5.      Roeder is Liable as a Controlling Person of Currency Trading

Section 13(b) of the Act imposes liability upon "[a]ny person who, directly or indirectly, controls any person who has violated any provision" of the Act or Regulations. "A fundamental purpose of Section 13(b) is to allow the Commission to reach behind the business entity to the controlling individual and to impose liability for violations of the Act directly on such individual as well as on the entity itself." *In re Glass*, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,337 at 46,561-4 (CFTC April 27, 1998); *see also In re Apache Trading Corp.*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,251 at 38,794 (CFTC March 11, 1992).

Controlling person liability attaches if a person possesses the ability to control the activities upon which the primary liability is predicated, even if that ability was not exercised. *See Monieson v. CFTC*, 996 F.2d 852, 859 (7th Cir. 1993). In addition, Section 13(b) of the Act requires that the controlling person "did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." All that is required to constitute "knowing inducement" under Section 13(b) of the Act is that the controlling person "had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1988).

Roeder had the requisite power and control. She exercised day-to-day authority over Currency Trading and its employees and performed all important managerial functions. For example, Roeder supervised the Currency Trading employees, determined the commissions that the instructors would be paid, controlled the content of most of Currency Trading's advertising and entered into Territorial Licensing agreements with the instructors on behalf of Currency Trading.

Roeder also did not act in good faith and had "actual or constructive knowledge" of the fraudulent activities. The developer told Roeder that the System was unable to limit losses to a specified amount and that he did not have eight years of trading experience. Nevertheless, Roeder continued to disseminate this false information in the advertising she created and in her oral presentations to clients. Roeder also misrepresented her trading success and experience to other instructors, and they repeated this false information in their solicitations to prospective clients. Moreover, as a co-creator of the Currency Trading website, Roeder had the ability to control the content of the website but allowed fraudulent misrepresentations to be made on the website Accordingly, it is clear that she either included misrepresentations on the website intentionally or failed to act in good faith. Thus, Roeder is liable for Currency Trading's fraudulent conduct.

**6.**      **Currency Trading is Liable for Roeder, Cybulski, and Stewart's Violations**

Section 2(a)(1)(B) of the Act provides that "the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person."

Roeder, Cybulski, and Stewart committed fraud while acting within the scope of their employment or agency at Currency Trading.  Currency Trading, therefore, is liable pursuant to Section 2(a)(1)(B) of the Act and Section 1.2 of the Regulations for Roeder, Cybulski, and Stewart's violations of Section 4o(1) of the Act, 7 U.S.C. § 6o(1), and Section 4.41(a), 17 C.F.R. §4.41(a), and Roeder's violation of Sections 4.31(a) and (b), and 4.41(b) of the Regulations, 17 C.F.R. §§ 4.41(a) and (b), and 4.41(b).

## IV.

## OFFER OF SETTLEMENT

Roeder and Currency Trading have submitted a Joint Offer, and Stewart and Cybulski have both submitted Offers in which they neither admit nor deny the allegations in the Amended Complaint or the findings in the Order.  Subject to the foregoing, the settling Respondents acknowledge service of this Order and admit the jurisdiction of the Commission with respect to the matters set forth in the Amended Complaint and the Order. They waive: (1) a hearing and all post-hearing procedures; (2) judicial review by any court; (3) any objection to the staff's participation in the Commission's consideration of the Offer; (4) all claims which they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (1994) and 28 U.S.C. § 2412 (1994), as amended by Pub. L. No. 104-121, §§ 231-32, 110 Stat. 862-63, and Part 148 of the Regulations, 17 C.F.R. §§ 148.1, *et seq.*, relating to or arising from this action; and (5) any claim of Double Jeopardy based upon the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief.

The settling Respondents stipulate that the record basis on which this Order is entered consists of the Amended Complaint and the Order and the findings to which they have consented in the Joint Offer, Stewart Offer and Cybulski Offer, respectively, which are incorporated in this Order.  The settling Respondents consent to the Commission's issuance of this Order, which makes findings as set forth herein, and orders:

1.      that the settling Respondents

a)      cease and desist from violating the provisions of the Act and the Regulations that they have been found to have violated;

15

b)    comply with the undertakings as set forth in the Offer and incorporated in this Order.

2.    that Roeder

a)    pay restitution in an amount of up to $760,500, plus prejudgment interest thereon of up to $122,478.67 for a total of $882,978.67 pursuant to a ten-year payment plan ("payment plan");

b)    pay a contingent civil monetary penalty ("CMP") of up to $760,500 pursuant to the payment plan; and

c)    be permanently prohibited from trading on or subject to the rules of any contract market.

3.    that Cybulski

a)    pay restitution in the amount of $21,300, plus prejudgment interest of $1,773.95, for a total of $23,073.95;

b)    pay a CMP in the amount of $85,934.45; and

4.    that Stewart

a)    pay restitution in the amount of $13,500, plus prejudgment interest of $592.71, for a total of $14,092.71; and

b)    pay a CMP in the amount of $20,956.41; and

## V.

## FINDINGS OF VIOLATIONS

Solely on the basis of the consents evidenced in the Amended Complaint, the Joint Offer, Cybulski's Offer, and Stewart's Offer and prior to any adjudication on the merits, the Commission finds that Roeder violated Sections 4b(a)(i) and (iii) and 4m(1) of the Act, 7 U.S.C. §§ 6b(a)(i) and (iii) and 6m(1) (1994), and Sections 4.31(a) and (b) of the Regulations, 17 C.F.R. §§ 4.31(a) and (b) (2001); that the settling Respondents violated Section 4o(1) of the Act, 7 U.S.C. §§ 6o(1) (1994), and Section 4.41(a) of the Regulations, 17 C.F.R. § 4.41(a) (2001); that Roeder and Currency Trading violated Section 4.41(b) of the Regulations, 17 C.F.R. § 4.41(b) (2001), and that Currency Trading is liable for Roeder, Cybulski, and Stewart's violations of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (1994), and Sections 4.41(a) and (b) of the Regulations, 17 C.F.R. §§ 4.41(a) and (b) (2001).

16

# VI.

## ORDER

Accordingly, IT IS HEREBY ORDERED THAT:

A. Roeder shall cease and desist from violating Sections 4b(a)(i) and (iii) and 4m(1) of the Act, 7 U.S.C. §§ 6b(a)(i) and (iii) and 6m(1) (1994), and Sections 4.31(a) and (b) of the Regulations, 17 C.F.R. §§ 4.31(a) and (b) (2001), that the settling Respondents shall cease and desist from violating Section 4o(1) of the Act, 7 U.S.C. §§ 6o(1) (1994) and Section 4.41(a) of the Regulations, 17 C.F.R. § 4.4 1(a) (2001), and that Roeder and Currency Trading shall cease and desist from violating Section 4.41(b) of the Regulations, 17 C.F.R. § 4.4 1(b) (2001);

B. Roeder is permanently prohibited from trading on or subject to the rules of any contract market and all contract markets shall refuse Roeder trading privileges thereon;

C. Roeder shall pay restitution on behalf of herself and Currency Trading in an amount of up to $760,500, plus prejudgment interest of $122,478.67, pursuant to a payment plan, as provided in subparagraph E below, to those persons identified as investors and listed in Attachment A to the Joint Offer and submitted to the Commission. Roeder shall make annual restitution payments, as calculated under the payment plan, to an account designated by a monitor designated by the Commission (the "Monitor")[3] on or before July 31 of each calendar year (the "Annual Restitution Payment"), starting in calendar year 2001 and continuing for ten years[4] (or until full restitution is made, if that happens first). Such funds shall be distributed annually as restitution payments to those persons identified in Attachment A, in the amounts calculated by the Monitor, unless, based upon the amount of funds available for distribution, the Monitor decides to defer distribution. If, at any time during the ten

---

[3] Roeder agrees that the National Futures Association is hereby designated as the Monitor for a period of eleven years commencing from January 1, 2001. Notice to the Monitor shall be made to Daniel A. Driscoll, Esq., Executive Vice President, and Compliance Officer, or her successor, at the following address: National Futures Association, 200 West Madison Street, Chicago, IL 60606. For ten years, based on the information contained in Roeder's sworn financial statements, tax returns and the other financial statements and records provided to the Monitor, the Monitor shall calculate the total amount of restitution or civil monetary penalty to be paid by Roeder for the year and the specific amounts of restitution payable to each person listed in Attachment A. On or before June 30 of each year and starting in calendar year 2002 and concluding in calendar year 2011, the Monitor shall also send written notice to Roeder with instructions to pay by no later than July 31 of that year the amount of restitution to an account designated by the Monitor, or, if Roeder's restitution obligation has been satisfied, the amount of civil monetary penalty to be paid in accordance with the payment instructions provided above in subparagraph E.

[4] Roeder's ten year restitution period shall run from January 1, 2001 through December 31, 2010. Restitution payments for a calendar year shall take place by July 31 of the following year. Therefore, the final restitution payment for the year 2010 will occur on or before July 31, 2011.

year period, the Annual Restitution Payment completely satisfies Roeder's restitution plus prejudgment interest obligations, any remaining amount of the Annual Restitution Payment as calculated under the annual payment plan set forth in paragraph E, below, shall be applied immediately to payment of the contingent civil monetary penalty set forth in paragraph D, below.  If, at the end of the ten year payment period or upon full restitution being made, if that happens first, any of the Annual Restitution Payments have not been distributed, the Monitor shall either distribute the funds in the account or make a recommendation to the Commission that the funds instead be paid and applied as a payment on Roeder's civil monetary penalty obligation, as provided in subparagraph D below.  In the event that the Commission rejects the Monitor's recommendation, the funds shall be distributed as restitution.

D.      Roeder shall pay a contingent civil monetary penalty ("CMP") on behalf of herself and Currency Trading in an amount of up to $760,500, pursuant to a payment plan, as provided in subparagraph E below, commencing upon Roeder's fulfillment of her restitution obligation as set forth in paragraph C above.  Roeder shall make an annual civil monetary penalty payment ("Annual CMP Payment"), as calculated under the payment plan, following Roeder's satisfaction of her restitution obligation, and continuing until December 31, 2010 (or until the civil monetary penalty is paid in full, if that happens first).  Roeder shall make each such Annual CMP Payment by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, made payable to the Commodity Futures Trading Commission, and sent to Dennese Posey, or her successor, Division of Trading and Markets, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581, under cover of a letter that identifies Roeder and the name and docket number of the proceeding; Roeder shall simultaneously transmit a copy of the cover letter and the form of payment to the Monitor and to the Director, Division of Enforcement, Commodity Futures Trading Commission, at the following address:  1155 21st Street, N.W., Washington, D.C. 20581.

E.      Roeder's Annual Restitution Payment and Annual CMP Payment, to be made pursuant to subparagraphs C and D above, shall consist of a portion of: (1) the adjusted gross income (as defined by the Internal Revenue Code) earned or received by Roeder or Currency Trading during the course of the preceding calendar year, plus (2) all other net cash receipts, net cash entitlements or net proceeds of non-cash assets (collectively "Net Cash Receipts") received by Roeder or Currency Trading during the course of the preceding calendar year plus (3) all monies received by Roeder as a result of the settlement of the lawsuit entitled Chicago Title Co. v. Joyce Valdez (California Super. Ct. No. GC016242).  The Annual Restitution Payment and Annual CMP Payment will be determined as follows:

18

| Where Adjusted Gross Income Plus Net Cash Receipts Total: | Percent of Total to be Paid by Roeder is: |
|---|---|
| Up to $25,000 | 0% |
| $25,000 to $50,000 | 20% of the amount above $25,000 |
| $50,000-$100,000 | $5,000 (=20% of the amount above $25,000)<br>PLUS<br>30% of the amount above $50,000 |
| Above $100,000 | $5,000 (=20% of the amount above $25,000)<br>PLUS<br>$15,000 (=30% of the amount above $50,000)<br>PLUS<br>40% of the amount above $100,000; |

F.     In the event that Roeder does not make payments as directed in paragraphs C, D, and E, *supra*, the Commission may bring a proceeding or an action to enforce compliance with this Order and at its option may seek payment of the unpaid Annual Restitution and/or Annual CMP Payments, or immediate payment of the entire amount of restitution and civil monetary penalty required by paragraphs C, D, and E, *supra*. The only issue that Roeder may raise in defense of such enforcement action is whether she has made the Annual Restitution and/or Annual CMP Payments as directed by the Monitor. Any action or proceeding brought by the Commission compelling payment of the Annual Restitution and/or Annual CMP Payments, due and owing pursuant to paragraphs C, D, and E, *supra*, or any portion thereof, or any acceptance by the Commission of partial payment of the Annual Restitution and/or Annual CMP Payments made by Roeder, shall not be deemed a waiver of Roeder's obligation to make further payments pursuant to the payment plans, or a waiver of the Commission's right to seek to compel payment of the remaining balance of the restitution and/or civil monetary penalty assessed against Roeder;

G.     The Commission notes that an order requiring immediate payment of a civil monetary penalty and restitution against Roeder and Currency Trading would be appropriate in this case, but does not impose it based upon Roeder's financial condition. Roeder acknowledges that the Commission's acceptance of the Offers is conditioned upon the accuracy and completeness of the sworn Financial Statements and other evidence she has provided regarding her financial condition. Roeder consents that if at any time following the entry of this Order, the Division obtains

information indicating that representations concerning her financial condition was fraudulent, misleading, inaccurate, or incomplete in any material respect at the time it was made, the Division may, at any time following the entry of the Order, petition the Commission to: (1) reopen this matter to consider whether Roeder provided accurate and complete financial information at the time such representations were made; (2) require immediate payment of the full amount of the restitution award and immediate payment of the full amount of the civil monetary penalty, required by paragraphs C, D, and E, *supra*; and (3) seek any additional remedies that the Commission would be authorized to impose in this proceeding if Roeder's Offer had not been accepted.   No other issues shall be considered in connection with this petition other than whether the financial information provided by Roeder was fraudulent, misleading, inaccurate, or incomplete in any material respect, and whether any additional remedies should be imposed. Roeder may not, by way of defense to any such petition, contest the validity of, or the findings in, the Order, assert that payment of a civil monetary penalty or restitution should not be ordered, or contest the amount of the civil monetary penalty or restitution to be paid.  If in such proceeding, the Division petitions for, and the Commission orders, payment of less than the full amount of the restitution award or of the full amount of the civil monetary penalty, such petition shall not be deemed a waiver of Roeder's obligation to pay the remaining balance of the restitution or civil monetary penalty assessed against Roeder pursuant to the payment plans;

H.      Roeder shall comply with her undertakings as set forth in Section III of the Joint Offer, as follows:

1.      Roeder shall provide her sworn financial statement to the Monitor on June 30 and December 31 of each calendar year, starting December 31, 2001 and continuing through and including December 31, 2010.  The financial statement shall provide:

(a)      a true and complete itemization of all of Roeder's rights, title and interest in (or claimed in) any asset, wherever, however and by whomever held;

(b)      an itemization, description and explanation of all transfers of assets with a value of $1,000 or more made by or on behalf of Roeder over the preceding six-month interval; and

(c)      a detailed description of the source and amount of all of Roeder's income or earnings over the preceding six-month interval, however generated.

2.      Roeder shall also provide the Monitor with complete copies of her signed federal income tax return (for the previous calendar year), including all

schedules and attachments thereto (e.g., IRS Forms W-2) and Forms 1099, as well as any filings she is required to submit to any state tax or revenue authority, on or before June 30 of each calendar year, or as soon thereafter as the same are filed, beginning in 2001 and ending in 2010.  If Roeder moves her residence or business at any time, she shall provide written notice of her new address to the Monitor and the Commission within ten (10) days thereof.   If, during the same time period, Roeder elects to file a joint tax return, she shall provide all documents called for by in this subparagraph, including the signed and filed joint tax return, plus a draft individual tax return prepared on IRS form 1040 containing a certification by a licensed certified public accountant that the "Income" section (currently lines 7-22 of the form 1040) truly, accurately, and completely reflects all of her income, that the "Adjusted Gross Income" section (currently lines 23-33 of the form 1040) truly, accurately, and completely identifies all deductions that she has a right to claim, and that the deductions contained in the "Adjusted Gross Income" section are equal to or less than 50% of the deductions that he is entitled to claim on the joint tax return; provided, however, that Roeder may claim 100% of the deductions contained in the "Adjusted Gross Income" section that are solely hers.  Such individual tax return shall include all schedules and attachments thereto (e.g., IRS Forms W-2) and Forms 1099, as well as any filings required to be submitted to any state tax or revenue authority;

3.   Roeder shall cooperate fully and expeditiously with the Monitor and the Commission in carrying out all aspects of her Annual Restitution and Annual CMP Payments.  She shall cooperate fully with the Monitor and the Commission in explaining her financial income and earnings, status of assets, financial statements, asset transfers, tax returns, and shall provide any information concerning her as may be required by the Commission. Furthermore, Roeder shall provide such additional information and documents with respect thereto as may be requested by the Monitor or the Commission;

4.   Roeder shall not transfer or cause others to transfer funds or other property to the custody, possession, or control of any member of Roeder's family or any other person for the purpose of concealing such funds or property from the Monitor or the Commission.

I.   Cybulski shall pay restitution in the amount of $21,300, plus prejudgment interest of $,1773.95 for a total of $23,073.95 to those persons identified as investors and listed in Attachment A to his Offer of Settlement.  Cybulski shall make payment to an

account designated by a monitor[5] designated by the Commission and is due within ten (10) days of the entry of the Order;

J.   Cybulski shall pay a civil monetary penalty ("CMP") in an amount of $85,934.45, due within ten (10) days of the date of the Order;  payment is to be made by electronic transfer to the account of the Commodity Futures Trading Commission at the United States Treasury, or by U.S. postal money order, certified check, bank cashier's check or bank money order, made payable to the Commodity Futures Trading Commission, and sent to Dennese Posey (or her successor), Division of Trading and Markets, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581, under cover of a letter that identifies Cybulski and the name and docket number of the proceeding; Cybulski shall simultaneously transmit a copy of the cover letter and of the form of payment to Phyllis J. Cela, Acting Director, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, N.W., Washington, D.C. 20581;

K.   Stewart shall pay restitution in an amount of $13,500 plus prejudgment interest of $592.71  for a total of $14,092.71 to those persons identified as investors and listed in Attachment A to his Offer of Settlement.  Stewart shall make payment to an account designated by a monitor[6] designated by the Commission and is due within ten (10) days of the Order;

L.   Stewart shall pay a civil monetary penalty ("CMP") in an amount of $20,956.41 due within ten (10) days of the date of the Order;  payment is to be made by electronic transfer to the account of the Commodity Futures Trading Commission at the United States Treasury, or by U.S. postal money order, certified check, bank cashier's check or bank money order, made payable to the Commodity Futures Trading Commission, and sent to Dennese Posey (or her successor), Division of Trading and Markets, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581, under cover of a letter that identifies Stewart and the name and docket number of the proceeding; Stewart shall simultaneously transmit a copy of the cover letter and of the form of payment to Phyllis J. Cela, Acting Director, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, N.W., Washington, D.C. 20581;

---

[5]   Cybulski agrees that the National Futures Association is hereby designated as the Monitor for a period of eleven years commencing from January 1, 2001.  Notice to the Monitor shall be made to Daniel A. Driscoll, Esq., Executive Vice President, and Compliance Officer, or his successor, at the following address: National Futures Association, 200 West Madison Street, Chicago, IL 60606.

[6]   Stewart agrees that the National Futures Association is hereby designated as the Monitor for a period of eleven years commencing from January 1, 2001.  Notice to the Monitor shall be made to Daniel A. Driscoll, Esq., Executive Vice President, and Compliance Officer, or his successor, at the following address: National Futures Association, 200 West Madison Street, Chicago, IL 60606.

M.  The settling Respondents shall comply with their undertakings as set forth in Section III of each of the Joint Offer, the Stewart Offer and the Cybulski Offer, respectively, as follows:

1.  The settling Respondents shall not apply for registration or seek exemption from registration with the Commission in any capacity and engage in any activity requiring such registration or exemption from registration, except as provided for in Section 4.14(a)(9) of the Commission's Regulations, 17 C.F.R. § 4.14(a)(9) (2001), or act as a principal, agent, officer or employee of any person registered, required to be registered, or exempted from registration, unless such exemption is pursuant to Section 4.14(a)(9) of the Commission's Regulations, 17 C.F.R. § 4.14(a)(9) (2001);

2.  Neither the settling Respondents, nor any of their agents or employees under their authority or control, shall take any action or make any public statements denying, directly or indirectly, any allegation in the Amended Complaint or findings or conclusions in the Order, or creating, or tending to create, the impression that the Amended Complaint or Order is without a factual basis; provided, however, that nothing in this provision shall affect the settling Respondents' (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party

The provisions of this Order shall be effective on this date.

BY THE COMMISSION.

Dated: November 6, 2001                        _____

Jean A. Webb
Secretary to the Commission
Commodity Futures Trading Commission