

TK & Partners
Legal and Advisory

Room 709, 7th floor,
26/1 V. Sargsyan str.,
Erebuni Plaza,
Yerevan, 0010, RA
T: +374 60 701 291

**To: Equiti Group Ltd.**
**Office 33 B, AU Gold Tower, Cluster I**
**JLT, Dubai, United Arab Emirates**

**Date: October 28, 2019**

Dear Sirs,

Under the engagement letter between Equiti Group Ltd. (the "Client") and TK & Partners CJSC ("TK & Partners"), dated October 18, 2019, we have been requested to provide a legal opinion ("Legal Opinion") on the matters related to Armenian law provided below.

## 1. GENERAL INFORMATION

1.1. This opinion is issued for reliance of the Client only.

1.2. This opinion is based solely on the laws of Armenia in force as of the date of this opinion and published and contained in publicly available sources of Armenian legislation. We do not consider impact of any laws other than Armenian laws.

1.3. We assume no obligation to update the opinions expressed herein, if laws, facts or circumstances change after the date hereof, unless separately instructed by the Client to provide an update.

1.4. In this opinion, Armenian legal concepts are expressed in English terms rather than in their original Armenian legal terms. The concepts concerned may not be identical to the concepts described by the equivalent English term, as they exist under the laws of another jurisdiction. This opinion may thus only be relied upon under the express condition that (i) any issues of interpretation or liability arising hereunder are governed by Armenian law and that (ii) the competent courts of Armenia have exclusive jurisdiction in respect of all disputes which may arise out of or in connection with this opinion.

1.5. For the purposes of this opinion, any reference to "opinion", "belief" or words of similar import means that our assessment is based upon our own analysis of Armenian law presently in effect, using our professional experience and the relevant legal sources available as of the date of this opinion. Generally, our opinions expressed herein are given on the basis that they represent a fair view of the legal position under Armenian law, but do not purport to reflect any and all positions taken by the courts, other authorities and legal writing in the past with respect to a particular legal issue.

## 2. BACKGROUND

2.1. Equiti Capital UK Limited ("Equiti UK") and Equiti AM CJSC ("Equiti AM") are brokers with which Blue Isle Markets Inc. (St. Vincent & Grenadines) ("Blue Isle") has customer and license agreements and trading accounts with open foreign exchange ("FX") and metals positions.

AK

2.2. On September 12, 2019, the United States Securities and Exchange Commission filed a complaint initiating a civil action against Blue Isle, along with other defendants, for alleged misappropriations, misrepresentations, omissions and other fraudulent conducts towards investors.

2.3. BI traded actively through both Equiti AM and Equiti UK. Currently BI's account in Equiti AM is negative and the accounts in Equiti UK are largely positive.

2.4. The only reason that Equiti AM allowed positions of BI to move into negative balance was because of the positive balance in the BI Equiti UK positions which served as collateral against BI's margin requirements under Clauses 15.3. and 15.4. of the General Terms and Conditions of Equiti AM.

2.5. Under the original terms and conditions executed by BI with Equiti AM, the accounts held by BI in Equiti UK are actionable collateral which can be effectively called after for setoff purposes by Equiti AM. This in order to be able to close out the negative open position of BI and remain fully compliant with Central Bank of Armenia regulations (in accordance with Clauses 15.3. and 17.2.2. of the General Terms and Conditions of Equiti AM).

2.6. On October 2, 2019, BI made an unopposed motion to permit it to request that Equiti UK and Equiti AM close all open positions in Blue Isle's accounts and convert those positions to US Dollars; the court in which the SEC action is pending granted that motion.

2.7. Equiti UK, and Equiti AM believe that it would be beneficial for BI's remaining open positions to be closed as soon as possible.

2.8. It is the view of Equiti UK and Equiti AM that, under Armenian law, and specifically the rules of the Central Bank of Armenia, the open transactions in the Blue Isle Equiti AM accounts cannot be closed unless there is sufficient cash in those accounts to cover the negative balances that would result from closing those positions.

2.9. Equiti UK and Equiti AM are of the opinion that they have both (i) a contractual right to set off the negative balance in Equiti AM Blue Isle accounts against cash transferred from Blue Isle's Equiti UK accounts and (ii) a right to accomplish the same result under Armenian law (which governs Blue Isle's accounts with Equiti AM).

## 3. DOCUMENTS EXAMINED, DEFINITIONS, INTERPRETATION

3.1. For the purposes of issuing this Legal Opinion we have examined the following laws and documents:

3.1.1. Civil Code of the Republic of Armenia[1];

3.1.2. Law on "Securities Market"[2];

3.1.3. CBA Regulation 4/07 on "Requirements Pertaining to the Activity of Entities Providing Investment Services"[3];

---

[1] Code N ՀO–239, dated 05.05.1998, amended as of 24 October 2018 (the "Civil Code").

[2] Code N ՀO-195-Ն, dated 11.10.2007, amended as of 9 June 2017 (the "Law on Securities Market").

[3] Regulation N 113-Ն, dated 08.04.2008, amended as of 11 June 2019 (the "Regulation 4/07").

AK

3.1.4. Divisa UK Ltd. (now named "Equiti UK") General Terms and Conditions dated May 2016 (T&C UK);

3.1.5. Divisa AM (now named "Equiti AM") General Terms and Conditions accepted by BI as per their online application for June 2016 (T&C AM);

3.1.6. Divisa US ("Equiti US") MOU with BI for WL services dated June 30, 2016;

3.1.7. BI's online application for an account with Divisa AM (Equiti AM), dated June 27, 2016;

3.1.8. Service Level Agreement executed between Equiti AM and Equiti UK dated May 22, 2018;

3.1.9. Equiti AM General Terms Conditions signed by Blue Isle on December 28, 2018;

3.1.10. Blue Isle Migration Form for accounts with Equiti AM to Equiti UK dated November 21, 2018;

3.1.11. Trading Accounts Set-Off Agreement ("Set-Off Agreement") executed between Equiti UK, Equiti AM and Blue Isle fully, signed on July 25, 2019;

3.1.12. Order granting temporary asset freeze made by District Court for the District of Colorado (US) on September 13, 2019.

3.1.13. E-mail communication between Managing Director of Divisa Capital Gary Dennison and Equiti Backoffice, Aram Babayan (Divisa AM), dated August 23, 2017,

3.1.14. E-mail communication between Managing Director of Divisa Capital Gary Dennison and representatives of BI, dated June 28, 2018,

3.1.15. E-mail communication between Accounts Divisa AM and General Manager of BI Michael "Mike" Stewart, dated November 11, 14 and November 21, 2018,

3.1.16. E-mail communication between CEO of Equiti Group Limited Company Gary Dennison and representatives of Mediatrix Capital, dated August 10, 14, 2018 and May 24, 2019.

3.1.17. Email communication between Stephen C. McKenna (Trial Attorney at US Securities and Exchanges Commission) and Douglas W. Henkin (attorney at Dentons US LLP), dated October 10, 11, 15 16, 2019.

3.2. Capitalized terms used herein without definition shall have the same meanings herein as set forth in the abovementioned documents provided to us by the Client on October 16 and afterwards, 2019, unless the context requires otherwise.

## 4. ASSUMPTIONS AND QUALIFICATIONS

4.1. We have prepared this opinion on the basis of the following assumptions and qualifications:

4.1.1. All documents and information submitted to us as originals are authentic and complete and all signatures and seals are genuine;



AK

4.1.2. All documents and information supplied to us as photocopies or facsimile transmitted copies or other copies conform to the originals and such originals are authentic and complete;

4.1.3. This opinion has been drafted upon reliance on the documents and information submitted to us by the Client;

4.1.4. We are qualified to practice law in the Republic of Armenia. We have made no independent investigation of the laws of England or any jurisdiction other than the Republic of Armenia as a basis for the opinions hereinafter expressed and do not express or imply any opinion thereon. We have assumed that the documents and information provided by the Client are valid, legally binding and enforceable in accordance with their terms under the relevant legislation by which they are expressed to be governed;

4.1.5. In such examination, we have assumed the due authorization, execution and delivery by the parties thereto of any documents referred to herein, the genuineness of all signatures and the authenticity of all documents submitted to us as originals and the conformity with the originals of all documents submitted to us as copies thereof, and we have found nothing to indicate that such assumptions are not fully justified, and

4.1.6. No case law has been generated in relation to issues addressed under this opinion. Although we believe that the opinions expressed hereunder are legally well-grounded and reasoned, we may not predict the position of the Armenian courts, the Central Bank or any relevant authorities regarding the opinions expressed hereunder.

## 5. LEGAL OPINION ON CLIENT'S QUERIES

Based on the background, assumptions and qualifications set out in Section 3 and 4 of this Legal Opinion, our opinion and conclusions thereto on the queries provided by the Client are as follows:

### 5.1. Would Equiti AM be in violation of Central Bank of Armenia ("CBA") regulations if it allowed closing positions with a negative balance without sufficient collateral to remedy the negative balance?

Regulation of the CBA relating to margin requirements for investment companies is very thin. The primary requirement is provided under Rule 82 of Regulation 4/07 according to which an investment company shall act in a way that possible losses for its clients do not exceed the sum provided as a minimum secured amount - margin (collateral). The primary policy rationale of this provision is to protect investors' interests by preventing the investors from incurring excessive losses and to ensure the stability of the financial system.

Neither Regulation 4/07 nor other regulations of the CBA provide guidance as to how Rule 82 operates. Particularly, no guidance is available as to whether or not (i) the margin requirement shall be complied with at all times when a contract with the client is outstanding, (ii) the requirement effectively applies to the instances when the balance will be negative at the time or as a result of closing of all or some open positions only (i.e. the investment company will be in violation of Rule 82 requirements in the event it closes any specific position and the existing margin does not cover the losses) or (iii) there is another mechanism against which the

ЯКR

requirements of Rule 82 operate (i.e. margin requirements should be complied with as of certain reporting dates etc.).

Considering, however, that effective control over compliance with the requirement of Rule 82 seems at least possible in instances when closing of one or more positions would result in a negative balance of a specific client's account, we believe that allowing closing positions with a negative balance without sufficient margin (collateral) to remedy the negative balance would constitute a violation of Rule 82 of Regulation 4/07.

5.2. **Would Equiti AM obtaining a set-off from Equiti UK remedy the non-compliance with CBA regulations?**

Subject to the analysis below (see point 5.3. of this opinion) and provided that the Armenian courts agree with Equity AM having treated the positive balance with the Equity UK as part of its margin, we are of the opinion that Equity AM obtaining such positive balance from Equity UK would remedy the non-compliance with CBA regulations.

Additionally, pursuant to clause 1.1. of the Set-Off Agreement, Equiti UK and Equiti AM are entitled to (but not obliged), at their sole discretion, and without the need to notify BI, set-off amounts held in any of BI's trading accounts with any Equiti Group member (defined as Equiti UK and Equiti AM) towards the full or partial settlement of any payment obligations owing by BI to any Equiti Group member.

As provided under clause 1.1. of the Set-Off Agreement, the right of Equiti AM to obtain a set-off from Equiti UK arises only in cases when there is a payment obligation under the AM Client Agreement (defined under the Set-Off Agreement as the client agreement and related terms and conditions with Equiti AM entered into on March 4, 2016).

The T&C AM provides for various circumstances under which a payment obligation of BI may arise towards Equiti AM. We are therefore of the opinion that a set-off obtained from Equiti UK under the Set-Off Agreement would remedy non-compliance with the CBA regulations to the extent that such set-off amounts are directed towards ensuring the compliance of BI with the requirements of sections 15.1 or 15.5 of the T&C AM.

5.3. **Can Equiti AM and Equiti UK carry out the close-off and set-off of BI's open positions under the original terms and conditions?**

Pursuant to Clause 15.3. of T&C AM, margin must be provided by or on behalf of BI in cash or other collateral acceptable to Equiti AM as determined by Equiti AM in its sole and absolute discretion. BI is obliged to maintain in its account, at all times, sufficient funds to meet all Margin requirements. In addition, Equiti AM is entitled to treat any assets deposited by BI from time to time (other than assets deposited for safe custody only) as collateral against BI's Margin requirements. In all cases Equiti AM is entitled, in its sole and absolute discretion, to determine the value of any collateral deposited.

At the same time, the Clause 17.2.2. of T&C AM provides for the right to sell or otherwise liquidate, or to cause to be sold or otherwise liquidated, any or all collateral posted by BI (whether or not constituting Margin) in Equiti AM 's possession or in the possession of any nominee or third party (…)" upon the occurrence of an Event of Default.

Under the Clause 2.2. of T&C AM, margin is defined as a deposit of funds or collateral relating to securing client's obligations in accordance with Clause 15.1.

AK

Article 447(1) of the Civil Code provides that when construing an agreement, the court shall rely on the literal meaning of the words and expressions contained therein. In case of vagueness of the literal meaning of a provision of an agreement, it shall be defined through considering its meaning in the context of other provisions and the overall meaning of the agreement.

At the same time, the part 2 of the same article 447(1) provides that where the rules contained in point 1 of Article 447 do not provide an opportunity to determine the content of an agreement, the real common intent of the parties must be clarified given the objective of the agreement. Moreover, all relevant circumstances shall be considered, including negotiations and correspondence preceding the agreement, the practice established in the interrelations between parties, customary business practices, further actions of parties.

When interpreting the Article 447 of Civil Code the Cassation Court of the Republic of Armenia, in its decision N ԵԱՆԴ/0976/02/13, stated that there are three main principles for construing the Agreement:

(i) based on literal meaning of the words and expressions,
(ii) through considering the provision in the context of the other provisions and the overall meaning of the agreement,
(iii) through exploration of the real intent of the parties.

The court has also stated that it is possible that in some cases the language of an agreement does not illustrate the real intent of the parties. In such a case interpretation of the agreement based only on literal meaning of the words and expressions provided therein will infringe with parties' right of fair trial and contradict to sound principles of interpretation of an agreement.

The T&C AM or the T&C UK do not provide for the specific accounts (cash and securities) to which the respective group entity shall have access by virtue of Clause 15. The reading of both the T&C AM and the T&C UK allows to conclude that for the purposes of the corresponding T&C, the Equiti Group member (party to such T&C) shall have access to cash and collateral deposited by the client to such Equiti Group member's client account (or trading account with such Equiti Group member).

In addition, neither the T&C AM nor the T&C UK provide for an express possibility that any positive balance held by one Equiti Group member (in such group member's client account or trading account with such Equiti Group member) shall be treated as a margin posted in favor of the other Equiti Group member. However, after examination of the print screens of the dashboard of Blue Isle provided to us by the client, it can be assumed that when accessing its dashboard, BI could clearly see an indication of the total margin, representing the aggregation of margins of UK and Armenian accounts. Also, according to the information provided by the client, section "Account Exposure" of the web-page provides an opportunity to BI to see the margins separately. Moreover, an email communication between BI, Equiti AM and Equiti UK contains an indirect indication of a possibility for Equiti AM and Equiti UK to treat each other's positive balance as a margin. Hence, we conclude that margins of two accounts were treated as one by all three parties.

Taking into account the analysis above, we are of the opinion that despite the fact that the T&C AM and the T&C UK do not indicate a provision which explicitly enables Equity AM and Equity UK to treat each other's positive balances as a margin, further actions taken by the parties, the practice established between the BI, Equity AM and Equity UK (as evidenced by the information provided by the client) will be given a significant evidential weight by

AK

Armenian courts when considering the Equiti group's claim to treat positive balance on different accounts as a shared margin.

5.4. **Will the Set-Off Agreement between Equiti AM, Equiti UK and BI be considered valid and applicable under the current circumstances under Armenian Law?**

Pursuant to Article 1284 of the Civil Code of Armenia, the parties to an agreement are free to choose the law applicable to it. Pursuant to Article 1287 the choice of applicable law extends to the following matters: (i) interpretation, (ii) performance, (iii) consequences of breach, (iv) termination, (v) consequences of nullity and validity, and (vi) assignment. As a result, by virtue of the above-mentioned rules of the Civil Code of Armenia the choice of English law for the Set-Off Agreement is valid and binding under Armenian law.

The Armenian Civil Code provides two separate grounds on which the enforcement of a foreign law governed agreement can be refused. Particularly, *first,* pursuant to Article 1258 of the Civil Code of the Republic of Armenia the application of foreign law shall be rejected in cases when the outcome of such application shall contradict to the principle of legal system (public policy (order)) in Armenia. *Second,* Article 1259 of the Civil Code also provides for rejection of enforcement of a foreign law governed contract when such contract contradicts the imperative provisions of Armenian legislation, which exclude the possibility of application of any other law by force of their peculiar significance in terms of protection of rights and interests of participants of civil relations. No guiding case law has been generated on these matters and therefore it impossible to opine as to whether Armenian courts would refuse to apply any of the terms of the Set-Off Agreement on the abovementioned grounds.

However, considering the application of these rules in similar civil law jurisdictions, we believe that it is unlikely that Armenian courts would reject the enforcement of the provisions of Set-Off Agreement based on Article 1258 and 1259 of Civil Code of Armenia.

As a result, to the extent that any payment obligation is outstanding under the T&C AM against the BI, and subject to assumption and qualification provided under the point 4.1.4 above, we are of the opinion that the set-off of any amounts held in the BI's trading account with Equiti UK will be enforceable in Armenia in accordance with its terms and applicable law.

**Aleksandr Khachaturyan**

**Partner, TK & Partners CJSC**