**Սիմպլեքս Քոնսալթինգ ՓԲԸ**
**Simplex Consulting CJSC**

ՀՀ, Երևան 0019, Մարշալ Բաղրամյան պ. 18
18 Marshal Bagramyan Ave., Yerevan 0019, Armenia
+ (374 10) 54 45 86
hmartirosyan@simplex.am

October 29, 2019

**Equiti Group Limited**
Office 33B1, AU Tower
Jumeirah Lakes Towers
Dubai, UAE
POB 117060

Dear Sirs:

You have asked us to provide advice with respect to Armenian law implications of certain brokerage activities by your Armenian subsidiary Equiti AM CJSC ("**Equiti AM**") as well as general advice on Armenian contractual and regulatory law.

The specific questions which have been posed to us are set out, together with respective answers, in Section 4 of this opinion (the **"Opinion Letter"**).

In connection with the foregoing, we have examined the following documents, which you have provided to us, as well as the following Armenian laws and regulations:

(i) Civil Code of the Republic of Armenia;

(ii) Republic of Armenia Law on Securities Market;

(iii) Central Bank of Armenia Regulation 4/07 on "Requirements Pertaining to the Activity of Entities Providing Investment Services";

(iv) Equiti Capital UK Limited (the **"Equiti UK"**) General Terms and Conditions, dated June 12, 2017 (the **"T&C UK"**);

(v) Equiti AM (previously named Divisia AM CJSC) General Terms and Conditions accepted by Blue Isle (the **"Client"**) as per online application, dated March 4, 2016 (the **"T&C AM"**);

(vi) Client's online application for an account with Equiti AM, submitted on February 26, 2016;

(vii) Service Level Agreement executed between Equiti AM and Equiti UK, dated May 22, 2018;

(viii) Equiti AM General Terms Conditions, dated December 28, 2018, signed by the Client;

(ix) Blue Isle Migration Form for accounts with Equiti AM to Equiti UK, dated November 21, 2018;

(x) Trading Accounts Set-Off Agreement (the **"Set-Off Agreement"**) executed between Equiti UK, Equiti AM and the Client, as of July 25, 2019;

(xi)   E-mail communication between Gary Dennison and Aram Babayan, dated August 23, 2017,

(xii)  E-mail communication between Gary Dennison and representatives of the Client, dated June 28, 2018,

(xiii) E-mail communication between Equity AM and Michael "Mike" Stewart, dated November 11, 14 and November 21, 2018,

(xiv)  E-mail communication between Gary Dennison and representatives of Mediatrix Capital, dated August 10, 14, 2018 and May 24, 2019.

(xv)   E-mail communication between Gary Dennison and Michael "Mike" Stewart, dated June 28, 2018;

(xvi)  Such other documents we deemed appropriate for examination, in connection with giving this opinion.

(together the **"Opinion Documents"**)

1. **TERMS AND SCOPE OF THE OPINION LETTER**

This Opinion Letter is solely regarding Armenian law (as in force at the date hereof). We have made no independent investigation of the laws of any jurisdiction (other than Armenia) as a basis for the Opinion Letter, and opinions thereby contemplated, and do not express or imply any opinion on the laws of any jurisdiction, other than Armenia.

This Opinion Letter is limited to the specific questions you have raised, and does not give any position regarding any tax, accounting, regulatory or other compliance related issues, that might be related to the matters discussed in the Opinion Letter, but are outside of the scope of the above-mentioned questions.

Further, we express no opinion as to any provisions of the Opinion Documents other than those to which express reference is made in this Opinion Letter.

2. **BACKGROUND**

Equiti UK and Equiti AM are brokers with which the Client has customer and license agreements and trading accounts with open foreign exchange and metals positions. The Client traded actively through both Equiti AM and Equiti UK. Currently the Client's account in Equiti AM is negative and the accounts in Equiti UK are largely positive.

3. **ASSUMPTIONS**

In examination of the Opinion Documents, we have assumed the due authorization, execution and delivery by the parties thereto of any documents, the existence and genuineness of all signatures and conformity with the originals of all documents submitted

to us as copies thereof. We have assumed that any representative of any of the parties, which has sent email or other correspondence, was duly authorized to do so.

We have assumed that any Opinion Document that is expressed to be governed by the laws of any jurisdiction, other than Armenian, is valid, legally binding and enforceable in accordance with its respective terms under the laws of such jurisdictions.

We have further assumed that Equiti AM is a closed joint stock company, duly registered and validly existing under Armenian law, licensed to act as an investment firm (as such terms is defined under the Armenian Law on Security Markets), and that Equiti AM is not bankrupt and is not in liquidation.

We have further assumed that Equiti UK is a non-Armenian company, with no activities or assets or accounts in Armenia.

We have further assumed that all the Opinion Documents have not been amended or terminated, unless and to the extent set forth in the Opinion Documents.

4. **OPINION**

On the basis of the foregoing terms and scope and assumptions, subject to the reservations and qualifications set out in Section 5 below, we give the following opinion in connection with the below questions.

**4.1 CBA FX Brokerage regulations on collateral (ability to use related accounts for margin purposes).**

The right of pledge is regulated by the Armenian Civil Code, Chapter 15 (Arts. 226-272). Although CBA rules, regulating investment companies and activities, have regulations that provide for various requirements, as to how the licensed companies need to operate and calculate their capital ratios, vis-à-vis the collaterals and secured transactions, they do not regulate the essence of pledge relations.

CBA Regulation 4/07, Rule 82, imposes the obligation on Armenian investment services providers to maintain security above the balance of the customer so that losses incurred are no greater than the margin posted by the client.

Under the Armenian Civil Code any property, including property rights, can be the subject of a pledge (there are certain restrictions which seem to be irrelevant for this analysis[1]). The requirements for creating a pledge are also set by the Armenian Civil Code. With the exception of pledges concerning immovable property, which require a

---

[1] Armenian Civil Code, Art. 230, provides for certain type of property that cannot be subject to pledge, as follows: "…property removed from circulation, claims inherently and inseparably connected with the debtor, including claims for compensation of alimony, damage caused to life or health, those registered government (treasury) securities the conditions of issuance of which provides that such securities may not be pledged, and those rights the transfer of which to another person is proscribed by law"

notarized agreement to be registered at the real-estate registry to become valid, pledge agreements over other types of property require a simple written form. Under the Armenian Civil Code, Art. 234, the pledge agreement shall contain[2] the names of the parties and their addresses, a description of the collateral, and the essence, amount and maturity of the obligation secured by collateral. Failure to include this required information may lead to invalidity of the pledge agreement.

As a matter of Armenian Law, the Client had the right of claim pertaining to the positive balance of the accounts the Client has with Equiti UK to be used as collateral for its account with Equiti AM. Since location of such collateral is in England, Armenian law requirements for perfection of such pledge rights, if any, would be in our opinion inapplicable.

In short, it is permissible under Armenian law for the Client to use the positive balance of accounts held with Equiti UK as collateral securing the Client's account with Equiti AM.

### 4.2 Contractual set-off under RA law (use of positive balance accounts to cover negative balance accounts)

Under Armenian Civil Code, Art. 426, mutual obligations of the same type that have fallen due can be set-off against each other. This right can be limited by contract. In other words, the default statutory regulation is that set-off of mutual obligations of the same type is permitted, once due, even absent a contract, but the scope of that right can be restricted by a contract[3]. If there is no contract specifying such restriction, the set-off right is unbounded pursuant to Art. 426.

Armenian law does not envisage a specific type of contract for set-off. However, Armenian law respects the freedom of contract; under Armenian Civil Code, Art. 437, parties can enter into contracts that are specifically provided under the statute and can also enter into contracts that are not provided for in the statutes.

In short, the Set-Off Agreement between the Client, Equiti UK and Equiti AM is valid under Armenian law.

### 4.3 Pledge status vis-à-vis collateral (RA Civil Code application to financial collateral agreements and use of related open accounts as collateral pledged to cover margin)

The Armenian Civil Code, Art. 252.1 regulates specific features of pledges in financial transactions. As such these additional regulations do not govern how a pledge is created (except for securitized securities that are purchased through a public offer, which is not

---

[2] Here again the pledge agreement for immovable property has certain additional requirements, which requirements are not applicable to this analysis.
[3] There are some statutory restrictions on the right of set-off, which seem irrelevant for this analysis.

relevant to this analysis), but rather provides for a more simplified regime of enforcement on the collateral (most notably, waiving any statutory period between the notice of enforcement is served and when the collateral can be sold or foreclosed, as well as removing any otherwise applicable requirement for notarization of agreement providing for realization of the collateral in a manner other than by public auction).

In short, the validity of a pledge in financial transactions, would still fall under generally applicable regulations of Armenian Civil Code, Chapter 15 and use of the balance in Client's accounts held with Equiti UK as collateral for the margin in the Client's account held with Equiti AM would comply with CBA Regulation 4/07, Rule 82, provided that such pledged collateral can be called instantly by Equiti AM.

### 4.4 Set-off right inherent in original T&C's of Equiti AM

As described above, the notion of set-off of rights is recognized by Armenian law. The set-off right provided by the Equiti AM T&C, Section 26.13 is valid and is a binding obligation of the Client, enforceable against it.

We note that Equiti AM T&C, Section 26.13 provides for a set-off without notice. Because the statutory set-off requires a type of notice (declaration), we believe there is a chance that Armenian courts might apply this requirement to contractual set-offs, and think it would be prudent, if feasible, while doing the set-off contemplated by Equiti AM T&C, Section 26.13, to serve a notice of such set-off to the Client. We do not think any specific form would be required, merely that the Client or its so authorized agent receive the notice; we further note that the Equiti AM T&C, Section 25.1.1 provide that notices can be made by electronic means, including email, and we believe that a notice for the purpose of Section 26.13 sent by electronic means shall be sufficient as a matter of Armenian law.

### 4.5 Analysis of set-off agreement Equiti AM, Equiti UK and the Client

The Trading Accounts and Set-Off Agreement is expressed to be governed by English law. The choice of English law is a valid choice of law pursuant to Armenian Civil Code, Art. 1284. The agreement does not contain any provision that would be in conflict with mandatory requirements of Armenian law.

The question of whether or not a set-off of the type described in the Trading Accounts and Set-Off Agreement is legal, valid and enforceable shall, in our opinion, be answered having regard to the rules of English law.

Under Armenian Civil Code, Art. 1258 and Art. 1259, a choice of law provision may not be upheld if it is incompatible with the public policy or the mandatory laws of Armenia. We do not see why this would be the case here.

● Page 6    October 29, 2019

The submission to the jurisdiction of English courts is legal, valid and binding. Under Armenian Civil Procedure Code, Art. 346, the decisions of foreign courts are recognized and enforced in Armenia if provided for by treaties or on the basis of reciprocity. Reciprocity is presumed to exist.

**4.6 Specific discussion on Clauses 15.3 and 17.2.2. of the General Terms and Conditions of Equiti AM**

Equiti AM General Terms and Conditions, Clause 15.3, provides the right of Equiti AM to request that the Client make payments of margins (including provision of collateral) to Equiti AM or its Associates, to maintain its accounts in conformity with the margin requirements, or to provide other security, i.e. collateral. From the Opinion Documents, and the remaining documents you have provided, it is evident that Equiti AM considers Equiti UK an "Associate" as defined under Clause 2.2 and that failure of the Client to make payment or provision of other collateral to Equiti AM or to Equiti UK, for the benefit of Equiti AM, would be an "Event of Default" under paragraph (a) of the definition of such term also under Clause 2.2. which specifically refers to Clause 15.

In addition, and as demonstrated from the emails between Gary Dennison of Equiti US and Michael Stewart of Blue Isle dated June 28, 2018 and the emails between Accounts Divisa AM of Equiti AM and Michael Stewart of Blue Isle dated November 21, 2018, Equiti AM has considered (and treated for Equiti AM regulatory compliance purposes under, under inter alias, CBA Regulation 4/07, Rule 82) the Client's accounts in Equiti UK as collateral servicing the margin requirements of the accounts of the Client with Equiti AM.

According to the Armenian Civil Code, article 1276, the lex situs determines the nature of an interest in, to, over or affecting real or movable properties. The lex situs shall equally govern the exercise of respective rights and remedies. The lex situs of the positive balance of Client's accounts at Equiti UK are located in England, and therefore Armenian law will not apply to those balances.

Equiti AM General Terms and Conditions, Clause 17.2.2 provide for the rules of extrajudicial enforcement of any collateral pledged by the Client. The enforcement procedures seem to be generally in compliance with the Armenian Civil Code, Chapter 15, except for the sale or foreclosure price in case of extrajudicial foreclosure, shall be reasonable market price, as required by Armenian Civil Code, Art. 249, and as such the absolute discretion of Equiti AM in deciding the price set forth in this Clause 17.2.2, might not be fully enforceable. We believe the value of the enforcement of

pledged collateral to be the market value of the positions held in the Client's accounts held with Equiti UK[4].

We further believe that Armenian law implications would in any event have very limited, if any, applicability for enforcement of collaterals located outside Armenia, but that Equiti AM has the right under Armenian Law to enforce the collateral outside of Armenia, which in case of financial collateral can be done by serving a simple notice to the Client and taking possession of the collateral held by Equiti UK immediately. As noted above, we believe that such notice being made by electronic means would be sufficient as a matter of Armenian law.

## 5.   QUALIFICATIONS

The opinions expressed in this Opinion Letter are subject to applicable bankruptcy, reorganization, insolvency or other similar laws of general application relating to or affecting the enforcement of creditors' rights, as well as any public policy considerations.

The opinions expressed in this Opinion Letter are based on the theoretical analysis of the laws of Armenia, as we understand them, in the context of general logic and applicability of it. To the best of our knowledge, after due inquiry, we do not know of any court precedent that could guide our interpretation of the laws of Armenia, on specific matters discussed in this Opinion Letter. We further do not express any position as to the possible intervention on any issues herein discussed by the Central Bank of Armenia, at its discretion, within the scope allowed under the laws of Armenia, as the regulatory body.

Yours faithfully,

*Simplex Consulting*

Simplex Consulting CJSC

---

[4] Please note that under the guiding interpretation of the Armenian Court of Cassation, the reasonable market value, is understood, as the liquidation value, i.e. the price of quick sale of the asset. However, for liquid assets the liquidation value (reasonable market price) would not be substantially lower than the fair market value, and in case of highly liquid assets, the two would nearly coincide (e.g. cash equivalents). Please note that pricing and valuation of subject matter assets, or any other assets, is outside the scope of our expertise and this Legal Opinion