IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:19-cv-02594-RM

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

MEDIATRIX CAPITAL INC., *et al.*,

Defendants,

and

MEDIATRIX CAPITAL FUND LTD., *et al.*,

Relief Defendants.

---

**PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S RESPONSE TO DEFENDANTS' UNOPPOSED MOTION DIRECTING BROKERS TO CLOSE POSITIONS AND REQUEST FOR EXPEDITED RULING**

---

Plaintiff United States Securities and Exchange Commission ("SEC") hereby files this response to Defendants' Mediatrix Capital Inc., Blue Isle Markets Inc., Blue Isle Markets Ltd., Michael S. Young, Michael S. Stewart, and Bryant E. Sewall (collectively, the "Defendants") request (Doc. # 41) that the trading accounts at Equiti Capital UK Limited ("Equiti UK") and its affiliate Equiti Armenia CJSC ("Equiti AM") (together, "Equiti") be closed (the "Motion"). Though the SEC does not oppose Defendants' request, the SEC files this response to clarify its position following certain representations and arguments made by Equiti in their opposition brief. *See* Doc. # 44 ("Opposition").

As outlined herein, the SEC respectfully requests that the Court: (1) order Equiti to immediately close out the open positions in the Equiti UK accounts and convert the funds to U.S. Dollars; and (2) allow the SEC to take discovery on, and additional time to investigate, the circumstances surrounding the Set-Off Agreement and whether Armenian law would be violated if the Equiti AM account is closed without permitting the loss to be set-off from funds in the Equiti UK accounts.[1]

## I.  INTRODUCTION

The SEC has alleged Defendants orchestrated a large-scale fraud whereby they represented to investors that their money would be invested using Defendants' algorithmic trading strategy in foreign exchange ("FX") and metals, which Defendants represented was highly successful and returned large and steady profits for their clients. In actuality, Defendants misappropriated tens of millions of dollars and their trading consistently lost money. As more fully outlined below, these losses were concealed by Defendants holding open certain losing trading positions thereby preventing those losses from being reflected on the profit-and-loss statements provided to investors. Though investors invested more than $125 million into Mediatrix Capital, and though Defendants represented it had $225 million of assets under management as of November 2018, the approximately $12.8 million held in the Equiti UK accounts – along with approximately $900,000 frozen in another brokerage account – encompass

---

[1] On October 31, 2019, the SEC filed an unopposed motion for expedited third party discovery (Doc. # 46), which has not yet been ruled on. Given the instant dispute over particular assets, an order granting the SEC's request would allow it to quickly investigate Equiti's claims. Regardless, the parties held their Rule 26(f) conference earlier today, November 12, and therefore discovery will begin soon.

the only assets that the SEC has identified that remain under Mediatrix's management.[2] Subtracting out payouts to investors, investor losses in the Equiti accounts are expected to exceed $60 million.

Given the SEC's allegations against Defendants, and the expected losses to investors, the SEC has endeavored to preserve any and all remaining assets in order recompense the Defendants' victims, even if only partially. The SEC's hesitance to support Equiti's request to take more than $3 million of defrauded investors' money should come as little surprise given the SEC's mission of protecting investors. To date, and as outlined herein, the SEC has not seen sufficient evidence that Equiti is entitled to the monies that it seeks. Regardless, whether or not funds in the Equiti UK must be used to offset the negative balance in the Equiti AM account, the Court should order that the Equiti UK positions be immediately closed in order to prevent further market losses and preserve those assets. Though Equiti claims that it cannot close the Equiti UK positions without also closing the Equiti AM positions "because that would put the collateral for these [Equiti AM] positions at risk under the Court's freeze order" (Opposition at 2), it cannot support this position. With respect to the Equiti AM account, the SEC requests more time to test Equiti's claim that it is entitled to the $3 million it seeks. The SEC is continuing to investigate the issue and gathering relevant information, including endeavoring to communicate with the Central Bank of Armenia.

---

[2] As noted below, the SEC has also frozen other assets held by Defendants and Relief Defendants from which investor losses may be recovered.

## II.  BACKGROUND

### A.  The Defendants' Fraudulent Scheme

In early 2016, Michael Stewart, Michael Young, and Bryant Sewall (the "Individual Defendants") began soliciting funds from investors to be invested using the Individual Defendants' allegedly profitable algorithmic trading strategy.  The investor funds were managed and traded by companies that the Individual Defendants owned and controlled, including Mediatrix Capital Inc., Blue Isle Markets Inc., and Blue Isle Markets Ltd. (the "Entity Defendants" or "Blue Isle").

Defendants induced investment by advertising consistent, high returns, and representing to investors that assets under management had rapidly increased consistent with their profitable trading and growing investor interest.  By late 2018, Defendants claimed in marketing literature to manage over $200 million of investor money, and stated that an investment from inception of the trading program would have returned over 1600%.  By September 2019, Defendants had raised over $125 million from investors.

Defendants' operation was a fraud.  In reality, Defendants' trading algorithm was a failure almost immediately.  Brokerage records show that Defendants' trading was unprofitable, amounting to a loss of over $30 million by September 2019.  Additionally, assets under management were just a fraction of the amounts represented to investors.  The approximately $12.8 million sitting in the Equiti UK accounts comprise the near entirety of Blue Isle's assets under management.  Moreover, during the course of the scheme, Defendants misappropriated large amounts of money to fund their lavish lifestyles.  Defendants withdrew over $40 million from Blue Isle, which they spent widely, including for the purchase of at least seven real

properties, numerous luxury automobiles, watercraft, jewelry, and other luxury goods and services.

### B. The SEC's Action and Asset Freeze

On September 12, 2019, the SEC initiated the instant case by seeking emergency relief intended to put a stop to Defendants' fraud and to preserve any and all remaining funds and assets for the benefit of the investors. On September 13, 2019, the Court granted a Temporary Restraining Order (Doc. # 10) freezing Defendants' assets, including those held by seventeen Relief Defendants also identified in the Complaint. The SEC diligently implemented the asset freeze for all covered assets, wherever found, which includes assets located in foreign jurisdictions including, but not limited to, the United Kingdom, Armenia, Ukraine, The Bahamas, and the Cayman Islands. The total present value of frozen assets of both the Individual Defendants and the Entity Defendants is approximately $30 to $33 million (including the approximately $12.8 million in the Equiti UK accounts). Because Equiti has not closed the open trading positions that are the subject of Defendants' Motion, the value of assets continues to fluctuate and be subject to market risk.[3] At the present time, the set-off that Equiti has requested in its Opposition would diminish the assets available for distribution to victims by approximately $3 million, or approximately 10%.[4]

---

[3] Equiti makes the incredible contention that "the SEC and the defendants [should] assum[e] the risks" that the positions decline in value (Opposition at 11) while remaining open. While the allocation of responsibility for further market losses between Equiti and Defendants may be a matter of further contractual analysis and briefing, no legal authority suggests that the SEC bears any responsibility.

[4] Additional assets may be located, and other factors may impact the amount ultimately available for distribution to victims. Accordingly, the figure of $30 to $33 million is not a final figure and instead should be considered an estimate that is subject to change.

5

### C. **Equiti Provided Lucrative Brokerage and Other Services to the Defendants**

Equiti AM has been Defendants' prime broker since early 2016, when Defendants started soliciting investments. Prime broker means the brokerage firm where all investor funds are held, and through which all trading is accomplished. Later, Defendants opened accounts with Equiti AM's affiliate, Equiti UK. As the names suggest, Equiti UK is located in the United Kingdom and Equiti AM is located in Armenia. The firms are under common control, but each are regulated by the relevant authority in their respective jurisdictions—the UK Financial Conduct Authority and the Central Bank of Armenia.

All investor funds received by Defendants, if not misused, were held at Equiti in one of a handful of accounts in the name of Blue Isle Markets Inc., and later Blue Isle Markets Ltd. There were multiple accounts at both Equiti UK and Equiti AM. Defendants' unsuccessful trading that resulted in approximately $30 million in losses occurred on Equity's trading platform. During that time period, Equiti received millions in commissions from Blue Isle's trading. For instance, From August 1, 2017 to April 30, 2019, Equiti UK received $12.73 million in gross revenue ($10.40 million in net revenue) from Blue Isle. This revenue figure does not include any revenue earned by Equiti AM throughout the entire relationship, from early 2016 to the present, nor does it include revenue for approximately four and a half months of Blue Isle's 2019 trading with Equiti UK. As of close of business on October 11, 2019, Blue Isle's accounts at Equiti UK were worth $12,833,770.50 and the account at Equiti AM had a negative balance of $3,067,348.89. Equiti AM's accounts had been negative, on and off, since August 2018.

Throughout the scheme, due to large trading losses, Blue Isle managed only a fraction of the money it represented to investors. For example, in November 2018, Blue Isle told investors it had over $200 million under management in its Equiti accounts, yet in reality that number was never more than tens of millions of dollars. Yet, throughout this period, Blue Isle provided monthly statements to investors reflecting balances corroborating their $200 million claim, which were generated by Equiti's software. Blue Isle paid a monthly fee to Equiti's U.S.-based affiliate, Equiti Capital LLC, to essentially rent space on Equiti's server, for the right to brand Equiti's software with Blue Isle's logo, and for technological support relating to that software. That package of services is known as a white label.

Defendants were able to effectuate their fraud by deceiving investors with the tools supplied by Equiti and other vendors that allowed Blue Isle to operate what is known as a closed profit and loss system ("Closed P&L"), which resided on Equiti's software. Blue Isle would trade in the pooled accounts at Equiti, and would allocate its profits and losses from trading to investors. However, with a Closed P&L, only trades that were "closed" would be reported on the profit and loss statement and thereby disclosed and allocated to investors. In other words, when a trading position was open, it was not reported on the profit and loss statement and therefore investors had no insight into whether the position was positive or negative. Thus, when a losing position was kept open, and a profitable position was closed, Equiti's software would allocate only profits to investors who had no way of knowing a losing position was sitting open that would wipe out the reported gains. Defendants were therefore effectively able to control the returns they reported to investors through the trading positions they opted to close.

In sum, Defendants were able to create the appearance of profitable trading by generally only closing profitable trades and allocating those gains to investors. Losing trades (especially large negative balances) were conversely held open so they would not be reported on the profit and loss statement and would not be allocated to investor accounts. Additionally, to eliminate further risk from the losing trades, Blue Isle would generally open an equal and opposite position, known as a hedge, that would effectively close out the losing position, but would not have the effect of the loss being reported on the profit and loss statement. In other words, rather than simply closing a losing position and taking the loss that would be allocated (and disclosed) to investors, Defendants would essentially cancel out the position by taking the opposition position that would cement the loss, but would not actually "close" the position thereby preventing that loss from being reflected on its profit and loss statement and therefore not being allocated to investor accounts. This, along with Defendants' representations of profitable trading, caused investors to believe they were investing in a profitable enterprise, despite Blue Isle's ballooning trading losses.

Thus, while Blue Isle's investors only saw the trades Blue Isle closed out that continually reflected (and allocated to them) large gains, Equiti saw Blue Isle's actual trading positions, which lost tens-of-millions of dollars. At a minimum, Equiti was aware that Blue Isle was trading investor monies, that those trades resulted in tens-of-millions of dollars in losses, that Blue Isle somehow remained in business and continued to bring in more investor money, and that Blue Isle's continued trading activity brought profits to Equiti.

### D. The Set-Off Dispute

Following entry of the Asset Freeze Order on September 13, 2019, the SEC had discussions with counsel for Defendants and Equiti and all agreed that the open positions at Equiti should be closed to prevent further investor losses. *See* Opposition at 5. To alleviate any concerns that closing open positions would violate the Asset Freeze Order, on October 2, 2019, Defendants filed an unopposed motion requesting that the Court enter an order "permitting Equiti Capital UK Limited (United Kingdom) and its affiliate, Equiti Armenia CJSC (Armenia) to close all open positions" in the Equiti UK and Equiti AM accounts "and convert the same to U.S. Dollars forthwith." Doc. # 27 at 3. That same day the Court entered the order and the SEC understood and believed that Equiti would then close out the positions. *See* Doc. # 30. On or about October 10, 2019, after learning that Equiti had not closed out the positions, the SEC contacted Equiti and was told that while the order "allowed" them to close out the positions, Defendants had not yet requested that the positions be closed. Defendants appear to dispute this (*see* Doc. # 41 at ¶ 5), but, regardless, Equiti acknowledges that on "October 17, 2019, Defendant Bryant Sewall (one of Ms. Drohan's clients) emailed Equiti to direct the closing of all open positions …." (Doc # 44 at 7). Equiti has refused to close out either the Equiti UK positions or the Equiti AM positions in accordance with the instructions it received from its brokerage customer.

### III. ARGUMENT

#### A. The SEC Has Acted in Good Faith.

The SEC's and Defendants' interests are hardly aligned in this case. Regardless, and though it should go without saying, the SEC has not secretly drafted emails on behalf of

Defendants (Response at 7 n.5), has not worked with Defendants "to the exclusion of Equiti" (*id*. at 8), and has not acted with "a lack of candor" or conspired with Defendants to keep information from this Court (*id*. at 2). Putting aside that the instant filing is the SEC's first statement to the Court on this issue, on October 15, 2019, the SEC specifically agreed with Equiti that the set-off dispute between it and Defendants "need[ed] to be resolved" and endorsed the plan of bringing this issue to "the Court's attention" through Blue Isle's request that the positions be closed. *See* Doc. # 44-6 at 2. The SEC understood Equiti would file a response in opposition, which it did shortly thereafter. Equiti cannot seriously allege wrongdoing by the SEC simply because it has not endorsed Equiti's arguments or somehow inserted Equiti's arguments into Defendants' Motion.

Moreover, contrary to Equiti's claims, the SEC continually engaged in good faith and meaningful discussions with Equiti about the issue of set-off and whether Equiti has the right to take more than $3 million of defrauded investor monies. Some of those communications were in exhibits to the Opposition. *See* Doc. # 44-6. Indeed, Equiti's claim that "the SEC was uninterested in engaging with Equiti regarding the setoff issue" (Opposition at 5) is belied by these emails, which show the SEC's immediate and substantive engagement with Equiti on the issue. Moreover, Equiti acknowledges that it was "Equiti [that] withdrew from discussions with the SEC." Opposition at 7.

Though the SEC and Equiti had multiple communications on this issue, the SEC was (and continues to be) unable to verify Equiti's claim that they are contractually entitled to $3 million of investors' monies held in the Equiti UK accounts or that Armenian law prevents them from closing out the Equiti AM account absent an immediate set-off. Given the allegations in

this case – that Defendants used Equiti's platform to effectuate a large-scale fraud that has resulted in more than $60 million of losses to investor-victims – it should come as no surprise that the SEC seeks to fully understand and evaluate Equiti's set-off claim (which may require retaining foreign counsel) before agreeing that Equiti is entitled to an additional $3 million of defrauded investors' monies.

### B. Equiti UK Positions Should be Closed Immediately.

Whether or not the positive Equiti UK accounts serve as collateral for the negative Equiti AM account, and whether or not Equiti is entitled to a set-off from the Equiti UK accounts, the Court should order Equiti to immediately close all open positions in the Equiti UK accounts and convert the funds to U.S. dollars. There is no reason the positions in the Equiti UK accounts need to remain open and subject to the meaningful risk that they will decline in value while the set-off dispute is being resolved.

The near entirety of Equiti's brief argues that the Equiti UK accounts should (and must) serve as collateral for the negative Equiti AM account. But the Opposition does not explain why Equiti is refusing to close the positions in the Equiti UK accounts, which would prevent the account from declining in value. Indeed, prior to the filing of their response brief, the SEC repeatedly inquired of Equiti as to why they were unable to close out the Equiti UK positions so those accounts would not be subject to market risk, but did not receive a satisfactory answer. In fact, the SEC specifically cited Equiti's inability to answer this question as a concern that prevented the SEC from supporting their set-off request. *See* Doc. # 44-6 at 2 ("We continue to evaluate Equiti's set-off argument but have concerns. For one thing, we do not understand why a frozen cash position in Equiti UK cannot serve as collateral for the AM account but a frozen

Equiti UK account with open positions can."). Equiti did not provide an answer to the SEC's question, but instead announced that it was "withdrawing from discussions with the SEC." *Id*. at 1. Though Equiti references in its Opposition this very same SEC email expressing concern with Equiti's refusal to close out the Equiti UK positions, Equiti disingenuously claims the SEC expressed only "unspecified" concerns and again fails to answer the question. *See* Opposition at 6.

In fact, in Equiti's 13-page filing, there is only one sentence dedicated to explaining why the Equiti UK accounts remain open after this Court allowed, and Defendants directed, they be closed: "[U]nder Armenian law the Equiti AM positions (which are currently negative) cannot be closed without setting those positions off using cash from the (currently positive) Equiti UK positions, nor can they remain open if the Equiti UK positions are closed (because that would put the collateral for those positions at risk under the Court's freeze order)." Doc. # 44 at 2. Equiti's claim that they cannot close out the Equiti UK positions and leave the Equiti AM position open for the time being is illogical.

As an initial matter, if the Equiti AM positions need to be set-off with "cash from the (currently positive) Equiti UK positions" (Opposition at 2), then there should be no prohibition on closing out the Equiti UK positions so those accounts are holding only cash. Indeed, the legal opinions Equiti submits provide no opinion supporting Equiti's claim that the Equiti UK positions must remain open until the Equiti AM positions are closed. Rather, they too make explicit that the Equiti UK account can (and in fact needs to) hold cash. *See, e.g.*, Maalouf Legal Opinion (Doc. # 44-3) at 3 ("…the open transactions in the Blue Isle Equiti AM accounts cannot be closed unless there is *sufficient cash* in [the Equiti UK] accounts to cover the negative

balances that would result from closing those positions.") (emphasis added); TK & Partners Legal Opinion (Doc. # 44-4) at ¶ 2.8 (…the open transactions in the Blue Isle Equiti AM accounts cannot be closed unless there is *sufficient cash* in those accounts to cover the negative balances that would result from closing those positions.") (emphasis added). Put simply, everybody agrees that the Equiti UK accounts should be converted to cash, but Equiti has thus far refused to do so in an apparent effort to hold the close-out of the positions hostage pending favorable resolution of their off-set claims.

Instead, Equiti puts forth the argument that the Equiti UK accounts cannot be closed while the Equiti AM account remains open "because that would put the collateral for those [negative Equiti AM] positions at risk under the Court's freeze order." Opposition at 2. This argument is meritless. This Court's asset freeze does not differentiate between cash and open trading positions within brokerage accounts – the assets are frozen regardless of their form. Equiti's apparent belief that the Equiti UK accounts are only frozen if they are holding cash is simply wrong. Because the Equiti UK accounts are frozen by order of this Court, the closing out the positions in those accounts and converting the same to cash, as authorized by this Court, has no bearing on this Court's asset freeze. The assets in the account are frozen now, and will remain frozen when the positions are closed and converted to cash.

In sum, the open positions in the Equiti UK accounts should be immediately closed – as directed by Defendants and authorized by this Court – so those accounts are holding only cash and are no longer exposed to market risk. The set-off dispute does not need to be resolved prior to ensuring the Equiti UK accounts do not decline in value.

### C. The SEC Should Be Permitted to Take Discovery On, and Additional Time to Investigate, Equiti's Set-Off and Armenian Legal Claims.

The Court should at this time refrain from allowing Equiti to access $3 million of investor-victims' monies and instead provide the SEC with the ability to take discovery on, and more time to evaluate, the claims put forth in Equiti's Opposition. That is because, on the current record, Equiti's claim to these monies is less than straightforward. Though the SEC would prefer the Equiti AM positions be closed, it does not object to those trades remaining open during the time it takes to resolve the offset issue given Equiti's claim that closing the positions would violate Armenian law.

As an initial matter, notwithstanding Equiti's claims to the contrary, SEC staff have spent considerable time evaluating Equiti's arguments and claim to the money they seek. In fact, immediately after learning of the July 25, 2019 agreement between Equiti and Blue Isle ("Set-Off Agreement"), the SEC staff inquired if there was a preexisting contractual right to set-off the Blue Isle Equiti UK accounts against the Equiti AM accounts, or if that supposed right was first created on July 25, 2019. Though Equiti claimed a preexisting contractual right to set-off and provided the SEC with the contracts it believed supported their right to set-off, those contracts do not appear to support this claim because while there was set-off language between different accounts *at Equiti AM*, there was nothing indicating Equiti AM accounts were to set off from funds held *at Equiti UK*. In fact, the TK & Partners legal opinion submitted by Equiti disclaims an express set-off agreement between Equiti and Blue Isle prior to the Set-Off Agreement: "…neither the T[erms] & C[onditions] AM nor the T[erms] & C[onditions] UK provide for an express possibility that any positive balance held by one Equiti Group member…shall be treated as a margin posted in favor of the other Equiti Group member." TK & Partners legal opinion

(Doc. # 44-4) at 6 (acknowledging that "the T&C AM and the T&C UK do not indicate a provision which explicitly enables Equiti AM and Equity UK to treat each other's positive balances as a margin…").[5] Regardless, Equiti appears to largely abandon this argument in its opposition and relies almost exclusively on the Set-Off Agreement (and their claim that a set-off is required under Armenian law which, as outlined below, is less than certain).

Thus, because Equiti's claimed right to a set-off appears to hinge on the July 25, 2019 Set-Off Agreement, it is important to note how and when this agreement was entered into. During the investigation, the SEC investigative staff first sought documents from Equiti UK in May 2019 and from Equiti AM in June 2019, with the assistance of their respective regulators. Additionally SEC staff had telephone conferences with Equiti UK in June 2019 and Equiti AM in July 2019. As noted above, Equiti has access to both Blue Isle's actual trading positions (open and closed) reflecting large losses, as well as the results of the closed trades reported to Blue Isle investors using the Equiti white label that reflected massive gains. Importantly, on July 15, 2019, after being contacted by SEC staff, Equiti confirmed to the staff that Blue Isle clients had told Equiti that they were unable to withdraw money from the Blue Isle accounts, and that Mediatrix Capital had false statements about Equiti accounts on its website. <u>Ten-days later</u>, on July 25, 2019, Equiti entered into the Set-Off Agreement with Blue Isle, which Equiti now claims gives them the contractual right to set-off account balances from one entity against the

---

[5] The Maalouf opinion appears to disagree with the TK Partners opinion because they believe the language in the Equiti AM, General Terms and Conditions refers to a set-off from Equiti UK accounts as opposed to other Equiti AM accounts (there are four). *See* Doc. # 44-3 at ¶ 4.6. Because the Maalouf opinion provides no analysis as to why they believe the Equiti AM T&C would be referencing Equiti UK accounts, because this opinion is contradicted by the TK & Partners legal opinion, and because Equiti does not put forth this argument in their Opposition, the SEC assumes Equiti is not relying on this portion of the Maalouf opinion.

other. The SEC understands that this Set-Off Agreement was the first such set-off agreement ever entered into between the parties and the agreement by which Equiti claims the right to over 10% of the investor-victim's funds remaining at Equiti. Notably, the Set-Off Agreement came as a surprise to the SEC staff who were not notified of the agreement nor provided with a copy of the document until after this case was filed.

Given that Equiti entered into the Set-Off Agreement after it was made aware of investigations into the fraud Defendants were operating on Equiti's platform, and after Equiti had confirmed Defendants had made false statements about Equiti accounts on its website, the SEC has concerns that Equiti used the Set-Off Agreement as a means to insulate itself from any losses if (and when) Blue Isle was subject to a law enforcement action or asset freeze. This timing may impact the enforceability of the Set-Off Agreement, especially where the SEC's investigation to date indicates that Equiti's trading platform provided it with a unique window into both Blue Isle's actual trading results and the very different results it provided to investors. Thus, contrary to Equiti's claims, this issue is not as simple as simply looking at the Set-Off Agreement and allowing Equiti to take an additional $3 million from defrauded investors.

Moreover, though Equiti claims that closing the Equiti AM account without an off-set would violate Armenian law, it may be that Armenian law was violated when the accounts became negative in the first place. Equiti and its legal opinions direct this Court to Central Bank of Armenia Rule 82, which "imposes the obligation on Armenian investment services providers to maintain security above the balance of the customer so that losses incurred are no greater than the margin posted by the client" (Simplex Consulting Legal Opinion [Doc. # 44-5] at ¶ 4.1). But despite this apparent requirement to maintain adequate security, the SEC staff's review of the

16

evidence produced to date by Equiti, shows that the Equiti AM account balance was negative for months before the July 29 set off agreement was entered into. Thus, the violation of Armenian law Equiti is concerned about may have already occurred.

In sum, on the current record, the SEC continues to have difficulty understanding and/or crediting Equiti's claim to more than $3 million of defrauded investor-victims' monies. Given the allegations in this case, and that investors have lost more than $60 million to Defendants' fraud, this Court should grant the SEC additional time to investigate the circumstances surrounding the Set-Off Agreement and whether Armenian law would be violated if the Equiti AM accounts are closed without permitting the loss to be set-off from funds in the Equiti UK accounts.

## IV. CONCLUSION

As outlined herein, the SEC respectfully requests that the Court (1) order Equiti to immediately close out the open positions in the Equiti UK accounts and convert the funds to U.S. Dollars; and (2) allow the SEC to take discovery on, and additional time to investigate, the circumstances surrounding the Set-Off Agreement and whether Armenian law would be violated if the Equiti AM account is closed without permitting the loss to be set-off from funds in the Equiti UK accounts.

Respectfully submitted on November 12, 2019

*s/ Mark L. Williams*
Stephen C. McKenna
Mark L. Williams
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
(303) 844-1036 (McKenna)
McKennas@sec.gov
(303) 844-1027 (Williams)
WilliamsML@sec.gov

## Certificate of Service

      I hereby certify that on November 12, 2019, I caused the foregoing to be electronically filed by using the CM/ECF system.  I further certify that a copy of the foregoing was served upon the following counsel of record via the Court's CM/ECF system:

Vivian Drohan  
Drohan Lee  
680 Fifth Avenue  
10th Floor  
New York, NY 10019  
vdrohan@dlkny.com  

Jeffrey R. Thomas  
Thomas Law LLC  
3773 Cherry Creek North Dr., Suite 600  
Denver, CO 80209  
jthomas@thomaslawllc.com  

*Attorneys for Defendants Mediatrix Capital Inc., Blue Isle Markets Inc. (St. Vincent & the Grenadines), Blue Isle Markets Ltd., Michael S. Young, Michael S. Stewart, and Bryant Sewall and Relief Defendants Victoria M. Stewart, Maria C. Young, and Hanna Ohonkova*


Thomas J. Krysa  
David B. Meschke  
Brownstein Hyatt Farber Schreck, LLP  
410 17th Street, Suite 2200  
tkrysa@bhfs.com  

*Attorneys for Relief Defendant Arual LP*


Tamera D. Westerberg  
Wheeler Trigg O'Donnell LLP  
370 17th Street, Suite 4500  
Denver, CO  80202  
westerberg@wtotrial.com  

*Attorney for Relief Defendant Walter C. Young III*


                                               *s/ Mark L. Williams*