IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 19-cv-02594-RPM

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

Plaintiff,

v.

MEDIATRIX CAPITAL INC., BLUE ISLE MARKETS INC. (St. Vincent & the Grenadines), BLUE ISLE MARKETS LTD., MICHAEL S. YOUNG, MICHAEL S. STEWART, and BRYANT E. SEWALL,

Defendants,

and

MEDIATRIX CAPITAL FUND LTD., ISLAND TECHNOLOGIES LLC, VICTORIA M. STEWART, MARIA C. YOUNG, HANNA OHONKOVA SEWALL, MICHAEL C. BAKER, WALTER C. YOUNG III, ARUAL LP, WEST BEACH LLC, SALVE REGINA TRUST, TF ALLIANCE, LLC, CASA CONEJO LLC, HASE HAUS, LLC, DCC ISLANDS FOUNDATION, KEYSTONE BUSINESS TRUST, WEINZEL, LLC, THE 1989 FOUNDATION, MEDIATRIX CAPITAL PR LLC, MEDIATRIX CAPITAL, LLC, and BLUE ISLE MARKETS INC. (Cayman Islands),

Relief Defendants.

**NON PARTIES' REPLY TO DEFENDANTS' AND SEC'S RESPONSES REGARDING THE MOTION FOR ORDER DIRECTING BROKERS TO CLOSE POSITIONS (WITH EXPRESS RESERVATION OF OBJECTIONS TO PERSONAL JURISDICTION AND CHOICE OF VENUE CLAUSES)**

Non-parties Equiti Capital UK Limited ("Equiti UK") and Equiti Armenia CJSC ("Equiti AM" and together with Equiti UK, "Equiti"), respectfully state the following in response to submissions made by Mediatrix Capital Inc., Blue Isle Markets Inc. (St. Vincent & The Grenadines), Blue Isle Markets Ltd., Michael S. Young, Michael S. Stewart, and Bryant E. Sewall (collectively " Blue Isle" or the "defendants") and the U.S. Securities and Exchange Commission (the "SEC," and, collectively with Blue Isle, the "Parties") relating to the Defendants' *Unopposed*

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE. EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

Motion for Order Directing Brokers to Close Positions and Request for <u>*Expedited*</u> Ruling (the "Liquidation Motion") (emphasis in the original).

## I. INTRODUCTION

As an initial matter, the SEC claims that the setoff issue is something it only recently learned about. That is false. At the very latest, the SEC learned about the setoff issue during its first communications with Equiti following commencement of this action and the entry of the Freeze Order, via emails from Equiti to the SEC summarizing the positions in Blue Isle's accounts as "Total" or "Consolidated" equity (Exhibit 1) and "positive values represent positive equity; *negative values represent negative equity and a deficit due to be cross-settled between Equiti Capital UK and Equiti AM Trading Accounts*" (Exhibit 2, p. 14 (emphasis added)). And during a September 19, 2019 call to discuss the SEC's questions about the September 17 email, the SEC discussed the Blue Isle accounts solely on a net basis (i.e., with the setoff included) and informed Equiti that it should handle closing positions in the ordinary course of its prior dealings with Blue Isle (which would include the "Total" or "Consolidated" position described to the SEC in the email). No one disputes that Equiti continuously raised the issue once Equiti's counsel began to interact with the SEC.

The Liquidation Motion stated that it was made in consultation with and was not opposed by the SEC. *See* Motion ¶¶ 1 & 7. Because the Liquidation Motion omitted key facts and issues Equiti submitted the Equiti Submission to provide a unified timeline of Equiti's interactions with the SEC and defense counsel after this case began. That unified timeline was important for the Court to understand why Equiti had concluded that the SEC was not going to address the setoff issue in a timely or reasonable way or permit defendants to do so (which was especially surprising given Equiti's extensive, voluntary cooperation with the SEC).

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE. EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

The Parties' briefs highlight two key issues for the Court regarding the Parties' attempts to dodge the setoff issue.  *First*, the SEC admits that it does not yet know whether the Liquidation Motion *to which it consented* would cause Equiti to violate Armenian law.  This is a stunning position for the United States government to express in a pleading, particularly after it consented to a motion asking this Court to issue an "*expedited*" ruling directing the very conduct that may violate Armenian law.  In doing so, the SEC has prioritized potential monetary recovery in one case over (i) a general policy of consistent, fair, and equal treatment of a non-party (Equiti) and (ii) respect for foreign sovereigns' laws.  This brings to mind the classic law school teaching paradigm:  What would happen if the situation were reversed, and the SEC learned that a court in another country was being asked to approve an order for someone to violate an SEC regulation?  It is likely that the SEC would not react well.

*Second*, the Parties seem to have joined in attempt to undermine the reputation and operation of a non-party, Equiti, who is not within the jurisdiction of the Court.  The SEC's submission is littered with barely-veiled suggestions that Equiti may have some sort of culpability for the defendants' wrongdoing.  This is absurd; it is akin to alleging that a stock exchange is responsible for disclosure fraud committed by a listed company.  Reading the two briefs together, the Parties try to impugn Equiti's motives and actions for providing access to the platform the defendants used to conduct business[1] and for attempting to enforce account-handling arrangements that were in place long before Equiti was aware of the defendants' alleged wrongdoing (and which,

---

[1]  The Parties omit the fact that the platform Equiti provided—MT4—is not proprietary to Equiti and is one of the most popular foreign exchange and metals trading platforms in the world, used by more than 750 banks and brokerages and millions of traders.  *See* https://www.metatrader4.com/en/brokers; *see also* https://www.benzinga.com/money/metatrader-4-review/ ("Considered the gold standard among trading platforms, MetaTrader 4 … .").  The defendants did not need accounts with Equiti to use MT4 and the third-party plug-ins that work with it (and which also do not come from Equiti and are not controlled by Equiti).

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE.  EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

3

as demonstrated below, are not solely about Blue Isle). *See* Exhibit 3. Despite their insinuations, the SEC does not allege that Equiti knew of the SEC's suspicions of the defendants' wrongdoing or had reason to have suspicions of its own, that the SEC informed Equiti of its concerns, or that the defendants' alleged fraud was open and notorious. Implying that Equiti should not have been compensated is dangerously close to arguing that trading platforms themselves should be responsible for—i.e., insurers of—fund investors' losses despite having no relationships to such investors. Indeed, it is black-letter law that the '34 Act would not permit such an argument. *See generally Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 345 (2005) (explaining that Section 10(b) does not provide investors with broad insurance against market losses).

The Parties' collective efforts have failed to dispute that this Court is not the appropriate forum to resolve whatever concerns they may have, although it is critical to note that (i) the SEC is still unwilling to state a definitive position and (ii) the defendants do not deny that any of the contracts they signed were, as represented at the time of signing, valid and binding. If such a position were to develop in the future, the Parties would be free to bring disputes in the courts of the United Kingdom or Armenia, but as the record stands now no Party has actually asserted such a dispute.

The most reasonable course thus open to the Court is to enter Equiti's proposed order: The Parties have not provided any *evidence* to contradict the validity and enforceability of the setoff agreement and the fact that Equiti treated the accounts as a single unit just as described in its first summary to the SEC in September, and have not provided any reason to prevent Equiti—a non-party—from acting in a manner to protect itself from regulatory risk from another sovereign. If not, the Court should deny the Liquidation Motion and allow the positions to remain open. This Court should not place the Parties' innuendo and speculation ahead of the legal risk Equiti would

---

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE.  EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

face if it simply granted the Liquidation Motion, especially in light of the Parties' obfuscation of the facts relevant to this dispute.

## II.  PROCEDURAL ISSUES

The SEC's "placeholder" filing (ECF 49) stated that it intended to file a response to the Liquidation Motion, and cited D.C. Colo. L.R. 7.1(d) for the proposition that it could respond to the Liquidation Motion within 21 days of the filing of that motion.  However, (i) the Liquidation Motion specifically stated that the defendants made that motion after consulting with the SEC and the SEC did not oppose it and (ii) the Liquidation Motion sought expedited determination (which is by definition a request that ordinary time periods be shortened, *see* https://www.merriam-webster.com/dictionary/expedited ("expedited:  accelerated or sped up **:** promptly executed")).  Then, within a span of less than two hours during the evening of November 12, the SEC filed a 17 page brief primarily directed at ***Equiti's*** submission, ***not*** at the Liquidation Motion, ***and*** the defendants filed an 11 page response to Equiti's submission, which is nowhere covered by Rule 7.1(d).[2]

## III. FACTS

As an initial matter, the Court should understand that one key flaw in the SEC's innuendo-based assertions about Equiti's potential culpability is that Blue Isle was not originally an Equiti customer.  Blue Isle opened accounts in 2016 with Divisa UK and Divisa AM, which later became Equiti UK and Equiti AM after Equiti bought the Divisa companies.  Because Equiti inherited Blue Isle as a client as a result of the acquisition of Divisa, there is no basis for the SEC's insinuations about Equiti.

---

[2]  Particularly given that the SEC vociferously disclaims any coordination with defendants (ECF 50 at 9-10) despite significant evidence to the contrary in the Equiti Submission, the Parties' submissions are, on their face, further evidence of just such coordination.

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE.  EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

The Parties do not dispute the core facts of Equiti's arguments. In its brief, Equiti provided the pre-brief communications that it had with the SEC and Blue Isle about the set-off issue. The Parties do not dispute that Equiti had been in weeks-long discussions with the Parties about the set-off issue. The Parties do not dispute that Equiti offered a stipulation that would have protected everyone's interests by allowing Equiti to complete the setoff without regulatory risk while specifically preserving the Parties' rights to challenge it in the future.[3] Finally, the Parties do not present any legal opinions that are contrary to the opinions provided by Equiti to this Court, and their claims regarding flaws in those analyses do not stand up to scrutiny.

The SEC still fails to give a satisfactory explanation of the record. Despite Equiti highlighting the timeline of events, the SEC continues to feign confusion as to why Equiti would assert its setoff rights in response to the Liquidation Motion. But Equiti's intent to offset the accounts when the positions were closed was not a surprise to the SEC, because Equiti made the SEC aware of it from the outset of its cooperative efforts. On September 23, 2019, Equiti sent the SEC an email following up on the multi-continent call Equiti had to walk the SEC through its systems. Exhibit 2. Attached to this email was a summary of Blue Isle positions with Equiti. The first page of this summary states the Blue Isle account "values represent positive equity; negative values represent negative equity and a deficit due to be cross-settled between Equiti Capital UK and Equiti AM Trading Accounts." Exhibit 2, p. 14. And the evidence attached to the Equiti Submission further demonstrates the discussions (including of the need to comply with Armenian

---

[3] The SEC's submission, for unknown reasons, studiously avoids ***any discussion whatsoever*** of the stipulation Equiti offered to the SEC or why the SEC rejected it, even though that stipulation would have given the SEC more than the SEC now seeks without even potential non-US regulatory issues.

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE. EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

law) and documentary evidence regarding the setoff issue, and the SEC's failure to address it even when offered a stipulation.

Despite being on notice of the need to set-off the accounts when the positions were closed, the SEC apparently failed to take steps that could have resolved the open issues before the Court. It could have reviewed documents from the defendants (such as emails and account documents). It also could have sought foreign legal advice, as Equiti has provided. Only now, *after* the filing of the "unopposed" Liquidation Motion, does the SEC request that it be allowed to do what it should have started doing in September. Given the extensive discussions of these very issues, the SEC should at least have begun this inquiry before supporting the Liquidation Motion.

The SEC's submission also leads to an incorrect view of Equiti's role in this matter. The SEC alleges that Equiti provided Blue Isle with a bespoke trading platform that enabled Blue Isle to commit fraud. ECF 50, p. 7. The SEC uses this tailored narrative to hint that Equiti should have somehow been aware that Blue Isle was committing fraud. This picture is, however, much more complicated than the SEC lets on.[4]

In fact, the MT4 platform (ECF 44-1, p. 1; 44-7, p. 2) is one of the most widely used Forex trading platforms in the world. MT4's own website claims that "750+ brokers and banks provide

---

[4] The SEC even seems to suggest that Equiti somehow made money from all of Blue Isle's trading losses without a shred of evidence to that effect. There are three major problems with that suggestion. *First*, Equiti only earned commissions and financing costs on Blue Isle's trading, a total of at most $3.8 million/year over the life of the accounts. *Second*, Blue Isle's losses were losses to the markets; it was not trading *with* Equiti but *through* Equiti. *Third*, the SEC fails to note that most of the money it claims Blue Isle defrauded from its investors was never deposited with Equiti, forgetting its own allegations that much of the money Blue Isle received from investors was diverted to cars, boats, real estate, and other destinations. Indeed, when Blue Isle first registered with Divisa, it only represented to Divisa that its balance sheet was "25,000,000+." *See* Exhibit 4, p. 2.

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE. EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

services to millions of traders using" MT4.[5]  As Equiti explained to the SEC and MT4's website confirms, Equiti licenses MT4 itself and then sublicensed it to Blue Isle.

As Equiti also explained to the SEC, the MT4 platform can be modified with numerous third-party plugins that are not provided or maintained by Equiti, but are purchased directly by end-users like Blue Isle.  It appears to have been one of these third-party plugins—Panda MAM—that Blue Isle allegedly used to omit open positions in the profit and loss statements it gave to its investors.  The Panda MAM plug-in was not, as the SEC would like this Court to believe, part of any Equiti-provided services, and yet the entire second paragraph of page 7 of the SEC's submission is about the Panda system, not the MT4 platform (which the SEC either omitted or did not understand despite the fact that Equiti explained the Panda plug-in to the SEC and provided the SEC with a user manual for the Panda MAM plugin).  *See* Exhibit 5.  Like the MT4 platform, these plugins are commonly used throughout the Forex trading industry.[6]

The ubiquity of these trading platforms and plugins renders their use far more banal than the SEC would have this Court believe.  There is no reason to assume, and the SEC in fact offers none, that Equiti would or should have had any awareness that Blue Isle was using these otherwise standard platforms and plug-ins for nefarious purposes.  This Court should reject any insinuation Equiti subsequently sought a setoff agreement because it suspected fraud.  In fact, Equiti began discussing moving all of Blue Isle's trading accounts to Equiti UK to avoid prior cross-netting

---

[5]    MT4's website claims that "750+ brokers and banks provide services to millions of traders using" MT4.  *See* https://www.metatrader4.com/en/brokers (Last accessed November 15, 2019).

[6]    Panda's website claims that its customizable Forex trading features are used by "[o]ver 100 of the world's leading online brokers."  *See* https://www.pandats.com/ (Last accessed November 15, 2019).  Interestingly, during this call one of the questions the SEC asked was whether Equiti could help the SEC identify whether URLs given to Blue Isle customers by Blue Isle to access their accounts were MT4 URLs or Panda MAM URLs (Equiti had suggested that they were not MT4 URLs); Equiti agreed and asked the SEC to send the URLs for Equiti to review.  Yet after receiving the Panda MAM manual, the SEC never sent the URLs, leading to the conclusion that it realized on its own that Equiti had been right.

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE.  EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

situations in 2018. *See* Exhibit 6. That the setoff agreement was signed later was due to Blue Isle's desire to try to trade out of its last open Equiti AM position and does not suggest that Equiti was aware of fraud by Blue Isle.

It also does not change the fact that even before Equiti purchased Divisa, Divisa had a system in place that required Divisa UK to run Divisa AM's margin and collateral operations and ensure Divisa AM's compliance with Armenian Central Bank rules for all of Divisa AM's clients, not just Blue Isle. *See* Exhibit 3 §§ 3.1 ("Conduct all operational duties … including margin calculation, risk management, margin calls, liquidity provision and liquidity management."), 3.2, and 5.2. And Blue Isle signed "Professional Client Classification and Title Transfer Collateral Arrangements" with both Divisa UK and Divisa AM (Exhibits 4 and 7, respectively), which under MiFID II caused all Blue Isle funds to be treated as "Firm" (Divisa) money vs "Client Money" under UK and European regulation and allowed Divisa to make setoffs without even notifying Blue Isle in advance.[7] When Equiti purchased Divisa, the same arrangements remained in place. These documents both (i) further support the setoff right (which is indeed an obligation of Equiti UK) and (ii) explain why Ms. Drohan never answered Equiti's question about whether any defendants were asserting that any relevant agreements were invalid or inoperative.

Importantly, in seeking to do the setoff, Equiti is not seeking any funds for itself; Equiti is only seeking to negate some of Blue Isle's own trading losses with Blue Isle's own trading gains. The SEC confuses this fact by claiming Equiti is somehow "tak[ing] more than $3 million worth of defrauded investor monies." ECF 50, p. 10. That money was already lost to other traders (not to Equiti) through the trading Blue Isle conducted on the open market. Equiti should not be put in

---

[7] *E.g.,* Commission Delegated Directive (EU) 2017/593 (April 7, 2016) (available at https://eur-lex.europa.eu/legal-content/en/TXT/?uri=CELEX:32017L0593).

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE. EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

a position to potentially bear the cost of those losses in addition to potential regulatory action from the Armenian Central Bank.

Finally, cash and open positions are not interchangeable for cross-collateralization purposes. Frozen cash is not as good collateral as the open positions are. Equiti has maintained this position all along. The open Equiti AM positions are cross-collateralized through the open Equiti UK positions. The Equiti AM positions are not cross-collateralized by cash (especially frozen cash), nor does any Party claim that has ever been the case. The Freeze Order keeps this open account cross-collateralization relationship in place. But once the Equity UK positions are closed and converted to cash, there would no longer be the same cross-collateral relationship. In a normal scenario, where Equiti was able to maintain liquid cash as collateral, the importance of the open vs. closed position distinction would be less important. The Freeze Order changes the dynamic and creates an unacceptable risk for Equiti that the Parties still fail to appreciate. Put differently, the SEC wants the benefit of closing positive UK positions without the negative of paying down the negative AM positions that are collateralized by the UK positions. But a court order to maintain the *status quo* cannot be used as both a sword and a shield, which is what the SEC is trying to do. It cannot choose which parts of the *status quo* to maintain and which parts to change.

## IV. ARGUMENT

The Parties are attempting to persuade the Court to disregard the setoff issue. For the reasons articulated below, the Court should not do so.

### A.    The Contracts At Issue Must be Presumed Valid

The Court has been presented with multiple contracts between Blue Isle and Equiti. *See* ECF 44-2; Exhibits 4 and 7 hereto. Those contracts must be presumed valid by this Court. *See*

---

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE.  EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

*Ohio & M.R. Co. v. McCarthy*, 96 U.S. 258, 267 (1877). Although the Parties argue about hypothetical circumstances, they present no actual evidence that any contract between Equiti and Blue Isle was invalid. Speculation and innuendo are not enough to deny the validity and enforceability of the contracts before the Court.

Equiti is thus complying with the bargained-for requirements and the account-handling system that preceded its purchase of Divisa. No Party has claimed that Equiti has breached any obligation or covenant, and if they did such a dispute would have to be determined by a UK or Armenian court. Indeed, by pursuing the Liquidation Motion in an effort to compel position closures in violation of Armenian law, Blue Isle has arguably itself breached the original contracts and thus created the risk that it would be obligated to pay Equiti's attorneys' fees, which would also by contract have to be paid out of Blue Isle's accounts before Equiti had any obligation to return funds to Blue Isle or anyone acting in its stead. See Exhibit 8 §§ 17.2.4 (Blue Isle undertaking to not send orders it has reason to believe are in breach of Applicable Regulations and undertaking to not take any step which would cause Equiti to fail to observe the standard of behavior reasonably expected of persons in Equiti's position); 20.4 (attorneys' fees incurred as a result of Blue Isle's failure to comply with contract).

### B. The Contracts Require Set-Off, and the SEC's and Blue Isle's Arguments Otherwise are Insufficient and Unsupported by Law.

In 17 pages, the SEC cites *no cases* in support of its position. The defendants do cite some cases, but those cases actually undermine the defendants' position. For instance, *FTC v. NHS Systems*, 708 F. Supp. 2d 456 (E.D. Penn. 2009) (ECF 51, p. 4 and 5) is easily distinguishable.[8] In *NHS Systems*, a *receiver* (which the SEC is not) sought access to funds held by a payment processor

---

[8] Blue Isle cites the same case twice, both times with the wrong year (2010). The opinion is from 2009.

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE. EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

in the name of a customer in receivership. The payment processor argued that it did not have to turn over funds because the receiver had no property right to them. The facts are wholly inapplicable to the cross-collateralized relationship between the Equiti accounts here for several reasons.

*First*, the court in *NHS Systems* noted that it was able to order payment of the funds by the non-party because the receivership created *in rem* jurisdiction. 708 F. Supp. 2d 456 at 463. The court noted that the statute creating this jurisdiction only extended to property within the United States. *Id. citing* 28 U.S.C. § 754. Section 754. No such jurisdiction is asserted here.

*Second*, the *NHS Systems* court held that "'the general rule is that a receiver acquires no greater rights in property' than the receivership entities had previously." The court also noted specifically that the government had the burden to show "which settled funds are being held on behalf of an entity subject to a court-ordered receivership." *Id*. at 465. Ultimately, the court determined that the processor could not withhold payment of the amounts owed to the receivership.

This situation is nothing like *NHS Systems*, and in fact the Parties' positions contradict the holding in *NHS Systems* that a receiver has no greater right than the receivership entities would. Equiti is seeking to use existing set-off rights between Blue Isle's cross-collateralized positions. Even if the Court were inclined to analogize the Freeze Order to a receivership (which it is not), Blue Isle has not articulated a basis for this court to extend the *NHS Systems* result to accounts held by non-parties in foreign jurisdictions. Moreover, the dispute here is not whether the open positions are property of Blue Isle, it is whether Blue Isle has the right to compel Equiti to convert open trading positions into cash in a manner that might change their collateral status.

Not surprisingly, nearly all the cases the defendants cite rely on aspects of receivership that are wholly inapplicable here. *See* ECF 51, pp. 4–5. In another instance, the defendants even

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE. EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

misconstrue the holding of a case that favors Equiti's position.  Defendants cite *Glenn Justice Mortg Co. v. First Nat'l Bank,* 592 F.2d 567 (10th Cir. 1979), and (wrongly) claim that the court there found "there was no 'special deposit' which would have allowed the setoff."  *See* ECF 51, p. 5.  In fact, *Glenn Justice* re-affirmed that special deposit accounts could not be used to set-off a debt, and went on to note that "[c]ases dealing with priority disputes between receivers and banks typically arise in insolvency proceedings … giving rise to the appointment of a receiver.  *Most of the cases in this area have allowed the bank to retain the funds set off.*" 592 F.2d at 573 (emphasis added).  This opinion shows that, at a minimum, receivership rights do not always trump setoff rights and thus does not help any of the Parties.

Thus, the case law supports Equiti's position that, contrary to the Parties' arguments, setoff and liquidation of the Equiti accounts are not "two distinct and separate issues."  ECF 51, p. 4.  It is therefore a gross oversimplification for defendants to assert "that if Equiti close[d] the accounts and reduce[d] them to cash it would be in the same position it is now."  *Id*.  Equiti has maintained, since first learning of this action, that its setoff rights are valid and enforceable.  Equiti's pre-existing setoff rights, in conjunction with Armenian banking laws and the Freeze Order, do in fact make setoff and liquidation two interdependent events.  As it stands, the *status quo* remains in place and the Equiti accounts are frozen, with the Equiti UK position remaining as collateral for the Equiti AM position.

But if UK positions are closed and converted into cash, that cash becomes frozen.  The Freeze Order does not address any transfers that would be necessary to effectuate Equiti's rights and obligations to setoff between the accounts.  Hence, if the Equiti UK account were to be liquidated that case would be frozen and could not be used to offset the negative Armenian position absent an additional order from this Court which, remarkably, the Parties oppose (despite

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE.  EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

defendants having signed multiple valid contracts giving Equiti the right to setoff).  As a result, the conversion of the Equiti UK position into cash immediately would, without more, cause the account to cease being available as collateral for the Equiti AM position and create a violation of Armenian law.

### C. The SEC should not be allowed to stake out a position without supporting research or legal opinions

Although the defendants assert that liquidating the respective Equiti UK and Equiti AM positions is no different than the *status quo* (all the more remarkable given the contracts they signed), the SEC does not appear so sure.  The SEC concedes it needs more time to ascertain if closing the Equiti UK account before off-setting the amount in the Equiti AM account would violate Armenian law.  ECF 50, p. 17.  The SEC also does not cite *any* precedent for its position.  Nonetheless, despite admitting it uncertainty regarding the foundational issue here, the SEC asserts that Equiti is wrongfully withholding $3 million in funds from defrauded investors in opposing the Liquidation Motion.

This Court should recognize the absurdity of the SEC's position.  According to the SEC, it is acceptable for this Court to issue an order that, at a minimum, *might cause Equiti AM to violate Armenian law*, simply because the SEC has not yet been able to formulate an argument against Equiti's position (beyond its "concerns").  The SEC has had more than enough time to research the applicable law; this Court should not issue such an order without solid evidence or legal reasoning from the SEC, and it should not adopt a principle that undervalues the risk of ordering a non-party to engage in potentially illegal conduct.  Equiti has submitted uncontested contractual and legal reasons why the relief the Parties seek, without allowing for setoff, would cause Equiti AM to violate Armenian law.  This alone should preclude the relief sought in the Liquidation Motion without the modifications sought by Equiti.

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE.  EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

Although the Parties dispute the legal opinions submitted by Equiti, they do so without any contrary opinions. Moreover, even if one of the Parties had submitted a contrary opinion, it would be up to a UK or Armenian court to decide such a dispute because that is what the relevant contracts require. The Parties do not dispute this.

The defendants spend much of their response disputing whether Equiti actually has setoff rights given the Freeze Order. ECF 51, p. 5. The defendants claim that "the primary goal of the asset freeze is to maintain the status quo until the rights of all parties and stakeholders are adjudicated." *Id*. But the defendants' own Liquidation Motion asks this Court to do the exact opposite—alter the *status quo* by liquidating the Equiti UK position irrespective of Equiti's contractual offset rights. The defendants cannot employ such twisted logic while accusing Equiti of being "disingenuous." If the defendants truly dispute whether these rights are available, they are free to pursue that dispute in the UK or Armenian courts. It is not, as the defendants claim, Equiti's responsibility to "move the court asserting any right to set-off" (ECF 51, p. 4) in a forum Equiti and Blue Isle specifically agreed would not have jurisdiction over such a dispute.

Like the defendants, the SEC's arguments miss the forest for the trees. The SEC incorrectly asserts that "Equiti's claimed right to a set-off appears to hinge on the July 25, 2019 Set-Off Agreement." ECF 50, p. 15. As noted above, other contracts provide the same right, and the legal opinions provide still further support under the General Terms and Conditions agreement between Equiti AM and Blue Isle, as well as the general course of dealing between Blue Isle and Equiti during which Blue Isle repeatedly used its Equiti UK positions to collateralize and offset its Equiti AM positions. Once again the SEC's primary response is to argue that it needs more time to investigate the issue. ECF 50, pp. 16–17. It has had enough time, and in any event this is hardly a basis for the Court to determine that no harm would befall Equiti if the Liquidation Motion were

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE. EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

granted as the SEC requests.  The record submitted by Equiti should be preferred over the SEC's admitted and belated speculation.

## V. CONCLUSION

The Parties want this Court to value expediency above causing legal risk to a non-party.  A court of law should recognize that a legal risk imposed upon a non-party is a far greater harm than a potential dissipation in value of a brokerage account.  The interests of justice in this case should compel this Court to deny the Liquidation Motion and enter Equiti's proposed order instead, or simply deny the Liquidation Motion.

Respectfully submitted this 18th day of November, 2019.

*/s/ Douglas W. Henkin*_____
Douglas W. Henkin (admitted)
Dentons US LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6832
douglas.henkin@dentons.com

Britton Nohe-Braun
Dentons US LLP
1400 Wewatta Suite 700
Denver, CO 80202
(303) 634-4319
britton.nohe-braun@dentons.com

Of Counsel:

Lisa M. Krigsten (admission pending)
Dentons US LLP
4520 Main Street, Suite 1100
Kansas City, Missouri 64111
(816)460-2554
lisa.krigsten@dentons.com

---

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE.  EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November, 2019, a true and correct copy of the foregoing was electronically filed with the clerk of the court using the CM/ECF system, which will send notification of such filing to the following:

Jeffrey Robert Thomas (jthomas@thomaslawllc.com)
Mark L. Williams (williamsML@sec.gov)
Stephen C. McKenna (mckennas@sec.gov)
Thomas Joseph Krysa (tkrysa@bhfs.com)
Vivian Rivera Drohan (vdrohan@dlkny.com)

*s/ Douglas W. Henkin*

---

EQUITI UK AND EQUITI AM ARE NOT MAKING GENERAL APPEARANCES IN THIS COURT FOR ANY PURPOSE AND DO NOT INTEND TO WAIVE THEIR ARGUMENT THAT THIS COURT LACKS PERSONAL JURISDICTION OVER THEM AND THE POWER TO DECIDE ANY DISPUTES RELATING TO OR ARISING FROM AGREEMENTS BETWEEN EQUITI UK, EQUITI AM, AND BLUE ISLE.  EQUITI UK AND EQUITI AM EXPRESSLY RESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.