# EXHIBIT 8



# GENERAL TERMS & CONDITIONS

## MAY 2016



## General Terms & Conditions

1.      **Introduction**

1.1     This document is referred to as the General Terms & Conditions (the "**Agreement**") and is entered into between you and Divisa UK Ltd ("**Divisa UK**", "**we**" or "**us**"), a company registered in England & Wales (Company No. 7216039), with its registered address at 14 King Street, London EC2V 8EA. Divisa UK is authorised and regulated by the Financial Conduct Authority (Firm Reference No. 528328).

1.2     *Definitions*. The following terms used within this Agreement shall, unless the context otherwise requires, have the following meanings:

| Account Statements | such statements as indicated by clause 15. |
|---|---|
| Act | the Financial Services and Markets Act 2000. |
| Affiliate | in relation to either party each and any subsidiary or holding company of that party and each and any subsidiary of a holding company of that party or any business entity from time to time controlling, controlled by, or under common control with, either party. |
| Application Form | the account application form completed by you and accessed through our Website. |
| Applicable Regulations | (i) FCA Rules or any other rules of a relevant regulatory authority; <br><br>(ii) the rules of the relevant Market; and <br><br>(iii) all other applicable laws, rules and regulations as in force from time to time as applicable to this Agreement. |
| Appropriateness Assessment | the process we use to assess the appropriateness of the Services for you. |
| Associate(s) | (in relation to a person) (A): <br><br>(i) an Affiliate of A; <br><br>(ii) an appointed representative of A or of any Affiliate of A; or <br><br>(iii) any other person whose business or domestic relationship with A or his Associate might reasonably be expected to give rise to an alignment of interests between them. |
| Base Currency | the currency used to open your account, which may be the lawful currency of the United Kingdom (GBP Sterling), the European Union (Euros), the United States (United States Dollars). |

**DIVISA**
C A P I T A L

| Business Day(s) | a day (other than a Saturday or Sunday) on which: |
|---|---|
| | (i) in relation to a date for the payment of any amount in: (a) any currency other than Euro, banks generally are open for business in the principal financial centre of the country of such currency; or (b) Euros, the settlement of payments denominated in Euros is generally possible in London or any other financial centre in Europe selected by us; and |
| | (ii) for all other purposes, is not a bank holiday or public holiday in London. |
| Client Money Rules | the provisions in the FCA's Client Assets sourcebook relating to client money. |
| Complex Product(s) | certain derivative products including, Forex, contracts for difference, futures, bullion and options. |
| Credit Support Document | any document containing an obligation of a Credit Support Provider. |
| Credit Support Provider | a third party who provides security for your obligations. |
| Electronic Trading Supplement | the supplemental terms relating to online trading which has been provided to you (a hard copy is available on request). |
| Eligible Counterparty | an eligible counterparty as defined in FCA Rules. |
| EMIR | means Regulation (EU) No 648/2012 of the European Parliament and of the Council of 4 July 2012 on OTC derivatives, central counterparties and trade repositories, as supplemented from time-to-time including by the Commission Delegated Regulation (EU) No 148/2013 of 19 December 2012, and the Commission Implementing Regulation (EU) No 1247/2012 of 19 December 2012 |
| Event of Default | the occurrence of one or more of the following events: |
| | (a) your failure to make any payment (including any payment of margin) to us or to any Associate in accordance with clause 16 of this Agreement; |
| | (b) your or a Credit Support Provider's continued failure to perform any obligation to us one Business Day after we have given you notice of non-performance; |
| | (c) the initiation by a third party of proceedings |

**DIVISA**
C A P I T A L

| | |
|---|---|
| | for your bankruptcy (if you are an individual) or for your winding-up or for the appointment of an administrator or receiver in respect of you or any of your assets (if you are a company) or (in both cases) if you make an arrangement or composition with your creditors or any other similar or analogous procedure is commenced in respect of you (a Bankruptcy Default); |
| | (d)  if you are an individual, your death; |
| | (e)  any representation or warranty made by you for a Credit Support Provider is or becomes untrue; |
| | (f)  Credit Support Document expires or is no longer in full force and effect before your obligations under this Agreement have been satisfied, unless we agree otherwise in writing; or |
| | (g)  you are or become unable to pay your debts as and when they fall due. |
| FATCA | the Foreign Account Tax Compliance Act (US). |
| FCA | the Financial Conduct Authority. |
| FCA Rules | the FCA Handbook of Rules and Guidance. |
| HMRC | Her Majesty's Revenue and Customs (UK). |
| Limit Order | an order to buy or sell an investment at its specified price limit or better and for a specified size. |
| Liquidity Provider | a bank or other financial institution that provides executable bid and offer prices in respect of foreign currencies on a continuous or regular basis. |
| LPOA | power of attorney, a legal document granting another person access to your account, which we have agreed to in writing. |
| Market | the rules, regulations, customs and practices from time to time of any market, multilateral trading facility, exchange, clearing house or other organisation or market involved in, or otherwise relevant to, the conclusion, execution, terms or settlement of a transaction or contract and any exercise by any such exchange, clearing house or other organisation or market of any power or authority conferred on it. |
| Margin | a deposit of funds or collateral relating to securing your obligations in accordance with clause 15.1. |



| | |
|---|---|
| Margin Call | a call for additional Margin or collateral by Divisa UK to secure your obligations in accordance with clause 15.5. |
| Platforms | electronic trading platforms, access to which we may from time to time facilitate for clients. |
| Professional Client | a professional client as defined in the FCA Rules. |
| Retail Client | a retail client as defined in the FCA Rules. |
| Risk Warning Notice | the information notice on our Website. |
| Services | the services we provide to you as set out in clause 3. |
| Website | the website at www.divisa.co.uk such other website as Divisa UK may maintain from time to time. |

1.3   **Interpretation**:

1.3.1   Section, clause and paragraph headings shall not affect the interpretation of the terms of this Agreement.

1.3.2   Unless the context otherwise requires, words in the singular shall include the plural and in the plural shall include the singular.

1.3.3   Any reference to a person shall include bodies corporate, unincorporated associations, partnerships and individuals.

1.3.4   Words and expressions used in this Agreement (unless the context otherwise requires) have the same meanings as in the FCA Rules.

1.3.5   Reference to notice or notifications shall not include written notice, unless otherwise expressed.

1.3.6   Any words following the terms including, include, in particular, for example or any similar expression shall be construed as illustrative and shall not limit the sense of the words, description, definition, phrase or term preceding those terms.

1.3.7   The Risk Notice, Order Execution Policy, Conflicts of Interest Policy and the Electronic Trading Supplement form part of this Agreement. We may add a Schedule or amend this Agreement by giving written notice to you. The Schedule or amendment shall take effect as at the date stipulated in the notice but within not less than 14 calendar days from receipt by you of the notice. If you do not wish to accept any Schedule or amendment you may



by written notice to us close any open transactions or your terminate this Agreement.

2.      **Risk Notice**

**Risk Warning:**  Investments in derivative products (including Forex) may carry a high degree of risk as further explained on our Website Risk Warning Notice Our Services will not be appropriate for you unless you are knowledgeable and experienced in the financial services market and in the types of transactions described in this Agreement. By entering into this Agreement you acknowledge and agree that you have the appropriate knowledge and experience to use our Services, that you understand the risks involved and that you have provided us with all the information necessary for us to confirm our Services are appropriate for you. If you are unsure about whether our Services are appropriate for you then you should consult an independent financial adviser.

3.      **Services**

3.1     **Execution only:**   Divisa UK may receive and transmit orders and provide execution-only brokerage services for transactions in Forex, Contracts for Difference and Precious Metals, and such other investments which we may notify to you from time to time (the "**Services**"). We may receive and transmit orders or deal as agent on your behalf (as a riskless principal, matched principal or otherwise) only for the purposes of the execution of transactions. We will not make personal recommendations or advise on the merits or suitability of purchasing, selling or otherwise dealing in particular investments or executing particular transactions, their legal, tax, accounting or other consequences or the composition of any account or any other rights or obligations attaching to such investments or transactions.   You should bear in mind that merely explaining the terms of a transaction or investment or its performance characteristics does not itself amount to advice on the merits of the investment.

3.2     **Incidental information:**   Where we do provide general trading recommendations, market commentary or other information:

    3.2.1   this is incidental to your dealing relationship with us.  It is provided solely to enable you to make your own investment decisions and does not amount to a personal recommendation or to advice;

    3.2.2   we give no representation, warranty or guarantee as to the accuracy or completeness of such information or as to the legal, tax or accountancy consequences of any transaction; and

    3.2.3   where information is in the form of a document containing a restriction on the person or category of persons for whom that document is intended or to whom it is distributed, you agree that you will not pass it on contrary to that restriction;

3.3     **Acknowledgement:**  You acknowledge and agree that you are capable of assessing the merits of and understand, and accept, the



nature and risks of transactions entered into under this Agreement and that you do not rely on advice from Divisa UK (or its Affiliates) in relation to the merits of any such transaction.

3.4 **Overseas Persons**: In the provision of the Services we may make an introduction or arrangement with a view to you dealing with an overseas person who is not authorised to carry on investment business in the United Kingdom. The investment services undertaken on your behalf (or provided to you) by such person are not covered by the rules and regulations governing the protection of investors in the United Kingdom. This means that you will not have the benefit of rights, including compensation arrangements, designed to protect investors under FCA Rules. Similar protections may, however, be provided in the jurisdiction within which the business is to be carried on.

4. **Commencement and cancellation**

4.1 **Commencement:** This Agreement supersedes any previous agreement between us on the same subject matter and takes effect when you signify your acceptance of this Agreement by signing the Application Form or signing this Agreement in the space provided.

4.2 **Cancellation**: If you are an individual acting for purposes which are outside your business, trade or profession you have a period of 14 calendar days from acceptance of this Agreement to withdraw from this Agreement without penalty and without giving any reason, except this right of withdrawal shall not apply to any transaction which is executed under this Agreement which will remain binding upon you.

5. **Applicable Regulations and Market Requirements**

5.1 **Subject to Applicable Regulations**: This Agreement and all transactions with you are subject to Applicable Regulations so that:

5.1.1 if there is any conflict between this Agreement and any Applicable Regulations, the Applicable Regulations will prevail;

5.1.2 we may take or fail to take any action we consider necessary to ensure compliance with any of the Applicable Regulations;

5.1.3 all Applicable Regulations and whatever we reasonably do or fail to do in order to comply with them will be binding on you; and

5.1.4 neither we nor any of our directors, officers, employees or agents shall be responsible if we reasonably take or fail to take any actions in order to comply with any Applicable Regulations.

5.2 **Market or Liquidity Provider action**: If a Market or Liquidity Provider (or intermediate broker or agent, acting at the direction of, or as a result of action taken by, a Market) or regulatory body takes any action which affects a transaction, then we may take any action that we reasonably consider desirable to minimise any loss which



may occur as a result of such action. Any such action that we take shall be binding on you.

6.      **Account Activation**

6.1     ***Activation preconditions*:** By law we are obliged to establish your identity before we can take you on as our client. We may, at our reasonable discretion, use various agencies to verify your details before activating your account. When you sign this Agreement, you warrant and represent that you (or anyone you appoint under a LPOA) are not a US resident or US citizen, unless otherwise notified in writing to Divisa UK. If at any time you (or anyone you appoint under a LPOA) become a US resident or citizen, you will notify Divisa UK immediately.

6.2     ***Activation*:** While reviewing your application we will need to perform an Appropriateness Assessment since you are proposing to trade a Complex Product. Once the assessment is finished and we have received the completed Application Form, a completed, signed or electronically executed copy of this Agreement and the Electronic Trading Supplement, the account will be activated.

6.3     ***Account password*:** It is your responsibility to keep the password(s) to your account(s) secure and confidential. You should not share your password details with any other party unless you have completed and returned the necessary LPOA to us. If you have told someone your password or log-in details, or you suspect that someone may know your password or log-in details, please notify us immediately by calling us on **+44.203.318.4573** or emailing us at **support@divisacapital.com**.

7.      **EMIR**

7.1     The following provisions shall apply to you if you are established in the EEA, or if you have entered into transactions that have a direct, substantial and foreseeable effect in the EEA or have conducted arrangements that are designed to avoid EMIR rules.

7.2     ***Transaction Reporting:***

        7.2.1   You expressly permit Divisa UK to report on your behalf the opening, closing and amendment of any transaction entered into between Divisa UK and you to a regulated trade repository, in accordance with the terms of EMIR.

        7.2.2   You shall not be charged for reporting. Although, you agree that Divisa UK may at any time charge you for reporting on your behalf, subject to providing you with 90 days written notice.

        7.2.3   Notwithstanding any reporting carried out by Divisa UK on your behalf, you remain solely responsible for the reporting of your transactions.

        7.2.4   You agree that Divisa UK shall not be liable for any loss or damage incurred by you as a result of a transaction reported on your behalf by Divisa UK, to the extent permitted under Applicable Law.



7.2.5   If you wish to cease having your transactions reported on your behalf you must give Divisa UK five Business Days' prior written notice to such effect. Divisa UK may cease reporting on your behalf by giving you thirty days' written notice.

7.3   **Portfolio Reconciliation:**

7.3.1   The parties agree to reconcile portfolios as required by the risk mitigation techniques stipulated under EMIR. Divisa UK shall provide you with portfolio data and general account information through the Platforms and/or a secure website.   Account information shall include transaction data, ticket numbers, rates, margin, profit and loss statements and any other information required by the FCA Rules ("**Confirmations**").   Account information shall be updated within twenty four hours of any activity on your account. You acknowledge and accept that the posting of Confirmations will be deemed delivery of trading Confirmations by Divisa UK to you. You may request receipt of the Confirmations at any time in hard copy or email by submitting a written request to info@divisacapital.com.   Such Confirmations shall be binding on you, unless subject to manifest error or unless you notify Divisa UK of your rejection of such Confirmation in accordance with the EMIR rules.

7.3.2   In accordance with clause 15, through the Platforms and/or a secure website, you can generate daily, monthly and yearly reports of your account. The provision of such information coupled with your ability to generate such reports will be deemed delivery of account statements by Divisa UK to you. You must generate an Account Statement at least once a month, to be done on the first day of each month for the preceding month and to perform data reconciliation in accordance with your portfolio reconciliation requirements under Article 13 of the Commission Delegated Regulations (EU) No 149/2013 of 19 December 2012. You may request at any time your Account Statements in hard copy or via email by submitting a written request to info@divisacapital.com.

7.4   **Dispute Resolution:**   The parties agree to use the following procedure to identify and resolve disputes between them:

7.4.1   Either party may identify a dispute be sending a dispute notice in writing ("**Dispute Notice**") to the other party. Each Dispute Notice will be effectively delivered if delivered in accordance with clause 26.

7.4.2   On or following the date that the dispute has been instigated by either party (the "**Dispute Date**"), the parties will consult in good faith in an attempt to resolve the dispute in a timely manner, including but not limited to, exchanging any relevant information and by identifying and using any agreed process which can be applied to the subject of the dispute or, where no such agreed process exists or the parties agree that such agreed process would be unsuitable, determining and applying a resolution method for the dispute.



7.4.3   With respect to any dispute that is not resolved within thirty (30) Business Days of the Dispute Date, refer issues internally to the appropriate senior members of staff of such party in addition to the actions stipulated under clause 7.4.2.

7.4.4   The parties each agree that to the extent that this resolution process applies to each party, it will have internal procedures and processes in place to record and monitor any dispute for as long as the dispute remains outstanding.

7.4.5   Nothing in this clause 7 obliges either party to deliver a Dispute Notice following the identification of any issue or discrepancy (notwithstanding that such issues or discrepancy remain unresolved) or limits the rights of the parties to service a Dispute Notice, to commence or continue an agreed process (whether or not any action under this clause 7 has occurred. Nothing in this clause 7 restricts you from instigating a complaint in accordance with clause 24.

8.   **Client Classification**

8.1   ***Classification:*** We will treat you as a Retail Client upon receiving your application submission. However, if you satisfy the definition of a Professional or Eligible Counterparty, the Company may unilaterally reclassify you as such and notify you accordingly prior to your account opening.

8.2   ***Protections: Option to elect:***  You may request at any time to be reclassified to a different class and therefore increase or decrease your level of regulation protections. We shall reasonably assess each request by you in light of your experience, expertise and knowledge and shall, at our discretion, determine the appropriate classification in accordance with such criteria.

9.   **Special Provisions for Managed Accounts and Introduced Accounts**

9.1.1   If your investments or account with us is being managed by an investment manager or you use the services of an investment adviser or you were  introduced to Divisa UK by a broker you acknowledge and agree that Divisa UK is responsible only for execution services as set out above and that we have no responsibilities, or obligations regarding any conduct, action, representation, advice, recommendation or statement of any third-party investment manager, investment adviser or broker in connection with your investment transactions with us. You understand that Divisa UK makes no warranties nor representations concerning third-party investment managers, investment advisers or brokers and that Divisa UK shall not be responsible for any loss to you occasioned by the actions of any third-party investment manager, investment adviser or broker, and that Divisa UK does not, by implication or otherwise, endorse or approve of the operating methods of any third-party



investment manager, investment adviser or broker. You further acknowledge and agree that:  (i) any third-party investment manager, investment adviser or broker acts as an independent intermediary for you; (ii) unless you have been expressly advised otherwise in writing by Divisa UK, no such person is an affiliate, employee or agent of Divisa UK; and (iii) no such person is authorised to make any representations concerning Divisa UK or the services to be provided by  Divisa UK  hereunder except as may be expressly authorised in writing by Divisa UK. In the event your account with us is managed by another person, you have delivered to Divisa UK a copy of such person's written trading authorisation in a form acceptable to Divisa UK.

9.1.2   You understand and agree that if your Divisa UK account is managed by another person that Divisa UK is authorised by you to provide your Divisa UK account information including address, phone number, and e-mail address to that person to enable them to provide on-going training, assistance, updates on services as it relates to the trading activities in your Divisa UK account.

9.1.3   You acknowledge and agree that the use of any third party trading system, course, program, research or recommendations provided, directly or indirectly, by an investment manager, investment adviser or broker will not necessarily result in profits, avoid losses or limit losses.

10.   **Instructions**

10.1   *Authority***:** Any person or agent that you have notified to us in writing is authorised by you may give us verbal or written instructions concerning any transaction or proposed transaction or any other matter.

10.2   *Reliance***:** You authorise us to rely and act on any order, instruction or communication we receive from you without further enquiry on our part as to the authenticity, genuineness, authority or identity of the person giving or claiming to give such instructions. You will be responsible for and bound by all obligations we enter into or assume on your behalf as a result of or in connection with such orders, instructions or communications.

10.3   *Platforms***:** Unless clause 10.4 applies, all instructions to enter into transactions must be given by you through the Platforms. You can only cancel instructions if we have not acted upon them.

10.4   *Assistance***:** We will make reasonable endeavours to provide you with telephone support and assistance and (unless otherwise agreed in writing) we may pass on your orders to intermediate brokers or dealers, on an execution only basis. If we agree, you may give us instructions by telephone. If any instructions are received by us by telephone, we may ask you to confirm these instructions in writing. We shall be authorised to follow such instructions even if you fail to confirm them in writing.



10.5    ***Right to refuse*:** We may decide to refuse to accept any order or instruction from you, provided that we inform you of our refusal as soon as reasonably practicable. We will endeavour to provide you with a reason for any refusal.

10.6    ***Instruction changes*:** Once given, instructions may only be withdrawn or amended with our consent, which will not be unreasonably withheld.

10.7    ***Order limits*:** You acknowledge and agree that we have the right (but no obligation) to set limits and/or parameters to control your ability to place orders. These limits and/or parameters may be amended, increased, decreased, removed or added to by us and may include (without limitation):

   10.7.1    controls over maximum order amounts and maximum order sizes;

   10.7.2    controls over our total exposure to you;

   10.7.3    controls over prices at which orders may be submitted (to include (without limitation) controls over orders which are at a price that differs greatly from the market price at the time the order is submitted to the order book);

   10.7.4    controls over the electronic services (to include (without limitation) any verification procedures to ensure that any particular order or orders has come from you); or

   10.7.5    any other limits, parameters or controls which we may be required to put in place in accordance with Applicable Regulations.

   However, in setting limits and/or parameters, we will seek to protect your interests as far as reasonably possible.

11.    **Manifest Errors**

11.1    ***Manifest error*:** From time to time it is possible that errors may occur in the pricing of contracts. Notwithstanding the rights that you have under Applicable Regulations or law, we reserve the right to void, or to amend the terms of, any transaction that we reasonably believe, at our sole discretion, to contain or be based on an obvious or palpable error (a Manifest Error). In deciding whether an error is a Manifest Error we may take into account any relevant information including, the state of the underlying market at the time of the error and any error within, or lack of clarity of, any information source or pronouncement. In deciding whether or not there has been a Manifest Error, we will make reasonable efforts to take into account any financial commitments that you have made or refrained from making in reliance on a transaction.

11.2    ***Liability limitation*:** In the absence of our fraud, wilful default or negligence, we will not be liable to you for any losses following a Manifest Error. In the event that a Manifest Error is made by any information source, commentator or official on whom we reasonably rely, we will not be liable to you, except for our fraud, wilful default or negligence, for any losses.

12.    **Execution of Orders**



12.1   **Timely execution:** We shall use all reasonable steps to execute any order promptly, but in accepting your order we do not promise that it will be possible to execute the order in accordance with your instructions. If we encounter any material difficulty relevant to the proper execution of an order we shall notify you promptly.

12.2   **OTC execution consent:** By entering into this Agreement you agree that we may execute as your agent an order outside a Market.

12.3   **Order Execution Policy consent:** We have established an order handling and execution policy to enable us to take all reasonable steps to achieve the best possible result for you. By entering into this Agreement you confirm that you have read and agree to our Order Execution Policy, which is available on our Website. If you have any questions about our Order Execution Policy, please call +44 (0)203 519 8292 or emailing us at **support@divisacapital.com** before agreeing to these terms.

12.4   **Intermediate brokers:** We may, at our reasonable discretion, arrange for any transaction to be made with or through the agency of an intermediate broker, who may be an Associate or Affiliate of ours and may not be in the United Kingdom. You will be responsible for any intermediate brokers or agents selected by you.

12.5   **Limits:** We may require you to limit the number of open positions which you have with us at any time and we may, at our reasonable discretion, close out any one or more transactions in order to ensure that such position limits are maintained.

12.6   **Aggregation of orders:** We may combine your orders with our own orders, orders of Associates and persons connected with us and orders of your agent or other clients. If your order is combined, we must reasonably believe that this is unlikely to operate to your and our other clients' disadvantage. However, on some occasions, combining orders may mean that you get a less favourable price than if your order had been executed separately.

13.   **Client Funds**

13.1   **Client money:** For Retail Clients, money held by us on your behalf will be treated as client money within the meaning of the Client Money Rules. We will, on receiving client money, promptly place this money into a segregated client account held at our custodian bank, no later than close of business on the Business Day on which we receive it. For Professional Clients or Eligible Counterparty clients, we will treat any transfer of money by you to us or held by us on your behalf as a transfer of full ownership to us for the purposes of securing or covering your present, future, actual, contingent or prospective obligations, and we will not be required to hold such clients funds in accordance with the Client Money Rules. A separate title transfer collateral arrangement agreement will be issued to you as part of the client on-boarding process regarding the treatment of such client funds.

13.2   **Transfer to intermediaries:** We may pass money received from you to a third party (e.g. a market, intermediate broker, OTC counterparty or clearing house) to hold or control in order to make a



transaction through or with that person or to satisfy your obligation to provide a deposit (such as an initial requirement that you provide margin) in respect of a transaction. Although we will remain responsible for money received from you even if we pass it to a third party, you may be exposed to the additional risk that, in the event of an insolvency or similar in relation to that third party, the amount of money received by us from the third party may not be sufficient to satisfy your claims.

13.3   **Non EEA custodians:** We may hold client funds on your behalf outside the European Economic Area (EEA). The legal and regulatory regime applying to any bank or person that holds your money outside the EEA will be different from that of the United Kingdom. As a result, should that bank or person go into insolvency or similar proceedings, your money may be treated differently than it would have been if the money was held with a bank in the United Kingdom. We will not be liable for the insolvency, acts or omissions of any third party referred to in this sub-clause.

13.4   **No interest entitlement:** To avoid doubt, we will not pay interest on any amounts in your account, unless we have agreed to do so in writing. Unless we have agreed otherwise in writing, on signing this Agreement, you consent to the fact that no interest will be paid to you on any amounts in your account and that we will retain all such interest.

13.5   **Dormant accounts:** You agree that, in the event that there has been no movement on your account balance for a period of at least six years (notwithstanding any payments or receipts of charges or similar items) and we are unable to trace you and return your account balance to you, despite having taken all reasonable steps to do so, we may cease to treat your money as client funds and accordingly release any client funds balances from the segregated account. However, if at any point after this time, you ask us to return your account balance to you; we will do so if your account balance is in credit.

## 14.   Currency

14.1   **Conversions:** We shall be entitled, without giving notice to you first, to make any currency conversions we consider reasonably necessary or desirable for the purposes of complying with our obligations or exercising our rights under this Agreement or any transaction. Any currency conversion shall be made by us in the manner and at the rates we determine to be appropriate, having due regard to the current market rates for currencies.

14.2   **Exchange risk:** Where it is necessary to make a currency conversion, you will bear all foreign currency exchange risk arising from any contract or from the compliance by us with our obligations or the exercise by us of our rights under this Agreement.

14.3   **Base Currency conversion:** If you trade in any transaction denominated in a currency other than a Base Currency, Divisa UK will automatically convert the total sum of the transaction into the Base Currency applicable to your account at the time of the transaction. The exchange rate for all types of currency conversion will be based



on the mid-market exchange rate. Exchange rates fluctuate and may change between the time that the indicative exchange rate is quoted and the time that the amounts are converted. Where applicable the confirmation of the conversion will show the exchange rate used.

15. **Confirmations and periodic statements**

15.1 ***Confirmations and statement delivery***: To the extent required under FCA Rules, we will send you a confirmation in respect of each transaction. We will send you a monthly statement (the "**Account Statement**") in respect of each of your accounts within 10 Business Days after the end of each calendar month. Such confirmations and statements may be sent electronically or we may provide you with online access to them as stored in a secure Divisa UK website account for you or on the Platforms.

15.2 ***Confirmations conclusive***: Unless we receive written notice from you within two Business Days of delivery of a confirmation to you or we notify you of an error in the confirmation, we shall be entitled to conclude that the confirmation is conclusive and accepted by you.

16. **Margin**

16.1 ***Margin arrangements***:  As a condition of entering into a transaction we may in our sole discretion require the deposit of funds or collateral acceptable to us to secure your liability to us for any losses which may be incurred in respect of a transaction ("**Initial Margin**").  Initial Margin is due and payable immediately as a condition to opening the relevant transaction and we may decline to open any transaction if you do not have sufficient available cash in your account to satisfy the Initial Margin required for that transaction at the time the relevant order is placed.  If there is an adverse movement in the price or value of a we transaction or if determine in our sole and absolute discretion that there is an increase in the risk of an adverse movement in the price or value of a transaction, we will require additional security from you in the form of cash deposits or other acceptable collateral to supplement the Initial Margin ("**Variation Margin**").

16.2 ***Changes in Margin requirements:***  Margin requirements may be set and varied without prior notice from time to time in our sole and absolute discretion in order to cover any realised or unrealised losses arising from or in connection with transactions, including subsequent variation of any Margin rates set at the time transactions are opened.

16.3 ***Form of margin:***  Margin must be provided by or on behalf of you in cash or other collateral acceptable to us as determined by us in our sole and absolute discretion.  You are obliged to maintain in your account, at all times, sufficient funds to meet all Margin requirements.  In addition, we will be entitled to treat any assets deposited by you from time to time (other than assets deposited for safe custody only) as collateral against your Margin requirements.  In all cases we will be entitled in our sole and absolute discretion to determine the value of any collateral deposited.  We are entitled to require payment of Margin of you (whether resident in the UK or in another jurisdiction) by telegraphic transfer or any other method of immediate/electronic funds transfer acceptable to us.   Only funds



received net of any bank charges, which relate to the transfer, will be credited as paid.

16.4 **_Close-out_:**  In the event that there is insufficient Margin in your account or in the event that the deposited Margin is not sufficient to meet the required Margin rates, as determined by us in accordance with clause 16.2 of this Agreement, and regardless of whether or not prior Margin Calls have been issued or not, we may in our sole discretion choose to close or terminate your transaction and/or account without notice to you immediately.  This will not constitute an Event of Default.  Without prejudice to the foregoing, any transaction entered into by you or on your behalf which results in there being insufficient Margin to cover any actual or anticipated losses or liabilities in connection with your Account will constitute an Event of Default and we may in our discretion exercise our rights in clause 18 of this Agreement, whether there has been a Margin Call or not.

16.5 **_Margin calls_:**   Divisa UK may from time to time and in its sole discretion call upon and request that you deposit additional Margin or collateral to secure your obligations.  Any Margin Call, without closing your account or liquidating your positions, shall not be deemed precedent for future Margin Calls.  Divisa UK is also not obliged to make any Margin Call of you at all or within any specific time period, and any failure or delay on their part to make any Margin Call at any time will not operate as a waiver of any of our rights or remedies under or in connection with this Agreement, whether in respect of such Margin Call or otherwise.  Divisa UK shall be deemed to have made a Margin Call on you if we have left a message requesting you to contact us, or if we are unable to leave a message and have used reasonable endeavours to contact you by telephone and or electronic means via web/e-mail.  Any message left for you requesting you to contact us should be regarded as extremely urgent.  Divisa UK shall not be liable for any losses you may suffer as a result of any failure to respond to an actual or deemed Margin Call.  Divisa UK may in its sole discretion close or terminate your transactions without notice to you immediately and decline to enter into any further transactions with you if you fail to honour any Margin Call and this shall constitute an Event of Default and it may exercise the rights in clause 18 and 19 of this  Agreement.

16.6 **_No waiver_:** Any action taken by us in connection with or pursuant to a transaction at a time at which any Event of Default has occurred (whether or not we have knowledge thereof) shall be entirely without prejudice to our rights to refuse any further performance thereafter, and shall not in any circumstances be considered as a waiver of that right or as a waiver of any other rights of it should any such Event of Default have occurred.

## 17.  **Your Warranties**

17.1 **_Representations and warranties_:** Representations and warranties are personal statements, assurances or undertakings given by you to us on which we rely when we deal with you. You make the following representations and warranties at the time you enter into this



Agreement, at the date of every transaction or any time you give us any other instruction:

17.1.1   if you are an individual, you are over 18 years old and you have full capacity to enter into this Agreement;

17.1.2   you have all necessary authority, powers, consents, licences and authorisations and have taken all necessary action to enable you lawfully to enter into and perform this Agreement and such transaction and to grant the security interests and powers referred to in this Agreement;

17.1.3   the persons entering into this Agreement and each transaction on your behalf have been duly authorised to do so;

17.1.4   this Agreement, each transaction and the obligations created under them both are binding upon you and enforceable against you in accordance with their terms (subject to applicable principles of law) and do not and will not violate the terms of any regulation, order, charge or agreement by which you are bound;

17.1.5   no Event of Default or any event which may become an Event of Default (a Potential Event of Default) has occurred and is continuing with respect to you or any Credit Support Provider;

17.1.6   you are acting on your own behalf (unless we have agreed otherwise in writing) and not as trustee in entering into this Agreement and each transaction;

17.1.7   any information which you provide or have provided to us in respect of your financial position, domicile or other matters is accurate and not misleading in any material respect;

17.1.8   you are willing and financially able to sustain a total loss of funds resulting from a transaction;

17.1.9   except as otherwise agreed by us, you are the sole beneficial owner of all Margin you transfer under this Agreement, free and clear of any security interest whatsoever other than a right to withhold or dispose of assets routinely imposed on all securities in a clearing system in which such securities may be held; and

17.1.10  you understand and accept that we assume no responsibility nor liability for any recommendations, advice, performance guarantees (or similar representations) that you may receive from any marketing agent, introducing broker, investment adviser or investment manager.

17.2   ***Your undertakings:***  You promise that:

17.2.1   you will at all times obtain and comply, and do all that is necessary to maintain in full force and effect, all



authority, powers, consents, licences and authorisations referred to in this clause;

17.2.2 you will promptly notify us of the occurrence of any Event of Default or Potential Event of Default with respect to yourself or any Credit Support Provider;

17.2.3 you will take all reasonable steps to comply with all Applicable Regulations in relation to this Agreement and any transaction, so far as they are applicable to you or us;

17.2.4 you will not send orders or take any action that could create a false impression of the demand for or value of a financial instrument, or send orders which you have reason to believe are in breach of the Applicable Regulations. You shall observe the standard of behaviour reasonably expected of persons in your position and not take any step which would cause us to fail to observe the standard of behaviour reasonably expected of persons in our position; and

17.2.5 upon demand, you will provide us with any information that we may reasonably require as evidence of your compliance with the matters referred to in this clause or any Applicable Regulations.

## 18. Rights on Event of Default

18.1 **Rights**: If an Event of Default occurs at any time then we may exercise the rights set out in this clause 18 (in addition to any other rights we have under this Agreement).

18.2 **Exercise of rights:** Upon occurrence of an Event of Default we may by notice specify a date for the termination of any or all outstanding transactions, except that the occurrence of an Event of Default of a type specified in the definition of Events of Default subparagraph (c), (d) or (g) will result in the automatic termination of all outstanding transactions.  If any or all outstanding transactions are terminated pursuant to the forgoing, we will be entitled, without prior notice to you and without limitation of any other rights or remedies we may have under this Agreement or otherwise, to take any or all of the following actions.

18.2.1 instead of returning to you assets equivalent to those credited to your account, to pay to you the fair market value of such assets at the time such termination is effective;

18.2.2 to sell or otherwise liquidate , or to cause to be sold or otherwise liquidated, any or all of your collateral (whether or not constituting Margin) in our possession or in the possession of any nominee or third party appointed under or in connection with this Agreement, in each case as we may in our sole and absolute discretion select and at such price or prices, at such time or times and in such manner as we in our sole and absolute discretion think fit (without being responsible for any diminution in price or



other loss), in order to realise funds sufficient to cover any amount due by you to us, including any and all costs related to the sale or other liquidation, which will be borne by you;

18.2.3    to treat any or all transactions then outstanding as having been repudiated by you, to close out, replace or reverse any or all such transactions, to buy, sell, borrow or lend any underlying asset, to enter into any other transaction or to take, or refrain from taking, such other action, all at such price or prices, at such time or times and in such manner as we in our sole and absolute discretion consider necessary or appropriate to cover, reduce or eliminate our actual or potential loss or liability under or related to any of your contracts, positions or commitments;

18.2.4    to make a claim under, enforce, or exercise any other right or remedy under or in connection with, any Credit Support Document; to enforce any charge, security interest or lien created or otherwise contemplated by this Agreement or to exercise our right of set-off provided in this Agreement or any other right of set-off or similar right we may have, whether as a matter of contract, under common law, or otherwise; and/or

18.2.5    to close any or all of your accounts.

18.3    **No Waiver**:  We will not lose any of our rights or remedies under or referenced in clause 18 by reason of any failure or delay on our part in exercising them, and no such failure or delay will constitute a waiver of any such right or remedy.  Under no circumstances will we be under any obligation to exercise any such right or remedy or, if we do exercise any such right or remedy, to do so at a time or in a manner that takes into account your interests or is otherwise beneficial to you.  Any action taken or not taken by us in connection with or pursuant to any transaction at any time after the occurrence of any Event of Default (whether or not we have knowledge of such event) will be entirely without prejudice to our right to take or not take any similar action or to refuse to take any further action at any time thereafter, and does not in any circumstances constitute as a waiver of that right or any other right or remedies of ours should any such Event of Default have occurred.

18.4    **Notice of Event of Default**:  You agree to give us notice of any Event of Default immediately upon becoming aware of its occurrence.

18.5    **No obligation to perform**:  Notwithstanding anything in this Agreement to the contrary, we will not be obliged to make any payment or delivery otherwise required to be made by us to you pursuant to or in connection with this Agreement or any transaction for as long as an Event of Default has occurred and is continuing.

18.6    **Additional remedies**:  Rights of Divisa UK under this clause shall be in addition to, and will not act to limit or exclude, any other rights which we may have (whether by agreement, operation of law or otherwise).



18.7   **All open transactions**:   This clause applies to each transaction entered into or remaining unsettled between Divisa UK and you on or after the date this Agreement takes effect.

18.8   **Close-out**:   Unless otherwise agreed in writing between us, or the rules of any relevant Market provide otherwise, if Divisa UK enters into any transaction with you in order to close out any existing transaction between you and Divisa UK then the parties respective obligations under both such transactions shall automatically and immediately be terminated upon entering into the second transaction, except for any settlement payment due from one of us to the other in respect of such close-out.

19.   **Default and Termination**

19.1   **Consequences of Event of Default**:   Notwithstanding clause 17 to this Agreement, if an Event of Default occurs or if we reasonably believe that you will not be able or willing in the future to perform any of your obligations to us, we shall be entitled without first giving you notice:

19.1.1   to pay you the fair market value of the investments credited to your account at the time of this payment, instead of returning to you investments equivalent to those investments;

19.1.2   to sell those of your investments that are in our possession or in the possession of any nominee or third party appointed under or in accordance with this Agreement, in each case as we may in our reasonable discretion select or and upon the terms that we reasonably think fit (without being responsible for any loss or reduction in price) in order to provide us with sufficient funds to cover any amount owed by you under this Agreement;

19.1.3   to close out, replace or reverse any transaction, buy, sell, borrow or lend or enter into any other transaction or take, or refrain from taking, any other action at any time or times and in the manner that we, at our reasonable discretion, consider necessary or appropriate to cover, reduce or remove our loss or liability under or in relation to any of your contracts, positions or commitments; and/or

19.1.4   to treat any or all transactions which have not been settled between us as having been repudiated by you, meaning that our obligations under the transaction(s) are immediately cancelled and terminated.

19.2   **Termination**:   We or you may terminate this Agreement by giving the other written notice, which will take effect immediately or after any period that is specified in the notice. However, we will give you reasonable notice of termination unless there is a valid reason not to, such as an Event of Default.

19.3   **Amount clause on termination**:   On the termination of this Agreement, all amounts payable by you to us will become



immediately due and payable, including (but without limitation) all outstanding fees, charges and commissions, any dealing expenses incurred by terminating this Agreement, and any losses and expenses resulting from the closing out of any transactions or settling or concluding outstanding obligations incurred by us on your behalf.

19.4    **Open transactions:**  Termination will be without prejudice to the completion of transactions already initiated. All transactions in progress will be executed in accordance with your instructions.

19.5    **Platform access on termination:**   Upon termination of this Agreement we will be entitled, without first giving you notice, to stop providing you with access to the Platforms.

19.6    **Accrued rights:**  The termination of this Agreement will not affect any rights which may already have arisen or obligation which may already have been incurred by either of us under this Agreement.

20.    **Charges and Taxes**

20.1    **Charges and taxes:**  You will pay our charges as agreed with you from time to time or we may deduct such charges from any funds held by us on your behalf.  We may charge a mark-up or mark-down (the difference between the price at which the counter-party takes a principal position and the transaction execution price with you).  We may alternatively agree to charge a commission or a combination of commission and mark-up or mark-down.  Where you approached us as a result of marketing by a marketing agent or your account was introduced to us by an introducing broker a portion of the charges or commissions paid by you may be given to the marketing agent or to the introducing broker (such charges shall be disclosed to you upon request).

20.2    **VAT and stamp duty liability:**  You must also pay any applicable VAT, stamp duty, stamp duty reserve tax, and any other taxes, levies or transaction costs. Please note that there is the possibility that other taxes or costs may exist that are not paid through us or imposed by us. You will at all times be fully responsible for payment of all other taxes due, for making all claims, for filing any tax returns and for providing any relevant tax authorities with information in relation to the services we carry out for you or your money and investments.

20.3    **Tax gross-up:** If you are required by law to deduct or withhold any sum for tax or other reasons, the amount owed to us will be increased, so that after you make such a tax deduction or withholding, we receive the same amount as if no such deduction or withholding had been made.

20.4    **Additional charges:** We may impose certain reasonable additional charges as set out from time to time in writing to you, which you shall have to pay in the event that you do not comply with your obligations under this Agreement. These additional charges may include, without limitation, any reasonable legal costs we may incur as a result of your failure to comply with this Agreement.  There are no additional charges payable by you by virtue of the fact that this



Agreement is entered into via email, telephone or fax or other distance means.

20.5   **Third-party expenses:** We may pass onto you certain third party charges incurred by us, including, but not limited to, credit card fees. The charges are set out on our Website. If you have any questions about these charges, please contact us at **info@divisacapital.com.**

20.6   **FATCA information:** DUK's FATCA registration can be located on the US IRS website register with the FATCA Status "Registered deemed compliant Foreign Financial Institution (Including IGA Reporting Model 1 Financial Institution) under Global Intermediary Identification Number ("**GIIN**") of "FVIV1H.99999.SL.826." For the purposes of FATCA, Divisa UK is deemed to be a "Foreign Financial Institution".

20.7   **FATCA disclosures:** As a FCA regulated financial firm, we are required to comply with the Intergovernmental Agreement between the UK and the US in relation to FATCA.

21.   **Conflicts of Interest and Material Interests**

21.1   **Material interests:** Your attention is drawn to the fact that when we deal with you or for you, we or an Affiliate or some other person connected with us may have another interest, relationship or arrangement that is material.  Without limiting the nature of such interests, examples include where we or an Affiliate could be:-

    21.1.1   dealing or quoting prices to the markets, in the investment or a related investment, as principal for our (or its) own account or that of someone else.  This could include selling to you or buying from you and also dealing with or using the services of an intermediate broker or other agent who may be an Affiliate;

    21.1.2   matching (e.g. by way of a cross) your transaction with that of another customer by acting on his behalf as well as yours; or

    21.1.3   buying from you and selling immediately to another customer, or vice versa; or

    21.1.4   in a contractual or agency relationship with marketing agents or introducing brokers who may solicit investment business from you for our benefit in consideration for commission rebate or similar remuneration payable to such agents or brokers.

21.2   **Consent to conflict:**  You accept that we and our Affiliates may have interests which conflict with your interests and may owe duties which conflict with duties which would otherwise be owed to you, and consent to our acting in any manner which we consider appropriate in such cases subject to Applicable Regulations.

21.3   **No liability to disclose or account:**  We will comply with Applicable Regulations binding on us, but we shall be under no further duty to disclose any interest to you, including any benefit, profit, commission or other remuneration made or received by reason of any transaction or any related transaction or position.



21.4    **Information barriers**:  Where necessary we maintain arrangements which restrict access by our employees to information relating to areas of our business (and that of Affiliates) with which, and the affairs of clients with whom, they are not directly concerned. Accordingly, we shall not be required to have regard to or disclose to you or make use of any information which belongs to or is confidential to another client or to us or any Affiliate, and we may be unable to advise or deal with you in relation to particular investments without disclosing the reason for this.

21.5    **Deals using a connected broker**:  Where a material connection exists between us and a connected broker, you hereby agree that you do not require us to give you notice of that.

21.6    **Conflicts policy**:  We are required to have arrangements in place to manage conflicts of interest between us and our clients and between different clients.   We operate in accordance with a conflicts of interest policy we have put in place for this purpose in which we have identified those situations in which there may be a conflict of interest, and in each case, the steps we have taken to manage that conflict.    A summary of our conflicts policy is available on the Website.

21.7    **Disclosure to you**:  We shall not be obliged to disclose to you or take into consideration any fact, matter or finding which might involve a breach of duty or confidence to any other person, or which comes to the notice of any of our directors, officers, employees or agents but does not come to the actual notice of the individual or individuals dealing with you.

21.8    **No fiduciary duties**:   The relationship between you and us is as described in this Agreement.   Neither that relationship, nor the services we provide nor any other matter, will give rise to any fiduciary or equitable duties on our part or on the part of any of our Affiliates.  As a result, we or any of our Affiliates involved in doing business with or for you may act as both broker, principal and agent and we or any of our Affiliates may do business with other clients and other investors whether for our own or such Affiliate's own account.

21.9    **Consent**:  You accept that we and our Affiliates may either (i) have interests which conflict with your interest's, or (ii) owe duties which conflict with duties which would otherwise be owed to you, and in either case (i) or (ii) you consent to our acting in any manner which we consider appropriate in such cases subject to Applicable Regulations.

22.    **Limitations of Liability**

22.1   Nothing in this Agreement shall exclude or restrict any duty or liability owed by Divisa UK to you under the Act or the FCA Rules (as may be amended or replaced from time to time). Apart from the foregoing, neither Divisa UK nor its directors, officers, employees or agents shall be liable to you or any third party for any losses, damages, costs or expenses (including direct, indirect, special, incidental, punitive, or consequential loss, loss of profits, loss of goodwill or reputation, loss data, loss of use of the Platforms, business interruption, business opportunity, costs of substitute, service or downtime costs), whether



arising out of negligence, breach of contract, misrepresentation or otherwise, incurred or suffered by you under this Agreement (including any transaction or where we have declined to enter into a proposed transaction) unless such losses arises directly from Divisa UK's respective gross negligence, wilful default or fraud.

22.2   Without limitation, we do not accept liability:

22.2.1   for any loss that you suffers in an event where any computer viruses, worms, software bombs, or similar items are introduced into your computer hardware or software via the Platforms, provided we have taken reasonable steps to prevent any such introduction;

22.2.2   any error or failure in the operation of the Platforms or any delay caused by the Platforms;

22.2.3   any failure by us to perform any of our obligations under this Agreement as a result of a cause beyond our control;

22.2.4   the acts, omissions or negligence of any intermediate broker or settlement agent;

22.2.5   for any actions we may take pursuant to its rights under this Agreement;

22.2.6   for any losses or other costs or expenses of any kind arising out of or in connection with the placement of orders by you or the execution of transactions with Divisa UK;

22.2.7   for any adverse tax implication of any transaction whatsoever;

22.2.8   by reason of any delay or change in market conditions before any particular transaction is affected; and

22.2.9   for communication failures, distortions or delays when using the Platforms.

22.3   Nothing in this Agreement shall limit Divisa UK's liability for death or personal injury resulting from its negligence.

22.4   You will pay us for any losses we may incur if you fail to perform any of your obligations under this Agreement or a transaction, or from your use of the Platform.

23.   **Personal data and recording of telephone calls**

23.1   ***Personal data***:  We may use, store or otherwise process personal information provided by you in connection with the provision of the Services.   We are registered as a data controller in the United Kingdom under the Data Protection Act 1998. If you are an individual, we are obliged to supply you, on request, with a copy of the personal data which we hold about you (if any), provided that you pay a small fee. Please be advised that by signing this Agreement, you will be consenting to the transmittal of your personal data (and/or have obtained consent from individuals working on your behalf) outside the EEA.  You agree that we may pass information about you which you have provided to other companies in our group and to external



companies to help us to process and/or analyse this information as part of the provision of Services to you.

23.2 **_Marketing_**:  With your permission, your personal data may also be used for marketing purposes or to conduct market research for us or other companies in our group, which may use the personal data to bring to your attention products and services that may be of interest to you, and also to assist in the efficient provision of the Services. We may from time to time contact you in relation to administering the Services provided to you under this Agreement or to offer you other financial services or products that you may be interested in. We may contact you by telephone, fax or other methods of communication for these purposes and you consent to this contact. Please advise us in writing if you do not wish to hear about other financial services or products.  You hereby consent to receive the communications described above and acknowledge that such communication would not be considered by you as being a breach of any of your rights under any relevant data protection and/or privacy regulations.   Our Privacy Policy is available on our website www.divisacapital.com.

24.    **Complaints and Compensation**

24.1   **_Complaints_**:  If you think that you have reason to make a complaint please e-mail compliance@divisa.co.uk or write to: Compliance, Divisa UK Limited, 14 King Street, London, United Kingdom, EC2V 8EA. Your complaint will be fully investigated and a full resolution sought. Our complaints procedure is available upon request, but we will automatically provide you with a copy if we receive a complaint from you (retail clients only).  If you are unhappy or dissatisfied with our handling or findings in relation to your dispute or complaint you may (if you are categorised as a Retail Client) refer the matter to the Financial Ombudsman Service for further investigation toll-free at 0800 023 4567 or internationally at 0300 123 9 123.  You can also write to them at the Financial Ombudsman Service, South Quay Plaza, 183 Marsh Wall, London E14 9SR.

24.2   **_Compensation_**:   We are a member of the Financial Services Compensation Scheme (the Scheme). You may be entitled to compensation from the Scheme if we cannot meet our obligations to you. This depends on the type of business and the circumstances of the claim. The Scheme is only available to certain types of claimants and claims. Payments under the Scheme in respect of investments are subject to a maximum payment to any eligible investor of 100% of the first £50,000. The amounts of compensation may be changed from time to time and you should check your entitlement with the Scheme. Further information about compensation arrangements is available from the Scheme. You can contact the Scheme by calling their Helpline on 0207 741 4100, logging onto their website at www.fscs.org.uk or writing to the Financial Services Compensation Scheme, 7th Floor, Lloyds Chambers, 1 Portsoken Street, London El 8BN. Although as a Professional Client or Eligible Counterparty you will generally not be eligible for compensation

25.    **Confidentiality**



*Confidentiality*:  The information we hold about you is confidential and will not be used for any purpose other than in connection with the provision of the Services. Information of a confidential nature will be treated as such provided that such information is not already in the public domain. Information of a confidential nature (including information relating to your transactions) will only be disclosed outside a group of companies to which we belong in the following circumstances: (i) where required by law or if requested by any regulatory authority or exchange having control or jurisdiction over us (or any respective Associate); (ii) to investigate or prevent fraud or other illegal activity; (iii) to any third party in connection with the provision of Services to you by us; (iv) to intermediate brokers or settlement agents; (v) for purposes ancillary to the provision of the Services or the administration of your account, including, without limitation, for the purposes of credit or identification enquiries or assessments; (vi) if it is in the public interest to disclose such information; or (vi) at your request or with your consent.

26.  **Notices**

26.1  **Notices**:   Any notice or other communication given under this Agreement must be in writing and may be:

    26.1.1   made by electronic means, including e-mail;

    26.1.2   delivered personally;

    26.1.3   sent by prepaid recorded delivery or registered post, or registered airmail in the case of an address for service outside the United Kingdom; or

    26.1.4   by fax with a confirmatory copy sent by post (as above), to your or our address as specified in this Agreement or to such other address, the e-mail address or fax number as either you or we may have last notified to the other, as applicable.

26.2  **Service of notices**:   Any such notice will be considered to have been served:

    26.2.1   if delivered by hand, at the time of delivery;

    26.2.2   if sent by prepaid recorded delivery or registered post, two clear Business Days after the date of posting (i.e. not including the day of posting itself);

    26.2.3   if sent by registered airmail, five clear Business Days from the date of posting (i.e. not including the day of posting itself);

    26.2.4   if sent by fax, at the completion of transmission during business hours at its destination or, if not within business hours, at the opening of the next period of business hours, but subject to:

        (a)   proof by the sender that it holds a printed transmission report confirming despatch of the transmitted notice;



(b)   the sender not receiving any telephone calls from the recipient, to be confirmed in writing, that the fax has not been received in a legible form; and

(c)   dispatch of the notice by post in accordance with clause 25.1.4 on the same day as its transmission; and

26.2.5   if sent by e-mail, one hour after sending during business hours at its destination or, if not within business hours, at the opening of the next period of business hours, but subject to no "not sent" or "not received" message being received from the relevant e-mail providers.

26.3   **E-mails**:  E-mail may be used to enable us to communicate with you. As with any other means of delivery this carries with it the risk of inadvertent misdirection or non-delivery. It is your responsibility to carry out a virus check on any attachments received. As internet communications are capable of data corruption we do not accept any responsibility for changes made to such communications after their despatch. For this reason it may be inappropriate to rely on the content of an e-mail without obtaining written confirmation of it. All risks connected with sending confidential information relating to you are borne by you and are not our responsibility. If you do not accept this risk, you should notify us in writing that e-mail is not an acceptable means of communication.

26.4   **Contact details**:  It is your responsibility to notify us immediately if any of the contact details provided by you change.

26.5   **Newsletters:** From time to time, we may decide to provide you with information by on-line newsletters, which we may post on our Website or provide to you in any other manner. We will make all reasonable efforts to ensure the accuracy and completeness of this information, but it will not amount to investment advice or recommendation and if you have any doubts as to the effect or consequences of the information for you, you should contact your independent financial adviser. We reserve the right to charge a fee for subscription to our newsletter, as detailed from time to time on our Website. If we do so, you are entitled to refuse subscription to the newsletter if you notify us in writing.

26.6   **Language of Communications**: You may communicate with us in English. All Divisa UK standard documents will be available in English. If a document is translated into another language this will be for information purposes only and the English original version will prevail in the event of any conflict or inconsistency.

27.   **General**

27.1   **Joint Accounts and/or Trust Accounts**:  If more than one natural person executes this Agreement, all such natural persons agree to be jointly and severally liable for the obligations assumed in this Agreement.  If this Agreement is executed by a trust, unincorporated association, partnership, custodian or other fiduciary, such customer agrees to indemnify, defend, save and hold free and harmless Divisa UK for any liabilities, claims, losses, damages, costs and expenses, including attorneys' fees, resulting directly or indirectly from breach



of any fiduciary or similar duty or obligation or any allegation thereof, including attorneys' fees.

27.2    **Electronic communications:**    Subject to Applicable Regulations, any communications between us using electronic signatures will be binding to the same extent as if they were in writing.  By signing the this  Agreement  you  give  your  consent  to  the  receipt  of communications by electronic means, notwithstanding that certain communications would otherwise be required to be made using a durable medium under Applicable Regulations.  Without limiting the generality of the foregoing, orders placed or other instructions given by  electronic  means  will  constitute  evidence  of  such  orders  or instructions.  If you no longer wish to communicate in this way, you must revoke your consent in writing in accordance with clause 26.1. If you do not wish to communicate via electronic means at all, you must inform us of your wishes prior to you signing this Agreement.

27.3    **Change of address:**  You agree to immediately notify us in writing of  any  change  of  your  address  or  other  contact  details,  such notification to be given in accordance with clause 0.

27.4    **Third party rights:**  A person who is not a party to this Agreement has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any terms of this Customer Agreement.

27.5    **Assignment:**  This Agreement is for the benefit of and binding upon both of us and our respective successors and permitted assigns.  You may not and will not assign, charge or otherwise transfer, or purport to assign, charge or otherwise transfer, this Agreement, any rights or obligations hereunder or any interest herein (including any indirect, beneficial,  synthetic  or  economic  interest),  in  each  case  without Divisa UK's prior written consent (which may be withheld or delayed in the sole and absolute discretion of Divisa UK), and any attempted or  purported  assignment,  charge  or  transfer  in  violation  of  this sentence will be void.  No assignment, charge or transfer by you will relieve you of any of your obligations or liabilities hereunder.  We may transfer this Agreement or any rights or obligations hereunder to any of our Affiliates or to any third party which acquires the business of Divisa UK, without your consent.

27.6    **Rights and remedies:**    The rights and remedies provided or referenced in this Agreement are cumulative and not exclusive of any other  rights  or  remedies  we  may  have,  whether  as  a  matter  of contract,  under  common  law,  or  otherwise.    We  will  be  under  no obligation to exercise any right or remedy at all or in a manner or at a time or in a manner that takes into account your interests or is otherwise beneficial to you.  No failure or delay by us in exercising any  of  our  rights  or  remedies  under  or  in  connection  with  this Agreement or any transaction will operate as a waiver of those or any other rights or remedies.  No single or partial exercise of a right or remedy will prevent further exercise of that right or remedy or the exercise of another right or remedy.

27.7    **Recording  of  calls:**    We  may  record  telephone  conversations between us without use of a warning tone, including for the purpose of  ensuring  that  the  material  terms  of  each  Transaction  and  any



other material information rare promptly and accurately recorded. Such records will be our sole property and accepted by you as evidence of orders placed or other instructions given.

27.8 **_Our records_:**  Our records will be evidence of your dealings with us in connection with our services.  You will not object to the admission of our records as evidence in any proceeding because such records are not originals, are not in writing or are documents produced by a computer.  You will not rely on us to comply with any of your record keeping obligations, notwithstanding the fact that records may be made available to you on request in our sole and absolute discretion.

27.9 **_Your records_:**  You agree to keep adequate records in accordance with Applicable Regulations to demonstrate the nature of orders submitted and the time at which such Orders are submitted.

27.10 **_Co-operation for proceedings_:**  You agree to co-operate with us to the full extent possible in the defence or prosecution of any legal or regulatory proceedings.

27.11 **_No waiver:_** The granting by you or us of any time or concession in respect of any breach of this Agreement by the other will not be considered to be a waiver of that breach.

27.12 **_Entire agreement:_** This Agreement comprises the entire agreement between the parties relating to the subject matter hereof and each of the parties acknowledges that it has not entered into this Agreement relying on any representation, statement or agreement, whether oral or in writing, other than those expressly incorporated in this Agreement.

27.13 **_Set-off rights:_** in addition to any other right to withhold payment, we may at any time and without notice to you, set off any amounts owing between you and us. If we exercise the right of set-off and it shows that the amounts due to us exceed the amounts due to you, we will give you notice of this and you shall immediately pay such excess to us.

27.14 **_Partial invalidity:_** If, at any time, any provision of this Agreement is or becomes invalid or unenforceable in any respect, under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected.

28.   **Governing Law and Jurisdiction**

This Agreement, and any other obligations connected with this Agreement, are governed by and construed in accordance with English law and you and we submit to the exclusive jurisdiction of the English courts.



## ELECTRONIC TRADING SUPPLEMENT

These supplemental terms should be read in conjunction with Divisa UK's General Terms and Conditions. This Supplement sets out the terms and conditions under which Divisa UK agrees to operate the Electronic Trading Service.

1. **Divisa UK Limited ("Divisa UK") is:** the provider of foreign exchange direct access online with integrated trading platforms and solutions for traders and institutional investors. Divisa UK Limited is authorised and regulated by the Financial Conduct Authority.

2. **The Electronic Trading Service is:** the means by which Divisa UK receives orders from the Client for execution

3. **This Supplement is effective as of**: the date of the Client Agreement and will remain effective until terminated by either party at any time, with or without cause, upon written notice to the other party

4. **Use of the Electronic Trading Service:** Divisa UK is providing the Electronic Trading Service to the Client for its own personal use and only for the purposes and subject to the terms of this Supplement and the Client Agreement. You may not sell, lease, or provide, directly or indirectly, the Electronic Trading Services or any portion of the Electronic Trading Services to any third party except as permitted by this Supplement and the Client Agreement.

4.1 The Client agrees to operate the Electronic Trading Service with all due skill, care and diligence. The Client confirms that it has implemented, and shall at all times comply with, all controls relating to access over order entry and security of the Electronic Trading Service required by Divisa UK.

4.2 The Client may access the Electronic Trading Service via a password. The Client acknowledges that it is solely responsible for ensuring that the password details are kept secure and confidential.

4.3 In the event that Divisa UK suspects, discovers or has been notified that any password has been disclosed to a third party Divisa UK will suspend the account immediately.

4.4 You acknowledge the inherent risk that communications by electronic means:

4.4.1 May not reach their intended destination or may do so much later than intended for reasons outside our control; and

4.4.2 May not be secure and may be intercepted or accessed by unauthorised or unintended parties.

4.4.3 You agree that we do not take any responsibility for communications transmitted over the internet

4.5 The Client acknowledges that in the event the Electronic Trading Service is not available it has alternative arrangements, as set out in the Client Agreement, for the transmission and execution of orders, instructions, and communications. The Client further acknowledges that Divisa UK reserves the right to alter the Electronic Trading



Service in any way at any time. Any such alterations will be in Divisa UK's absolute discretion.

5.   **Orders and Transactions:** The Client acknowledges that Divisa UK is not under any obligation to accept, or to execute or cancel, all or any part of an Order that the Client seeks to execute or cancel through the Electronic Trading Service. Divisa UK shall not be responsible for any Orders that are inaccurate or not received by Divisa UK, and may execute any orders on the terms actually received by Divisa UK.

5.1   The Client acknowledges that, in the event Divisa UK receives an Order from the Client outside of the relevant Exchange's opening hours (or with insufficient time to execute it prior to close of business on the relevant exchange, Divisa UK will deal with such an Order as soon as reasonably practicable when the relevant Exchange is next open for business and accordingly there is no guarantee that the Client will obtain the opening market price of the relevant instrument. The Client acknowledges and accepts that the volatility in price movements and the spread between buying and selling prices may be greater when the relevant exchange first opens that at other times of the day

5.2   The Client acknowledges that Divisa UK may partially execute an Order if it is not able, for any reason whatsoever; to execute such Order in full unless the Client informs Divisa UK at the time the order is placed that it will only accept execution in full.

5.3   Divisa UK shall provide the Client with an electronic confirmation, in accordance with the Client Agreement, of the execution of each Order executed through the Electronic Trading Service.

5.4   The Client acknowledges that where an Order is placed through a third party service provider, any acknowledgement of receipt of such Order received by the Client from such third party service provider is not binding on Divisa UK and shall not indicate that such order has been accepted for execution by Divisa UK. Divisa UK shall not be responsible for any losses, damages, or costs that may result from errors made by any third party service provider in delivering such Order to Divisa UK.

5.5   The Client agrees that in the event that a Confirmation is expected but not received by the Client in relation to any Order, the Client shall telephone Divisa UK to enquire about the lack of information as soon as reasonably practicable but in any event within 24 hours after the Order was placed before taking any further action, including without limitation re-entering the Order.

6.   **Cancellation:** The Client acknowledges that it shall be liable for any order which arises in circumstances where it is not possible (for any reason whatsoever) to withdraw or cancel the related Order.

6.1   On receipt of an instruction from the Client to cancel an Order, Divisa UK shall use its reasonable endeavours to cancel such Order (although Divisa UK will not be responsible and accordingly shall have no liability for ensuring that such an Order is cancelled) provided that such Order has not been executed in whole or part.



6.2     The Client acknowledges that it shall be liable for any Order which arises in circumstances where it is not possible (for any reason) to withdraw or cancel the related Order, without prejudice to the generality of the foregoing, in the event that the Client instructs Divisa UK to cancel an order which Divisa UK has partially executed by the time such cancellation instruction is received, the Client shall be bound in respect of the partially executed Order.

7.      **Intellectual Property:**

7.1     The Client acknowledges that all proprietary rights in the Electronic Trading Services are owned by Divisa UK, or by any applicable third party services providers selected by Divisa UK, providing Divisa UK with all or part of the Electronic Trading Services, or providing the Client with access to the Electronic Trading Services, or their respective licensors, and are protected under copyright, patent, trademark and other intellectual property laws and other applicable law.

7.2     Any publicly registered Internet Protocol address(s) (**IP Addresses**) assigned to the Client by Divisa UK in connection with the Electronic Trading Service shall be used solely in connection with the Electronic Trading Service. In the event that the Electronic Trading Service is discontinued for any reason or this Supplement is terminated, the client shall have no further right to use the IP Addresses.

8.      **Representations and Warranties:**

8.1     The Client warrants and represents that it will at all times comply with all applicable laws and regulations of the United Kingdom or any part thereof and with all applicable laws, rules and regulations including those of any relevant exchange, trading system, the Financial Conduct Authority and any other applicable regulator, Exchange, trading system or clearing house and all requirements imposed pursuant to such laws, rules or regulations (Applicable Regulations) and with any requirements that may be imposed from time to time by Divisa UK with respect to the Account for the purpose of ensuring or monitoring compliance with the Client Limit (Applicable Requirements).

8.2     The Client warrants and represents that neither the Client nor any Authorised User shall reverse engineer, decompile, or disassemble any material owned by Divisa UK (including, without limitation, any software used by Divisa UK for the provision of the Electronic Trading Service), or to create derivative works of it.

8.3     Divisa UK does not guarantee and makes no express or implied representation or warranty concerning the Electronic Trading Service (or any part thereof), including without limitation the accuracy, security or integrity of any information or data transmitted, transmission capabilities, trade execution, communication or any other features whatsoever of the Electronic Trading Service. This Clause shall not be affected by termination of this Supplement.

8.4     Divisa UK may, at its discretion and without further notice to the Client, give the police or any regulatory or investigatory authority any information Divisa UK reasonably believes to be relevant about the loss, theft or misuse of the Access Method or the unauthorised use of



the Electronic Trading Service. The Client authorises Divisa UK to take all such steps as Divisa UK may in its discretion consider necessary or appropriate for Divisa UK to take to comply with Applicable Regulations and Applicable Requirements.

9.    **Customer Liability:**

9.1    The Client hereby accepts responsibility for and liability to Divisa UK with respect to:

    9.1.1    all instructions, communications and Orders given or made using the Electronic Trading Service and

    9.1.2    taking all reasonable steps to ensure that no computer viruses, worms, software bombs or similar items are introduced into the System or Software the Client uses to access the Electronic Trading Service

9.2    The Client agrees to indemnify and hold Divisa UK (and its affiliates, employees, officers, directors or agents) harmless from and against any and all losses, liabilities, damages, demands, claims, expenses and costs (including legal fees, interest, penalties, Value Added Tax or similar taxes) suffered by Divisa UK (or any of its affiliates, employees, officers, directors or agents) directly or indirectly resulting from or relating to:

    9.2.1    any breach by the Client or an Authorised User of the Client's or Authorised User's duties or obligations under this Supplement;

    9.2.2    the failure or alleged failure of the Client or Authorised User to comply with Applicable Rules; or

    9.2.3    any negligence, wilful default or fraud of the Client or Authorised User. This indemnity shall survive termination of this Supplement.

10.    **Limitation of Liability:** Subject to Divisa UK's statutory and regulatory duties and liabilities from time to time, in the absence of fraud, negligence or wilful default, Divisa UK and its Associates, employees, officers, directors or agents shall not under any circumstances be liable to the Client or Authorised User (or, if applicable, any third party, in the event that a claim is made by such party) in respect of any loss of whatever nature sustained or incurred by the Client or Authorised User (or any third party), arising out of or in connection with the use of the Electronic Trading Service by the Client or Authorised User.

11.    **Suspension, Termination and Consequences of Termination:** Divisa UK has the right to suspend or terminate (at any time, with or without cause or prior notice) all or any part of the Electronic Trading Service, or access to the Electronic Trading Service, or access to the Electronic Trading Service.

11.1    The Client acknowledges that in the event that the Client Agreement is terminated for any reason whatsoever, this Supplement shall be deemed to terminate at the same time. Termination shall be without prejudice to the accrued rights of the parties as at the date of such termination.



11.2    If the Client uses, or attempts to use, the Electronic Trading Service for any purpose other than its intended purpose (including without limitation by tampering, hacking, modifying or otherwise corrupting the security or functionality of the Electronic Trading Service), the Client may be subject to civil and criminal liability.

12.    **General Provisions:** This Supplement shall be governed by, and construed in all respects in accordance with the laws of England and Wales and shall be subject to the non-exclusive jurisdiction of the Courts of England and Wales

**This Electronic Trading Supplement forms part of our Agreement, upon which we intend to rely. For your own benefit and protection, you should read this Supplement carefully before accepting. If you do not understand any point, please ask for further information or seek independent legal or financial advice.**



**Agreement Execution and Signature Page**

**I CONFIRM THAT I HAVE READ THE FOLLOWING POLICIES/DOCUMENTS AND AGREE TO THEIR TERMS.**

      ☒   Order Execution Policy
      ☒   Conflicts of interest policy
      ☒   Risk Disclosure
      ☒   Electronic Trading Supplement (*enclosed herein*)
      ☒   The Privacy Policy and Marketing terms

**I HAVE READ THIS GENERAL TERMS & CONDITIONS AND AGREE TO ITS TERMS:**

Client Authorised Signature: **X** _____

Full Name (*authorised individual*): Michael Stewart

Authorised Position: General Manager / Director

Date: June 12, 2017

---

Divisa UK Ltd Authorised Signature: **X** _____

Full Name (*authorised individual*): IAN TESSLER

Authorised Position: HEAD OF COMPLIANCE

Date: 3|8|2017