**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 19-cv-02594-RPM

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

MEDIATRIX CAPITAL INC., BLUE ISLE MARKETS INC. (St. Vincent & the Grenadines), BLUE ISLE MARKETS LTD., MICHAEL S. YOUNG, MICHAEL S. STEWART, and BRYANT E. SEWALL,

     Defendants,

and

MEDIATRIX CAPITAL FUND LTD., ISLAND TECHNOLOGIES LLC, VICTORIA M. STEWART, MARIA C. YOUNG, HANNA OHONKOVA SEWALL, MICHAEL C. BAKER, WALTER C. YOUNG III, ARUAL LP, WEST BEACH LLC, SALVE REGINA TRUST, TF ALLIANCE, LLC, CASA CONEJO LLC, HASE HAUS, LLC, DCC ISLANDS FOUNDATION, KEYSTONE BUSINESS TRUST, WEINZEL, LLC, THE 1989 FOUNDATION, MEDIATRIX CAPITAL PR LLC, MEDIATRIX CAPITAL, LLC, and BLUE ISLE MARKETS INC. (Cayman Islands),

     Relief Defendants.

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION TO DISMISS THE COMPLAINT**
**PURSUANT TO FRCP 12(b)(1)**

---

Drohan Lee LLP
Vivian R. Drohan
680 Fifth Avenue
New York, NY 10019
Telephone: 202-710-0000
E-Mail: vdrohan@dlkny.com

*Attorneys for Defendants Mediatrix Capital Inc., Blue Isle Markets Inc. (St. Vincent & the Grenadines), Blue Isle Markets Ltd., Michael S. Young, Michael S. Stewart, and Bryant E. Sewall.*

## Table of Contents

INTRODUCTION AND PROCEDURAL BACKGROUND ............................................................ 1

ARGUMENT ................................................................................................................................. 7

I.  LACK OF JURISDICTON .................................................................................................... 7

    a.  FRCP 12(b)(1) Standard for Motion to Dismiss ............................................................. 7

    b.  The SEC Lacks Jurisdiction Over the Activities of Defendants ...................................... 8

    A.  The Provision of Investment Advice Related to Separate OTC Metals and Currency
    Accounts by Mediatrix did Not Create or Involve a "Security" as Defined by the Securities
    Act, the Exchange Act and/or the Advisers Act........................................................... 9

II. SHOULD THIS COURT DENY THE MOTION TO DISMISS FOR LACK OF
    JURISDICTION IN FULL OR IN PART, A STAY OF THIS ACTION AND/OR
    DISCOVERY IS APPROPRIATE .................................................................................. 18

    a.  Legal Standard ............................................................................................................. 18

        1.  The Criminal Ivestigation and Civil Proceedings Involve the Same Subject Matter. ... 19

        2.  Although not Indicted the Defendant's Fifth Amendment Rights Will Need to be
        Invoked During Discovery. ........................................................................................ 20

        3.  A Stay Will Not Prejudice Plaintiff's Rights. ............................................................. 20

        4.  Plaintiff Will Suffer Substantial Prejudice Without a Stay........................................... 20

        5.  The Court's Interests Strongly Favor a Stay. .............................................................. 21

        6.  The Criminal Proceedings Protect the Public's Interests. ............................................ 21

    CONCLUSION .......................................................................................................................... 21

TABLE OF AUTHORITIES

Cases

*Basso v. Utah Power & Light Co.*, 495 F.2d 906 (10th Cir. 1974) ................................. 8

*Baxter v. Palmigiano*, 425 U.S. 308, 317-19, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976)) ............ 18

*Benson White & Co.*, 1995 SEC No-Act. LEXIS 553 ................................................. 14

*Berman and Bache, Halsey, Stuart, Shields, Inc.*, 467 F.Supp. 311 (S.D. Ohio 1979) ............... 14

*Cady v. A.G. Edwards & Sons, Inc.* 648 F Supp 621 (DC Utah 1986)........................................ 17

*Cmty. of Cambridge Envtl. Health & Cmty. Dev. Group. v. City of Cambridge,* 115 F. Supp.2d
    550 (D. Md. 2000)................................................................................ 8

*Continental Marketing Corp. v. Securities & Exchange Com'n.*, 387 F.2d 466 (10th Cir. 1967) 11

*DeAtley v. Allard,* 2014 U.S. Dist. LEXIS 41037 (USDC 2014) ................................. 18

*Dominguez v. Hartford Fin. Servs. Group, Inc.,* 530 F. Supp. 2d 902, 906 (S.D. Tex. 2008) ..... 19

*E.F. Hutton & Co.*, 847 F.2d 673 (11th Cir. 1988)............................................... 17

*Fairfax Countywide Citizens Ass'n v. Fairfax County, Va.,* 571 F.2d 1299, 1303 (4th Cir. 1978) 8

*Gaudette v. Panos*, 644 F. Supp. 826, 834 (D. Mass. 1986)........................................ 14

*Gilbert v. Nixon*, 429 F.2d 348 (10th Cir. 1970)................................................ 11

*Hirk v. Agri-Research*, 561 F.2d 96 (7th Cir. 1977) ................................................ 11

*Holtzman v. Proctor, Cook & Co.*, 528 F. Supp. 9 (D. Mass. 1982) ........................... 11

*In re CFS-Related Sec. Fraud*, 256 F. Supp. 2d 1227, 1236-37 (N.D. Okla. 2003).................... 19

*International Asset Management, Inc.*, 1990 SEC No-Act. LEXIS 294, at *2 (Jan. 29, 1990) ... 14

*Long v. Shultz Cattle Co.*, 896 F.2d 85 (5th Cir. 1990) .......................................... 14

*Madsen v. United States ex rel. U.S. Army, Corps of Eng'rs*, 841 F.2d 1011, 1012 (10th Cir.
    1987)........................................................................................... 7

*Maine Bank v. Weaver*, 455 U.S. 551, 560 (1982) ............................................. 16

*Mechigian v. Art Capital Corp.*, 612 F. Supp. 1421 (2nd Circuit 1985) ...................... 14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353 (1982)............................ 17

*Meyer v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 686 F.2d 818 (9th Cir. 1982).... 11

*Mid-America's Process Serv. v. Ellison*, 767 F.2d 684, 687 (10th Cir. 1985) ........................ 18

*Milnarik v. M-S Commodities, Inc.* 457 F2d 274 (7th Cir. 1972)................................... 12

*Morgan Keegan & Co.*, 1990 SEC No-Act. LEXIS 1168 .......................................... 14

*Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994) .................................... 14

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir.
    1991).......................................................................................... 8

*S.E.C. v. Trujillo,* 2010 WL 2232388, at *2 (D. Colo. June 1, 2010)........................... 19

*Salcer v. Merrill Lynch, Pierce, Fenner and Smith Inc.*, 682 F.2d 459 (1982) ...................... 11

*Schofield v. First Commodity Corp.*, 638 F. Supp. 4 (USDC Mass 1985) .................... 14

*Schofield v. First Commodity Corp.*, 638 F. Supp. 4, 7 (D. Mass. 1985), aft'd, 793 F.2d 8 (1st
    Cir. 1986) ..................................................................................... 15

*SEC v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974) ...................... 13

*SEC v. Dresser Industries Inc.*, 628 F.2d 1368, 1375, 202 U.S. App. D.C. 345 (D.C. Cir. 1980)18

*SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 n.7 (9th Cir. 1973)............................ 15

*SEC v. Goldfield Deep Mines*, 758 F.2d 459, 463 (9th Cir. 1985) ............................................. 15

*SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991) ................................. 15

*SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946) ........................................................................ 10

*See Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216 (6th Cir. 1980)......... 14

*See Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995)................................................. 8

*Sennett v. Oppenheimer & Co.*, 502 F. Supp. 939, 945 (N.D. M. 1980) ..................................... 14

*Shotto v. Laub*, 635 F. Supp. 835, 839 (D. Md. 1986)................................................................ 15

*Trustees of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.* 886 F.
    Supp. 1134, 1140 (S.D.N.Y. 1995) ..................................................................................... 20

*Tso v. Murray*, 2017 U.S. Dist LEXIS 218 663, 2017 WL 8787045 (DC Col 2017) ................... 7

*United States v. Kordel*, 397 U.S. 1, 12 n.27 (1970) ................................................................. 18

*Vincent v. L Moench*, 473 F.2d 430 (10th Cir. 1973) ................................................................ 11

*Wall Street Preferred Money Managers, Inc.*, 1992 SEC No-Act. LEXIS 648, at *2 (Apr. 10,
    1992)................................................................................................................................. 14

*Wasnowic v. Chicago Board of Trade*,  352 F Supp 1066 (DC Penn 1972) ............................... 12

*West America Co.*, 1991 SEC No-Act. LEXIS 1321 ................................................................ 14

*Zuppardo v. Serv. Cab Co.,* 2017 U.S.  Dist LEXIS 31126, 2017 WL 877318 ( ED LA 2017).. 19

**Statutes**

15 U.S. Code § 77b(a)(1) ........................................................................................................ 9

15 U.S. Code § 78c(a)(10) ..................................................................................................... 10

15 U.S.C. § 77e(a)................................................................................................................... 1

15 U.S.C. §§ 80b-6(1).............................................................................................................. 2

17 C.F.R. § 240.10b-5.............................................................................................................. 2

7 U.S.C. § 2(a)(1)(A) ............................................................................................................. 16

Federal Rule of Civil Procedure 12(b)(1) ................................................................................. 1

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat. 1651, 2189-2204
    (2008) ............................................................................................................................... 17

U.S. Securities Act of 1933...................................................................................................... 1

**Other Authorities**

MCBRIDE JOHNSON & THOMAS LEE HAZEN, COMMODITIES REGULATION § 4.41, at
    282-83 (2d ed. 1989) ......................................................................................................... 16

SEC No-Act. 90-340-CC ........................................................................................................ 18

SEC No-Act. 90-436-CC ........................................................................................................ 18

Steve Thel and Harvey E. Bines, Investment Management Arrangements and the Federal
    Securities Laws, 58 Ohio St. L. J. 459 (1997-1998) ............................................................ 13

INTRODUCTION AND PROCEDURAL BACKGROUND

Defendants Mediatrix Capital Inc. ("Mediatrix"), Blue Isle Markets Inc, Blue Isle Markets Ltd. (taken together or individually, "Blue Isle"), Michael S. Young ("Young"), Michael S. Stewart ("Stewart"), Bryant E. Sewall ("Sewall"), by and through undersigned counsel, respectfully submit this Memorandum of Law in support of their motion to dismiss the Complaint filed by the United States Securities and Exchange Commission (the "SEC") (the "Complaint") for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) those claims asserted against them which fall outside the scope of the SEC's jurisdiction. Defendants submit that the U.S. federal securities laws cited by Plaintiff do not encompass Defendants' conduct as alleged in the Complaint. Nearly all of Defendants' activities as alleged neither constituted nor involved the offer or sale of "securities" nor "advice related to 'securities'" as defined in the relevant federal statutes.

Plaintiff filed this emergency action under seal on September 12, 2019, alleging that Defendants operated a fraudulent currency and precious metals trading program. At the same time, Plaintiff filed an emergency motion for an *ex parte* asset freeze, a temporary restraining order, expedited discovery, and other emergency relief, which this Court granted. On October 23, 2019 the Court "So Ordered" the Stipulation between the parties permitting the asset freeze and agreeing to a preliminary injunction.  Defendants reserved the right to move for dismissal on subject matter jurisdiction as to certain claims.  Dkt #34 and 38.

The Complaint alleges that Defendants violated Sections 5(a) and (c) and Section 17(a) of the U.S. Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77e(a) and (c) and §77q(a)], as well as Section 10(b) of the U.S. Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C.

1

§ 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5]. The Complaint alleges that Mediatrix, Young, Stewart, and Sewall also violated Sections 206(1), 206(2), and 206(4) of the U.S. Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], and, in the alternative, Defendants Young, Stewart, and Sewall aided and abetted Mediatrix's violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

The allegations as pled center around two categories of conduct: (i) investment advisory services provided by Mediatrix to its clients and (ii) the offer and sale of shares of Mediatrix Capital Fund Ltd. (the "Fund").  According to the Complaint, $3.5 million was raised by the Fund (Dkt #1 page 9, Par. 19), but the remaining allegations relate to the balance of the $125 million in separate managed accounts over which Mediatrix acted as advisor under trading power (the "Separate Accounts"). (Dkt #1 page 15, Par. 49). The Separate Accounts transacted exclusively in foreign currency and precious metals.  See Dkt#1, page 14, Par. 43, Dkt #1 page 20, Par. 72, Dkt #1 Ex. 24.   In addition to the civil action, a criminal investigation has been opened and FBI Agents have sought to interview employees of Mediatrix and Blue Isle as well as the individual defendant, Michael Stewart.

Plaintiff makes several arguments attempting to classify this overwhelming bulk (97.2 percent) of Defendants' alleged conduct as relating to "securities." These include efforts, regardless of the underlying assets upon which Mediatrix advised, to variously categorize the Separate Accounts themselves as "securities," or the "pooling" of investor funds at Blue Isle and/or with Blue Isle's third-party prime brokers, as a "security." See Dkt #1 page 14, Par. 47.  However, these conclusions of law are not supported by the facts as pled, nor the Complaint's exhibits.  It is

undisputed that each and all of the Separate Accounts transacted exclusively in over-the-counter

("OTC") bilateral contracts for the purchase or sale of foreign currency and physical precious

metals settleable by spot delivery.  See Dkt #1 page 32, Par. 116 (b).  No Separate Account at any

time contained, nor did the Separate Accounts at any time transact in, any asset or contract

classifiable as a security under the Acts. Additionally, the Separate Accounts were maintained and

managed outside of the U.S.  The majority of clients were non-U.S. persons, with respect to whom

the alleged conduct neither took place within, nor had any effect upon, the U.S.

The transactional fees referred to in Dkt #1, Ex. 10 ("Limited Power of Attorney," or

"LPA") were calculated and accrued daily by Blue Isle's principal prime broker, Equiti Capital

UK Limited, UK Financial Conduct Authority reference no. 528328 (together its affiliates,

"Equiti," formerly known as Divisa Capital).  Equiti calculated these fees (the "Mark-ups") based

solely on trading volume, pursuant to the terms of the LPA which had been individually executed

by each Separate Account client who "further ratifies and confirms that he/she has agreed to pay

the following fees and commission to the Account Manager from the Account."  Dkt #1, Ex. 10,

page 3.

Whether or not the language of the LPA or other documentation might be construed to

render the Mark-ups subject to performance as Plaintiff would argue does not need to be decided

for the purposes of this motion. The Complaint and exhibits leave no doubt that the fees were in

fact calculated solely with reference to transactional volume, reported to the clients and paid to

Defendants by Equiti.  See Exhibit A, screen shots from the Equiti web portal detailing calculation

of the Mark-ups based exclusively on trade volume through September 19, 2019 (approximately

$45 million in aggregate).  See also Exhibit B, emails between Equiti and Defendant Michael

Stewart related to correction of an error in Equiti's Mark-up calculations.[1] This exhibit makes it plain that the Mark-Ups were in fact based solely and directly upon the volume of trading, and not on performance or net assets.

Plaintiff alleges that trade orders placed by Mediatrix with Equiti to hedge and/or cover separate Account exposures were often entered and allocated in an "undifferentiated fashion without respect to the ownership of those funds of the strategy of any particular investor." Dkt #1 page 20, Par. 73. But Plaintiff's own exhibits demonstrate that each of the Separate Accounts was titled in an individual client's name, and each client's profits and losses were calculated and accounted for separately. Dkt #1 Ex. 24. The specific trades (and, accordingly, the profits and losses) in each Separate Account varied from those in other Separate Accounts on the basis of several factors, including timing of deposits and withdrawals by the client, mix of currency and metals trades in which the client elected to participate, the client's desired base currency, and the client's desired use of leverage. See Deposition Transcript, Dkt #1, Ex. 1, pp. 145-147. See also Exhibit C, consisting of 14 separate executed Managed Account Asset Allocation forms. These forms were a part of the client documentation package executed by Mediatrix Separate Account clients, which appear to be lacking in the Complaint exhibits (see Exhibit D: complete and fully executed Separate Account documentation package, containing the Managed Account Asset Allocation form). The Managed Account Asset Allocation Forms permitted each individual client to select the mix and relative ratios of assets and algorithmic strategies to be traded in its account, consisting of such alternatives as "30-Pair Currency System," "Precious Metals and Currency

---

[1] The Exhibit B email chain supports that Mark-Up amounts were disclosed to Mediatrix Separate Account clients by Defendants as well as directly by Equiti. Equiti's offers its apology (intended for a Separate Account client) for its error in Mark-Up calculation. *Id.*

System," "4-Pair Currency System," "Silver System," and "Gold System." Exhibit C. Advisory clients could further customize the basis of their account's management by special instruction.  See handwritten notation, Exhibit C, page 16. This included specific instruction as to the risk (leverage/margin) levels each client desired to apply to its Separate Account.  See Dkt #1, Ex. 10, page 2, disclosure citing that the client is "responsible for discussing their risk capital and risk appetite with Account Manager" prior to opening the Separate Account.  See also Exhibit E, email exchange of July 17, 2017 between Defendant Michael Young and a Mediatrix Separate Account client, discussing the client's asset and strategy preferences as well as his desired level of leverage (risk).  These exhibits demonstrate that before opening a Separate Account, Mediatrix personnel discussed with the prospective client its individual objectives and risk tolerances. They also demonstrate that the trading and performance of each Separate Account were not a mere pro rata interest in a central pool of risk but differed based on client preferences.

Each Separate Account was opened and funded directly by the advisory client in its own name at Blue Isle, a separately organized OTC currency and metal's brokerage firm (see Blue Isle Customer Agreement, Exhibit F).  Blue Isle credited its books with a separate liability to each customer, then forwarded the amount to Blue Isle's hedging account at Equiti. Contrary to Plaintiff's allegations (Dkt #1, pages 18-19, Pars. 66-70, *inter alia*),[2] all Blue Isle customer deposits were immediately reflected on the Metatrader4 ("MT4") account management and

---

[2] Among other misstatements, the Complaint alleges that the Separate Accounts were "not so-called 'omnibus' accounts whereby brokerage firms maintain an aggregate account for an institutional customer, with subaccount designations denoting the funds of numerous of the institutional customer's underlying clients," and that Equiti did not "maintain any information regarding the individual investors… ." Dkt #1, page 18-19, par. 66. These statements are contradicted not only by Exhibits H through J, but see also Exhibit L, emails directly between Equiti and a prospective Separate Account client referencing "the existing Omnibus account that Mediatrix/Blue Isle have with Divisa [Equiti]." Exhibit L, page 3.

reporting platform provided and operated by Equiti, separately referencing each customer from whom the deposit originated by name and other identifying information.  While the nominal sender often appeared as "Blue Isle" in the header of email reports to Separate Account customers (Dkt #1, Exhibit 24, monthly trade statement), they were in fact calculated and transmitted directly to each customer by Equiti based upon trade data on the MT4 platform which it operated in Blue Isle's name under a "white label" arrangement. See "Divisa Capital Memorandum of Understanding," Exhibit G.  The white label agreement specifies that among its services to the "Client" (Blue Isle), Equiti provided "Customer Support" (Exhibit G, page 1).  It also demonstrates that Plaintiff's assertions that Equiti did not know the names of or deal directly with Blue Isle's underlying customers (Dkt #1, pages 18-19, Pars. 66-70) are simply untrue.[3]  Equiti acknowledged that "all customer information from the Client is confidential," and covenanted to preserve same from unauthorized access. Id.  See also Exhibit H, Exhibit I, Exhibit J. These exhibits contain monthly statements generated and directly emailed to Separate Account clients by Equiti. They are identical to those presented by Plaintiff as allegedly generated and transmitted by Blue Isle in Dkt #1, Ex. 24.[4]

In summary, while block trade orders may have been allocated to multiple clients, the mix of positional exposures varied from any given Separate Account to another in accordance with each individual client's chosen strategy mix (Dkt #1, Exhibit 1, pp. 145-147 and Exhibit C) and

---

[3] In recent Court filings Plaintiff appears to acknowledge that in operating the MT4 platform under while label, Equiti directly provided each Mediatrix client access to its account information and periodic statements. November 12, 2019 Response to Unopposed Motion for Order Directing Brokers to Close Positions. Exhibit K, pages 7-8.

[4] This additionally counters Plaintiff's allegation that Blue Isle "emails the MAFEF investors daily and monthly account statements showing their purported ending balance, along with commissions and any performance fees charged." Complaint page 19, Par. 70. MT4 account statements were calculated and directly emailed by Equiti.  Equiti and Blue Isle staff are referred to by Separate Account clients as a "team" (Exhibit J, page 3).

risk preferences (Dkt #1, Ex. 10, page 2 and Exhibit E), as did performance.   (Deposition

Transcript, Dkt #1, Ex. 1, pp. 145-147). Accordingly, the trading and performance of each Separate

Account were not a mere pro rata interest in a central pool of risk.  Mediatrix discussed individual

objectives and preferences with each Separate Account client before they were engaged.  The LPA

provided for Mediatrix to earn the volume-based Mark-Ups.  Dkt #1, Ex. 10, page 3.  Account

documentation and client correspondence disclosed the terms of the Mark-Ups, as well as the

manager's inherent conflict (as opposed to commonality) of interest. *Id*., pages 2 and 3.[5]  It is clear

that the Mark-Ups were in fact calculated and paid based upon volume.

## ARGUMENT

## I.  LACK OF JURISDICTON

### a.  FRCP 12(b)(1) Standard for Motion to Dismiss

Federal courts, as courts of limited jurisdiction, must have a statutory basis for their

jurisdiction. As noted in *Tso v. Murray*, 2017 U.S. Dist LEXIS 218 663, 2017 WL 8787045 (DC

Col 2017), pursuant to Federal Rule of Civil Procedure 12(b)(1), the court may dismiss a complaint

for lack of subject matter jurisdiction. The determination of a court's jurisdiction over subject

matter is a question of law. *Madsen v. United States ex rel. U.S. Army, Corps of Eng'rs*, 841 F.2d

1011, 1012 (10th Cir. 1987). "A court lacking jurisdiction cannot render judgment but must

dismiss the cause *at any stage* of the proceedings in which it becomes apparent that jurisdiction is

---

[5] The Limited Power of Attorney discusses "…[t]he risk of the churning of the Account, which may lead to higher commissions or fees and imbalance performance results." Dkt #1, Ex. 10, page 2.  It further and more specifically states that "Customer understands that Account Manager may receive transaction based compensation in the form of commissions, fees or rebates. These types of compensation may be paid by the Customer or BIFX in the form of a widened spread, per round turn lot, or volume basis.  These transaction based compensations may constitute a conflict of interest as it may create an incentive for the Account Manager to trade the Customer's Account more frequently in order to generate more revenue." *Id*., page 3.

lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). A motion **[*6]** to dismiss for a lack of subject matter jurisdiction may take two forms. *See Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). It may facially attack a complaint's allegations or it may challenge the facts upon which subject matter jurisdiction depends. *Id.* at 1002-1003.

The Plaintiff has the burden of proving that subject matter exists. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), "The district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Plaintiffs "have the burden of proving that subject matter jurisdiction exists." *Cmty. of Cambridge Envtl. Health & Cmty. Dev. Group. v. City of Cambridge,* 115 F. Supp.2d 550, 553 (D. Md. 2000) (Blake, J.). *In Fairfax Countywide Citizens Ass'n v. Fairfax County, Va.,* 571 F.2d 1299, 1303 (4th Cir. 1978), the Court noted, ("[a] district court is a court of limited jurisdiction '[a]nd the fair presumption is (not as with regard to a court of general jurisdiction, that a cause is within its jurisdiction unless the contrary appears, but rather) that a cause is without its jurisdiction till the contrary appears.'") (quoting *Turner v. President, Directors & Co. of the Bank of N.A.,* 1 U.S. (4 Dall.) 7, 10 (1799)). Plaintiff has not met its affirmative duty to establish jurisdiction over the Defendants.

### b.  The SEC Lacks Jurisdiction Over the Activities of Defendants

Each of the Acts and rules Plaintiff alleges were violated by Defendants required the offer and sale of, or advice related to, a "security." Because Defendants, in advising the Separate

Accounts, neither sold, offered to sell, nor provided investment advice related to a "security," the Security Act, Exchange Act and Advisers Act are inapplicable.

A. **The Provision of Investment Advice Related to Separate OTC Metals and Currency Accounts by Mediatrix did Not Create or Involve a "Security" as Defined by the Securities Act, the Exchange Act and/or the Advisers Act**

Plaintiff points to a single use of the word "securities" in a boiler plate catch-all disclosure of the Fund's authority to invest proceeds in a wide scope of underlying assets. Dkt #1, page 45, Par. 158. However, the only "security" Plaintiff alleges Defendants *actually* invested in or advised upon is "the Blue Isle Brokerage Accounts." Dkt #1 page 45, Par. 158. Whether this refers to the Fund's account with Blue Isle, Blue Isle's corresponding hedge accounts with Equiti, or both, is ambiguous. The Complaint contains no allegation that anything other than OTC precious metals and foreign currencies were actually traded in the Fund's or any Separate Account. Plaintiff's own exhibits demonstrate the contrary. And nowhere does the Complaint allege that these underlying OTC commodity interests themselves constitute securities. Plaintiff reiterates solely that "[t]he securities at issue are the investments of the MAFEF investors and of the Fund into pooled accounts at prime brokerage firms, and investors' investments into the Fund." Dkt #1 page 14, Par. 47. Attempting to resolve ambiguities of pleading, it appears Plaintiff seeks to impose the conclusion that the mere depositing of monies into a general customer funds account at a commodity broker is enough to confer jurisdiction under Federal securities law.

The term "security" is defined both in Section 2(a)(1) of the Securities Act (15 U.S. Code § 77b(a)(1)) and Section 3(a)(10) of the Exchange Act (15 U.S. Code § 78c(a)(10)). While the Complaint does not assert otherwise, note that neither of those nearly identical definitions extends to OTC precious metals or foreign currencies, nor do they include currency options or contracts

not traded on a regulated securities exchange.[6] Both however, include the term "investment contract." *Id.*, and as referenced by Plaintiff (Dkt #1 page 47, Par. 165).  Likewise, a person is subject to regulation under the Advisers Act when providing advice in respect to "securities" as similarly defined.[7]  The SEC has historically focused on the instruments upon which advice was rendered and their status under the Securities Act, determining that, if no security was found, Advisers Act registration was not required.[8]  The SEC has taken the longstanding position that "unless a metals transaction involves an 'investment contract' or some other specified security the [SEC] has no jurisdiction over the transaction."[9]

The landmark U.S. Supreme Court case setting forth circumstances under which an investment contract may be deemed a security is *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946). *Howey* held that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  Most relevant to separate discretionary (managed) trading accounts is the "common enterprise" requirement.  The majority of Federal Courts define a common enterprise as one involving "horizontal commonality," where multiple investors share proportionally in the profits and risk of the enterprise. This includes this Circuit, where "[s]ubstance is exalted over form and emphasis is placed on economic reality"

---

[6] 15 U.S. Code § 77b(a)(1).  The Exchange Act definition contains identical language, but further clarifies the exclusion of currencies: "but shall not include currency… ." 15 U.S. Code § 78c(a)(10).

[7] 15 U.S. Code § 80b–2(a)(11).

[8] SEC No-action Letter to Dreyfus Gold Deposits, Inc. (Jan. 4, 1978). *See also* SEC No-action Letter to E.F. Hutton & Co., Inc. (Dec. 31, 1974); SEC No-action Letter to Merrill Lynch, Pierce, Fenner & Smith, Inc. (Dec. 26, 1974).

[9] *Commodity Investment Fraud II, Hearings Before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs,* 98th Cong., 2d Sess. 145-88 (1984) at 201.

*Vincent v. L Moench*, 473 F.2d 430 (10th Cir. 1973), citing *Continental Marketing Corp. v. Securities & Exchange Com'n.*, 387 F.2d 466, 470 (10th Cir. 1967), and which has limited the finding of a security to situations involving "schemes of one kind or another in which a promoter sells undivided interests in a common enterprise to the public generally." *Vincent v. L Moench* at 432. See *Continental Marketing Corp.*; *Gilbert v. Nixon*, 429 F.2d 348 (10th Cir. 1970); and *Woodward v. Wright*, 266 F.2d 108 (10th Cir. 1959).

Most Courts have held that managed securities or commodities trading accounts are not securities. Horizontal commonality is rarely present in such cases, since discretionary accounts, unlike mutual or private funds, are one-on-one agreements where the success of a client is not dependent upon the commensurate success of the advisor's other clients. See *Hirk v. Agri-Research*, 561 F.2d 96 (7th Cir. 1977) at 96. Vertical commonality, which requires a direct relationship between the success or failure of the promoter and the investor, likewise is rarely found, since the manager, as in the instant case, earns commission or other revenues from the account at the same time as the client may be losing money.[10]

In the commodities context, most Circuits apply the "horizontal commonality" test, requiring proportional profit sharing among multiple investors. *See Hirk v. Agri-Research*, 561 F.2d 96 (7th Cir. 1977). In *Hirk*, a discretionary futures account was held not to be an "investment contract" and thus not a "security," despite the fact that accounts were similarly traded, because

---

[10] See e.g. *Mordaunt v. Incomco*, 686 F.2d 815 (9th Cir. 1982) (discretionary commodity account not a security); *Meyer v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 686 F.2d 818 (9th Cir. 1982), *cert. denied* (discretionary commodity account not a security: "[p]lainly, just as in *Mordaunt* and *Brodt*, the promoter continued to profit through commissions even as the account lost money"), *Meyer v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 686 F.2d 818 (9th Cir. 1982), *cert. denied*, 460 U.S. 1023 (1983); *Salcer v. Merrill Lynch, Pierce, Fenner and Smith Inc.*, 682 F.2d 459 (1982); *Holtzman v. Proctor, Cook & Co.*, 528 F. Supp. 9 (D. Mass. 1982) (discretionary securities account not a security).

each discretionary futures trading account was unitary in nature and succeeded or failed without regard to other investors.  *Id*. at 101.  *Hirk* distinguishes *SEC v. Wickham*, 12 F Supp 245 (DC Minn 1935), a case decided prior to *Howey*, stating that the "essential difference" between *Wickham* and *Hirk* lies in the pooling of multiple investors funds into a single account, and stands for the "assumption that a sharing or pooling of funds is required by Howey." *Id.* at 98.  See also *Milnarik v. M-S Commodities, Inc.* 457 F2d 274 (7th Cir. 1972) (a discretionary trading account is not a security, followed by *Hirk*)  and *Wasnowic v. Chicago Board of Trade*, 352 F Supp 1066 (DC Penn 1972), citing *Milnarik*, both of which place significance on the absence of any pooling of funds.  It should be noted that the "pooling" required by this line of cases is the pooling of multiple client's monies into a common *trading* strategy, managed by the same third-party advisor. "Pooling" cannot logically be read in this context to mean the general deposit of investor monies into commingled customer funds accounts with a *broker*—a practice universal to all CFTC-regulated Futures Commission Merchants ("FCM"s) and foreign brokers, and explicitly authorized by CFTC Rules.[11]  Such a reading would subject all client segregated funds accounts held by FCMs at their respective banks to registration under the Securities Act.

Within the minority of Circuits looking to one or another form of "vertical commonality," the view of "narrow vertical commonality" is most commonly applied.  Under this view**,** a security may be found where a bilateral common venture between the promoter and a single investor exists, provided the manager profits exclusively where the investor profits. However, an even rarer number of courts take a "broad vertical commonality" approach, in which it may be enough that

---

[11] (e) *Commingling.* (1) "A futures commission merchant may for convenience **commingle** the futures customer funds that it receives from, or on behalf of, multiple futures customers in a single account or multiple accounts with one or more of the depositories listed in paragraph (b) of this section. 17 C.F.R. § 1.20(e)(1). [Emphasis added.]

the investor's success is solely dependent on the efforts of the manager. The singular most extreme example of "broad vertical commonality" is *SEC v. Continental Commodities Corp*., 497 F.2d 516 (5th Cir. 1974).  In that case, the Fifth Circuit concluded that investors were participating in a common enterprise.  The district court had followed *Milnarik*.  The Fifth Circuit based its refusal to do so on its own decision in *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir. 1974) rendered just a few days prior.  *Koscot* had held that a multi-level distributorship scheme was an investment contract even though investors received profits that were largely independent of those of other investors. Even under this approach however, a careful analysis reveals at least some consideration of the collective nature of an investment—the issue upon which most other Circuits base the "horizontal commonality" standard.  According to *Continental Commodities*, the "critical inquiry" in deciding whether a common enterprise is present is whether "the fortuity of the investments *collectively* is essentially dependent upon promoter expertise." *Id*. at 518-519 (emphasis added).[12]  The accounts at issue in *Continental Commodities* were quite different from standard brokerage accounts, in which the investor owns the assets purchased for the account, and the sole risk of loss is the "wisdom" of the investment decision.  Thel and Bines. at 475. Instead, they involved bilateral OTC options written by the promotor/manager himself, and the investors were therefore relying on the promotor's economic viability as much as its market expertise. *Continental Commodities* 516, 518. Thus, even under SEC rules, and the broad vertical commonality standards applied by the smallest minority of courts following *Continental*

---

[12] *See* also Steve Thel and Harvey E. Bines, *Investment Management Arrangements and the Federal Securities Laws*, 58 Ohio St. L. J. 459 (1997-1998) 472-475 ("the courts repeated references to 'the trading enterprise' might be read to contemplate that a manager's activities can constitute a common enterprise only when they involve several accounts or at least several investors").

*Commodities*, indicia of client ownership of the underlying assets and the absence of manager default risk would likely defeat the finding of an investment contract.[13]   For these and other reasons, *Continental Commodities* and *Koscot* have been widely distinguished in the Fifth Circuit itself (*see Long v. Shultz Cattle Co.*, 896 F.2d 85 (5th Cir. 1990)*; Smith International, Inc. v. Texas Commerce Bank*, 844 F.2d 1193 (5th Cir. 1988)), and roundly cautioned and questioned by a number of other courts. *See Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216 (6th Cir. 1980), *Schofield v. First Commodity Corp.*, 638 F. Supp. 4 (USDC Mass 1985), *Mechigian v. Art Capital Corp.*, 612 F. Supp. 1421 (2nd Circuit 1985), *Brodt v. Bache & Co.*, 595 F.2d 459 (9th Cir. 1978); *Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994); *Gaudette v. Panos*, 644 F. Supp. 826, 834 (D. Mass. 1986), complaint dismissed, 650 F. Supp. 912 (D. Mass. 1987), complaint ordered reinstated, 852 F.2d 30 (1st Cir. 1988); *Sennett v. Oppenheimer & Co.*, 502 F. Supp. 939, 945 (N.D. M. 1980). For example, in *Curran*, the court held that a finding of vertical common enterprise, based solely on the relationship between the promoter and investor, is fundamentally inconsistent with *Howey*. 622 F.2d at 224. In particular, finding a common enterprise based solely upon the entrustment by a single principal of money to an agent would effectively eliminate the common enterprise requirement of *Howey*. *Id.* (citing *Berman and Bache, Halsey, Stuart, Shields, Inc.*, 467 F.Supp. 311, 315-16 (S.D. Ohio 1979)). Thus, a discretionary commodity account is not a security.  *Id.* at 224-5.  Rather, it is an agency for hire, where the client

---

[13] *See also* Id., fn. 82 ("The SEC has repeatedly indicated that an investor's retention of the indicia of ownership of underlying investments is critical if an investment management arrangement is not to be treated as a security" (citing Investment Company Act Release No. 21,260, supra note 62, at 86,968, 86,973; Benson White & Co., 1995 SEC No-Act. LEXIS 553, at *6 (June 14, 1995); Wall Street Preferred Money Managers, Inc., 1992 SEC No-Act. LEXIS 648, at *2 (Apr. 10, 1992); West America Co., 1991 SEC No-Act. LEXIS 1321, at *1 (Nov. 26, 1991); Morgan Keegan & Co., 1990 SEC No-Act. LEXIS 1168, at *1 (Oct. 2, 1990); International Asset Management, Inc., 1990 SEC No-Act. LEXIS 294, at *2 (Jan. 29, 1990))).

understands that its return is based on a one-to-one vertical relationship with the trader and that there is no contractual tie to any other accounts. *Id*. at 225.

Indeed, among courts which look to vertical commonality, the bases of the aforementioned criticisms have been reduced to rule by a majority in the "narrow vertical commonality" test. Under this test, to find an investment contract the Ninth Circuit has required that "the fortunes of the investors are linked with those of the promoters." *SEC v. R.G. Reynolds Enters., Inc*., 952 F.2d 1125, 1130 (9th Cir. 1991) (quoting *SEC v. Goldfield Deep Mines*, 758 F.2d 459, 463 (9th Cir. 1985)); see also *Goldfield Deep Mines* at 463 ("A common enterprise is a venture 'in which the "fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties."'") (quoting *Brodt v. Bache & Co*., *supra* at 459, 460 quoting in turn *SEC v. Glenn W. Turner Enters., Inc*., 474 F.2d 476, 482 n.7 (9th Cir. 1973). Under this more common "narrow" vertical commonality, it is not enough that the investors' returns are dependent upon the efforts of the manager.  Instead, an *interdependence* between the success of the manager and investor must exist.  As in the instant case, where the manager may profit from commissions or similar volume-based revenues while the client loses money, an account is found not to constitute a security.  See *Brodt*, 595 F.2d at 459; *Schofield v. First Commodity Corp*., 638 F. Supp. 4, 7 (D. Mass. 1985), aft'd, 793 F.2d 8 (1st Cir. 1986); *Shotto v. Laub,* 635 F. Supp. 835, 839 (D. Md. 1986).

While the U.S. Supreme Court has not yet provided a rule of universal application as to which commonality test is preferred, it has held that a profit-sharing agreement, negotiated one-on-one by the parties, is not a security, implying agreement with the majority of federal circuits that the horizontal, and not the vertical commonality test should apply. *Maine Bank v. Weaver*,

455 U.S. 551, 560 (1982).  In *Maine Bank*, the Court explained that Congress intended securities laws to cover those instruments ordinarily and commonly considered to be securities in the commercial world. *Id*. at 559.  Unusual instruments found to constitute securities in prior cases involved offers of investments designed for multiple investors, not private transactions that could be negotiated one-on-one by the parties. *Id*.  *Maine Bank* goes further however, maintaining that under the Securities Act, even an instrument which otherwise seems to fall within the definition of "security" is not to be so considered if "the context otherwise requires." *Id*. at 559.  In *Maine Bank*, this supervening context was federal banking law, which already covered the instruments (certificates of deposit) there at issue. *Id*.

Similarly, here, the Commodity Exchange Act ("CEA") provides a considered and comprehensive regulatory framework covering commodity interests, including advisory services over managed commodity accounts.[14]  Most courts have concluded that the structure of federal financial law and regulation precludes the application of federal securities laws to commodities instruments or accounts, one noting that the basic rule "the specific controls the general" renders the application of *Howey* to discretionary commodities accounts "faulty," since *Howey* applies "the most general terms" in the securities statutes while ignoring specific terms in the jurisdictional

---

[14] In passing the Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, (88 Stat. 1389, 1974) ("CFTCA"), Congress elected to endow the CFTC with "exclusive jurisdiction . . . with respect to accounts, agreements... and transactions involving contracts of sale of a commodity for future delivery . . . ." 7 U.S.C. § 2(a)(1)(A) (1994), and many commentators read the CFTCA to have conclusively established that commodities accounts are not securities. *See* McBride, Johnson & Thomas Lee Hazen, *Commodities Regulation* § 4.41, at 282-83 (2d ed. 1989).  Legislative history has broadly supported the notion that Congress intended to prevent any application of the federal securities laws to commodities accounts.  The Commodity Exchange Act and its 1974 amendments ("CEA") had the purpose of creating a "comprehensive regulatory structure," the jurisdictional and other provisions of which were intended by Congress "to fill all regulatory gaps" and "to avoid unnecessary, overlapping and duplicative regulation." H.R. 13113, 93d Cong., 2d Sess. §201 (1974). *See generally* Kenneth M. Raisler, Whitney Adams, and Maureen A. Donley-Hoopes, *Discretionary Commodity Accounts: Why They are not Governed by the Federal Securities Laws*, 42 Wash. & Lee L. Rev. 743 (1985).

statutes of both the SEC and the CFTC. *Mallen v. Merrill Lynch, Pierce, Fenner & Smith*, 2

COMM. FUT. L. REP. (CCH) 22,601 at 30,577 (N.D. Ga. March 28, 1985).[15] Since the passage

of the CFTCA, U.S. commodities laws have been repeatedly amended to create direct client

protections where Congress deemed them necessary.[16]  Congress acted again in 2008 to fully

clarify the jurisdiction of the CFTC with respect to foreign currency transactions. The CFTC

Reauthorization Act of 2008 ("CRA") fundamentally altered the CEA to designate foreign

currency as a distinct category of regulated product under the jurisdiction of the CFTC. *Food,

Conservation, and Energy Act of 2008*, Pub. L. No. 110-246, 122 Stat. 1651, 2189-2204 (2008).

Among other changes, the CRA amended the CEA to encompass participants advising on retail

foreign currency and acting within current registration categories such as Commodity Trading

Advisors ("CTAs"), and Commodity Pool Operators ("CPOs"). *Id.*  While Congress elected to

incorporate certain exemptions from portions of these regulations for transactions with institutional

and very high net worth clients,[17] this in no way diminishes the CEA's overarching preemptive

purpose and jurisdictional scope. To hold otherwise would have far-reaching and logic-defying

---

[15] *See also Cady v. A.G. Edwards & Sons, Inc.* 648 F Supp 621 (DC Utah 1986); Messer v. *E.F. Hutton & Co.*, 847 F.2d 673 (11th Cir. 1988) *Trustman v. Merrill Lynch, Pierce, Fenner & Smith*, 2 COMM. FUT. L. REP. (CCH) 22,490, at 30,166 (C.D.Cal. Jan. 24, 1985); *Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*, 493 F. Supp. 499, 504 (S.D.N.Y. 1980); *Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co., Ltd.*, 470 F. Supp. 610, 614 (S.D.N.Y. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 736-37 (N.D. Cal. 1978); *Gravois v. Fairchild, Arabatzis*, [1977-1980 Transfer Binder] Comm. Fur. L. REP. (CCH) 20,706, at 22,874 (E.D. La. Nov. 9, 1978); *Bartels v. International Commodities Corp.*, 435 F. Supp. 865, 869 (D. Conn. 1977); *E. F. Hutton v. Schank*, 456 F. Supp. 507, 513 (D. Utah 1976); see also *Kupke v. Shearson/American Express*, 2 Comm. Fur. L. REP. (CCH) 22,757 (M.D. Fla. Oct. 10, 1985) (order dismissing federal securities claims); cf. *Marshall v. Green Giant Co.*, No. 4-83-578 (D. Minn. June 26, 1984).  *See also* Thel and Bines, *supra*, at 459.

[16] *See e.g.*, 7 U.S.C. §§ 9, 9a, 13, 13a, 13a-1, 13a-2, 13b, 18 (1994); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) (finding private right of action under Commodities Exchange Act); Johnson & Hazen, supra, §§ 1.83-.84, 4.145-.190. ).

[17] 7 U.S.C. § 1a (18).

effect, including the potential registration of every managed commodity and commodity futures account in the country as a separate securities offering.[18]

## II.   SHOULD THIS COURT DENY THE MOTION TO DISMISS FOR LACK OF JURISDICTION IN FULL OR IN PART, A STAY OF THIS ACTION AND/OR DISCOVERY IS APPROPRIATE

### a.  Legal Standard

Federal courts have ample discretion to stay discovery and civil proceedings pending the completion of related criminal proceedings. *United States v. Kordel*, 397 U.S. 1, 12 n.27 (1970); *Mid-America's Process Serv. v. Ellison*, 767 F.2d 684, 687 (10th Cir. 1985).  In *DeAtley v. Allard,* 2014 U.S. Dist. LEXIS 41037 (DC Col 2014), the Court noted, "when considering a stay in a matter involving parallel criminal and civil proceedings, the primary debate centers on the criminal defendant's potential waiver or invocation of his Fifth Amendment rights. 'The Constitution does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings." *SEC v. Dresser Industries Inc.*, 628 F.2d 1368, 1375, 202 U.S. App. D.C. 345 (D.C. Cir. 1980) (citing *Baxter v. Palmigiano,* 425 U.S. 308, 317-19, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976)). Nevertheless, "a court may decide in its discretion to stay civil proceedings, postpone civil

---

[18] It should be noted that the SEC has itself historically provided no-action (*See* SEC No-Act. 90-436-CC; SEC No-Act. 90-340-CC) and exemptive relief from registration even of discretionary *securities* trading accounts, as embodied in 17 CFR § 270.3a-4. The final regulation notes that "there is no registration requirement under section 5 of the Securities Act [15 U.S.C. 77e] with respect to programs that are organized and operated in the manner described in § 270.3a-4." *Id.*  While the relief in 3a-4 is directly intended for security, and not commodity, trading programs, the Separate Accounts meet all qualifications for such relief: *inter alia*, each client's account is managed on the basis of the client's financial situation and investment objectives and in accordance with any reasonable restrictions or conditions imposed by the client; at the opening of the account Mediatrix personnel obtained information from the client regarding the client's financial situation and investment objectives; the client maintained full control and benefit of its funds and account holdings; and reporting exceeded the periodic requirements set by 3a-4.

discovery, or impose protective orders and conditions when the interests of justice seem to require such action." *Id. at 1375* (internal quotation omitted).

The Courts have stated six factors when evaluating whether to determine a stay in a civil case and if a party's Fifth Amendment rights are substantially prejudiced: (1) the extent to which issues in the criminal case overlap with those in the civil case; (2) the status of the case, including whether defendant has been indicted; (3) the private interests of plaintiff in proceeding expeditiously versus the prejudice to plaintiff caused by delay; (4) the private interests of, and burden on, defendant; (5) the interests of the Court; and (6) the interests of the public. *DeAtley v. Allard,* 2014 U.S. Dist. LEXIS 41037 (DC Col 2014); *Trustees of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mechanical*, 886 F. Supp. 1134 at 1139 (DCNY 1995); *In re CFS-Related Sec. Fraud*, 256 F. Supp. 2d 1227, 1236-37 (N.D. Okla. 2003); *S.E.C. v. Trujillo,* 2010 WL 2232388 (D. Colo. June 1, 2010).

**1.   The Criminal Investigation and Civil Proceedings Involve the Same Subject Matter.**

Where the cases involve the same subject matter, self-incrimination is highly likely and justifies a stay. *In re CFS*, 256 F. Supp. 2d at 1237. Courts have found facts to be interrelate where the same events triggered both the civil and criminal litigation. *Dominguez v. Hartford Fin. Servs. Group, Inc.,* 530 F. Supp. 2d 902, 906 (S.D. Tex. 2008).   Some courts have found that "the similarity of the issues in the underlying civil and criminal actions is considered the most important threshold issue in determining whether to grant a stay." *Zuppardo v. Serv. Cab Co*., 2017 U.S. Dist LEXIS 31126, 2017 WL 877318 (ED LA 2017).   Such is the case here.

**2. Although not Indicted the Defendant's Fifth Amendment Rights Will Need to be Invoked During Discovery.**

Courts give the greatest level of deference a civil party's Fifth Amendment rights after she or he has been criminally indicted for a serious offense. *S.E.C. v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375-76 (D.C. Cir. 1980). However, Courts have also granted stays of civil proceedings where a criminal investigation has clearly been undertaken and/or is ongoing. *SEC v. Stanley*, 2012 (DC Cal. 2012); *SEC v. Downe*, 1993 U.S.Dist LEXIS 753; 1993 WL 22126 (SD NY 1993).

**3. A Stay Will Not Prejudice Plaintiff's Rights.**

The potential harm to the individual Defendants, however, from an unfavorable inference if the Fifth Amendment is invoked are far more significant than any harm the Plaintiff will suffer. The injunctive relief has been agreed to and Defendants are prevented from continuing business. In addition, available assets are frozen. There is no significant harm in delaying the action.

**4. Plaintiff Will Suffer Substantial Prejudice Without a Stay.**

A defendant has a significant interest in "avoiding the quandary of choosing between waiving their Fifth Amendment rights or effectively forfeiting the civil case." *Transworld Mech., Inc.* 886 F. Supp. 1134 at 1140 (S.D.N.Y. 1995). Defendants who invoke the Fifth Amendment privilege in civil cases may be subject to an adverse inference. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Defendants who waive this privilege to defend the civil case subject themselves to broader civil discovery rules that may allow the prosecution to obtain additional information for use during the criminal case, and the defendants may also be forced to expose their criminal defenses to the prosecution. *Dresser*, 628 F.2d at 1375-76.

5.   **The Court's Interests Strongly Favor a Stay.**

Courts have noted that in general considerations of judicial economy weigh most strongly in favor of staying a civil proceeding or aspects of the civil proceeding when a parallel criminal proceeding is pending at the same time and involves overlapping issues. *SEC v. Nicholas*, 569 F. Supp 2d 1065, 1071 (C.D. Cal 2008); *SEC v. Stanley*, 2012 U.S. Dist. LEXIS 20059 (CD Cal. 2012).

6.   **The Criminal Proceedings Protect the Public's Interests.**

When the same subject matter gives rise to civil and criminal cases, the latter protects the public's interests. *Trustees of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mechanical*, 886 F. Supp. 1134 at 1140 (DCNY 1995).  See also, United States SEC v. Trujillo, 2011 U.S.Dist. LEXIS 6832 (DC Col. 2011); SEC v. Stanley, supra, where the Court noted, "[i]n cases in which the civil defendant, not the government seeks the stay of civil discovery, the defendant's ability to adequately assert his Fifth Amendment privilege is often a key consideration in determining the propriety of a stay."

## CONCLUSION

It is requested that the Court grant Defendants' Motion to Dismiss pursuant to FRCP 12(b)(1) by dismissing the portion of the claims not subject to jurisdiction of the Securities and Exchance Commission; or in the alternative  a (2) stay of this action pending completion of the criminal investigation.

Respectfully submitted this 17 day of December, 2019.

/s/ Vivian R. Drohan
Drohan Lee LLP
680 Fifth Avenue
New York, New York 10019
Telephone:  212-710-0004
Fax:  212-710-0003
Email:  vdrohan@dlkny.com

Jeffrey R. Thomas
Thomas Law LLC
3773 Cherry Creek North Dr, Suite 600
Denver, CO 80209
Telephone: 720-330-2805
E-Mail: jthomas@thomaslawllc.com
*Attorneys for Defendants Mediatrix Capital Inc., Blue Isle Markets Inc. (St. Vincent & the Grenadines), Blue Isle Markets Ltd., Michael S. Young, Michael S. Stewart, and Bryant Sewall and Relief Defendants Victoria M. Stewart, Maria C. Young, and Hanna Ohonkova*