# EXHIBIT 1

## APPENDIX B.

## MEMORANDUM OF AMERICAN CASES AND RECENT ENGLISH CASES ON THE LAW OF TRADING WITH THE ENEMY.

By CHARLES WARREN, Assistant Attorney General of the United States.

### I.

### AMERICAN CASES.

(1) *Every species of intercourse with the enemy is illegal. The prohibition is not limited to mere commercial intercourse.*

Johnson, J., in *The Rapid* (1814) (8 Cranch, 155, 162, 163):

"Whether this was a trading in the eye of the prize law such as will subject the property to capture.

"The force of the argument on this point depends upon the terms made use of. If by *trading* in prize law was meant that signification of the term which consists in negotiation or contract, this case would certainly not come under the penalties of the rule. But the object, policy, and spirit of the rule is to cut off all communication or actual locomotive intercourse between individuals of the belligerent States. Negotiation or contract has therefore no necessary connection with the offense. *Intercourse* inconsistent with actual *hostility* is the offense against which the operation of the rule is directed, and by substituting this definition for that of *trading with an enemy* an answer is given to this argument."

And see especially Story, J., in *The Julia* (1814) (8 Cranch, 181, 193, 194, 195):

"Nor is there any difference between direct intercourse between the enemy countries and an intercourse through the medium of a neutral port. The latter is as strictly prohibited as the former."

See also Story, J., in *The Julia* (1813) (1 Gallison, 594, 602, 603):

"* * * It would seem a necessary result of a state of war to suspend all negotiations and intercourse between the subjects of the belligerent nations. By the war every subject is placed in hostility to the adverse party. He is bound by every effort of his own to assist his own government and to counteract the measures of its enemy. Every aid, therefore, by personal communication or by other intercourse which shall take off the pressure of the war or foster the resources or increase the comforts of the public enemy, is strictly inhibited. No contract is considered as valid between enemies, at least so far as to give them a remedy in the courts of either government, and they have, in the language of the civil law, no ability to sustain a *persona standi in judicio.* The ground upon which a trading with the enemy is prohibited is not the criminal intentions of the parties engaged in it or in the direct and immediate injury to the State. The principle is extracted for a more enlarged policy, which looks to the general interests of the Nation, which may be sacrificed under the temptation of unlimited intercourse or sold by the cupidity of corrupted avarice."

See also *The St. Lawrence* (1814) (8 Cranch, 434); *The Alexander* (1814) (8 Cranch, 169); *The Rugen* (1816) (1 Wheaton, 62); *United States v. Barber.* (1815). (9 Cranch, 243); *United States v. Sheldon* (1817) (2 Wheaton, 119).

64

16   TO DEFINE; REGULATE, AND PUNISH TRADING WITH THE ENEMY.

Story, J., in *The Liverpool Packet* (1813) (1 Gallison, 512, 521, 522):

"I look back upon that decision (*The Julia*) without regret, and after much subsequent reflection can not doubt that it has a perfect foundation in the principles of public law.  To the many authorities there stated I might have added the pointed language of Sir W. Scott, in the *Jonge Pieter* (4 Rob., 79), that 'without the license of the government *no communication, direct or indirect*, can be carried on with the enemy,' and the rule strongly illustrative of the principle, which is acknowledged as early as the yearbooks and has received sanction down to the present times, that every contract and engagement made with the enemy pending war is utterly void."

*The Lord Wellington* (1814) (2 Gallison, 102).

The case of United States *v.* Barker (1820, Circ. Ct. N. Y.) (1 Paine, 156), constitutes a departure from the general rule.

The rigid rule was reaffirmed in Scholefield *v.* Eichelberger (1833) (7 Pet., 586, 593):

"The doctrine is not at this day to be questioned; that during a state of hostility the citizens of the hostile States are incapable of contracting with each other.  For near 20 years this has been acknowledged as the settled doctrine of this court, and in a case which proves it to be a rule of very general and rigid application (*The Rapid*).  * * *  The question has never yet been examined whether a contract for necessaries, or even for money to enable the individual to get home, would not be enforced, and analogies familiar to the law as well as the influence of the general rule in international law, that the severities of war are to be diminished by all safe and practical means, might be appealed to in support of such an exception.  But at present it may be safely affirmed that there is no recognized exception but permission of a State to its own citizen, which is also implied in any treaty stipulation to that effect entered into by the belligerents."

In Jecker *v.* Montgomery (1855) (13 How., 110, 112, 119):

"The consequence of this state of hostility is that all intercourse and communication between them is unlawful.  * * *

"We have seen, by the authorities cited, that *intercourse with the enemy is sufficient cause for personal punishment and for the confiscation of property; that it is a cause originating in and inflexibly enforced by necessity for guarding the public safety.*"

(2) *Property engaged in illegal intercourse with the enemy is deemed enemy property and is liable to forfeiture.*

*The Sally* (1814) (8 Cr., 382, 384):

➤ "By the general law of prize, property engaged in an illegal intercourse with the enemy is deemed enemy property;  It is of no consequence whether it belong to an ally or to a citizen; the illegal traffic stamps it with the hostile character, and attaches to it all the penal consequences of enemy ownership."

*The Rapid* (1814) (8 Cr., 155, 162, 163):

➤ "The law of prize is part of the law of nations.  In it a hostile character is attached to trade, independently of the character of the trader who pursues or directs it.  Condemnation to the use of the captor is equally the fate of the property of the belligerent and of the property found engaged in antineutral trade.  But a citizen or ally may be engaged in a hostile trade, and thereby involve his property in the fate of those in whose cause he embarks.

65

"This liability of the property of a citizen to condemnation as prize of war may be likewise accounted for under other considerations. Everything that issues from a hostile country is, *prima facie*, the property of the enemy, and it is incumbent upon the claimant to support the negative of the proposition. But if the claimant be a citizen or an ally at the same time that he makes out his interest, he confesses the commission of an offense which, under a well-known rule of the civil law, deprives him of his right to prosecute his claim. * * *

"Whether, on the breaking out of a war, the citizen has a right to remove to his own country with his property is a question which we conceive does not arise in this case. This claimant certainly has not a right to leave the United States for the purpose of bringing home his property from an enemy country; much less could he claim it as a right to bring into this country goods the importation of which was expressly prohibited."

See also *The Diana* (1814) (2 Gallison, 93; 97); Jecker *v.* Montgomery (1855) (13 How., 110, 114); *The Adula* (1899) (176 U. S., 361, 379), and cases cited.

*The Benito Estenger* (1900) (176 U. S., 568, 571):

"By the law of prize, property engaged in any illegal intercourse with the enemy is deemed enemy property, whether belonging to an ally or a citizen, as the illegal traffic stamps it with the hostile character and attaches to it all the penal consequences.'

See also *The Carlos F. Roses* (1900) (177 U. S., 655).

Betts, J., in *The Crenshaw* (1861), Blatchford's Prize Cases, 27:

"Not only is property taken trading with the enemy liable to forfeiture, but it is subject to forfeiture as a prize of war."

Nelson, J., in Charge to Grand Jury (1861) (5 Blatchf., 549; Fed. Cases No. 18271):

"Trade with the enemy * * * according to the law of nations is forbidden and the property engaged in it is liable to forfeiture."

Betts, J., in *The Shark* (1862) (Blatchford's Prize Cases, p. 218).

(3) *All persons doing business with the enemy, whether citizens of the United States or citizens of the other belligerent nation or neutrals, are as to their property to be deemed enemies.*

Prize Cases (1862) (2 Black, 674):

"But in defining the meaning of the term 'enemies' property,' we will be led into error if we refer to Fleta and Lord Coke for their definition of the word 'enemy.' It is a technical phrase peculiar to prize courts, and depends upon principles of public policy as distinguished from the common law.

"Whether property be liable to capture as 'enemies' property' does not in any manner depend on the personal allegiance of the owner. 'It is the illegal traffic that stamps it "as enemies' property." It is of no consequence whether it belongs to an ally or a citizen. (8 Cr., 384.) The owner, *pro hac vice*, is an enemy.' (3 Wash. C. C. R., 183.)

"The produce of the soil of the hostile territory, as well as other property engaged in the commerce of the hostile power, as the source of its wealth and strength, are always regarded as legitimate prize, without regard to the domicile of the owner, and much more so if he reside and trade within their territory."

S. R—65-1—vol 1——30

18   TO DEFINE, REGULATE, AND PUNISH TRADING WITH THE ENEMY.

*The Flying Scud* (1867) (6 Wall., 263, 266):

"Although they are Mexican citizens, yet being established in business in the enemies' country, must be regarded according to settled principles of prize law, as enemies, and their cotton as enemies' property."

See Juragua Iron Co. v. United States (1909) (212 U. S., 297, 305, 306):

"Cuba, being a part of Spain, was enemy's country, and all persons, whatever their nationality, who resided there were, pending such war, to be deemed enemies of the United States and of all its people. The plaintiff, though an American corporation, doing business in Cuba, was, during the war with Spain, to be deemed an enemy to the United States with respect to its property found and then used in that country, and such property could be regarded as enemy's property, liable to be seized and confiscated by the United States in the progress of the war than being prosecuted."

So in Young v. United States (1877) (97 U. S., 39, 60):

"All property within enemy territory is in law enemy property just as all persons in the same territory are enemies."

30 Hogsheads of Sugar v. Boyle (1815) (9 Cranch, 191).

*The Sarah Starr* (1861) (Blatchford's Prize Cases, 74, 76):

"* * * Loyal citizens or neutrals who * * * have a mercantile domicile in an enemy country are regarded in the prize courts in their commercial dealings and transactions there as enemies in relation to vessels and cargoes owned by them and captured at sea. * * *

"The American authorities are equally explicit that a neutral, even enjoying the privilege of consul, domiciled and trading in a belligerent country, is, in war, deemed a belligerent, and his acts are clothed with the character of one of its subjects; and he can neither hold title to property acquired in such country during war, nor confer it upon others, against the interests imparted, by capture at sea, to adversary belligerents."

*The Mary Clinton* (1863) (Blatchford's Prize Cases, p. 560).

See also *The Venus* (1814) (8 Cranch, 253); *The Vowles* (1814) (ibid., 348); *The Frances* (1814) (ibid., 351); Livingston v. Maryland Ins. Co., (1813) (7 Cranch, 542); U. S. v. Guillem (1850) (11 How., 50); *The William Bagaley* (1866) (5 Wall., 377); Miller v. U. S. (1870) (11 Wall., 268).

(4) *In general, during war, contracts with, or powers of attorney or agency from, the enemy executed after outbreak of war are illegal and void; contracts entered into with the enemy prior to the war are either suspended or are absolutely terminated; partnerships with an enemy are dissolved; powers of attorney from the enemy, with certain exceptions, lapse; payments to the enemy (except to agents in the United States appointed prior to the war and confirmed since the war) are illegal and void; all rights of an enemy to sue in the courts are suspended.*

*The William Bagaley* (1866) (5 Wall., 377, 405, 407):

"Public war duly declared or recognized as such by the lawmaking power, imports a prohibition by the sovereign to the subjects or citizens of all commercial intercourse and correspondence with citizens or persons domiciled in the enemy country."

67

resources are more likely to determine the result of the present conflict than armies and navies. Therefore, everything reasonably possible should be done to prevent our enemy from reaping the advantages of commercial transactions with the people of the United States. To summarize the purpose of the bill is not to create new international rules or practices, but to define and mitigate them.

1. The first modification is found in the definition of the word "enemy" (sec. 2, subsec. (a), p. 1); whereby the enemy with whom or with trade which is interdicted is not so much determined by the nationality or allegiance of the individual, association, or corporation as by his or its commercial domicile or residence in enemy territory. The enemy domiciled or residing in the United States is not included in the direct operation of the act itself, but may be reached by subsequent proclamation of the President, as authorized by the act. One leading purpose of the bill is to prevent the least practicable restriction upon trade carried on in the United States, and therefore law-abiding persons, whether Germans or neutrals, residing within the United States are not affected by the direct operation of the act, unless the conduct of such persons is of a character so hostile that they should be brought within the terms of the act by the proclamation of the President.

2. The trade or commerce regulated or prohibited is defined in subsections (a), (b), (c), (d), and (e), page 4. This trade covers almost every imaginable transaction, and is forbidden and made unlawful except when allowed under the form of licenses issued by the Secretary of Commerce (p. 4, sec. 3, line 18). This authorization of trading under licenses constitutes the principal modification of the rule of international law forbidding trade between the citizens of belligerents, for the power to grant such licenses, and therefore exemption from the operation of the law, is given by the bill. It should also be added that the prohibitions and limitations applicable to the enemy are in the main also applicable to an ally of the enemy.

3. The forbidden intercourse or commerce extends to the transportation of an enemy or ally of an enemy, and also to the transmission, or attempted transmission, out of the United States of any letter, document, writing, message, picture, diagram, map, device, or other form of communication addressed to an enemy or the ally of an enemy. The necessity of this particular prohibition is too obvious to require explanation.

## II.

1. In the order found in the bill the power of the Government to deal with enemy property is next reached (p. 7, sec. 6). It is manifest that the United States should as far as practicable conserve and utilize enemy property found within its jurisdiction. To this end such property must be brought under the control of the Government, to be impounded or used, and to await such disposition at the close of the war as Congress may determine. Therefore, enemy property is required by its owner or its agents to be disclosed, and paid over, conveyed, transferred; or delivered to an agent of the Government known as the "alien-property custodian" who is to be appointed by the Secretary of Commerce, with the approval of the

68

The present bill is less stringent, and designedly so, than the present English act. And it is less stringent than the law of trade with the enemy as laid down by our courts, for it provides for a system of licenses by which any act or business forbidden by the bill may be licensed to be done, if the President shall be of opinion that it can be carried on or done with safety to the United States. The provisions of this bill greatly amplify and make more practical a system of license or permit which was provided for by the Government during the Civil War. The bill may in some ways interfere with the freedom of American commerce, and it may bear hardly, in places, upon individuals. By this license system, however, we provide a method of relief in individual cases where the relief can be extended without injury to the interests of the country. But it is necessary always to bear in mind that a war can not be carried on without hurting somebody, even, at times, our own citizens. The public good, however, must prevail over private gain. As was said in Bishop v. Jones (28 Texas, 294), there can not be "a war for arms and a peace for commerce."

One of the most important features of the bill is that which provides for the temporary taking over of enemy property, its conservation in the hands of the alien property custodian, and its investment in United States bonds. The investment feature, so far as I know, is an entirely new provision, contained in no previous statute, and in line with modern, lenient policies with reference to private property in time of war. I call attention to Secretary Redfield's characterization of this part of the bill, in the House committee hearings. He said: "I do not know who was the originator of the idea, but whoever was has created something as fine in its way as the return of the Boxer indemnity, because the enemy property is all in our hands to bear its share of our expenses in fighting the enemy, and yet it is safeguarded so that if it be the will of Congress, under urgent conditions, it may be returned to him intact and safe guarded by us during the whole period of the war."

The theory of the bill is that enemy property in this country shall not remain in the hands of the enemy's debtor or agent here; but that, if the President so directs, it shall be temporarily conscripted by the Government to finance the Government through investment in its bonds, and to be paid back to the enemy or otherwise disposed of at the end of the war as Congress shall direct. In other words, we fight the enemy with his own property during the war; but we do not permanently confiscate it. Moreover, this temporary conscription of enemy property is also conservation of enemy property; for it is taken from the hands of debtors or agents, as to whose solvency the enemy would otherwise have to assume the risks, and invested in the safest security in the world—United States bonds—or deposited in Government depositaries.

For convenience reference is herein made to the pages of the printed hearings, at which detailed explanation may be had of the various sections of the bill.

The American judicial authorities on trading with the enemy are collected in a memorandum in the Senate subcommittee hearings, pages 170–175, and are published herein with additions as Appendix B. The English judicial authorities, collected by Assistant Attorney General Warren, are published herein as Appendix C.

The bill is susceptible of division into four portions.

The first portion defines the word "enemy" and prescribes the acts which shall be forbidden and which are made criminal if performed without license.

The second portion provides for a system by which any act otherwise unlawful and criminal may be licensed by the President if compatible with the safety of the United States and the successful prosecution of the war.

The third portion deals with the conservation and utilization of enemy property during the war.

The fourth portion deals with the entirely separable question of patents.

Taking up the sections in detail:

Section 2 prescribes the classes of persons who shall be deemed within the purview of the term "enemy" for the purposes of trade during time of war and for the purposes of this act. (Hearings, pp. 133–136.)

# EXHIBIT 2

83d Congress
1st Session }      SENATE      { Report
No. 98–549

# EMERGENCY POWERS STATUTES:

## Provisions of Federal Law Now in Effect Delegating to the Executive Extraordinary Authority in Time of National Emergency

---

# REPORT

### OF THE

# SPECIAL COMMITTEE ON THE TERMINATION OF THE NATIONAL EMERGENCY UNITED STATES SENATE



NOVEMBER 19, 1973



RECEIVED

JUL 26 1991

Jay L. Debow, Chartered

---

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1973

24–509 O

43

# FOREWORD

————•♦•————

Since March 9, 1933, the United States has been in a state of declared national emergency. In fact, there are now in effect four presidentially proclaimed states of national emergency: In addition to the national emergency declared by President Roosevelt in 1933, there are also the national emergency proclaimed by President Truman on December 16, 1950, during the Korean conflict, and the states of national emergency declared by President Nixon on March 23, 1970, and August 15, 1971.

These proclamations give force to 470 provisions of Federal law. These hundreds of statutes delegate to the President extraordinary powers, ordinarily exercised by the Congress, which affect the lives of American citizens in a host of all-encompassing manners. This vast range of powers, taken together, confer enough authority to rule the country without reference to normal constitutional processes.

Under the powers delegated by these statutes, the President may: seize property; organize and control the means of production; seize commodities; assign military forces abroad; institute martial law; seize and control all transportation and communication; regulate the operation of private enterprise; restrict travel; and, in a plethora of particular ways, control the lives of all American citizens.

With the melting of the cold war—the developing détente with the Soviet Union and China, the stable truce of over 20 years duration between North and South Korea, and the end of U.S. involvement in the war in Indochina—there is no present need for the United States Government to continue to function under emergency conditions.

The Special Committee on the Termination of the National Emergency was created [1] to examine the consequences of terminating the declared states of national emergency that now prevail; to recommend what steps the Congress should take to ensure that the termination can be accomplished without adverse effect upon the necessary tasks of governing; and, also, to recommend ways in which the United States can meet future emergency situations with speed and effectiveness but without relinquishment of congressional oversight and control.

In accordance with this mandate, the Special Committee—in conjunction with the Executive branch, expert constitutional authorities, as well as former high officials of this Government—is now engaged

———

[1] S. Res. 9, 93d Cong., 1st Sess.

Page 000020

# EXHIBIT 3

*U.S. Congress*

# Congressional Record

## PROCEEDINGS AND DEBATES

OF THE

### FIRST SESSION OF THE
### SEVENTY-THIRD CONGRESS

ALSO

### SPECIAL SESSION OF THE SENATE

OF

### THE UNITED STATES
### OF AMERICA

---

## VOLUME 77–PART 1

MARCH 4, 1933, TO MARCH 6, 1933—MARCH 9, 1933, TO APRIL 3, 1933

(Pages 1 to 1158)



LA LAW LIBRARY

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1933

**LA LAW LIBRARY**

creased income, and we all admit that he should have an income. From whom is he to receive this income?

We have a national income today of I do not know how many billion dollars. The farmer is to receive an increased income and it is to come from the American working people, the very people whom just a few days ago you voted to take from the Federal pay roll, and the veterans, from whom it is proposed to take $500,000,000 of their earned and justly due compensation and pension. You cannot build up the farmer, except merely temporarily, unless you build up the income of the entire Nation, and you can build up the income of the entire Nation if you will take the huge profits from bankers and restore those profits to the American people. Congress has the power and the right to control and coin money, and it should certainly have the right to control the profits of bankers. If you wish to put the farmer on his feet, let us do as some of the Republicans indicated yesterday, do it by direct loans at low rates of interest, and most of all, let us issue $5,000,000,000 and put the unemployed to work. If you will do that, the problems of the farmer will dissipate into clear air, and also, while you are about it, why not pay the soldiers' bonus, which is justly due them?

The SPEAKER pro tempore. The time of the gentleman from California has expired.

Mr. FULMER. Mr. Speaker, I yield now to the gentleman from California [Mr. STUBBS].

Mr. STUBBS. Mr. Speaker, I hail from an agricultural district in California. It is as large as four of the eastern States—Massachusetts, Rhode Island, Connecticut, and Delaware. It so happens that the largest living things in the world are in my district, and it so happens that the highest point in the United States, that of Mount Whitney, overlooks the great area which I represent. My district reaches from the snow-crowned Sierras to the sea. Those mighty snow-crowned peaks are standing there silent and watchful guardians, insuring wealth and happiness to the 300,000 people in my district.

But somehow or other during these years of misrule and misguidance our people are prostrate at this time, and from those 300,000 across the continent today is coming the cry for help upon the part of this Congress. To my desk come literally scores of telegrams asking that this Congress give to this agricultural area some assurance of relief and some hope. I believe it would be wise for this body at this time to support this measure, for it holds out some hope and some encouragement to this agricultural district of mine and to the hundreds of others of this Nation. So I shall favor this measure because my people are anxious for this relief. [Applause.]

The SPEAKER pro tempore. The time of the gentleman from California [Mr. STUBBS] has expired.

Mr. CLARKE of New York. Mr. Speaker, I yield 15 minutes to the gentleman from Pennsylvania [Mr. BECK].

Mr. BECK. Mr. Speaker, there is one very significant feature of this debate and that is that there has been, so far as I have followed it, no reference to any grant of power to the Congress by the Constitution, which would justify the passage of this legislation. If this were a bill that followed well-defined lines and could invoke a settled line of judicial decisions in its support and was not a bill, which, as the President has said, invites us to enter upon a "new and untrod path", then the absence of this primary question of constitutional power might be explained; but we are confronted with a bill, about which we are unanimous in one respect, that is, that it is the most extraordinary law that was probably ever proposed to the American Congress. Yet, with that common consent as to its unprecedented features, no one has suggested any pertinent clause of the Constitution, which grants to the Congress the power to pass this legislation.

The gentleman from California [Mr. HOEPPEL] said a few moments ago that this bill was contrary to the laws of God and of man. He might have added with equal force, but perhaps he included it in the last of the two classes, that it is indubitably in violation of the Constitution of the United States.

Let us recur to the very elementary principle, that for some years past has been ignored in this body, that the Constitution never vested in the Congress any power in respect to agriculture as such.

In the Constitutional Convention an attempt was made to confer a federal authority over manufactures, but that was promptly voted down on the ground that it would be destructive of the limited purposes of the Federal Government; but no one had the audacity to suggest in the Constitutional Convention, although many of its members, including its illustrious presiding officer, George Washington, were farmers, that there should be a federal power in respect to agriculture as such. Notwithstanding the fact that a large majority of that convention were farmers, they, with the pride of the good yeomen of this country, nothing undervalued to the "good yeomen " of England, of whom Shakespeare speaks, never contended that there should be a federal power in respect to agriculture. How, then, have we any constitutional control over agriculture? Simply in respect to the interstate transportation of agricultural products or foreign commerce or legitimate taxation, and if this bill were limited to transactions which were properly part of interstate or foreign transportation of agricultural products, or interstate commerce therein, it would then have some justification.

The only other theory, which may reconcile the Members of this body in respect to their constitutional powers in voting for this measure, is the suggestion of an emergency. I think of all the damnable heresies that have ever been suggested in connection with the Constitution the doctrine of emergency is the worst. It means that when Congress declares an emergency there is no Constitution. This means its death. It is the very doctrine that the German Chancellor is invoking today in the dying hours of the parliamentary body of the German Republic, namely, that because of an emergency it should grant to the German Chancellor absolute power to pass any law, even though that law contradicts the constitution of the German Republic. Chancellor Hitler is at least frank about it. We pay the Constitution lip service, but the result is the same. With that dictatorship the German Republic will for some indefinite time probably try to function.

Let me summarize some details of the bill by using the words of a recognized publicist, Mr. Mark Sullivan, when he said, in substance, that—

The Secretary is empowered " to enter into marketing agreements with producers of any agricultural commodity ", " to issue licenses ", " to suspend or revoke such license ", to exclude any processor not licensed under penalty of a fine of $1,000 a day, " to provide for reduction in the acreage of any basic agricultural commodity ", to fix prices for farm products equivalent to prices "during the pre-war period, August 1909 to July 1914 "; " to establish State and local committees or associations of producers to act as his agents "; " to levy, assess, and collect * * * a tax to be paid by the processor ", to change this tax at will, to abate or refund taxes, to borrow from the Treasury. The Secretary is even empowered to levy, assess, and collect duties upon imports into the United States upon commodities which, within the United States, are subject to the processing tax. " Such duties shall be in addition to any other duty imposed by law." A special set of powers having to do with cotton gives the Secretary authority " to buy cotton ", " to sell cotton ", " to borrow money on cotton ", " to enter into contracts with producers of cotton ", to deliver to producers of cotton " nontransferable option contracts ", to be exercised by producers who reduce their acreage.

Thus we are making the Secretary of Agriculture a czar for the agricultural interests of the country, with a power not only over the American farmer, who once had great pride and self-respect—and I believe still has—but we are giving him a power such as was never dreamed before over the products of the farm and over the processors who convert them into useful commodities. What is the result then? We confer upon the Secretary of Agriculture these powers to determine who shall take part in any processing business, because the power is given to him to license, and, if he refuses to grant a license, anyone who attempts to pursue a

LA LAW LIBRARY

## CONGRESSIONAL RECORD—HOUSE

legitimate business of processing can be indicted in the federal courts and fined $1,000 a day for daring—God save the mark—to engage in a legitimate business interest without the visa and permission of the Secretary of Agriculture.

Do you realize that a year ago the Supreme Court of the United States said that that could not be reconciled with the fundamental liberties of the American citizen as guaranteed by the fifth amendment as to the Federal Government and by the fourteenth amendment as to the people of the States; for in a case that came up from Oklahoma the legislature of that State provided that no one should engage in the ice business unless he got a permit from the Corporation Commission? The Supreme Court of the United States said that the business of engaging in ice was a legitimate business, that it had no suggestion of a public utility that gave any larger governmental power, and that therefore it was to take from a man the right to life, liberty, and the pursuit of happiness if he is denied the right to engage in any legitimate calling without first asking the permission and getting the visa of the Corporation Commission of the State of Oklahoma.

Mr. JONES. Will the gentleman yield?

Mr. BECK. Yes; I yield.

Mr. JONES. In this particular bill the license applies only to those engaged in interstate commerce or in the current of interstate commerce, whereas the instance of which the gentleman speaks is a local matter.

Mr. BECK. It was local, but as I understand this bill, anyone who processes agricultural commodities must obtain a license from the Secretary of Agriculture.

Mr. JONES. I think the gentleman will find it is not quite that broad.

Mr. BECK. The gentleman from Texas is far more familiar with this bill than I am. If my statement is wrong, I am wrong, but it does not alter the fact that the Secretary of Agriculture is given unprecedented powers in respect to the intermediate practice of processing. Moreover, even if the license system is confined by the act to interstate commerce, yet the Supreme Court has never sanctioned a doctrine which would require a governmental license to engage in interstate commerce unless it was a public utility like the stockyards. The taxes assessed by the Secretary of Agriculture on processing do not go into the Treasury for the general benefit of the Treasury but are turned over to a special class of the American people, thus robbing Peter to pay Paul; and that is a gross perversion of the power of taxation.

I could not pretend to exhaust the constitutional objections to this bill. They are many and varied. I have hinted at two: one, the lack of power to deal with agriculture as such, except insofar as its products go into interstate commerce; and, I referred to the extraordinary power over the legitimate business of processing, which is given to the Secretary of Agriculture, which makes him another Stalin over agriculture. Just as the Russian dictator controls the unhappy farmers of Russia, so precisely, the Secretary of Agriculture is now to be lifted up on a supreme throne of power and made the most powerful official of the Government, measured by practical effects, by the powers thus conferred upon him.

I may say, without pretending to argue the unconstitutionality of the law, that this aspect of the question that the bill will be passed whether it is consistent with the Constitution or not confronts every thoughtful man with this portentous fact: The Constitution of the United States, insofar as it prescribes the mechanics of government, still lives; the Constitution of the United States in respect to certain personal limitations that are to protect and safeguard the liberties of the individual still lives; but the Constitution of the United States, as a restraining influence in keeping the Federal Government within the carefully prescribed channels of power, is moribund, if not dead. We are witnessing its death agonies, for when this bill becomes a law, if unhappy it becomes law, there is no longer any workable Constitution to keep the Congress within the limits of its constitutional powers.

Mr. LOZIER. Mr. Speaker, will the gentleman yield?

Mr. BECK. I yield.

Mr. LOZIER. The gentleman is a great constitutional lawyer and I always listen to his addresses with interest and profit.

Is it not true that in the development of our governmental structure and in the evolution of our complex civilization in America our people and courts have traveled far from John Marshall's and Alexander Hamilton's conceptions of government and construction of the Constitution? Is it not a fact that in the last hundred years the constitutionality of many of the most important and far-reaching laws has been challenged when they were first presented in Congress, and the constitutionality of which laws was afterward established? I refer particularly to the legislation that followed the great Civil War.

Mr. BECK. I do not want to interrupt my friend, but my time is limited and I yielded for a question only.

Mr. LOZIER. Is it not true that the courts have been construing the Constitution more liberally in the last 50 years than in the early days of our Republic, and are not our courts, whenever it can be done without doing violence to the plain mandate of the Constitution, construing that great document in the light of present-day problems, in order to accomplish much-needed reforms, better serve the citizenry, and promote social justice, on the theory that the purpose of all just governments is to promote the interests and welfare of the people; and have we not traveled far from the old rules or canons of construction formulated by Marshall, to which the distinguished gentleman so eloquently and convincingly appeals this afternoon?

Mr. BECK. We have traveled far from Chief Justice Marshall—the more the pity—but the gentleman from Missouri is right, in my judgment, and I agree with all he has said as a statement of fact. There is no such thing as a static Constitution, as it is of necessity a living organism, and it has always responded and must inevitably respond in a democracy to the profound changes of a mechanical civilization; but there must be some limit unless you are willing to agree that we are not living under a government of limited powers but under a government of unlimited powers. If the concluding sentence of the statement of the gentleman from Missouri is correct, namely, that whatever is for the general welfare of the United States—and that means whatever Congress deems for the general welfare of the United States—is a justification of any legislation, then we have no Constitution; its form has survived, but its substance is gone; it is, as Chief Justice Fuller said in a notable opinion:

It is with governments as with religions, the form often survives the substance of the thing.

When our Constitution was framed a wise and powerful ruler, Frederick the Great, said that no federated government was possible in a country of widely scattered communities, whose economic interests were conflicting. The Fathers of the Republic sought to meet this objection by confining the Central Government to well-defined channels of power, and these were prescribed in words of such admirable clarity that they have won the admiration of the world; but the doctrine today that animates this Congress—Senate and House—for years past is that the Constitution is a beautiful thing to respect and occasionally read, but as a practical force in restraining unconstitutional legislation it is nonexistent. Whether the Union can survive the destruction of the wise restraints of the Constitution is a question that must now seriously interest all thoughtful men.

I recall a saying of a distinguished American philosopher, who once said—I quote from memory—that as he saw the American people gaily rushing with invincible optimism to the abyss of destruction, he seemed to be witnessing one of the greatest tragedies in the history of the world. This was not an exaggeration. We are fast wasting in a spirit of opportunism our noble heritage—the Constitution of the United States. [Applause.]

[Here the gavel fell.]

# EXHIBIT 4

93d Congress }
1st Session }

SENATE

{ Report
No. 93-549

# EMERGENCY POWERS STATUTES:

### Provisions of Federal Law Now in Effect Delegating to the Executive Extraordinary Authority in Time of National Emergency

---

## REPORT

#### of the

## SPECIAL COMMITTEE ON THE TERMINATION OF THE NATIONAL EMERGENCY UNITED STATES SENATE



NOVEMBER 19, 1973



RECEIVED

JUL 2 6 1981

Jay L. Decew, Chartered

---

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1973

24-509 O

43

# FOREWORD

Since March 9, 1933, the United States has been in a state of declared national emergency. In fact, there are now in effect four presidentially proclaimed states of national emergency: In addition to the national emergency declared by President Roosevelt in 1933, there are also the national emergency proclaimed by President Truman on December 16, 1950, during the Korean conflict, and the states of national emergency declared by President Nixon on March 23, 1970, and August 15, 1971.

These proclamations give force to 470 provisions of Federal law. These hundreds of statutes delegate to the President extraordinary powers, ordinarily exercised by the Congress, which affect the lives of American citizens in a host of all-encompassing manners. This vast range of powers, taken together, confer enough authority to rule the country without reference to normal constitutional processes.

Under the powers delegated by these statutes, the President may: seize property; organize and control the means of production; seize commodities; assign military forces abroad; institute martial law; seize and control all transportation and communication; regulate the operation of private enterprise; restrict travel; and, in a plethora of particular ways, control the lives of all American citizens.

With the melting of the cold war—the developing détente with the Soviet Union and China, the stable truce of over 20 years duration between North and South Korea, and the end of U.S. involvement in the war in Indochina—there is no present need for the United States Government to continue to function under emergency conditions.

The Special Committee on the Termination of the National Emergency was created [1] to examine the consequences of terminating the declared states of national emergency that now prevail; to recommend what steps the Congress should take to ensure that the termination can be accomplished without adverse effect upon the necessary tasks of governing; and, also, to recommend ways in which the United States can meet future emergency situations with speed and effectiveness but without relinquishment of congressional oversight and control.

In accordance with this mandate, the Special Committee—in conjunction with the Executive branch, expert constitutional authorities, as well as former high officials of this Government—is now engaged

---

[1] S. Res. 9, 93d Cong., 1st Sess.

Page 000027

# EXHIBIT 5

93D CONGRESS }      SENATE      { REPORT
1st Session }                    No. 93–549

# EMERGENCY POWERS STATUTES:

### PROVISIONS OF FEDERAL LAW
### NOW IN EFFECT DELEGATING TO THE
### EXECUTIVE EXTRAORDINARY AUTHORITY
### IN TIME OF NATIONAL EMERGENCY

---

# REPORT

### OF THE

## SPECIAL COMMITTEE ON THE
## TERMINATION OF THE
## NATIONAL EMERGENCY
## UNITED STATES SENATE



**NOVEMBER 19, 1973**



RECEIVED

JUL 2 6 1991

Jay L. Decew, Chartered

---

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1973

24–509 O

43

93D CONGRESS } SENATE { REPORT
1st Session } { No. 93–549

## EMERGENCY POWERS STATUTES:

### PROVISIONS OF FEDERAL LAW NOW IN EFFECT DELEGATING TO THE EXECUTIVE EXTRAORDINARY AUTHORITY IN TIME OF NATIONAL EMERGENCY

November 19, 1973.—Ordered to be printed

Mr. MATHIAS (for Mr. CHURCH) as co-chairman of the Special Committee on the Termination of the National Emergency, submitted the following

## REPORT

[Pursuant to S. Res. 9, 93d Cong.]

## INTRODUCTION

### A—A BRIEF HISTORICAL SKETCH OF THE ORIGINS OF EMERGENCY POWERS NOW IN FORCE

A majority of the people of the United States have lived all of their lives under emergency rule. For 40 years, freedoms and governmental procedures guaranteed by the Constitution have, in varying degrees, been abridged by laws brought into force by states of national emergency. The problem of how a constitutional democracy reacts to great crises, however, far antedates the Great Depression. As a philosophical issue, its origins reach back to the Greek city-states and the Roman Republic. And, in the United States, actions taken by the Government in times of great crises have—from, at least, the Civil War—in important ways shaped the present phenomenon of a permanent state of national emergency.

American political theory of emergency government was derived and enlarged from John Locke, the English political-philosopher whose thought influenced the authors of the Constitution. Locke argued that the threat of national crisis—unforeseen, sudden, and potentially catastrophic—required the creation of broad executive

(1)

Page 000030

# EXHIBIT 6

States, and in view of the provisions of section 3 of Public Law 93-110, 87 Stat. 352, as amended by section 2 of Public Law 93-373, 88 Stat. 445, [set out as a note under section 442 of former Title 31, Money and Finance], it is ordered as follows:

SECTION 1. Executive Order No. 6260 of August 28, 1933, as amended by Executive Order No. 6359 of October 25, 1933, Executive Order No. 6556 of January 12, 1934, Executive Order No. 6560 of January 15, 1934, Executive Order No. 10896 of November 29, 1960, Executive Order No. 10905 of January 14, 1961, and Executive Order No. 11037 of July 20, 1962; the fifth and sixth paragraphs of Executive Order No. 6073, March 10, 1933 [formerly set out as a note under section 95 of this title]; sections 3 and 4 of Executive Order No. 6359 of October 25, 1933 [formerly set out as a note under section 248 of this title]; and paragraph 2(f) of Executive Order No. 10289 of September 17, 1951 [set out as a note under section 301 of Title 3, The President], are hereby revoked.

SECTION 2. The revocation, in whole or in part, of such prior Executive orders relating to regulation on the acquisition of, holding of, or other transactions in gold shall not affect any act completed, or any right accruing or accrued, or any suit or proceeding finished or started in any civil or criminal cause prior to the revocation, but all such liabilities, penalties, and forfeitures under the Executive orders shall continue and may be enforced in the same manner as if the revocation had not been made.

This order shall become effective on December 31, 1974.

GERALD R. FORD.

### § 95b. Ratification of acts of President and Secretary of the Treasury under section 95a

The actions, regulations, rules, licenses, orders and proclamations heretofore or hereafter taken, promulgated, made, or issued by the President of the United States or the Secretary of the Treasury since March 4, 1933, pursuant to the authority conferred by section 95a of this title, are approved and confirmed.

(Mar. 9, 1933, ch. 1, title I, § 1, 48 Stat. 1.)

CODIFICATION

This section is also set out as a note under section 5 of Title 50, Appendix, War and National Defense.

### SUBCHAPTER V—OBTAINING AND ISSUING CIRCULATING NOTES

### §§ 101 to 110. Repealed. Pub. L. 103–325, title VI, § 602(e)(5)–(11), (f)(2)–(4)(A), (g)(9), Sept. 23, 1994, 108 Stat. 2292, 2294

Section 101, acts Mar. 14, 1900, ch. 41, § 12, 31 Stat. 49; Oct. 5, 1917, ch. 74, § 2, 40 Stat. 342, provided for delivery of circulating notes in blank to national banking associations depositing bonds with Treasurer of United States.

Section 101a, R.S. § 5159; Dec. 23, 1913, ch. 6, § 17, 38 Stat. 268; June 21, 1917, ch. 32, § 9, 40 Stat. 239, related to deposit of bonds to secure circulating notes.

Section 102, R.S. § 5158, construed term "United States bonds" as including registered bonds.

Section 103, act Oct. 5, 1917, ch. 74, § 3, 40 Stat. 342, related to denominations of notes and limitation on amount of $1 and $2 notes.

Section 104, R.S. § 5172; May 30, 1908, ch. 229, § 11, 35 Stat. 551; Dec. 23, 1913, ch. 6, § 27, 38 Stat. 274; Aug. 4, 1914, ch. 225, 38 Stat. 682; Mar. 3, 1919, ch. 101, § 4, 40 Stat. 1315, related to printing and form of circulating notes.

Section 105, act June 20, 1874, ch. 343, § 5, 18 Stat. 124, provided that Comptroller of Currency was to print charter numbers of association on circulating bank notes.

Section 106, act Mar. 3, 1875, ch. 130, § 1, 18 Stat. 372, provided for printing national-bank notes on distinctive paper adopted by Secretary of the Treasury.

Section 107, R.S. § 5173, related to custody of plates and dies procured for printing notes and payment of expenses.

Section 108, R.S. § 5174; Feb. 27, 1877, ch. 69, § 1, 19 Stat. 252, related to examination of plates, dies, and other material from which national-bank circulation was printed, and destruction of obsolete material.

Section 109, R.S. § 5182; Jan. 13, 1920, ch. 38, 41 Stat. 387, provided that banks could issue and circulate notes the same as money if signed by officers in manner of obligatory promissory notes payable on demand at place of business, and specified demands for which such notes were to be received.

Section 110, R.S. § 5183; Feb. 18, 1875, ch. 80, § 1, 18 Stat. 320, prohibited banks from issuing unauthorized notes.

### SUBCHAPTER VI—REDEMPTION AND REPLACEMENT OF CIRCULATING NOTES

### § 121. Repealed. Pub. L. 103–325, title VI, § 602(f)(4)(B), Sept. 23, 1994, 108 Stat. 2292

Section, acts June 20, 1874, ch. 343, § 3, 18 Stat. 123; Dec. 23, 1913, ch. 6, § 20, 38 Stat. 271; May 29, 1920, ch. 214, § 1, 41 Stat. 654, provided that every national banking association was to establish reserve in Treasury for redemption of notes by Treasurer of United States, forward notes unfit for use to Treasurer for disposition, and reimburse expenses of Treasury.

### § 121a. Redemption of notes unidentifiable as to bank of issue

Whenever any Federal Reserve bank notes or Federal Reserve notes are presented to the Treasurer of the United States for redemption and such notes cannot be identified as to the bank of issue or the bank through which issued, the Treasurer of the United States may redeem such notes under such rules and regulations as the Secretary of the Treasury may prescribe.

(June 13, 1933, ch. 62, § 1, 48 Stat. 127; Pub. L. 89-427, § 4(a), May 20, 1966, 80 Stat. 161; Pub. L. 103-325, title VI, § 602(g)(8)(A), Sept. 23, 1994, 108 Stat. 2294.)

AMENDMENTS

1994—Pub. L. 103-325, § 602(g)(8)(A)(i), which directed the amendment of this section by striking out '', and the notes, other than Federal Reserves notes, so redeemed shall be forwarded to the Comptroller of the Currency for cancellation and destruction'' after "Treasury may prescribe'', was executed by striking out text which contained the word "Reserves'' rather than "Reserve'', to reflect the probable intent of Congress.

Pub. L. 103-325, § 602(g)(8)(A)(ii), substituted "Whenever any Federal Reserve bank notes,'' for "Whenever any national bank notes, Federal Reserves bank notes,''.

1966—Pub. L. 89-427 excepted Federal Reserve notes from the category of notes which, upon redemption by the Treasurer of the United States, must be forwarded to the Comptroller of the Currency for cancellation and destruction

TRANSFER OF FUNCTIONS

For transfer of functions to Secretary of the Treasury, see note set out under section 55 of this title.

### § 122. Repealed. Pub. L. 97–258, § 5(b), Sept. 13, 1982, 96 Stat. 1068

Section, act July 14, 1890, ch. 708, § 6, 26 Stat. 289, related to deposits received by the Treasurer from national banks made to redeem circulating notes of such banks and disposition of those deposits.

# EXHIBIT 7

# PUBLIC LAWS OF THE SEVENTY-THIRD CONGRESS

### OF THE

## UNITED STATES OF AMERICA

*Passed at the first session, which was begun and held at the city of Washington, in the District of Columbia, on Thursday, the ninth day of March, 1933, and was adjourned without day on Friday, the sixteenth day of June, 1933.*

FRANKLIN D. ROOSEVELT, President; JOHN N. GARNER, Vice President; KEY PITTMAN, President of the Senate *pro tempore*; HENRY T. RAINEY, Speaker of the House of Representatives.

---

[CHAPTER 1.]

### AN ACT

To provide relief in the existing national emergency in banking, and for other purposes.

*March 9, 1933.*
*[H.R. 1491.]*
*[Public, No. 1.]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Congress hereby declares that a serious emergency exists and that it is imperatively necessary speedily to put into effect remedies of uniform national application.

National banking system. Emergency declared existing.

## TITLE I

SECTION 1. The actions, regulations, rules, licenses, orders and proclamations heretofore or hereafter taken, promulgated, made, or issued by the President of the United States or the Secretary of the Treasury since March 4, 1933, pursuant to the authority conferred by subdivision (b) of section 5 of the Act of October 6, 1917, as amended, are hereby approved and confirmed.

Proclamations, orders, etc., issued since March 4, 1933; approval.
*Post,* p. 343.
Trading with the Enemy Act, amended.
Vol. 40, pp. 415, 966, amended.
Foreign exchange, export or hoarding of coin, bullion, etc.

SEC. 2. Subdivision (b) of section 5 of the Act of October 6, 1917 (40 Stat. L. 411), as amended, is hereby amended to read as follows:

Regulatory powers of President during national emergency.

"(b) During time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange, transfers of credit between or payments by banking institutions as defined by the President, and export, hoarding, melting, or earmarking of gold or silver coin or bullion or currency, by any person within the United States or any place subject to the jurisdiction thereof; and the President may require any person engaged in any transaction referred to in this subdivision to furnish under oath, complete information relative thereto, including the production of any books of account, contracts, letters or other papers, in connection therewith in the custody or control of such person, either before or after such transaction is completed. Whoever willfully violates any of the provisions of this subdivision or of any license, order, rule or regulation issued thereunder, shall, upon conviction, be fined not more than $10,000, or, if a natural person, may be imprisoned

Compulsory testimony, etc.

Punishment for violation.

86037°—34——1

1

# PUBLIC LAWS OF THE SEVENTY-THIRD CONGRESS

### OF THE

## UNITED STATES OF AMERICA

*Passed at the first session, which was begun and held at the city of Washington, in the District of Columbia, on Thursday, the ninth day of March, 1933, and was adjourned without day on Friday, the sixteenth day of June, 1933.*

FRANKLIN D. ROOSEVELT, President; JOHN N. GARNER, Vice President; KEY PITTMAN, President of the Senate *pro tempore*; HENRY T. RAINEY, Speaker of the House of Representatives.

[CHAPTER 1.]

### AN ACT

To provide relief in the existing national emergency in banking, and for other purposes.

March 9, 1933.
[H.R. 1491.]
[Public, No. 1.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Congress hereby declares that a serious emergency exists and that it is imperatively necessary speedily to put into effect remedies of uniform national application.

National banking system.
Emergency declared existing.

## TITLE I

SECTION 1. The actions, regulations, rules, licenses, orders and proclamations heretofore or hereafter taken, promulgated, made, or issued by the President of the United States or the Secretary of the Treasury since March 4, 1933, pursuant to the authority conferred by subdivision (b) of section 5 of the Act of October 6, 1917, as amended, are hereby approved and confirmed.

Proclamations, orders, etc., issued since March 4, 1933, approved.
*Post,* p. 343.
Trading with the Enemy Act, amended.
Vol. 40, pp. 415, 966, amended.

SEC. 2. Subdivision (b) of section 5 of the Act of October 6, 1917 (40 Stat. L. 411), as amended, is hereby amended to read as follows:

Foreign exchange, export or hoarding of coin, bullion, etc.
Regulatory powers of President during national emergency.

"(b) During time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange, transfers of credit between or payments by banking institutions as defined by the President, and export, hoarding, melting, or ear-marking of gold or silver coin or bullion or currency, by any person within the United States or any place subject to the jurisdiction thereof; and the President may require any person engaged in any transaction referred to in this subdivision to furnish under oath, complete information relative thereto, including the production of any books of account, contracts, letters or other papers, in connection therewith in the custody or control of such person, either before or after such transaction is completed. Whoever willfully violates any of the provisions of this subdivision or of any license, order, rule or regulation issued thereunder, shall, upon conviction, be fined not more than $10,000, or, if a natural person, may be imprisoned

Compulsory testimony, etc.

Punishment for violation.

80027°—34——1

# EXHIBIT 8

H.R. 1491    (PUBLIC....No....1.........73d CONGRESS)

## Seventy-third Congress of the United States of America;

### At the First Session,

Begun and held at the City of Washington on Thursday, the ninth
day of March, one thousand nine hundred and thirty-three.

## AN ACT

To provide relief in the existing national emergency in banking, and
for other purposes.

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,* That the Con-
gress hereby declares that a serious emergency exists and that it is
imperatively necessary speedily to put into effect remedies of
uniform national application.

### TITLE I

SECTION 1. The actions, regulations, rules, licenses, orders and
proclamations heretofore or hereafter taken, promulgated, made, or
issued by the President of the United States or the Secretary of the
Treasury since March 4, 1933, pursuant to the authority conferred
by subdivision (b) of section 5 of the Act of October 6, 1917, as
amended, are hereby approved and confirmed.

SEC. 2. Subdivision (b) of section 5 of the Act of October 6, 1917
(40 Stat. L. 411), as amended, is hereby amended to read as follows:

"(b) During time of war or during any other period of national
emergency declared by the President, the President may, through
any agency that he may designate, or otherwise, investigate, regulate,
or prohibit, under such rules and regulations as he may prescribe, by
means of licenses or otherwise, any transactions in foreign exchange,
transfers of credit between or payments by banking institutions as
defined by the President, and export, hoarding, melting, or ear-
marking of gold or silver coin or bullion or currency, by any person
within the United States or any place subject to the jurisdiction
thereof; and the President may require any person engaged in any
transaction referred to in this subdivision to furnish under oath,
complete information relative thereto, including the production of
any books of account, contracts, letters or other papers, in connec-
tion therewith in the custody or control of such person, either before
or after such transaction is completed. Whoever willfully violates
any of the provisions of this subdivision or of any license, order,
rule or regulation issued thereunder, shall, upon conviction, be fined
not more than $10,000, or, if a natural person, may be imprisoned
for not more than ten years, or both; and any officer, director, or

H. R. 1491—9

able to enable it to obtain adequate credit accommodations through rediscounting at the Federal reserve bank or any other method provided by this Act other than that provided by section 10 (a), any Federal reserve bank, under rules and regulations prescribed by the Federal Reserve Board, may make advances to such member bank on its time or demand notes secured to the satisfaction of such Federal reserve bank. Each such note shall bear interest at a rate not less than 1 per centum per annum higher than the highest discount rate in effect at such Federal reserve bank on the date of such note. No advance shall be made under this section after March 3, 1934, or after the expiration of such additional period not exceeding one year as the President may prescribe."

SEC. 403. Section 13 of the Federal Reserve Act, as amended, is amended by adding at the end thereof the following new paragraph:

"Subject to such limitations, restrictions and regulations as the Federal Reserve Board may prescribe, any Federal reserve bank may make advances to any individual, partnership or corporation on the promissory notes of such individual, partnership or corporation secured by direct obligations of the United States. Such advances shall be made for periods not exceeding 90 days and shall bear interest at rates fixed from time to time by the Federal reserve bank, subject to the review and determination of the Federal Reserve Board."

## TITLE V

SEC. 501. There is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $2,000,000, which shall be available for expenditure, under the direction of the President and in his discretion, for any purpose in connection with the carrying out of this Act.

SEC. 502. The right to alter, amend, or repeal this Act is hereby expressly reserved. If any provision of this Act, or the application thereof to any person or circumstances, is held invalid, the remainder of the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby.

*Vice President of the United States and*
*President of the Senate.*

Approved —

March 9ᵗʰ 1933

8 : 30 p. m.

Franklin D Roosevelt

Henry T. Rainey

*Speaker of the House of Representatives.*

# EXHIBIT 9

ized as authorized by existing law: *Provided*, That the pay of the grades of general and lieutenant general shall be $10,000 and $9,000 a year, respectively, with allowances appropriate to said grades as determined by the Secretary of War: *And provided*, That brigadier generals of the Army shall hereafter rank relatively with rear admirals of the lower half of the grade. And, hereafter, the chief of any existing staff corps, department, or bureau, except as is otherwise provided for the Chief of Staff, shall have the rank, pay, and allowances of major general.

*Proviso.*
*Pay and allowances.*

*Brigadier generals to rank with rear admirals.*

*Chiefs of bureaus, etc., made major generals.*

Approved, October 6, 1917.

---

CHAP. 106.—An Act To define, regulate, and punish trading with the enemy, and for other purposes.

*October 6, 1917.*
*[H. R. 4960.]*
*[Public, No. 91.]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act shall be known as the "Trading with the enemy Act."

*Trading with the Enemy Act.*

SEC. 2. That the word "enemy," as used herein, shall be deemed to mean, for the purposes of such trading and of this Act—

*Terms defined.*
*"Enemy."*

(a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such territory, and any corporation incorporated within such territory of any nation with which the United States is at war or incorporated within any country other than the United States and doing business within such territory.

*Persons residing in enemy country or trading therein.*

*Foreign corporations included.*

(b) The government of any nation with which the United States is at war, or any political or municipal subdivision thereof, or any officer, official, agent, or agency thereof.

*Government, officials, etc.*

(c) Such other individuals, or body or class of individuals, as may be natives, citizens, or subjects of any nation with which the United States is at war, other than citizens of the United States, wherever resident or wherever doing business, as the President, if he shall find the safety of the United States or the successful prosecution of the war shall so require, may, by proclamation, include within the term "enemy,"

*Other designated persons.*

The words "ally of enemy," as used herein, shall be deemed to mean—

*"Ally of enemy."*

(a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation which is an ally of a nation with which the United States is at war, or resident outside the United States and doing business within such territory, and any corporation incorporated within such territory of such ally nation, or incorporated within any country other than the United States and doing business within such territory.

*Persons residing, or trading, in country thereof.*

*Corporations.*

(b) The government of any nation which is an ally of a nation with which the United States is at war, or any political or municipal subdivision of such ally nation, or any officer, official, agent, or agency thereof.

*Government, officials, etc.*

(c) Such other individuals, or body or class of individuals, as may be natives, citizens, or subjects of any nation which is an ally of a nation with which the United States is at war, other than citizens of the United States, wherever resident or wherever doing business, as the President, if he shall find the safety of the United States or the successful prosecution of the war shall so require, may, by proclamation, include within the term "ally of enemy."

*Other designated persons.*

60

# EXHIBIT 10

SIXTY-FIFTH CONGRESS. Sess. I. Chs. 105, 106. 1917.    411

ized as authorized by existing law: *Provided*, That the pay of the grades of general and lieutenant general shall be $10,000 and $9,000 a year, respectively, with allowances appropriate to said grades as determined by the Secretary of War: *And provided*, That brigadier generals of the Army shall hereafter rank relatively with rear admirals of the lower half of the grade. And, hereafter, the chief of any existing staff corps, department, or bureau, except as is otherwise provided for the Chief of Staff, shall have the rank, pay, and allowances of major general.

Approved, October 6, 1917.

<span style="float:right">*Previous.*<br>Pay and allowances.</span>
<span style="float:right">Brigadier generals to rank with rear admirals.</span>
<span style="float:right">Chiefs of bureaus, etc., made major generals.</span>

---

CHAP. 106.—An Act To define, regulate, and punish trading with the enemy, and for other purposes.

<span style="float:right">October 6, 1917.<br>[H. R. 4960.]<br>[Public, No. 91.]</span>

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That this Act shall be known as the "Trading with the enemy Act."

<span style="float:right">Trading with the Enemy Act.</span>

SEC. 2. That the word "enemy," as used herein, shall be deemed to mean, for the purposes of such trading and of this Act—

<span style="float:right">Terms defined.<br>"Enemy."</span>

(a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such territory, and any corporation incorporated within such territory of any nation with which the United States is at war or incorporated within any country other than the United States and doing business within such territory.

<span style="float:right">Persons residing in enemy country or trading therein.</span>
<span style="float:right">Foreign corporations included.</span>

(b) The government of any nation with which the United States is at war, or any political or municipal subdivision thereof, or any officer, official, agent, or agency thereof.

<span style="float:right">Government, officials, etc.</span>

(c) Such other individuals, or body or class of individuals, as may be natives, citizens, or subjects of any nation with which the United States is at war, other than citizens of the United States, wherever resident or wherever doing business, as the President, if he shall find the safety of the United States or the successful prosecution of the war shall so require, may, by proclamation, include within the term "enemy."

<span style="float:right">Other designated persons.</span>

The words "ally of enemy," as used herein, shall be deemed to mean—

<span style="float:right">"Ally of enemy."</span>

(a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation which is an ally of a nation with which the United States is at war, or resident outside the United States and doing business within such territory, and any corporation incorporated within such territory of such ally nation, or incorporated within any country other than the United States and doing business within such territory.

<span style="float:right">Persons residing, or trading, in country thereof.</span>
<span style="float:right">Corporations.</span>

(b) The government of any nation which is an ally of a nation with which the United States is at war, or any political or municipal subdivision of such ally nation, or any officer, official, agent, or agency thereof.

<span style="float:right">Government, officials, etc.</span>

(c) Such other individuals, or body or class of individuals, as may be natives, citizens, or subjects of any nation which is an ally of a nation with which the United States is at war, other than citizens of the United States, wherever resident or wherever doing business, as the President, if he shall find the safety of the United States or the successful prosecution of the war shall so require, may, by proclamation, include within the term "ally of enemy."

<span style="float:right">Other designated persons.</span>

60