# EXHIBIT 33

64

more after the passage of these statutes, they were still in operation at the time; thus the decisions did work a sizable if belated check on the government's crisis activity. Just how effective a limitation on crisis action this makes of the Court is hard to say. In light of the recent war, the Court today would seem to be a fairly harmless observer of the *emergency* activities of the President and Congress. It is highly unlikely that the separation of powers and the Tenth Amendment will be called upon again to hamstring the efforts of the government to deal resolutely with a serious national emergency.[88]

[Emphasis supplied.]

## Emergency Administration

Having established a number of new programs, either through statutory authorizations or by grants of discretionary power, the President was faced with the task of purposefully administering and coordinating these mandates. "Organizationally, in dealing with the depression, it was Roosevelt's general policy to assign new, emergency functions to newly created agencies, rather than to already existing departments."[49] The President had a variety of reasons for pursuing this course: he thought the departments were burdened with duties which preoccupied them in meeting the current crisis; he believed a new agency with a single task in attacking an exigency would be dedicated and persistent in its mission; he felt that such new agencies with emergency duties as might be created to deal with the depression could, when the crisis passed, be easily eradicated without disturbing the regular Executive branch departments; he thought talented and expert personnel might be attracted to the specialized new emergency units; and there was also a desire on the part of the President to avoid the established Civil Service channels in staffing for the emergency period and to utilize political appointees.[50]

As a first step toward establishing a coordinating instrument, Roosevelt, acting under the authority of the Federal Emergency Relief Act (48 Stat. 22) and the National Industrial Recovery Act (48 Stat. 195), issued E.O. 6202A on July 11, 1933, establishing a temporary Executive Council.[51] As an explanation for the creation of this panel the following statement was offered in a chronology of the unit's activities:

The wide diffusion of emergency activities undertaken by the Federal Government immediately following the first inauguration of Franklin D. Roosevelt as President, coupled with the imperative requirement for quick action, necessitated the forming of a compact group of administrative officials of both permanent and temporary units who could advise the Chief Executive with respect to various courses

---

[48] Clinton Rossiter. *Constitutional Dictatorship: Crisis Government in the Modern Democracies.* Princeton: Princeton University Press, 1948, p. 264.
[49] Wann, *op. cit.,* p. 28; also see Robert E. Sherwood. *Roosevelt and Hopkins.* New York: Harper and Brothers, 1948, pp. 31–32.
[50] Wann, *op. cit.,* pp. 26–27.
[51] ...evelt papers (Vol. II, pp. 279–280).

65

of procedure, and, at the same time, be in a position to follow them through with a minimum of delay or confusion.[52]

Composed of twenty-four members and meeting every Tuesday afternoon with Roosevelt presiding, the Council soon "proved too cumbersome for effective discussion."[53]

Actually, the Executive Council functioned more or less as an enlarged Cabinet, with Roosevelt conducting the Council meetings in much the same way as he did those of the regular Cabinet. Although he may have originally intended that the Executive Council would serve as a broad coordinating agency, it did not function effectively in that way. The Council was not provided with a staff, nor did it have any formal power to coordinate the work of the departments and agencies other than that exercised by Roosevelt himself. The only coordinating function served by the Council was that of enabling the heads of the regular departments to meet once a week with the heads of the new emergency agencies and the President to exchange ideas and information on problems that were interdepartmental in scope.

In itself, this was undoubtedly of considerable value in the early days of the New Deal, but neither the Council nor the Executive Secretary served in an important way to make decisions of a coordinative nature for the President. Such decisions were made by Roosevelt himself, with the Executive Council serving only as a source of information and advice. [Frank C.] Walker's most valuable role continued to be that of an informal "trouble shooter" who served the President behind-the-scenes in trying to iron out difficulties and smooth ruffled feelings, rather than in his formal role as Executive Secretary of the Executive Council. Except insofar as it may have been valuable as a device for exchanging information and for enabling the heads of the departments and agencies to get to know each other better, the Council did not serve as an effective mechanism for coordination.[54]

Recognizing the deficiencies of the Executive Council, the President established another coordinating organization with a more limited membership. Relying upon the same statutory authority utilized for creating the Executive Council, together with the provisions of the Agricultural Adjustment Act (48 Stat. 31), Roosevelt issued E.O. 6433A on November 17, 1933 setting up the National Emergency Council.[55]

In establishing the National Emergency Council Roosevelt had some significant political motives as well. The creation

---

[52] The U.S. National Emergency Council. *The National Emergency Council: A Chronological Review of its Activities from November 17, 1933 Through December 31, 1937.* Washington: The U.S. National Emergency Council, 1938, p. 1; Cf. Roosevelt, *op. cit.,* p. 141.
[53] Lester G. Seligman and Elmer E. Cornwell, Jr., eds. *New Deal Mosaic: Roosevelt Confers with his National Emergency Council, 1933–1936.* Eugene: University of Oregon Press, 1965, p. xv.
[54] Wann, *op. cit.,* p. 51.
[55] Roosevelt papers (Vol. II), pp. 487–489.

**EXHIBIT 34**

# BOUVIER'S

# LAW DICTIONARY

BY

## JOHN BOUVIER

*Ignoratis terminis ignoratur et ars.* — Co. Litt. 2a

*Je sais que chaque science et chaque art a ses termes propres, inconnus au commun des hommes.* — Fleury

### A New Edition

THOROUGHLY REVISED AND BROUGHT UP TO DATE

BY

## FRANCIS RAWLE

OF THE PHILADELPHIA BAR

## VOL. I.

BOSTON

THE BOSTON BOOK COMPANY

1897

Page 000201

PREFA(

Entered according to Act of Congress, in the year 1839, by
JOHN BOUVIER,
in the Clerk's Office of the District Court of the United States for the Eastern District of Pennsylvania.

Entered according to Act of Congress, in the year 1843, by
JOHN BOUVIER,
in the Clerk's Office of the District Court of the United States for the Eastern District of Pennsylvania.

Entered according to Act of Congress, in the year 1846, by
JOHN BOUVIER,
in the Clerk's Office of the District Court of the United States for the Eastern District of Pennsylvania.

Entered according to Act of Congress, in the year 1852, by
ELIZA BOUVIER AND ROBERT E. PETERSON, TRUSTEES,
in the Clerk's Office of the District Court of the United States for the Eastern District of Pennsylvania.

Entered according to Act of Congress, in the year 1867, by
ELIZA BOUVIER AND ROBERT E. PETERSON, TRUSTEES,
in the Clerk's Office of the District Court of the United States for the Eastern District of Pennsylvania.

Entered according to Act of Congress, in the year 1883, by
ROBERT E. PETERSON,
in the Office of the Librarian of Congress at Washington.

Copyrighted in the year 1897, by
R. EVANS PETERSON, TRUSTEE.

transfer the tenancy or privity of estate between himself and his landlord, without the latter's consent: an assignee, who comes in only in privity of estate, is liable only while he continues to be legal assignee; that is while in possession under the assignment. Bac. Ab. Covenant, E 4; Woodf. L. & T. 279; Vin. Ab. h. t.  Vide *Privies.*

PRIZE, *mar. law, war,* is the apprehension and detention at sea, of a ship or other vessel, by authority of a belligerent power, either with the design of appropriating it, with the goods and effects it contains, or with that of becoming master of the whole or a part of its cargo. 1 Rob. Adm. R. 228.  The vessel or goods thus taken are also called a prize. Goods taken on land from a public enemy, are called booty, (q. v.) and the distinction between a prize and a booty consists in this that the former is taken at sea and the latter on land.  In order to vest the title of the prize in the captors, it must be brought with due care into some convenient port for adjudication by a competent court.  The condemnation must be pronounced by a prize court of the government of the captor sitting in the country of the captor, or his ally; the prize court of an ally cannot condemn.  Strictly speaking, as between the belligerent parties the title passes, and is vested when the capture is complete; and that was formerly held to be complete and perfect when the battle was over, and the *spes recuperandi* was gone.  1 Kent, Com. 100; Abbott on Shipp. Index, h. t.; 13 Vin. Ab. 51; 8 Com. Dig. 885; 2 Bro. Civ. Law, 444; Merl. Répert. h. t. Vide *Infra præsidia.*

PRIZE COURT, *Engl. law,* the name of a court which has jurisdiction of all captures made in war on the high seas.  In England this is a separate branch of the court of admiralty, the other branch being called the *instance court,* (q. v.)  The district courts of the United States have jurisdiction both as instance and prize courts, there being no distinction in this respect as in England. 3 Dall. 6; vide 1 Gall. R. 563; Bro. Civ. & Adm. Law, ch. 6 & 7; 1 Kent, Com. 356.

PRO.  A latin preposition signifying for.  As to its effects in contracts, vide Plowd. 412.

PRO CONFESSO, *chan. pract.* For confessed.  When the defendant has been served personally with a subpœna, or when not being so served has appeared, and afterwards neglects to answer the matter contained in the bill, it shall be taken *pro confesso,* as if the matter were confessed by the defendant.  Blake's Ch. Pr. 80; Newl. Ch. Pr. ch. 1, s. 12; 1 Johns. Ch. R. 8.  It may also be taken *pro confesso* if the answer is insufficient.  4 Vin. Ab. 446; 2 Atk. 24; 3 Ves. 209; Harr. Ch. Pr. 154.  Vide 4 Ves. 619, and the cases there cited.

PRO INDIVISIO.  For an undivided part.  The possession or occupation of lands or tenements belonging to two or more persons, and consequently neither knows his several portion till divided.  Bract. l. 5.

PRO RATA.  According to the rate, proportion or allowance.  A creditor of an insolvent estate, is to be paid *pro rata* with creditors of the same class.

PROBABLE CAUSE.  When there are grounds for suspicion, that a person has committed a crime or misdemeanor, and public justice and the good of the community require that the matter should be examined, there is said to be a *probable cause* for making a charge against the accused, however malicious the intention of the accuser may have been. Cro. Eliz. 70; 2 T. R. 231.  And probable cause will be presumed till

# EXHIBIT 35

# REPORTS

ON

## THE LAW OF CIVIL GOVERNMENT IN TERRITORY SUBJECT TO MILITARY OCCUPATION BY THE MILITARY FORCES OF THE UNITED STATES.

SUBMITTED TO

### HON. ELIHU ROOT,

SECRETARY OF WAR,

BY

### CHARLES E. MAGOON,

LAW OFFICER, BUREAU OF INSULAR AFFAIRS,
WAR DEPARTMENT

PUBLISHED BY ORDER OF THE SECRETARY OF WAR.

SECOND EDITION.

BUREAU OF INSULAR AFFAIRS,
WAR DEPARTMENT.

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1902.

Checked
May 1913

Go gle

264

ereignty of the United States and obedience thereto in the Philippines. The owners should be made to clearly understand that the United States requires them to see to it that the insurgents shall not benefit from this fund. If to comply with this requirement it is necessary to withdraw their funds and employees from localities infested by insurgents, such withdrawal must be made.

The fact that this banking concern is operating under an English charter does not relieve it from obedience to the authority of the United States, nor enable it to deal with the insurgents with impunity, nor justify it in demanding indemnity from the United States when its dealings with the insurgents involve it in disaster—financial or otherwise.

If the views herein expressed are approved by the State Department it may prevent further complications if the State Department could induce the Government of Great Britain to inform Messrs. Smith, Bell & Co. that said Government assents to the views entertained by the United States regarding this matter. Messrs. Smith, Bell & Co. are probably acting in ignorance of the laws and usages of war and the comity of nations, but in undoubting faith that the British Government will uphold them in the exercise of rights accorded by the usages of trade in times of peace. The situation under the conditions existing in the Philippines is liable to create international complications, which could be obviated by a little judicious advice or admonition from a source respected by the intended beneficiary.

Meanwhile it might be well to ask Major-General Otis what, if any, objection or obstacle prevents the seizure of the draft.

---

## THE CONFISCATION OF PRIVATE PROPERTY OF ENEMIES IN WAR.

[Submitted February 1, 1901. Case No. 2414, Division of Insular Affairs, War Department.]

### SYNOPSIS.

1. When the United States is engaged in war, foreign or civil, the President, as chief in command of a belligerent force, may prevent the shooting down of the soldiers of the United States by depriving the men who are doing the shooting of the means of securing ammunition.
2. The authority so to do is derived from the laws of war, and constitutes a belligerent right, the exercise of which is subject to the discretion of that branch of the Government which is charged with the conduct of belligerent undertakings.
3. For the accomplishment of this purpose the President may use all branches of the military establishment, including the several departments of a military government of territory subject to military occupation.

265

4. Should the President desire to utilize the services of the Federal courts of the United States in promoting this purpose or military undertaking, since these courts derive their jurisdiction from Congress and do not constitute a part of the military establishment, he must secure from Congress the necessary action to confer such jurisdiction upon said courts.

5. The laws and usages of war make a distinction between enemies' property captured on the sea and property captured on land.   The jurisdiction of the courts of the United States over property captured at sea is held not to attach to property captured on land in the absence of Congressional action.

6. If it be necessary for Congress to confer authority before enemies' private property on land can be confiscated, such authority exists by virtue of the provisions of sections 5308 and 5309, Revised Statutes of the United States, and may be exercised against the insurgents in the Philippines, *provided* the insurrection therein is against "the Government of the United States."

7. If confiscation of private property is intended as a punishment for offenses of a criminal character against the Federal Government of the United States it is necessary for the legislative branch to define the crime, prescribe the penalty, and confer the jurisdiction to inflict such penalty.

8. If such confiscation is intended as a punishment for offenses against the military government of the Philippines, the legislative branch of that government may provide the necessary legislation.

SIR: I have the honor to acknowledge the receipt of your request for a report on the above-entitled matter, and in response thereto I have the further honor to submit the following:

The right of confiscation is a sovereign right.   In time of peace the exercise of this right is limited and controlled by the domestic constitution and institutions of the Government.   In time of war, when the right is exercised against enemies' property as a war measure, such right becomes a belligerent right, and as such is not subject to the restrictions imposed by domestic institutions, but is regulated and controlled by the laws and usages of war.

Under our form of government Congress may provide the ways and means of exercising this right, as it does an army and navy to prosecute a war, but the use and application of said ways and means devolve upon the Executive and those charged with the conduct of military operations.

All property within the enemy's territory is enemy's property and subject to capture and confiscation. (Young *v.* United States, 97 U. S., 39.)

The same rules, relative to capture and confiscation of property apply to civil wars as to wars between nations, for a like necessity exists for injuring and weakening the hostile force.   (Miller *v.* United States, 11 Wall., 308, 313; The confiscation cases, 20 Wall., 92; Gay's Gold, 13 Wall. 351; The *Amy Warwick*, 2 Black (U. S.), 636.)

Confiscation of private property is more easily justified in civil wars than in foreign wars, for the insurgents in levying war against the government to which they owe allegiance not only subject their property to the hazard of that war, but also are guilty of treason.

266

In exercising the right to confiscate enemies' property, modern nations make a distinction between property on the sea and property on land. The right exists alike in both cases, but the practice is to refrain from confiscating property on land for a period after the condition of war is found to prevail, while the seizure of property at sea is commenced as soon as war is recognized or declared to exist. The property of citizens of many nations is to be found on the sea, and, as the sea is a common highway, no presumption of hostility results from the property being there, such as results from its being in hostile territory; therefore prize courts are established for the purpose of determining the liability to confiscation of captures at sea. The jurisdiction and procedure of these courts are fixed by statute and common law, and continue through times of peace as well as times of war. Being specially provided to deal with property captured at sea, this jurisdiction is held not to attach to property seized on land. The courts of the United States are dependent upon Congress for their jurisdiction; therefore, in order that the courts of the United States may entertain proceedings regarding confiscation of property seized on land, it is necessary for Congress to confer authority therefor. (Brown *v.* United States, 8 Cranch, 110.)

Confiscation by court procedure is not the only means by which a belligerent nation may dispose of enemy's property, for the purpose of weakening that enemy or strengthening itself. Under the laws and usages of war all property situated in enemy's territory is presumed to be tainted with hostility and liable to confiscation, therefore it is not necessary to have that question judicially determined, as is done when property is captured at sea.

The final purpose of court proceedings in confiscation is to pass the title of the property to the capturing nation, and thereby enable it to convey the title to others. Under the laws and usages of war title to personal property passes with possession, and therefore title to such property passes to the captors when the capture is made complete and his possession becomes firmly fixed. It is well understood that capture passes the title to such property as arms, ammunition, and other munitions of warfare, or to property, public or private, of such character as may assist the enemy in promoting his undertakings.

Belligerent nations do not resort to court procedure to exercise the rights of impressment of property, reprisal, or the enforcement of military contribution. Yet the exercise of these rights constitutes confiscation, and the title to the property seized passes to the captor upon the capture being completed.

The rule as to real property is different. When the proprietary interests in real property belong to the public or belligerent sovereignty, the title passes to the capturing belligerent and remains there during the period it is occupied (actually or constructively) by the captor. If such occupancy becomes permanent, the title is permanent.

267

Under the laws and usages of modern warfare, when the title to real property is in a private individual the title does not pass by capture or hostile occupation of the territory. Such occupation, however, gives the occupying belligerent the right to confiscate real estate which is the subject of private ownership. This right is seldom exercised. Whether it is exercised or not usually depends upon the individual owners. If they persist in defying the new sovereignty, or refuse obedience to the military government instituted pursuant to the laws of military occupation, or wantonly violate others of the laws of war, or continue in unauthorized efforts to prevent the advent of peace, then recourse is had to confiscation of their lands and goods as a military measure for the accomplishment of the purpose of all military measures—to compel peace.

Such confiscation may be—

1. A military measure to deprive such enemy of means which he is using or is likely to use in opposition to the purposes and objects of the endeavors in which the belligerent making the confiscation is engaged.

2. A punishment for an overt act in violation of the laws of war, the laws of the military government of the territory, or the sovereignty to which the territory is subject.

In order to justify such confiscation it is necessary to establish certain facts relating to the individual and the use of the property which is being made, contemplated, or probable. This produces a situation analogous to that of property captured at sea. It may or may not be liable to confiscation, and the question is a proper one to refer to a tribunal which may exercise judicial powers in investigation and determination.

When the United States is engaged in a war, which branch of the Government is authorized to declare the will of the sovereignty of the United States regarding the confiscation of private property of the enemy, prescribe the rules therefor, and means for their enforcement?

Undoubtedly Congress may exercise this authority, for the Constitution grants to Congress the right "to define and punish  *  *  * offenses against the law of nations," and "to  *  *  *  make rules concerning captures on land and water;" also "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers and all other powers vested by this Constitution in the Government of the United States or in any department thereof." (Section 8, article 1.)

During the civil war Congress exercised this authority and passed two acts, entitled as follows:

An act to confiscate property used for insurrectionary purposes. (App. Aug. 6, 1861. 12 U. S. Stat. at Large, 319.)

An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes. (App. Aug. 6, 1861. 12 U. S. Stat. at Large, 589.)

268

These acts were held to be a legitimate exercise of the war power and constitutional. (Miller *v.* United States, 11 Wall., 294.)

The attention of the Secretary of War is directed to the fact that the provisions of the act approved August 6, 1861, are continuing in effect, are not confined to the geographical area designated as the United States, and are declared by the Supreme Court to be an exercise of the war powers of this Government, powers which extend to and are exercised in any and every country wherein the United States becomes involved in war. The provisions of said act were incorporated in the Revised Statutes of the United States wherein it is provided as follows:

SEC. 5308. Whenever during any insurrection against the Government of the United States, after the President shall have declared by proclamation that the laws of the United States are opposed, and the execution thereof obstructed, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the power vested in the marshals by law, any person, or his agent, attorney, or employee, purchases or acquires, sells or gives, any property of whatsoever kind or description, with intent to use or employ the same, or suffers the same to be used or employed in aiding, abetting, or promoting such insurrection or resistance to the laws, or any person engaged therein; or being the owner of any such property, knowingly uses or employs, or consents to such use or employment of the same, all such property shall be lawful subject of prize and capture wherever found; and it shall be the duty of the President to cause the same to be seized, confiscated, and condemned.

SEC. 5309. Such prizes and capture shall be condemned in the district or circuit court of the United States having jurisdiction of the amount, or in admiralty in any district in which the same (may) be seized, or into which they may be taken and proceedings first instituted.

The original act provided:

That if, during the present *or any future* insurrection against the Government of of the United States, etc. (12 Stat. L., 319.)

If the insurrection in the Philippines is held to be an "insurrection against the Government of the United States," it would appear that Congress has already declared the will of the sovereignty of this nation and declared for the confiscation of the private property of the insurgents, and that proceedings in regard thereto were to be conducted in admiralty. If there are courts in the Philippines exercising admiralty jurisdiction, may they not also exercise jurisdiction in confiscation matters? If there are no courts in the Philippines exercising jurisdiction in admiralty, may not the jurisdiction be conferred upon them by the Commission by the exercise of legislative powers? The Supreme Court of the United States sustained the jurisdiction in admiralty conferred upon the Territorial courts of Florida by the Territorial legislature. (American Ins. Co. *v.* Canter, 1 Pet., 511.)

If this view is accepted, attention is directed to the fact that said provisions become operative "after the President of the United States shall have declared by proclamation that the laws of the United States

269

are opposed, and the execution thereof obstructed, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings." It is the "*laws*" not the *statutes* of the United States that that are to be declared "opposed."

The authorities establish (in the judgment of the writer):

1. That the right to confiscate private property, as a military measure intended to promote the purposes of a war, is derived from the laws of war. The right is not conferred by legislation, but its exercise may be regulated thereby. (Smith *v.* Brazleton, 1 Heisk. (Tenn.), 59–61; Mrs. Alexander's Cotton, 2 Wall., 419, 420; The Prize Cases, 2 Black, 671; Brown *v.* United States, 8 Cranch, 122, 123, 149–151, 154; Planters' Bank *v.* Union Bank, 16 Wall., 483; Gray Jacket, 5 Wall., 369; Sprott *v.* United States, 20 id., 459; Lamar *v.* Browne, 92 U. S., 187.)

2. Where judicial proceedings are had to complete the transfer of title and provide a record thereof, such proceedings are *in rem*, and it is not necessary that the person of the proprietor should be in the custody of the court. (The Confiscation Cases, 20 Wall., 93, 104; Miller *v.* United States, 11 Wall., 268.)

3. A confiscation of private property intended to prevent the use of said property by the enemy as munition of war is an exercise of the war power of the nation made to protect and promote its belligerent rights. (Young *v.* United States, 97 U. S., 39; Miller *v.* United States, 11 Wall., 268.)

4. A confiscation of private property belonging to an insurgent, as a punishment for treason, is an exercise of the *municipal* power of the nation, made to protect and promote its *sovereign* rights. (Ibid.)

5. While engaged in suppressing an insurrection, the United States may exercise the war powers and the sovereign powers of a nation. (Ibid.)

When confiscation of property is intended as a punishment for crime, it is doubtless necessary for the legislative branch to authorize such punishment, for in the United States crimes and their penalties originate in statutes. Such is not the case when the war powers of the nation are called into action. A failure to observe this distinction has produced a theory that the right to confiscate private property of the enemy must be conferred upon the military authorities by the political branch of the Government, when in fact it is derived from that branch of international law known as the laws and usages of war. It is the right to utilize the courts in confiscation matters that is conferred by the political branch.

So high an authority as the American and English Encyclopædia of Law failed to observe this distinction, and in its first edition laid down the rule as follows:

The power to decide whether enemy property seized upon land shall be confiscated or not in any war waged by the United States is a political one, and Congress must decide the question in any such war. (Vol. 11, p. 459, 1st ed., title: International Law.)

This language is omitted from the discussion of International Law in the second edition, and therein it is stated:

It was decided by the Federal Supreme Court early in the nineteenth century that property found in the United States at the outbreak of a war with the country to which the owners of the property belonged was subject to confiscation, but that the

270

exercise of this right was a matter for the legislative department, and in the absence of an act of Congress providing for such confiscation the property could not be *judicially condemned*, a mere declaration of war not being sufficient for the purpose. (Vol. 16, p. 1152.)

In Young *v.* United States (97 U. S., 39) the court say (p. 58):

It is equally beyond doubt that during the war cotton found within the Confederate territory, though the private property of noncombatants, was a legitimate subject of capture by the national forces. We have many times so decided without dissent. *The authority for the capture was not derived from any particular act of Congress,* but from the character of the property, it being "potentially an auxiliary" of the enemy and constituting a means by which they hoped and expected to perpetuate their power.

The court further say (p. 67):

Property captured during the war was not taken by way of punishment for the treason of the owner any more than the life of a soldier, slain in battle, was taken to punish him. He was killed because engaged in war and exposed to its dangers. So property was captured because it had become involved in the war, and its removal from the enemy was necessary in order to lessen their warlike power.

Lincoln's famous question to those who complained of the arrest of Vallandigham presents the justifying principle. As applied to the situation in the Philippines, the question is: May not the President, as Commander in Chief of the Army and Navy, prevent the shooting down of American soldiers by depriving the men who are doing the shooting of the means of securing ammunition?

## II.

In the absence of legislation by Congress providing therefor, may the military government in the Philippines provide for the confiscation of property found on land in said archipelago, when the property is owned by individual insurgents, and authorize the courts of the islands to conduct proceedings in condemnation?

If the confiscation is intended to be a punishment for treason against the *Federal Government* of the United States, it is undoubtedly necessary for Congress to impose it.

If the confiscation is intended as a punishment for resisting the lawful authority of the military government of the Philippines, that government has the right to inflict it and may use its courts for that purpose.

This question arose during the existence of the military government in New Mexico.

The conquest of New Mexico by the military forces of the United States was accomplished by the campaign of 1846. In compliance with instructions given by the President, the officer in command, General Kearny, organized a civil government for the occupied territory and filled the executive and judicial offices by appointment. In Decem-

271

ber, 1846, the native inhabitants organized a conspiracy to overthrow the United States authority in New Mexico. On the night of January 15, 1847, the insurgents began hostilities and succeeded in killing the governor and a number of others—officials and citizens of the United States. The insurrection became general, and the declared purpose was to kill all the Americans and those Mexicans who had accepted office under the American Government. The insurrection was suppressed by the military forces of the United States and a number of the insurgents captured, and by the latter part of 1847 comparative safety was secured and maintained by stationing troops at various points. Of the insurgent prisoners, fifteen or twenty, perhaps more, were tried by courts-martial, sentenced to death, and executed. The others were turned over to the civil authorities of the military government for trial in the civil courts. A grand jury indicted four of them for the offense of treason against the United States. One was tried by a jury and convicted. The prisoner challenged the jurisdiction of the civil court and assailed the indictment on the ground that he was not a citizen of the United States, nor bound to yield allegiance to that Government. Strong pressure was brought to bear in his behalf, and the district attorney, Mr. Blair, referred the matter to Washington for instruction. He addressed his communication to Hon. John Y. Mason, then Attorney-General of the United States. Said letter was as follows:

SANTA FE, *April 1, 1847.*

SIR: You will doubtless have received before this reaches you the particulars of the late insurrection in the northern district of this territory through the public prints.

Of the prisoners taken in the suppression of that rebellion one of the leaders was executed under sentence of a court-martial, the remainder were turned over for trial to the civil authorities on the charge of treason against the United States.

At a term of the United States district court for this territory, held at this capital in March last, four conspicuous persons in the late rebellion were indicted for treason by the grand jury; three put upon their trial, one of whom was found guilty and sentenced by the court, one discharged under a nolle prosequi, and two obtained continuance to the adjourned term of the court in May next. Some twenty-five prisoners were discharged, the grand jury not finding sufficient evidence to indict them for treason.

About fifty prisoners are confined at Taos, in the northern district, awaiting trial at the term of the court commencing on the 5th instant, at which time both the circuit court for that county and the United States district court will be in session.

A number of the prisoners can be identified as active participants in the massacre of the late Governor Bent and others; these it is the intention to prosecute before the circuit court; but many others, who were active in the planning and exciting the late insurrection, I feel it my duty to prosecute for treason against the United States.

I have taken the liberty to lay these particulars before you, in order that I may understandingly ask your counsel and advice, which I have had a great desire to obtain before entering upon these prosecutions, but the want of opportunity to communicate with you did not permit it.

You are doubtless fully aware of the manner and form in which Brigadier-General Kearny declared New Mexico a territory of the United States, and its inhabitants

272

citizens, subject to her laws and liable to penalty for their infraction in like manner as citizens of any other Territory of the United States. By the authority in him vested he established a civil government, a superior court, with jurisdiction as a United States district court. In this last-named court I, by appointment, act as United States district attorney, and have felt it my duty to prosecute all acts of treason committed by the inhabitants of this territory, holding them responsible for all their acts as citizens of the United States.

In nearly all the cases tried the counsel for the defense have entered pleas to the jurisdiction of the court, which the court overruled, and in the case of Trujillo, who was convicted, the defense plead the jurisdiction of the court before the jury, declaring it to be unconstitutional to try any native inhabitant of New Mexico for the crime of treason against the Government of the United States until by actual treaty with Mexico he became a citizen. The court ruled out any consideration of this point by the jury, leaving it only the evidence and the facts upon which to make its verdict. Considering that as constituted, the court was bound by its oath to view all the inhabitants of New Mexico as citizens of the United States and to execute the laws in regard to them as such, leaving the responsibility of the question of its constitutionality to fall back upon the power which constituted it.

I am anxious to receive your counsel and advice at the earliest possible moment in regard to all the matters above referred to.

Mails for this place will no doubt leave Fort Leavenworth regularly hereafter, and I trust you will oblige me by replying to this by the first opportunity.

Very respectfully, your obedient servant,

FRANK P. BLAIR.

Hon. JOHN Y. MASON,
    *Attorney-General of the United States.*

The Attorney-General referred the matter to the War Department. Hon. W. L. Marcy was then Secretary of War, and he addressed his communications relating to the matter to Col. Sterling Price, in command of the United States forces in New Mexico. From these communications the following passages are quoted:

WAR DEPARTMENT, *June 11, 1847.*

SIR:
  *      *      *      *      *      *      *

I am not aware that the President has yet received the petition for the pardon of Antonio Maria Trujillo, but I have conversed with him, and am now enabled to present his views on that subject.

The temporary civil government in New Mexico results from the conquest of the country. It does not derive its existence directly from the laws of Congress or the Constitution of the United States, and the President can not, in any other character than that of Commander in Chief, exercise any control over it. It was first established in New Mexico by the officer at the head of the military force sent to conquer that country under general instructions contained in the communication from this Department of the 3d of June, 1846. Beyond such general instructions the President has declined to interfere with the management of the civil affairs of this territory. The powers and authority possessed by General Kearny when in New Mexico were devolved on you as the senior military officer on his departure from that country. They are ample in relation to all matters presented to the consideration of the President in the communication of the acting governor, Vigil, dated 23d March last, and to you as the senior military officer, or to whosoever is such officer, he will leave such matters without positive or special direction. Your better knowledge of all the

273

facts and circumstances will doubtless enable you to take a wise and prudent course in regard to them.

The insurrection in that department called for energy of action and severe treatment of the guilty. It was but justice that the offenders should be punished. The safety of our troops and the security of our possessions required it. Beyond what was necessary to these ends it is presumed you have not gone, and the President sincerely hopes that the life of Antonio Maria Trujillo may be spared without disregarding them. With this suggestion he leaves the case of Trujillo to your disposal, as he does all others yet under consideration.

\*     \*     \*     \*     \*     \*     \*

Very respectfully, your obedient servant,

W. L. MARCY,
*Secretary of War.*

Col. STERLING PRICE,
    *Or officer Commanding U. S. Forces at Santa Fe, N. Mex.*

---

WAR DEPARTMENT,
*Washington, June 26, 1847.*

SIR:

\*     \*     \*     \*     \*     \*     \*

The foundation of the civil government in New Mexico is not derived directly from the laws and Constitution of the United States, but rests upon the rights acquired by conquest. I call your particular attention to the fourth paragraph of my letter of the 11th of June as containing the principles on which the temporary government at New Mexico does or should rest. The territory conquered by our arms does not become by the mere act of conquest a permanent part of the United States, and the inhabitants of such territory are not, to the full extent of the term, citizens of the United States. It is beyond dispute that on the establishment of a temporary civil government in a conquered country the inhabitants owe obedience to it and are bound by the laws which may be adopted. They may be tried and punished for offenses. Those in New Mexico who in the late insurrection were guilty of murder or instigated others to that crime were liable to be punished for these acts either by the civil or military authority; but it is not the proper use of legal terms to say that their offense was treason committed against the United States, for to the Government of the United States as the Government under our Constitution it would not be correct to say that they owed allegiance. It appears by the letter of Mr. Blair, to which I have referred, that those engaged in the insurrection have been proceeded against as traitors against the United States. In this respect I think there was error, so far as relates to the designation of the offense. Their offense was against the temporary civil government of New Mexico and the laws provided for it, which that government had the right, and, indeed, was bound to see executed.

On two former occasions I have addressed you in regard to Trujillo, who has been convicted of participating in the insurrection and the execution of his sentence suspended, and made known the decided wishes of the President that his punishment should be remitted.

Firmness may under some circumstances be required as an element of security to the citizens of the United States and other persons in countries conquered by our arms. When such is the case, it should be unshrinkingly exercised; but when a merciful course can be safely indulged it is strongly commended as promising in the end the best results. Such a course is prompted by the better feelings of our nature, and, on the ordinary principles of human action, can not fail to promote quiet, security, and

13635—02——18

Page 000215

274

conciliation.  I would therefore suggest that this course be adopted in all the other cases not finally disposed of so far as considerations of safety will allow.

\*           \*           \*           \*           \*           \*

Very respectfully, your obedient servant,

W. L. MARCY,
*Secretary of War.*

Col. STERLING PRICE,
*Commanding United States Forces, Santa Fe, N. Mex.*

For the reasons stated in the foregoing correspondence the President declined to exercise the power to pardon vested in him as Chief Civil Magistrate of the United States, but as Commander in Chief of the Army authorized the military governor to use his discretion in the matter, and the prisoner was pardoned by the governor.

The events resulting from this insurrection did not escape the attention of Congress.  That body on July 10, 1848, passed a resolution calling upon the President for information in regard to the existence of civil governments in New Mexico and California, their form and character, by whom instituted and by what authority, and how they were maintained and supported; also whether any persons had been tried and condemned for "treason against the United States" in New Mexico.

President Polk replied to said resolution by message (dated July 17) received July 24, 1848, in which he discusses the character of military government, taking the position that such a government may exercise the "fullest rights of sovereignty."  With said message he transmitted the correspondence above referred to, and also a letter received by him from the Secretary of War.  In this message President Polk said:

The temporary governments authorized were instituted by virtue of the rights of war.  The power to declare war against a foreign country, and to prosecute it according to the general laws of war as sanctioned by civilized nations, it will not be questioned, exists under our Constitution.  When Congress has declared that war exists with a foreign nation, "the general laws of war apply to our situation," and it becomes the duty of the President, as the constitutional "Commander in Chief of the Army and Navy of the United States," to prosecute it.

In prosecuting a foreign war thus duly declared by Congress we have the right by "conquest and military occupation" to acquire possession of the territories of the enemy, and, during the war, to "exercise the fullest rights of sovereignty over it."  The sovereignty of the enemy is in such case "suspended," and his laws can "no longer be rightfully enforced" over the conquered territory "or be obligatory upon the inhabitants who remain and submit to the conqueror.  By the surrender the inhabitants pass under temporary allegiance" to the conqueror, and are "bound by such laws, and such only, as" he may choose to recognize and impose.  "From the nature of the case no other laws could be obligatory upon them, for where there is no protection, or allegiance, or sovereignty there can be no claim to obedience."  These are well-established principles of the laws of war as recognized and practiced by civilized nations, and they have been sanctioned by the highest judicial tribunal of our own country.

275

The letter from the Secretary of War, which accompanied the President's message, was as follows:

WAR DEPARTMENT, *Washington, July 19, 1848.*

SIR: In compliance with your direction to be furnished with such information as may be in this Department, to enable you to answer the resolutions of the House of Representatives of the 10th instant, in relation to the civil governments in New Mexico and California; to the appointment of civil officers therein and the payment of their salaries; to trials for treason against the United States in New Mexico, etc., I have the honor to state that the documents from this Department which accompanied your message to the House of Representatives of the 22d of December, 1846, in reply to a request by that body for information "in relation to the establishment or organization of civil government in any portion of the territory of Mexico, which has been or might be taken possession of by the Army or Navy of the United States," contain all the orders and directions which had been issued by the War Department previous to that time and all the information then known here in regard to the form and character of the governments established in New Mexico and California, the authority by which they were established, and the appointment of civil officers therein.

The documents which accompany this communication contain all the information on the same subjects subsequently received at this Department, as well as all the orders and instructions issued from it since the date of that message.

The governments in New Mexico and California resulted from the conquest and military occupation of these territories, and were established by the military officer in chief command. They have been continued by the same authority, and whatever changes may have occurred in the office of governor have been generally made by the commanding military officer, without special instructions from this Department. In respect to California, instructions were given to General Kearny to proceed from New Mexico to that territory, and, on his arrival, to hold it and exercise, as far as was necessary, civil functions therein. Col. R. B. Mason, of the First Regiment of Dragoons, was afterwards sent to take chief military command of that territory whenever General Kearny, who had leave to return to the United States, should withdraw from it; and, as an incident of such command, to exercise the duties of temporary civil governor; or make proper arrangements for civil government therein.

It appears, by the accompanying papers, that Charles Bent, who had been appointed civil governor of New Mexico by General Kearny, was murdered in an insurrection which took place in January, 1847, and the office of governor, by that event, was devolved on Doniciano Vigil, who was secretary of state under Governor Bent.

The appointment not only of governor but of all the other civil functionaries was left to the military authority, which held the country as a conquest from the enemy. There is no other information in this Department in relation to the changes in the civil officers of either New Mexico or California than such as is contained in the documents which accompany this communication.

It is presumed that the expenses of the civil government in both of these territories have been defrayed by revenues raised within the same. There is nothing in the documents in the Department, nor have I information from any other source, to show that the salaries of officers of the civil government in either have been paid from the Treasury of the United States; or that any money has been drawn therefrom to defray any part of the expenses of the civil government established in them.

It appears, by the accompanying documents, that early in January, 1847, there was an insurrection in New Mexico, confined to that part of it which lies east of the Rio Grande, and many murders, mostly of American citizens, were perpetrated. By the energetic conduct of our military force it was suppressed; not, however, until after considerable loss of life on both sides. Some of the instigators of it, taken in arms,

276

were executed by the military authority; and others, deeply implicated in the crimes committed, were turned over for trial to a civil tribunal called a "district court of the United States." They were, in form, charged with treason against the United States, condemned, and some of them executed. In April, 1847, the person acting as district attorney on their trial addressed a letter to the Attorney-General of the United States (a copy of which is among the documents appended hereto), but it was not received until the latter part of May or the first of June of that year. By this letter, it appears that objections were made at the trials, by the accused, to the jurisdiction of the court. It was urged by them that being citizens of Mexico before the conquest of the territory they did not become thereby citizens of, and consequently could not be guilty of the crime of treason against the United States. These objections were overruled, the trials proceeded and resulted in the conviction and execution of several of the accused.

This letter was referred to this Department by the Attorney-General, with a suggestion that he would give an official opinion upon the questions presented, if, as is the legal course, it should be requested, but the error in the designation of the offense was too clear to admit of doubt, and it is only in cases of doubt that resort can be had to the Attorney-General for his opinion. On the 26th of June, 1847, I wrote to the commanding officer of Santa Fe a letter (a copy of which accompanies this communication), in which the incorrect description of the crime in the proceedings of the court is pointed out. It is therein stated that "the territory conquered by our arms does not become, by the mere act of conquest, a permanent part of the United States, and the inhabitants of such territory are not, to the full extent of the term, citizens of the United States. It is beyond dispute that, on the establishment of a temporary civil government in a conquered country, the inhabitants owe obedience to it, and are bound by the laws which may be adopted; they may be tried and punished for offenses. Those in New Mexico, who in the late insurrection were guilty of murder, or instigated others to that crime, were liable to be punished for these acts either by the civil or military authority, but it is not the proper use of legal terms to say that their offenses was treason committed against the United States. For to the Government of the United States—as the Government under our Constitution—it would not be correct to say that they owed allegiance. It appears by the letter of Mr. Blair, to which I have referred, that those engaged in the insurrection have been proceeded against as traitors to the United States. In this respect I think there was error, so far as relates to the designation of the offense. Their offense was against the temporary civil government of New Mexico and the laws provided for it, which that government had the right and, indeed, was bound to see executed."

No copy or record of the proceedings of the court on these trials for treason has been received at this Department.

Very respectfully, your obedient servant,

W. L. MARCY, *Secretary of War.*

To the PRESIDENT.

(House Ex. Doc. No. 70, first session Thirtieth Congress. War Dept. Cong. Doc. 521.)

The situation in New Mexico at that time was as follows: The military government of New Mexico asserted sovereignty over said territory. The government of Texas also asserted sovereignty thereover. A portion of the inhabitants acknowledged allegiance to Old Mexico and a portion to Texas. A portion of the inhabitants acknowledged the authority of the United States resulting from the military occupation, but by far the greater portion of the inhabitants refused such acknowledgment and were attempting to expel the forces of the United States.

277

Attention is directed to the fact that at the time these trials occurred the treaty of peace with Mexico had not been signed, but the United States has always maintained that it acquired title to New Mexico and California by conquest, and not from the treaty. The treaty does not pretend to cede territory; it is a treaty of peace, in which Mexico acknowledged the rights secured by the United States by conquest. The title of the United States commences with the completion of the conquest, and dates from the period when the territory was occupied by the United States military forces.

The authority of the military government of New Mexico to institute courts, confer jurisdiction thereon, and prescribe the procedure therein, was recognized and sustained by the Supreme Court of the United States. (Leitensdorfer v. Webb, 20 How., 176.)

During the Revolutionary war the American colonies, severally, organized State governments. Nearly all, if not all, of these governments enacted laws for the confiscation of the property, both real and personal, of the Tories and nonresident subjects of Great Britain who continued their allegiance to the British Crown.

In regard thereto the Supreme Court of the United States say (11 Wall., 312):

It is not without weight, that when the Constitution was formed its framers had fresh in view what had been done during the Revolutionary war. Similar statutes for the confiscation of property of domestic enemies, of those who adhered to the British Government, though not residents of Great Britain, were enacted in many of the States, and they have been judicially determined to have been justified by the laws of war. They show what was then understood to be confiscable property, and who were public enemies. At least they show the general understanding that aiders and abettors of the public enemy were themselves enemies, and hence that their property might lawfully be confiscated. It was with these facts fresh in memory, and with a full knowledge that such legislation had been common, almost universal, that the Constitution was adopted. It did prohibit *ex post facto* laws. It did prohibit bills of attainder. They had also been passed by the States. But it imposed no restriction upon the power to prosecute war or confiscate enemy's property. It seems to be a fair inference from the omission that it was intended the Government should have the power of carrying on war as it had been carried on during the Revolution, and therefore should have the right to confiscate an enemy's property, not only the property of foreign enemies, but also that of domestic, and of the aiders, abettors, and comforters of a public enemy. The framers of the Constitution guarded against excesses that had existed during the revolutionary struggle. It is incredible that if such confiscations had not been contemplated as possible and legitimate, they would have been expressly prohibited, or at least restricted.

### III.

In the absence of Congressional authority, may the military authorities of the United States, engaged in suppressing the insurrection in the Philippines, confiscate property found on land, which property belongs to individual insurgents?

During the period of actual hostilities the commander of a belligerent

278

force maintaining military occupation possesses a large and extraordinary power. Such rule is an element of the *jus belli.*

The commander of the occupying army rules the territory within his military jurisdiction as necessity demands and prudence dictates, restrained by international law and obligations, the usages and laws of war, and the orders of his superior officers or the government he serves and represents. (Honsard's Parliamentary Debates, 3d ser., vol. 95, p. 80.   Op. Atty. Gen., vol. 8, p. 369.)

A military government, used as a means for promoting the purposes and endeavors of active hostilities, is subject only to such conditions and restrictions as the laws of war impose upon it.

As was said by the Supreme Court of the United States, such government—

may do anything necessary to strengthen itself and weaken the enemy. There is no limit to the powers that may be exerted in such cases save those which are found in the laws and usages of war.   *   *   *   In such cases the laws of war take the place of the Constitution and laws of the United States as applied in time of peace. (New Orleans *v.* Steamship Co., 20 Wall., 394.)

Commenting on this view of the law, the Texas supreme court say:

This language, strong as it may seem, asserts a rule of international law, recognized as applicable during a state of war.   (Daniel *v.* Hutcheson, 86 Tex., 61.)

The war in the Philippines continues to be one of active hostilities—*flagrante bello,* or, at least, *non cessante bello.*

The conduct of such war devolves upon the President as Commander in Chief of the Army and Navy.

Bennett's Edition of Pomeroy's Constitutional Law, says:

When actual hostilities have commenced, either through a formal declaration made by Congress, or a belligerent attack made by a foreign government which the President must repel by force, another branch of this function as Commander in Chief comes into play.  He wages war; Congress does not.  The legislature may, it is true, control the course of hostilities in an indirect manner, for it must bestow all the military means and instruments, but it can not interfere in any direct manner with the actual belligerent operations.  Wherever be the theater of the warlike movements, whether at home or abroad, whether on land or on the sea, whether there be an invasion or a rebellion, the President as Commander in Chief must conduct those movements; he possesses the sole authority and is clothed with the sole responsibility.  (Sec. 706, p. 591.)

The same author further says:

This military law, or in other words, this code of positive, enacted, statutory rules for the government of the land and naval forces, is something very different from martial law, which, if it exists at all, is unwritten, a part and parcel of the means and methods by which the Commander in Chief may wage effective war, something above and beyond the jurisdiction of Congress, for that body has no direct authority over the actual conduct of hostilities, when war has been initiated.  (Sec. 469, p. 383.)

Chief Justice Chase, in the minority opinion in ex parte **Milligan,** said (4 Wall., 139):

Congress has the power not only to raise and support and govern armies, but to declare war.  It has, therefore, the power to provide by law for carrying on war.

Page 000220

279

This power necessarily extends to all legislation essential to the prosecution of war with vigor and success, *except such as interferes with the command of the forces and the conduct of campaigns.* That power and duty belong to the President as Commander in Chief. Both these powers are derived from the Constitution, but neither is defined by that instrument. Their extent must be determined by their nature, and by the principles of our institutions.

The power to make the necessary laws is in Congress; the power to execute in the President. Both powers imply many subordinate and auxiliary powers. Each includes all authorities essential to its due exercise. But neither can the President, in war more than in peace, intrude upon the proper authority of Congress, *nor Congress upon the proper authority of the President.*

In expressing his individual views in Brown *v.* United States (8 Cranch, 152) Mr. Justice Story said:

The act declaring war has authorized the Executive to employ the land and naval forces of the United States to carry it into effect. When and where shall he carry it into effect? * * * Upon what ground can he authorize a Canadian campaign or seize a British fort or territory and occupy it by right of capture and conquest I am utterly at a loss to perceive, unless it be that the power to carry the war into effect gives every incidental power which the law of nations authorizes and approves in a state of war.

Continuing the discussion, Justice Story says (pp. 153, 154):

My argument proceeds upon the ground that when the legislative authority, to whom the right to declare war is confided, has declared war in its most unlimited manner, the Executive authority, to whom the execution of the war is confided, is bound to carry it into effect. He has a discretion vested in him as to the manner and extent, but he can not lawfully transcend the rules of warfare established among civilized nations. He can not lawfully exercise powers or authorize proceedings which the civilized world repudiates and disclaims. The sovereignty as to declaring war and limiting its effects rests with the legislature. The sovereignty as to its execution rests with the President. If the legislature do not limit the nature of the war all the regulations and rights of general war attach upon it.

The rule is that private property on land may be confiscated when the necessities of the military operations require such action. Who is to determine the question of necessity? In Mrs. Alexander's Cotton (2 Wall., 404) the court say:

Being enemies' property, the cotton was liable to capture and confiscation by the adverse party. It is true that this rule, as to property on land, has received very important qualifications from usage, from the reasonings of enlightened publicists, and from judicial decisions. It may now be regarded as substantially restricted "to special cases dictated by the necessary operation of the war," and as excluding in general "the seizure of the private property of pacific persons for the sake of gain." The commanding general may determine in what special cases its more stringent application is required by military emergencies, while considerations of public policy and positive provisions of law and the general spirit of legislation must indicate the cases in which its application may be properly denied to the property of noncombatant enemies.

All departments of the military government of the Philippines are to be considered as instruments with which a belligerent is waging a war. Therefore its courts, as well as its cannon, may be used to

280

weaken its enemy and strengthen itself. If confiscation is resorted to as a military measure, the commander of the belligerent force having used its soldiers to capture property may use its courts to condemn such captures. Both agencies are instruments of actual war.

The case of Brown *v.* United States (8 Cranch, 110) does not apply to the situation in the Philippines, as understood by the writer.

In that case a private citizen of the United States, in no way connected with the military establishment and without authorization from the military authorities, seized private property alleged to belong to an individual enemy, and sought the assistance of a court of admiralty to condemn said property as prize of war, pursuant to the provisions of the laws regarding prizes captured at sea. The court sustained an objection to the jurisdiction.

In delivering the opinion of the court, Mr. Chief Justice Marshall said (pp. 122, 123):

Respecting the power of government no doubt is entertained. That war gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found is conceded. The mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but can not impair the right itself. That remains undiminished, and when the sovereign authority shall choose to bring it into operation the judicial department must give effect to its will. But until that will shall be expressed no power of condemnation can exist *in the court.*

The Chief Justice further said (pp. 121–122):

It does not appear that this seizure was made under any instructions from the President of the United States; nor is there any evidence of its having his sanction, unless the libels being filed and prosecuted by the law officer, who represents the Government, must imply that sanction. On the contrary, it is admitted that the seizure was made by an individual, and the libel filed at his instance by the district attorney who acted from his own impressions of what constituted his duty.

All parties to that action conceded that Congress alone could invest the courts of the United States with jurisdiction to hear and determine confiscation proceedings. The contention of the libellant was that, by the passage of the act declaring war against England, Congress had thereby declared that confiscation of enemies' goods on land was as permissible as confiscation of such goods on the sea, and the court had the same jurisdiction over goods confiscated on land as was conferred by the "prize laws" of Congress regulating the seizure of goods on the sea, and that a private citizen of the United States was thereby authorized to make the seizure and maintain condemnation proceedings in the courts. The issues were stated by the court as follows (p. 123):

The questions to be decided by the court are:

First. May enemy's property, found on land at the commencement of hostilities, be seized and condemned as a necessary consequence of the declaration of war?

Second. Is there any legislative act which authorizes such seizure and condemnation?

281

Since in this country, from the structure of our Government, *proceedings* to condemn the property of an enemy found within our territory at the declaration of war can be sustained only upon the principle that they are instituted in execution of some existing law.

And again, the court say (p. 126):

The acts of Congress furnish many instances of an opinion that the declaration of war does not of itself authorize *proceedings* against the persons or property of the enemy found at the time within the territory.

Evidently the "proceedings" referred to were proceedings in the civil courts of the United States. The holding of the court was that before the civil courts of the United States can assume jurisdiction, at the instance of a private citizen, to condemn the private property of an individual enemy seized on land by a private citizen of the United States, it is necessary for Congress to confer such jurisdiction and authorize private citizens to invoke it; and that the act declaring war against England did not confer such jurisdiction or authority, and the existing laws known as "prize laws" applied only to captures at sea.

---

## IN THE MATTER OF TRANSMITTING OVER THE TELEGRAPH LINES OPERATED BY THE MILITARY GOVERNMENT OF CUBA MESSAGES RECEIVED FROM OR DESTINED FOR POINTS IN THE UNITED STATES, VIA HAITI AND SANTIAGO DE CUBA.

[Submitted July 9, 1901. Case No. 2105, Division of Insular Affairs, War Department.]

### SYNOPSIS.

1. Examination of the conflicting claims asserted by the International Ocean Telegraph Company, the Cuba Submarine Cable Company, and the French Cable Company, regarding their relative and respective rights under the several concessions granted said companies by the Government of Spain.

2. The Spanish concession to the Cuba Submarine Cable Company appears to confer upon that company the exclusive privilege of transmitting private telegrams passing between Santiago de Cuba, Cienfuegos, Batabanó, and the central station of Habana.

3. Said concession does not curtail the right of the Government to send Government messages between said designated points over the telegraph lines of the Spanish Government, nor to grant concessions for telegraph lines to points in Cuba which will not connect any two of the places reserved to the Cuba Submarine Cable Company.

4. The exclusive privilege conferred by the Spanish concession to the International Ocean Telegraph Company is confined to the exclusive right to ground in the coastal waters of Cuba any telegraph cable the other end of which is attached to any point in the United States. Otherwise than results from this grant the Government of Spain did not undertake to limit or control the international right of the United States to communicate with the island of Cuba.

SIR: I have the honor to acknowledge your request for a report on a matter arising as follows:

The International Ocean Telegraph Company maintains and operates a cable between the United States and Cuba. This company claims

Page 000223

**EXHIBIT 36**

SIXTY-FIFTH CONGRESS. Sess. I. Ch. 106. 1917.        **425**

lector with reference to such shipment and particularly those which may indicate that such gold or silver coin or bullion or moneys of the United States may be intended for delivery or may be delivered, directly or indirectly, to an enemy or an ally of enemy.

Sec. 15. That the sum of $450,000 is hereby appropriated, out of any money in the Treasury of the United States not otherwise appropriated, to be used in the discretion of the President for the purpose of carrying out the provisions of this Act during the fiscal year ending June thirtieth, nineteen hundred and eighteen, and for the payment of salaries of all persons employed under this Act, together with the necessary expenses for transportation, subsistence, rental of quarters in the District of Columbia, books of reference, periodicals, stationery, typewriters and exchanges thereof, miscellaneous supplies, printing to be done at the Government Printing Office, and all other necessary expenses not included in the foregoing. *Appropriation for salaries, expenses, etc.*

Sec. 16. That whoever shall willfully violate any of the provisions of this Act or of any license, rule, or regulation issued thereunder, and whoever shall willfully violate, neglect, or refuse to comply with any order of the President issued in compliance with the provisions of this Act shall, upon conviction, be fined not more than $10,000, or, if a natural person, imprisoned for not more than ten years, or both; and the officer, director, or agent of any corporation who knowingly participates in such violation shall be punished by a like fine, imprisonment, or both, and any property, funds, securities, papers, or other articles or documents, or any vessel, together with her tackle, apparel, furniture, and equipment, concerned in such violation shall be forfeited to the United States. *Penalty for violating provisions, licenses, regulations, etc. Punishment for natural persons. Forfeiture of property, etc.*

Sec. 17. That the district courts of the United States are hereby given jurisdiction to make and enter all such rules as to notice and otherwise, and all such orders and decrees, and to issue such process as may be necessary and proper in the premises to enforce the provisions of this Act, with a right of appeal from the final order or decree of such court as provided in sections one hundred and twenty-eight and two hundred and thirty-eight of the Act of March third, nineteen hundred and eleven, entitled "An Act to codify, revise, and amend the laws relating to the judiciary." *Jurisdiction of district courts. Appeals, etc. Vol. 36, pp. 1133, 1157.*

Sec. 18. That the several courts of first instance in the Philippine Islands and the district court of the Canal Zone shall have jurisdiction of offenses under this Act committed within their respective districts, and concurrent jurisdiction with the district courts of the United States of offenses under this Act committed upon the high seas and of conspiracies to commit such offenses as defined by section thirty-seven of the Act entitled "An Act to codify, revise, and amend the penal laws of the United States," approved March fourth, nineteen hundred and nine, and the provisions of such section for the purpose of this Act are hereby extended to the Philippine Islands and to the Canal Zone. *Jurisdiction of courts of Philippine Islands and Canal Zone. Conspiracies, etc. Vol. 35, p. 1096.*

Sec. 19. That ten days after the approval of this Act and until the end of the war, it shall be unlawful for any person, firm, corporation, or association, to print, publish, or circulate, or cause to be printed, published, or circulated in any foreign language, any news item, editorial or other printed matter, respecting the Government of the United States, or of any nation engaged in the present war, its policies, international relations, the state or conduct of the war, or any matter relating thereto: *Provided,* That this section shall not apply to any print, newspaper, or publication where the publisher or distributor thereof, on or before offering the same for mailing, or in any manner distributing it to the public, has filed with the postmaster at the place of publication, in the form of an affidavit, a true and complete translation of the entire article containing such matter proposed to be published in such print, newspaper, or publication, and has *Printing, etc., in foreign language, matter respecting Government policies, etc., unlawful. Proviso. Not applicable if sworn translation filed with postmaster, and printed therewith.*

02

## LETTER OF SUBMITTAL

SUPREME COURT OF THE UNITED STATES,
*Washington, D. C., December 20, 1937.*

MY DEAR MR. ATTORNEY GENERAL:

By direction of the Supreme Court, I transmit to you herewith the Rules of Civil Procedure for the District Courts of the United States which have been adopted by the Supreme Court pursuant to the Act of June 19, 1934, chapter 651 (48 Stat. 1064).

In accordance with Section 2 of that Act, the Court has united the general rules prescribed by it for cases in equity with those in actions at law so as to secure one form of civil action and procedure for both. The Court requests you, as provided in that section, to report these rules to the Congress at the beginning of the regular session in January next.

I am requested to state that Mr. Justice Brandeis does not approve of the adoption of the rules.

I have the honor to remain,

Respectfully yours,

(Signed)   CHARLES E. HUGHES,
*Chief Justice of the United States.*

Honorable HOMER CUMMINGS,
*Attorney General of the United States,*
*Washington, D. C.*

**EXHIBIT 37**

PUBLIC LAW 94-412—SEPT. 14, 1976          90 STAT. 1255

## Public Law 94-412
## 94th Congress

### An Act

To terminate certain authorities with respect to national emergencies still in effect, and to provide for orderly implementation and termination of future national emergencies.

*Sept. 14, 1976*
*[H.R. 3884]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "National Emergencies Act".

National Emergencies Act. 50 USC 1601 note.

## TITLE I—TERMINATING EXISTING DECLARED EMERGENCIES

SEC. 101. (a) All powers and authorities possessed by the President, any other officer or employee of the Federal Government, or any executive agency, as defined in section 105 of title 5, United States Code, as a result of the existence of any declaration of national emergency in effect on the date of enactment of this Act are terminated two years from the date of such enactment. Such termination shall not affect—

50 USC 1601.

(1) any action taken or proceeding pending not finally concluded or determined on such date;

(2) any action or proceeding based on any act committed prior to such date; or

(3) any rights or duties that matured or penalties that were incurred prior to such date.

(b) For the purpose of this section, the words "any national emergency in effect" means a general declaration of emergency made by the President.

"Any national emergency in effect."

## TITLE II—DECLARATIONS OF FUTURE NATIONAL EMERGENCIES

SEC. 201. (a) With respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such national emergency. Such proclamation shall immediately be transmitted to the Congress and published in the Federal Register.

50 USC 1621.

(b) Any provisions of law conferring powers and authorities to be exercised during a national emergency shall be effective and remain in effect (1) only when the President (in accordance with subsection (a) of this section), specifically declares a national emergency, and (2) only in accordance with this Act. No law enacted after the date of enactment of this Act shall supersede this title unless it does so in specific terms, referring to this title, and declaring that the new law supersedes the provisions of this title.

Presidential proclamation, transmittal to Congress; publication in Federal Register.

SEC. 202. (a) Any national emergency declared by the President in accordance with this title shall terminate if—

(1) Congress terminates the emergency by concurrent resolution; or

(2) the President issues a proclamation terminating the emergency.

Termination. 50 USC 1622.

90 STAT. 1258          PUBLIC LAW 94–412—SEPT. 14, 1976

## TITLE V—REPEAL AND CONTINUATION OF CERTAIN EMERGENCY POWER AND OTHER STATUTES

Loss of nationality.

SEC. 501. (a) Section 349(a) of the Immigration and Nationality Act (8 U.S.C. 1481(a)) is amended—

(1) at the end of paragraph (9), by striking out "; or" and inserting in lieu thereof a period; and

(2) by striking out paragraph (10).

Leases, non-excess property.

(b) Section 2667(b) of title 10 of the United States Code is amended—

(1) by inserting "and" at the end of paragraph (3);

(2) by striking out paragraph (4); and

(3) by redesignating paragraph (5) as (4).

Repeal.

(c) The joint resolution entitled "Joint resolution to authorize the temporary continuation of regulation of consumer credit", approved August 8, 1947 (12 U.S.C. 249), is repealed.

Repeal.

(d) Section 5(m) of the Tennessee Valley Authority Act of 1933 as amended (16 U.S.C. 831d(m)) is repealed.

Repeal.

(e) Section 1383 of title 18, United States Code, is repealed.

(f) Section 6 of the Act entitled "An Act to amend the Public Health Service Act in regard to certain matters of personnel and administration, and for other purposes", approved February 28, 1948, is amended by striking out subsections (b), (c), (d), (e), and (f) (42 U.S.C. 211b).

Repeal.

(g) Section 9 of the Merchant Ship Sales Act of 1946 (50 U.S.C. App. 1742) is repealed.

Savings provision.
50 USC 1601 note.

(h) This section shall not affect—

(1) any action taken or proceeding pending not finally concluded or determined at the time of repeal;

(2) any action or proceeding based on any act committed prior to repeal; or

(3) any rights or duties that matured or penalties that were incurred prior to repeal.

50 USC 1651.

SEC. 502. (a) The provisions of this Act shall not apply to the following provisions of law, the powers and authorities conferred thereby, and actions taken thereunder:

(1) Section 5(b) of the Act of October 6, 1917, as amended (12 U.S.C. 95a; 50 U.S.C. App. 5(b));

(2) Act of April 28, 1942 (40 U.S.C. 278b);

(3) Act of June 30, 1949 (41 U.S.C. 252);

(4) Section 3477 of the Revised Statutes, as amended (31 U.S.C. 203);

(5) Section 3737 of the Revised Statutes, as amended (41 U.S.C. 15);

(6) Public Law 85–804 (Act of Aug. 28, 1958, 72 Stat. 972; 50 U.S.C. 1431–1435);

(7) Section 2304(a)(1) of title 10, United States Code;

(8) Sections 3313, 6386(c), and 8313 of title 10, United States Code.

Page 000229