**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-02594-RM-STV

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

 Plaintiff,

v.

MEDIATRIX CAPITAL INC., *et al.,*

 Defendants,
and

MEDIATRIX CAPITAL FUND LTD., *et al.,*

 Relief Defendants.

---

**MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANTS MICHAEL S. STEWART AND BRYANT E. SEWALL**

---

 The Securities and Exchange Commission ("SEC"), through undersigned counsel,

respectfully moves for summary judgment as to Defendants Michael S. Stewart ("Stewart") and

Bryant E. Sewall ("Sewall") (together, "Defendants")[1] on its Claims 1-7, and 9[2] on the grounds

that they are collaterally estopped from re-litigating their liability in light of their criminal

convictions in the related criminal case, *United States v. Stewart, et. al.,* 1:21-cr-00034-WJM (D.

Colo.) ("the Criminal Case" or "Criminal Trial"). The facts that support this Motion were

---

[1] The SEC is not moving for summary judgment on Claims 8 or 10, alternatively pled aiding and abetting claims, because the undisputed evidence establishes that Defendants Stewart and Sewall are primary violators, ECF 1 ¶¶ 198-200, 204-206. Further, should this Motion be granted, the SEC will separately file a motion seeking remedies.

[2] For the purposes of the Motion, the term "Defendants" refers only to Stewart and Sewall. The SEC is currently seeking Commission approval of a settlement in principle between the SEC and Michael S. Young. ECF 697 & 699.

determined in the Criminal Case and establish Defendants' liability to the SEC's charges.

Summary judgment is warranted.

## I.     INTRODUCTION

As detailed below, in May 2024—following a three-week jury trial—Defendants were

convicted in the Criminal Case. *See* Movant's Separate Statement of Undisputed Material Facts

("MSUMF"), ¶ 19. The jury found them guilty of fourteen counts of wire fraud and one count of

conspiracy based on their multi-year operation of an investment offering fraud and Ponzi

scheme. *Id*. Pursuant to the scheme, Defendants falsely claimed that they, through their company

Mediatrix Capital, Inc. ("Mediatrix"), would invest their clients' funds using a highly profitable,

algorithmic, foreign-exchange ("Forex") trading strategy that they claimed generated consistent

positive returns. *Id.* ¶ 2. By March 1, 2019, Defendants claimed that they managed over $245

million in assets, had achieved a total return of over 1,600%, and had never sustained a monthly

loss. *Id.* ¶ 50. None of this was true. The SEC's Complaint alleged this same conduct.  *Id.* ¶ 1

("Complaint").

Under collateral estoppel, the Criminal Case's factual and legal determinations are

binding on the Defendants and cannot be relitigated. The core elements of wire fraud and the

securities fraud claims alleged here by the SEC—including Defendants' false statements,

deceptive conduct, and scienter—are indistinguishable. Thus, the SEC can rely on those findings

to establish violations in this matter. The only additional elements the SEC must show in this

case is that Defendants' violations involved securities (all Claims), that Defendants were

investment advisers (Claims 6, 7, & 9), that Mediatrix Capital Fund Ltd. (the "Fund") was a

pooled investment vehicle (Claim 9), and that Defendants sold unregistered securities (Claim 5).

2

As detailed below and established in the MSUMF, there is no genuine dispute of any material fact as to those elements.

## II.    SUMMARY OF UNDISPUTED MATERIAL FACTS

### A.  The SEC's Allegations

#### 1.  Defendants' Scheme

The SEC alleged that from March 2016 through September 2019, Defendants, through Mediatrix, Blue Isle Markets, Inc., and Blue Isle Markets Limited (the Blue Isle entities collectively, "Blue Isle") raised more than $125 million from investors in unregistered securities offerings by representing that investor funds would be invested using Defendants' allegedly highly profitable algorithmic trading strategy. Complaint at ¶ 1.[3] Defendants offered two related investments: (1) the managed account foreign exchange funds ("MAFEF") whereby investors' monies would be pooled and traded according to Defendants' trading strategy in foreign currency markets, and (2) the Mediatrix Fund ("the Fund") which "invest[ed] in securities, derivatives and other instruments to establish long and short investment exposures around the world." *Id.* ¶¶ 42-44. Most investor money was invested in the MAFEF. *Id.* ¶ 56. Defendants had majority ownership of and operated Blue Isle for the purported purpose of acting as an intermediate broker between Mediatrix's investors and its brokerage firm where the Forex trading took place. *Id.* ¶¶ 14-15, 40-41, 61. Mediatrix's investors were directed to wire funds to bank accounts held by either Blue Isle or the Fund. *Id.* ¶¶ 57, 63. Defendants owned and controlled Mediatrix. *Id.* ¶ 19.

---

[3] Generally, citation to a complaint in a summary judgment motion is not permitted, however, where the argument is based on collateral estoppel, it is appropriate. As discussed in Section III below, the purpose of collateral estoppel is to prevent re-litigation of issues and facts already established. Accordingly, using the complaint's allegations to prove symmetry with the criminal case is appropriate and requiring the moving party to come forward with undisputed facts would undermine the very purpose of collateral estoppel.

### 2. Defendants' Material Misstatements

The Complaint alleges that Defendants solicited investors by making numerous false and misleading statements found in the offering documents that they prepared. Complaint ¶¶ 50-53. These statements included:

- that Mediatrix had a successful trading strategy that, "[a]s of June 2018 . . . achieved 54 straight months of client gains" and had "[v]erified, annualized net returns of 50%+ per year since December 2013," *id.* ¶ 96;

- that Defendants provided "100% transparency" when in reality Defendants provided investors daily and monthly statements that omitted losing trades and misrepresented trading profitability and the account values, *id.* ¶¶ 148-49;

- that Mediatrix had a long history of successful trading dating back to 2013 when in fact, Mediatrix was not formed until 2015, *id.* ¶¶ 109-14;

- that Mediatrix's trading results for the MAFEF were audited, *id.*¶¶ 143-46;

- that Defendants had assets under management ("AUM") that were steadily increasing: for instance reaching $225 million as of the end of 2018, when in reality Mediatrix had only $35.4 million at 2018 year end, because its trading was unprofitable, *id.* ¶¶ 102-06;

- that Defendants would only charge performance fees if certain positive performance benchmarks were met, *id.* ¶¶ 75-81, yet Defendants charged performance fees based on falsified statements that reflected increasing account values, *id.* ¶¶ 88-89 & 126-30; and

- concealing that Defendants owned both Mediatrix and Blue Isle and creating the false impression that both entities were entitled to charge separate fees, *id.* ¶¶ 134-41.

### 3. Defendants' Misappropriation of Investor Funds

The Complaint also alleged that Defendants misappropriated at least $35 million of investors' funds and used investor proceeds in ways they had not disclosed to investors. Complaint ¶¶ 115-25. For instance, Defendants represented to investors that they were investing their money in the Fund and the MAFEF, when they had (a) misappropriated investor funds; (b) made Ponzi-like payments to investors who requested redemptions; and (c) took improper performance fees. *Id.* ¶¶ 90-94 & 115-25.

**B. The Criminal Case Allegations and Jury Verdict**

On February 4, 2021, the grand jury returned an Indictment charging Defendants with fourteen counts of wire fraud which involved "devis[ing] and intend[ing] to devise a scheme to defraud and to obtain money and property from investors by means of materially false and fraudulent pretenses, representations, and promises by obtaining from investors money for the purpose of investing in algorithm-based trading in Forex markets[.]" MSUMF ¶ 2.

**1. Defendants' Scheme**

The Indictment alleged that from early 2016 through September 2019, Defendants owned and operated Mediatrix for the purpose of soliciting investor funds for the algorithm-based Forex trading and to act as an investment adviser in connection with Forex trading. MSUMF ¶ 2.

The Indictment also alleged that through Mediatrix, Defendants offered investors two programs for Forex trading: the MAFEF and the Fund.[4] *Id.* ¶ 5. Most investor money was invested through the MAFEF. *Id.* ¶ 6. The Indictment further alleged that from at least late 2015 through at least September 2019, Defendants had majority ownership of and operated Blue Isle for the purported purpose of acting as an intermediate broker between Mediatrix's investors and its brokerage firm where the Forex trading took place. *Id.* ¶¶ 7, 60. Mediatrix's investors were directed to wire funds to bank accounts held by either Blue Isle or Mediatrix. *Id.* ¶ 8. Defendants owned and controlled Mediatrix. *Id.* ¶ 59.

**2. Defendants' Material Misstatements**

The Indictment further alleged that Defendants made the following materially false misrepresentations or omissions in offering materials and elsewhere:

---

[4] The Indictment refers to the MAFEF investment as the "Managed Accounts," *see* MSUMF ¶ 2, but to avoid confusion the Motion will refer to the Managed Accounts as the MAFEF, since they are the same thing.

5

- that Defendants developed proprietary trading algorithms that were successful, *id.* ¶ 10;

- that Mediatrix had a history of successful Forex trading dating back December 2013 with no months in which Mediatrix incurred net losses, *id.* ¶ 11;

- that potential investors would be offered "100% Transparency" and "World Class Returns," *id.* ¶ 12;

- that Mediatrix's trading results were audited and verified by third parties, *id.* ¶ 13;

- that Mediatrix had a certain amount of AUM, which was inflated and shown to investors to bolster Defendants' false representations about Mediatrix's successful trading history, *id.* ¶ 14;

- that Mediatrix would only charge performance fees for successful trading and that no fees would be charged unless there were net profits above the initial investment amount, *id.* ¶ 15; and

- even though Mediatrix and Blue Isle were owned and operated by Defendants, Defendants falsely created the impression that these were unaffiliated and distinct entities, performing services for which they would be entitled to collect distinct fees; the common ownership was never disclosed to investors, *id.* ¶ 16.

### 3. Defendants' Misappropriation of Investor Funds

The Indictment also alleged that Defendants misappropriated millions of dollars of investors' assets by taking over $40 million for personal and business expenses and returning approximately $39 million to investors in the form of supposed profits and return on principal investments (*i.e.*, Ponzi-style payments). *Id.* ¶ 17.

### 4. The Jury Instructions

At trial the court instructed the jury as follows for the wire fraud counts:

[t]o find that defendants committed the crime of wire fraud you must be convinced that the government has proved each of the following beyond a reasonable doubt: *First:* the defendants devised or intended to devise a scheme to defraud the investors identified during this trial by making false and fraudulent representations regarding investments in a foreign currency exchange program; *Second:* the defendants acted with specific intent to defraud; *Third:* the defendants caused another person to use interstate or foreign wire communication facilities for the purpose of carrying out the scheme; *Fourth:* the scheme employed false or fraudulent pretenses, representations, or promises that were material.

MSUMF ¶ 20. The jury instructions also instructed the jury on how to determine whether

Defendants engaged in a "scheme to defraud," how to determine if a representation is "false" or

"material," and how to determine whether Defendants acted knowingly. *Id.* ¶¶ 21-24.

On May 17, 2024, after a three-week jury trial, Stewart and Sewall were found guilty of

all 15 counts in the Indictment. MSUMF ¶ 19. Sewall was sentenced to 276 months

imprisonment and restitution of approximately $93 million. *Id.* ¶ 28. The Tenth Circuit affirmed

his conviction. *Id.* ¶ 29. Stewart was sentenced to 288 months in prison and was ordered to pay

restitution of approximately $93 million jointly and severally with Sewall. *Id.* ¶ 30. Stewart filed

a notice of appeal, which is pending. *Id.* ¶ 31.

### C.  Other Undisputed Material Facts

#### 1.  The Interests Defendants Offered in the Fund and MAFEF Were Securities.

Defendants offered investors who contributed money to the Fund shares in the Fund in

exchange for their investments. *Id.* ¶¶ 34, 37-38.

Defendants also offered interests in the MAFEF, which purported to be a managed

account but was a pooled investment. *Id.* ¶¶ 34- 35, 39-43. By 2019, Defendants had

approximately 170 investors, and because of this it was necessary to pool the individual accounts

for trading. *Id.* ¶¶ 33, 41-42. Defendants pooled investor funds in fewer than ten accounts at two

brokerage firms, all in Blue Isle's name. *Id*. By pooling the MAFEF accounts, defendants were

able to hide losses from their clients using a Percentage Allocation Management Module

("PAMM") software system. *Id.* ¶¶ 44-48. The PAMM software allowed Defendants to

selectively withhold losing trades from clients' subaccounts, thus allowing them to conceal

floating losses from their clients. *Id.* This practice, which is akin to a common type of market

abuse known as "cherry picking" facilitated the fraud and could not have occurred absent

MAFEF pooling. *Id.* ¶¶ 46-47.

The MAFEF investment was also a Ponzi scheme. *Id.* ¶¶ 49-54. Mediatrix lost

approximately $33 million through unsuccessful trading. *Id*. ¶ 49. Mediatrix represented to

investors and prospective investors that its trading strategy consistently generated profits by

sending them fabricated monthly statements. *Id.* ¶ 50.  Mediatrix received funds from investors

and failed to transfer a large portion of those funds to the brokerage accounts. *Id.* ¶ 53. At the

same time, Mediatrix paid funds to investors in amounts that exceeded withdrawals that it made

from the Blue Isle brokerage accounts. *Id.* ¶¶ 52, 54.

### 2.  Defendants Offered and Sold Unregistered Securities.

Defendants sold securities in the Fund and the MAFEF using the means of interstate

commerce. MSUMF ¶ 32. They did not file a registration statement with respect to the offer and

sale of these securities on the SEC's EDGAR system, which is where such filings are made. *Id.*

¶¶ 61-62.

### 3.  Defendants Were Investment Advisers to the Fund.[5]

Mediatrix held itself out as the Fund's investment adviser, MSUMF ¶¶ 55-57,

recommended and invested the Fund in the pooled Blue Isle brokerage accounts, *id.*, and

received compensation for managing the Fund, *id.* ¶ 58. Defendants owned and controlled

Mediatrix. *Id.* ¶ 60.

### 4.  The Fund was a Pooled Investment Vehicle.

All the Funds' assets were held in Blue Isle pooled brokerage accounts. *Id.* ¶ 57.

---

[5] Counts 6, 7, and 9, which alleged violations of the Investment Adviser's Act, only apply to the Fund investments. MSUMF ¶ 1 at ¶¶  192-97, 201-203.

III.    **ARGUMENT**

   **A.  Legal Standards for Summary Judgment and Collateral Estoppel**

   Summary judgment under Federal Rule of Civil Procedure 56(a) is appropriate where
"there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as
a matter of law." Fed. R. Civ. Proc. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).
A movant must submit evidence to establish the essential elements of its claim or affirmative
defense. *Harper v. Mancos Sch. Dist. RE-6,* 837 F. Supp. 2d 1211, 1217 (D. Colo. 2011). "Once
the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a
genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of
Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).

   Collateral estoppel or issue preclusion prevents re-litigation of issues that were decided in
a previous case. *Orjias v. Stevenson,* 31 F.3d 995, 1010 (10th Cir. 1994). To invoke collateral
estoppel, mutuality of parties is not necessary. *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1520
(10th Cir. 1990). The doctrine applies when the same issues are presented in a later proceeding
and were necessarily decided in a valid, final judgment. *Id.*

   "It is well established that a prior criminal conviction may work an estoppel in favor of
the Government in a subsequent civil proceeding. Such estoppel extends to questions 'distinctly
put in issue and directly determined' in the criminal prosecution.'" *Emich Motors Corp. v.
General Motors Corp.*, 340 U.S. 558, 568-69 (1951); *United States v. $29,599.98 in US
Currency,* 955, 955 F.2d 49 (10th Cir. 1992). To establish issue preclusion such that Defendants'
criminal convictions result in their liability for securities fraud in this case, the SEC must show:
(1) the issue previously decided is identical with the one presented in the action in question, (2)
the prior action has been fully adjudicated on the merits, (3) the party against whom the doctrine

9

is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action. *Adams v. Kinder-Morgan, Inc*., 340 F.3d 1083, 1093 (10th Cir. 2003); *SEC v. Gordon*, 822 F. Supp. 2d (N.D. Okla. 2011).

Applying these standards, courts routinely apply issue preclusion to award summary judgment in subsequent civil SEC cases, even where the statute charged in the successive civil suit is not identical to the criminal statute. *See SEC v. Royal Bengal Logistics, Inc.,* No. 0:23-cv-61179, 2026 WL 1740870, at *12 (S.D. Fla. May 21, 2026) (applying collateral estoppel in civil securities fraud case to prevent defendant from relitigating factual issues determined in conviction for wire fraud); *SEC v. CJ's Fin.*, No. 10-13083, 2012 WL 3600239, at *6 (E.D. Mich July 30, 2012) (same); *SEC v. Milligan*, 13-CV-1403 (VSB), 2007 WL 9724907, at *3 (E.D.N.Y. June 5, 2007) (same); *SEC v. Apostelos,* No. 1:15-CV-00699, 2019 WL 3944755, at *5 (S.D. Ohio Aug. 21, 2019) (same result for defendant convicted of wire and mail fraud); *SEC v. Hansen,* 13-CV-1403 (VSB), 2017 WL 1298022, at *5 (S.D.N.Y. March 31, 2017) (same); *SEC v. Bravata*, 3 F. Supp. 3d 638, 655 (E.D. Mich. 2014) (same); *SEC v. Shehyn*, No. 04 CV 2003(LAP), 2010 WL 3290977, at *3 (S.D.N.Y. Aug. 9, 2010) (same); *SEC v. Pace,* 173 F. Supp. 2d 30, 33 (D.D.C. 2001) (wire and tax fraud). That Defendants were convicted of wire fraud rather than criminal securities fraud does not lessen the applicability of collateral estoppel, as the critical inquiry is the commonality of *factual* issues in both proceedings, not identical causes of action. *Apostelos*, 2019 WL 3944755, at *5.

**B. Collateral Estoppel is Appropriate.**

Here, as in the cases cited above, the Court's summary judgment analysis is simplified because the SEC's Complaint concerns the same conduct as the Indictment that resulted in Defendants' convictions and the issues decided are identical. As outlined below, the SEC is

10

entitled to summary judgment on Claims 1-4, 6, 7, and 9 because of the preclusive effect of

Defendants' criminal convictions, and the uncontested fact that their scheme to defraud occurred

while Defendants offered and sold securities, acted as investment advisers, and involved a pooled

investment vehicle. All four elements of collateral estoppel are established here.

### 1.  The Issues Previously Decided are Identical to those Presented Here.

The first element—that the issues previously decided be identical with the ones presented

here—is satisfied as the conduct underlying both the criminal and civil enforcement case is the

same and the jury made findings against Defendants on the same issues necessary to find

Defendants liable for securities fraud. Courts conduct this analysis by "compar[ing] the criminal

indictment with the civil complaint." *Hansen*, 2017 WL 1298022 at *5. As shown above, *see*

*supra* at Sections II.A.1-3 and II.B.1-3, the Indictment and the Complaint allege the same

fraudulent scheme:

- Investments in the Fund and the MAFEF, *see* Complaint ¶¶ 43-45 & MSUMF ¶ 5;

- Defendants' offer and sale of investments in the Fund and MAFEF where investors invested in Defendants' purported proprietary Forex trading program with the expectation of earning returns on their investments, Complaint ¶¶ 43-45, 56 & MSUMF ¶¶ 4-5, 10;

- Defendants' material misrepresentations and omissions about the length of time Mediatrix had been in business, the consecutive and ever-increasing profitability of the trading strategy, that the trading results had been audited, and Defendants' use of investor funds, Complaint ¶¶ 96(b), ¶¶ 109-110 & MSUMF ¶ 11; and

- Defendants' misappropriation of investor funds for their personal benefit, to pay unearned performance fees, and to make Ponzi payments to investors, Complaint ¶ 1 at ¶¶ 80-81, 93, 119-25 & MSUMF ¶¶ 17-18.

Based on the facts alleged in the Indictment, the evidence elicited at trial, the jury instructions

explaining how to apply the facts to the law, and the verdict, the jury necessarily determined: (1)

Defendants intentionally devised a scheme to defraud investors to obtain their money to invest it

in two investment schemes, the Fund and the MAFEF, (2) the scheme involved

misrepresentations and concealment of material facts, and (3) Defendants used interstate

commerce in furtherance of the scheme. 18 U.S.C. § 1343; *see* MSUMF ¶¶ 2, 19-25.

### 2. The Criminal Case has been Fully Adjudicated on the Merits.

Next, the facts supporting the Motion were fully litigated over a three-week jury trial.

MSUMF ¶ 19. As stated in the section above, the jury specifically determined Defendants had

engaged in conduct satisfying all the elements of wire fraud, which are substantially the same as

those in securities fraud, except for the element relating to whether Defendants offered or sold

securities. *Id.* ¶¶ 19-25.

Defendants' conviction resulted in a final judgment on the merits of the Criminal Case.

MSUMF ¶¶ 28, 30. Defendant Sewall appealed his conviction, but the Tenth Circuit affirmed. *Id.*

¶ 29. Stewart filed a notice of appeal. *Id.* ¶ 31. Stewart's pending appeal of his conviction does

not prevent the application of collateral estoppel since final judgment retains all its *res judicata*

consequences pending decision of the appeal. *Gordon*, 822 F. Supp. 2d at 1156. Therefore, for

purposes of collateral estoppel, Defendants' convictions are final.

### 3. The Party Against Whom the Doctrine is Invoked was a Party, or in Privity With a Party, to the Prior Adjudication.

This element is established because the Defendants are the same here as in the Criminal

Case. *Compare* Complaint & MSUMF ¶ 2.

### 4. Defendants had a Full and Fair Opportunity to Litigate the Issues.

Finally, Defendants had a full and fair opportunity to litigate the issues in the Criminal

Case during a three-week jury trial, where the United States was held to the highest burden of

proof—beyond a reasonable doubt. MSUMF ¶¶ 19, 25. Defendants were represented by counsel,

*id.*, ¶ 26, presented evidence, *id.* ¶ 27, argued motions, *id.*, and cross-examined government

witnesses, *id*. The jury resolved all disputed factual issues concerning Defendants' conduct, intent, and the fraudulent scheme by convicting Defendants on all counts. *Id.* ¶ 19.

      **C.** **Summary Judgment Should be Granted on Claims 1-4, 6, 7, and 9 Based on Collateral Estoppel and Additional Undisputed Facts.**

      **1.** **Section 10(b)/Rule 10b-5 and Section 17(a) (Claims 1-4)**

Claims 1-4 of the Complaint charge Defendants with securities fraud for violating Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act of 1933 ("Securities Act"). These statutory sections prohibit essentially the same behavior. *U.S. v. Naftalin*, 441 U.S. 768, 773 n. 4 (1979); *see SEC v. Unique Fin. Concepts, Inc.*, 119 F. Supp. 2d 1332, 1339 (S.D. Fla. 1998). The language of the three subsections of Sections 10(b) and 17(a) is "expansive" and "capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019). In *Lorenzo*, the Supreme Court recognized that there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and thus the same underlying conduct may establish a violation of more than one subsection. *Id.*

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder render it unlawful, "by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange" and "in connection with the purchase or sale" of securities,[6] to: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement or omission of material fact; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. A showing of scienter is required under Section 10(b) and Rule 10b-5 thereunder. *SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008).

---

[6] The fact that the Fund and the MAFEF were securities is addressed in Section III.C.2 & 3 below.

Section 17(a) of the Securities Act makes it unlawful in the "offer or sale" of securities and "by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly" to: (a) "employ any device, scheme, or artifice to defraud;" (b) "obtain money or property by means of any untrue statement of a material fact or any [material] omission;" or (c) "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1)-(3). A showing of scienter is required under Section 17(a)(1), but Sections 17(a)(2) and (a)(3) only require negligence. *Aaron v. SEC*, 446 U.S. 680, 697 (1980).

As reflected in the Court's Charges to the Jury in the Criminal Case, to convict Defendants of wire fraud, the jury necessarily found that (1) Defendants knowingly devised or participated in a scheme to defraud investors by using false or fraudulent pretenses, representations, or promises, *see* MSUMF ¶¶ 20, 22, (2) those false pretenses, representations, or promises were material, *id.* ¶ 23, (3) Defendants acted with the intent to defraud, *see* MSUMF ¶ 20, 24 and (4) Defendants transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme. *See* MSUMF ¶ 20. Those findings neatly align with and establish nearly all the elements required under Sections 10(b) and Section 17(a) other than a finding that the investments were securities, which is established below.

### 2. The Investments in the Fund Are Securities.

Investments in the Fund are securities because the Fund investors who contributed money to the Fund received shares in the Fund entity in exchange for their investments. MSUMF ¶¶ 34, 37-38. An investment in the form of stock is explicitly identified as a security pursuant to the federal securities laws. *See* 15 U.S.C. §§ 77b(a)(1) & 78c(a)(10); *see Landreth Timber Co. v. Landreth*, 471 U.S. 681, 690-91 (1985) (finding an instrument labeled stock with characteristics

14

that bear out the label to fit "plainly within the statutory definition" of a security).  Stock means

"the shares of a particular company. . . ."  Definition of the word "stock" 5.b, Dictionary.com

(last visited July 17, 2026).

### 3.    The Investments in the MAFEF Are Investment Contracts.

The investments in the MAFEF are securities because they meet the definition of an

"investment contract," one of the statutorily enumerated forms of a security. *See* 15 U.S.C. §§

77b(a)(1) & 78c(a)(10). The Supreme Court has defined an "investment contract" as (1) "an

investment of money"; (2) "in a common enterprise"; and (3) with a reasonable expectation of

profits to be derived "solely from the efforts of others." *SEC v. W.J. Howey Co.,* 328 U.S. 293,

301 (1946). In making this determination, courts "disregard form over substance and focus on

the economic realities underlying a transaction, and not on the name appended thereto." *SEC v.

Scoville*, 913 F.3d 1204, 1220 (10th Cir. 2019); *see* ECF 133, Order on Motion to Dismiss ()

("[I]n this circuit, the existence of a "common enterprise" and a "security" depends on "the

economic reality of the transaction that occurred.").

#### a.    First and Third Prong: Investment of Money and Profits to be Derived *"Solely From the Efforts of Others."*

The investments in the MAFEF were investments of money, MSUMF ¶ 34, 39, and

investors gave that money to Defendants for the purpose of investing in the MAFEF. *Id*.

Investors expected their investments in the MAFEF to perform solely based on Defendants'

efforts. *Id.* ¶ 36. It was the efforts of Defendants, and not the investors or anyone else, that

purportedly would lead to trading profits. *Id*.

#### b.    Second Prong: Investment in the MAFEF was a Common Enterprise.

"If . . . a transaction is in reality an investment (that is, a transaction of a type in which

stock is often given), then it creates a 'common enterprise' and gives rise to a 'security[.]'"

15

*McGill v. Am. Land & Expl. Co.*, 776 F.2d 923, 925-26 (10th Cir. 1985). The Tenth Circuit has adopted a "flexible rather than static principle" of applying the "common enterprise" analysis. *SEC v. Shields*, 744 F.3d 633, 642-34 (10th Cir. 2014). In *Shields* the Tenth Circuit stated that the analysis should be applied to "effectuate the regulation of investments, in whatever form they are made and by whatever name they are called." *Id.* (internal citation omitted).

The economic reality of the MAFEF investment was that Defendants commingled investor funds because it was an operational imperative, and it allowed them to perpetrate their massive fraud. *Id.* ¶¶ 41-48. Defendants created a common enterprise by pooling and managing the MAFEF investor funds, and in doing so sold securities. *Id.* Specifically, when investors contributed money to the MAFEF, those funds were sent to a Blue Isle bank account and, if not misappropriated, then sent to a brokerage account at the broker. MUSMF ¶¶ 35, 41-42. Mediatrix had to pool and commingle the funds of approximately 170 investors into several brokerage accounts, all held in the name of Blue Isle, to avoid unworkable complexities of trading in 170 individual accounts. *Id.* ¶¶ 33, 41-48.; *See SEC v. Merrill Scott & Assocs., Ltd.*, 505 F. Supp. 2d 1193, 1213 (D. Utah 2017) (finding a common enterprise where defendant commingled client funds, held assets in accounts in the name of defendant's entity, and controlled the accounts). After trading was done at the broker, Defendants allocated trades at Blue Isle through a PAMM system. *Id.* ¶ 46.

Commingling investor funds was also a critical component of the fraud. *Id.* ¶¶ 42, 44-48. The pooling allowed Defendants to "cherry pick" winning trades to client accounts and conceal losing trades from clients. *Id.* This fraudulent practice would have been impossible but for the commingling of accounts. *Id.* If client accounts were separate, investors would have been better able to track losses. *Id.* ¶ 48.  Thus, the economic reality of the MAFEF is that it operated as a

16

common enterprise because its pooling of client accounts enabled Defendants to "cherry pick"
trades, perpetuated the fraud, and investor losses were interconnected.

Finally, courts have observed that a *Ponzi* scheme, by its very nature necessarily involves
a common enterprise because it ties the fortunes of existing investors to the ability to attract new
investors. *See Hays v. Adam*, 512 F. Supp. 2d 1330, 1337 (N.D. Ga. 2007); *accord Royal Bengal
Logistics, Inc.*, 2026 WL 1740870, at *12. Not only did the Indictment allege that Mediatrix
operated as a *Ponzi* scheme, *see* MSUMF ¶ 2 at ¶ 18, the facts show that Defendants operated the
MAFEF as a *Ponzi* scheme. *Id.* ¶¶ 49-54. Mediatrix represented to investors that its trading
strategy was highly profitable but in truth it consistently lost money, Mediatrix paid money to
investors who requested withdrawals that exceed the amount that it ever withdrew from the Blue
Isle brokerage accounts. *Id*. With no trading profits and insufficient funds withdrawn from the
brokerage, the facts demonstrate that any excess amount returned to investors must have been
Ponzi payments, which amounted to a minimum of $11.5 million. *Id.* ¶ 54. Thus, the success of
the MAFEF depended on Defendants' success at attracting new investments. *Id*. *Howey*'s second
prong is met.

### 4.  Section 206 (Claims 6, 7, and 9)

Defendants' criminal convictions similarly establish core elements of the SEC's claims
under Section 206 of the Investment Advisers Act of 1940 ("Advisers Act"). Claims 6, 7, and 9
charge Defendants with violations of Section 206(1), 206(2) and 206(4) of the Adviser's Act and
Rule 206(4)-8, thereunder.  Sections 206(1) and (2) of the Advisers Act provide that:

> It shall be unlawful for any investment adviser, by use of the mails or any means or
> instrumentality of interstate commerce, directly or indirectly—
> (1)  to employ any device, scheme, or artifice to defraud any client or prospective
> client;
> (2)  to engage in any transaction, practice, or course of business which operates as
> a fraud or deceit upon any client or prospective client.

17

15 U.S.C. §§ 80b-6(1), (2). Section 206(1) requires proof of scienter; liability under § 206(2) only requires a showing of negligence. *See Malouf v. SEC*, 933 F.3d 1248, 1263 (10th Cir. 2019).

Courts have found that "[f]acts showing a violation of Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206 violation." *SEC v. Young*, Civ. Action No. 09-1634, 2011 WL 1376045, at *7 (E.D. Pa. Apr. 12, 2011); *see also Hansen*, 2017 WL 1298022, at *6; *CJ's Fin.*, 2012 WL 3600239, at *7. Accordingly, for the reasons explained in the prior section, Defendants employed a "device, scheme, or artifice to defraud any client or prospective client" and engaged "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

The undisputed material facts establish that the Defendants were investment advisers, which the SEC much also show for these claims. The Advisers Act defines "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2. Mediatrix held itself out to be an investment adviser to the Fund in its marketing materials. MSUMF ¶¶ 55-58. Defendants controlled Mediatrix's decision making, made the decision to invest Fund assets in the Blue Isle pooled brokerage accounts, received compensation, and therefore, they too were investment advisers to the Fund. *Id.* ¶¶ 57-59; *See SEC v. Berger*, 244 F. Supp. 2d 180, 193 (S.D.N.Y. 2001) (finding the defendant an investment adviser because he controlled the entity's decision making).

With respect to Claim 9, to establish a violation under Section 206(4) of the Advisers Act and Rule 206(4)-8, the SEC must show that Defendants "engage[d] in any act, practice, or course of business which is fraudulent, deceptive, or manipulative" in connection with a pooled

investment vehicle. 15 U.S.C § 80b-6(4); 17 C.F.R. § 275.206(4)-8. For the reasons explained

above, Defendants' conviction in the Criminal Case establishes that they engaged in fraud.

Defendants were also investment advisers to a "pooled investment vehicle." Here, the

Fund was a pooled investment vehicle. Rule 206(4)-8(b) defines a "pooled investment vehicle"

as any investment company as defined in Section 3(a) of the Investment Company Act of 1940

("Investment Company Act").[7] 17 C.F.R. § 275.206(4)-8. The Fund meets the definition of an

investment company under Section 3(a)(1)(A) of the Investment Company Act because the Fund,

in its offering materials, held itself out as being engaged primarily in the business of investing in

securities. MSUMF ¶¶ 55-56. The Fund also meets the definition of an investment company

under Section 3(a)(1)(C) of the Investment Company Act because, by investing all its assets in

the Blue Isle pooled brokerage accounts, all its assets were invested in securities. *Id.* ¶ 57.

### D. Summary Judgment Should be Granted on Claim 5, that Defendants Engaged in an Unregistered Securities Offering, Based on the Undisputed Facts.

Claim 5 alleges that Defendants violated Sections 5(a) and 5(c) of the Securities Act by

engaging in unregistered offerings of securities issued by Blue Isle (the MAFEF) and the Fund.

Sections 5(a) and 5(c) "make it unlawful to offer or sell a security in interstate commerce if a

registration statement has not been filed as to that security, unless the transaction qualifies for an

exemption from registration." *SEC v. GenAudio Inc.*, 32 F.4th 901, 939 (10th Cir. 2022). A *prima

facie* case for violating Section 5 is established by showing that: (1) no registration statement

was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3)

interstate transportation or communication and the mails were used in connection with the sale or

---

[7] Investment Company Act Section 3(a)(1) defines "investment company" as any issuer which (A) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities; or (C) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis. *See* 15 U.S.C. §§ 80a-3(a)(1)(A) & (C).

19

offer of sale. *See id.*; *SEC v. Parrish*, CA No. 11-cv-00558-WJM-MJW, 2012 WL 4378114, at *3 (D. Colo. Sept. 25, 2012). Scienter is not required to prove a violation of Section 5. *Parrish*, 2012 WL 4378114, at *3.

Once the SEC establishes a *prima facie* violation, the defendant assumes the burden of proving that the securities qualify for a registration exemption. *GenAudio Inc.*, 32 F.4th at 940-41; *Parrish,* 2012 WL 4378114 at * 3.

Here, Defendants did not file a registration statement for the sale of the MAFEF or Fund securities. MSUMF ¶ 61. If Defendants had registered the Blue Isle or Fund securities, there would be securities registration statements on file with the SEC in its EDGAR database, and there are no such filings. *Id.* ¶ 62. As there are no factual disputes that Defendants violated Securities Act Sections 5(a) and (c), the Court should enter summary judgment against Defendants as to Claim 5.

## IV.    CONCLUSION

For the reasons outlined above, the Court should grant summary judgment in favor of the SEC on Claims 1-7 and 9.

Respectfully submitted this 17th day of July 2026.

<div style="margin-left: 40%;">

*s/ Sharan E. Lieberman*
Sharan E. Lieberman
*Securities and Exchange Commission*
1961 Stout Street, Suite 1700
Denver, CO 80294
Telephone: 303-844-1000
liebermans@sec.gov
*Attorney for Plaintiff*

</div>

20

**Table of Contents for Exhibits to the SEC's Motion for Summary Judgment**

| Exhibit | | Description |
|---|---|---|
| | | **Exhibits relating to Criminal Case** |
| 1. | | Indictment in Criminal Case |
| 2. | | Verdict form |
| 3. | | Minute Entries (Days 1 & 14) |
| 4. | | Jury Instructions |
| 5. | | Counsel of Record for Stewart and Sewall |
| 6. | | Defendants' Witnesses and Exhibits |
| 7. | | Defendants' Trial and Pre-trial Motions |
| 8. | | Minute Entry for Sewall Sentencing |
| 9. | | Sewell Judgment |
| 10. | | Sewall Notice of Appeal |
| 11. | | Tenth Circuit Order and Judgment |
| 12. | | Minute Entry for Stewart Sentencing |
| 13. | | Stewart Judgment |
| 14. | | Stewart Notice of Appeal |
| | | **Declarations and Related Exhibits** |
| 15. | | Declaration of Jeffrey Felder |
| A. | | Criminal Trial Transcripts (Excerpts) |
| B. | | Trial Exhibits from Criminal Trial (with original exhibit numbers) |
| | 9 | 1006 Summary: Blue Isle Brokerage Accounts Gains and Losses – March 1, 2016 to September 30, 2019 with October 2016 Trades Adjustment |
| | 14 | 1006 Summary: Blue Isle Markets and Mediatrix Capital Flow of Funds March 1, 2016 to September 30, 2019 – Entities and Expenditures Listed |
| | 20 | 1006 Summary: Blue Isle and Mediatrix Capital Fund Assets Under Management – March 1, 2016 through September 30, 2019 |
| | 23 | 1006 Summary: Investor and Brokerage Firm Bank Transactions by Month – March 1, 2016 to August 30, 2019 [Table] |
| | 62 | MC Statement for Investor dated 7/31/17 |
| | 73 | MC Managed FX Disclosure Documents 2017 signed by Investor 8/17/17 |
| | 74 | MC Limited Power of Attorney signed by Investor 8/17/17 |
| | 87 | Email from Young to Investor dated 9/29/17 |
| | 99 | MC Monthly Account Statements dated November 2017, December 2017, May 2018, June 2018, & December 2018 |
| | 147 | MS Monthly Statement for Investor December 2018 |
| | 157 | Email from Young to Investor dated 2/7/18 |
| | 189 | Email from Young to Investor dated 11/5/18 attaching CEM, Subscription Agreement, etc. |
| | 213 | MC Monthly Statements for Investor April – June, 2019 |
| | 396 | August 2019 Performance Fee Statement |
| | 610 | Performance History 3/1/2019 |
| | 625 | Navigator Algo |

| | | |
|---|---|---|
| **C.** | Michael Young Investigative Transcript (Excerpts) | |
| **D.** | Island Tech Ownership Chart | |
| **E.** | Hanna Sewall Deposition (Excerpts) | |
| **16.** | Declaration of Hugh Clark | |
| **17.** | Declaration of James Becker | |